**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| EDNA MCMANUS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | Civil Action No.07-252-CKK |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| | ) | |

**<u>NOTICE</u>**

COMES NOW, Defendants, EDNA MCMANUS, et al, by and through his/her undersigned counsel, hereby submits this Notice for inadvertently late filing due to a computer error in the above case, and further requests that Exhibits and Affidavit be accepted with Defendant's Opposition to Motion Rule 11 Sanctions.  The link attached to this notice cannot be filed, because of the security built into the document, but the link can provide easy access to the settlement agreement.

http://forms.unum.com/StreamPDF.aspx?strURL=/FMS_045874-1.pdf

Respectfully submitted,


/s/ James Q. Butler
James Q. Butler, Esq.,
Butler Legal Group, PLLP
818 18th Street, 10th Floor
Washington, D.C.  20006

Telephone:  (202) 223-6767
Facsimile:  (202) 223-3039
Attorney for Plaintiffs

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

G. CLINTON MERRICK, JR.,
                    *Plaintiff-Appellee,*

                    v.

PAUL REVERE LIFE INSURANCE
COMPANY; PROVIDENT LIFE &
ACCIDENT INSURANCE; UNUM
PROVIDENT,
          *Defendants-Appellants.*

No. 05-16380

D.C. No.
CV-00-00731-JCM

G. CLINTON MERRICK, JR.,
                    *Plaintiff-Appellee,*

                    v.

PAUL REVERE LIFE INSURANCE
COMPANY; PROVIDENT LIFE &
ACCIDENT INSURANCE; UNUM
PROVIDENT,
          *Defendants-Appellants.*

No. 05-17059

D.C. No.
CV-00-00731-JCM

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
May 16, 2007—San Francisco, California

Filed August 31, 2007

Before: Cynthia Holcomb Hall, Diarmuid F. O'Scannlain,
and Sandra S. Ikuta, Circuit Judges.

11109

11110    MERRICK v. PAUL REVERE LIFE INSURANCE CO.

Opinion by Senior Circuit Judge Hall

11112    MERRICK V. PAUL REVERE LIFE INSURANCE CO.

## COUNSEL

Evan M. Tager, Mayer, Brown, Rowe & Maw, Washington, DC, for the defendants-appellants.

Thomas L. Hudson, Osborn Maledon, Phoenix Arizona, for the plaintiff-appellee.

---

## OPINION

HALL, Senior Circuit Judge:

Defendants Paul Revere Life Insurance Company and Unum Provident Corporation (collectively "the insurers") appeal the district court's jury verdict awarding $1.65 million in compensatory and $10 million in punitive damages to plaintiff G. Clinton Merrick, Jr. for breach of contract and of the duty of good faith and fair dealing, stemming from the insurers' denial of Merrick's disability insurance claim. Among other issues, this appeal requires us to examine the constitutional limits upon the use of evidence of injury inflicted upon nonparties, as discussed in *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). The district court had jurisdiction pursuant to 28 U.S.C. § 1332. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for a new trial on punitive damages due to the district court's failure to give an adequate limiting jury instruction under *Williams*.

## I.    Background

### A.    History of Merrick's Claim

G. Clinton Merrick, Jr. purchased an "own occupation" disability policy from defendant Paul Revere Life Insurance Company in 1989. Under that policy, if Merrick was "unable to perform the important duties of [his] Occupation" due to "Injury or Sickness," he was entitled to a "total disability" benefit of $12,000 per month for the duration of his disability. At the time, Merrick was one of three partners at a venture capital firm, responsible for raising capital, evaluating invest-

ment options, and participating as a director in companies in which the firm invested. Merrick had entered the venture capital arena following a successful career as a marketing executive, where his accomplishments included campaigns for Country Time Lemonade, Crystal Light drink mix, and the "Kool-Aid Man."

In the early 1990s, Merrick began suffering from fatigue, muscle pain, mental confusion, and other difficulties that affected his work performance. His attending physician, Dr. Simon Epstein, referred him to several specialists to identify the problem. In August 1993, Dr. Stuart Mushlin indicated that Merrick may be suffering from Chronic Fatigue Syndrome (CFS) and found him unable to work. This diagnosis coincided with his partners' decision to buy out Merrick's interest in the firm due to recent underperformance, which Merrick attributed to his health problems.

Merrick first alerted Paul Revere to his disability on May 31, 1994, stating that he was "suffering from a disabling condition" but was not yet filing a claim. Merrick then met with additional specialists and underwent a battery of specialized tests at the Mayo Clinic, some of which showed normal results and some of which indicated abnormalities. Dr. Michael Silber, summarizing the Mayo Clinic results, diagnosed Merrick as suffering from CFS and Lyme Disease, and advised that he "restart work at a much lower stress level than previously." By this time Merrick was under the regular care of Dr. Alan Rapaport rather than Dr. Epstein; both Epstein and Rapaport concurred with the CFS diagnosis and found Merrick unable to work.

Following the Mayo Clinic's confirmation of the CFS diagnosis, Merrick filed a formal claim with Paul Revere. Paul Revere's in-house physician reviewed Merrick's documentation, questioned the diagnosis but ultimately agreed that the records supported a finding of "significant impairment."

Therefore Paul Revere began paying out Merrick's claim as of December 1994, when his benefits began to accrue.

Merrick tried to start a new venture capital firm in late 1994, but his illness prevented him from getting beyond the initial stages. Merrick's other insurer, Northwestern Mutual, notified Paul Revere in June 1995 that Merrick was seeking to enter a new business venture. That August, a Paul Revere field representative offered to settle Merrick's claim for an amount equal to four months of disability benefits, citing the "return to work and recovery" provision of his claim. Merrick declined, whereupon the representative left him with a check for one month of benefits. Merrick returned this check because he believed an endorsement provision on the check would have settled his claim upon cashing.

Paul Revere then arranged for Dr. James Donaldson to perform an Independent Medical Examination in December 1995. Dr. Donaldson's report was inconclusive: based on his tests, he concluded that Merrick "does not have either an active neurological problem or active Lyme disease" but did note his chronic fatigue, attributing it to depression. He also found that Merrick "deserves aggressive treatment, both pharmacotherapy and psychotherapy, by a seasoned psychiatrist." Paul Revere's claim file shows that the company interpreted Donaldson's report as supporting "significant impairment," and as implying that Merrick could not return to work.[1] Dr. Rapaport, Merrick's treating physician, disputed Dr. Donaldson's conclusions and reiterated his CFS diagnosis.

Paul Revere conducted an intensive review of Merrick's claim file, which concluded that "there does not appear to be any neuropsychologically-based disability." The field repre-

---

[1]Dr. Donaldson's report did not explicitly state whether he thought Merrick could return to work. Paul Revere's internal examiner recommended that the company ask Donaldson to clarify his findings in this regard, but apparently this follow-up never happened.

sentative again offered a compromise settlement, which Merrick refused. On December 9, 1996, Paul Revere denied Merrick's claim on the ground that the internal review showed "no objective medical documentation which supports an inability to perform the duties of your occupation as a venture capitalist." After Merrick protested, Paul Revere agreed to pay two additional months of benefits while Merrick provided the company with objective medical evidence. But the company's medical consultants rejected the two follow-up reports Merrick offered to document his illness, so Paul Revere continued to deny Merrick's claim. Merrick filed suit against Paul Revere and its parent corporation, Unum Provident, in April 2000, claiming breach of contract and of the duty of good faith and fair dealing.

## B.   Pretrial Motion in Limine

Merrick sought production of all documents added to Paul Revere's claim file after Merrick brought suit. The insurers resisted this request, citing among other reasons attorney-client privilege. After Merrick brought a motion to compel production, the magistrate judge warned the insurers that failure to produce a privilege log would waive privilege and instructed the insurers not to invoke the privilege unless the claim file actually included privileged material. Paul Revere then reiterated its privilege objection in a supplemental response to Merrick's document request, without producing a privilege log, and attested that "[n]otwithstanding and subject to these objections," it had produced all responsive documents.

In the meantime, Merrick discovered that when he filed this suit, counsel for the insurers assumed active management of the Merrick claim file. As a result, he became concerned that the insurers were using the attorney-client privilege to shield otherwise responsive documents from discovery, by claiming they were privileged communications between the insurers and counsel rather than routine documents related to claims

adjustment. Merrick sought another hearing before the magistrate judge, who granted Merrick's motion to compel, held all privileges waived and ordered the insurers to produce all responsive documents. The insurers produced no additional documents in response; indeed, Unum Provident reiterated its privilege claim in a later discovery response.

Merrick then brought a motion in limine to suppress all documents in his claim file acquired after litigation commenced, on the ground that the insurers were picking and choosing which documents would be produced in discovery. In response, the insurers stated that no documents had been withheld on the basis of privilege, although at the hearing counsel for the insurers suggested in passing that such privileged documents existed. Merrick found this representation incredible, given that the insurers had collected over 3,000 pages of documents following the filing of the suit yet produced only three short memos analyzing that material. Merrick insisted before the district judge that the insurers were hiding evidence and demanded production of all "post-litigation notes" and other documents reflecting the "thought processes" underlying management of Merrick's claim. The district court judge granted the motion in limine, and at trial suppressed much of this documentation on the ground that defendants were picking and choosing which documents to produce. After the court granted the motion in limine, the insurers submitted a declaration stating that they did not withhold any documents on the basis of privilege.

## C.   Trial

At trial, Merrick argued that the denial of his claim was part of a larger scheme to "scrub" the company's liability for expensive and noncancellable "own occupation" disability policies. Merrick relied largely upon the testimony of Stephen Prater, an insurance industry expert, who testified regarding Unum Provident's allegedly aggressive and unethical claim-closing practices. These practices included pressuring claim-

ants to settle for a fraction of total benefits, insisting upon "objective medical evidence" of a disability even when the policy did not require such evidence, building a stable of biased Independent Medical Examiners who would support claim denials, and holding regular "round table" meetings with lawyers, doctors, and claims handlers designed to "triage" the most expensive claims. Merrick introduced a substantial number of internal Unum Provident memos showing the evolution of this scheme during the early 1990s, and Prater testified regarding the tremendous financial gains Unum Provident posted by adopting these "best practices."

Unum Provident announced a merger with Paul Revere, Merrick's insurer, in April 1996. Prater testified that in the months leading up to the merger, Unum Provident began importing its "best practices" procedures to the Paul Revere organization, including training its claims representatives in "objectification" and "round tabling" Paul Revere claims. Prater testified that Paul Revere representatives received this training shortly before the company began re-evaluating Merrick's claim (which it had initially paid out). Prater testified that the company's handling of Merrick's claim was consistent with many of Unum Provident's improper practices, including attempting to settle for a fraction of the total amount (and threatening to sue for reimbursement if Merrick refused to settle), insisting upon "objective medical evidence" and seeking to get Merrick's claim off the books before the end of the fiscal year. Merrick also argued that the explanations Paul Revere gave Merrick for denying his claim were inconsistent with the company's internal documentation, which largely supported the conclusion that Merrick suffered "significant impairment."

The jury returned a verdict for Merrick, awarding him $1,147,355 in unpaid benefits and $500,000 for mental and emotional distress, to be paid by the insurers jointly and severally. It also imposed $2,000,000 in punitive damages on Paul Revere and $8,000,000 on Unum Provident. The insures

brought a renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure and a motion for a new trial under Rule 59. The judge denied these motions and awarded Merrick $500,000 in attorney's fees. The insurers timely appealed.

## II.    Discussion

The insurers appeal several decisions made by the court below. We address each argument in turn.

### A.    Motion for New Trial

In their opening brief, the insurers argue that they are entitled to judgment as a matter of law on the issues of bad faith and punitive damages. Merrick responds, correctly, that the insurers did not include these claims in their Rule 50 motion below, meaning the issue is not properly before us now. *Desrosiers* v. *Flight Int'l, Inc.*, 156 F.3d 952, 957 (9th Cir. 1998). In their reply brief, the insurers concede the point and ask the court to construe their argument as an appeal of their Rule 59 request for a new trial, which did raise these arguments.

Generally, issues raised for the first time in a reply brief are considered waived. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990). Here, however, we exercise our discretion to consider the insurers' claim because the appellee has not been misled and the issue has been fully explored. *See Ellingson v. Burlington N., Inc.*, 653 F.2d 1327, 1332 (9th Cir. 1981). The insurers' Rule 59 argument is identical to their Rule 50 argument, to which Merrick has responded. We note, however, the differing standard of review. Whereas a properly presented Rule 50 question is reviewed de novo, we give "great deference" to the trial court's denial of a motion for a new trial, and will reverse "for a clear abuse of discretion only where there is an *absolute absence of evidence* to support the jury's verdict." *Desrosiers*, 156 F.3d at 957

(emphasis in original) (quoting *Pulla v. Amoco Oil Co.*, 72 F.3d 648, 656-57 (8th Cir. 1995) (White, J.)).

**[1]** Given this deferential standard of review, we find the evidence more than sufficient to support the jury's bad faith verdict. Under Nevada law, "[b]ad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct." *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956 (Nev. 1998) (citation omitted). Viewing the evidence in Merrick's favor, *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 774 (9th Cir. 2005), the jury could have found that the insurers conducted a biased investigation of Merrick's claim as part of an improper company-wide initiative to target and terminate expensive "own occupation" policies. It also could have found that the insurers misrepresented the terms of the policy by requiring Merrick to present "objective medical evidence" of his disability. The Nevada Supreme Court recognizes biased investigations and misrepresentation of policy terms as evidence of bad faith. *See Powers v. U.S.A.A.*, 962 P.2d 596, 604 (Nev. 1998); *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956 (Nev. 1998). We have previously found that these defendants' improper claim-scrubbing supports a finding of bad faith claim denial in a case decided under California law, which like Nevada anchors bad faith liability in the reasonableness of the insurer's action. *See Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1010-11 (9th Cir. 2004).

**[2]** Similarly, there was substantial evidence before the jury that the insurers should be liable for punitive damages. Under Nevada law, a plaintiff may secure punitive damages upon showing "by clear and convincing evidence" that the defendant is "guilty of oppression, fraud, or malice, express or implied." Nev. Rev. Stat. 42.005. Here, the jury could have concluded that by subjecting Merrick's claim to improper claim-scrubbing procedures, the insurers "undertook an intentional course of conduct designed to ensure the denial" of the claim. *See Powers*, 962 P.2d at 604-05. Both the Nevada

Supreme Court and the Ninth Circuit have held that such conduct could constitute "fraud and malice." *Id.* at 605; *see also Hangarter*, 373 F.3d at 1012-13 (California law).[2]

**[3]** Because we cannot say that there was a "complete absence of evidence" to support the jury's verdicts, we affirm the district court's denial of the insurers' Rule 59 motion.

## B.   Motion in Limine

**[4]** The insurers also challenge the district court's order suppressing certain evidence placed in the claim file after litigation commenced. The district court granted this motion upon finding that the insurers withheld evidence that they were ordered to produce regarding their post-litigation treatment of Merrick's claim. The insurers argue that the court erred in finding that they had withheld any evidence. "Courts need not tolerate flagrant abuses of the discovery process" and have "inherent power" to exclude evidence as a sanction for such abuses. *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). We review the imposition of discovery sanctions for abuse of discretion and the underlying factual determinations for clear error. *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1052 (9th Cir. 1998).

---

[2]The insurers argue that Merrick offered insufficient evidence linking Unum Provident's illicit practices to Paul Revere's handling of this claim, because Paul Revere denied the claim before the merger was completed. Merrick showed that Unum Provident engaged in claim-scrubbing prior to the merger, and that Paul Revere began importing Unum Provident's "best practices" in claim management before the merger was completed. He also showed that his claim, which Paul Revere initially granted, was re-evaluated and ultimately denied shortly after this transition period began. Prater testified that Paul Revere's behavior, such as pressuring the claimant to settle before year's end and relying upon a lack of objective medical evidence to terminate an expensive claim, was consistent with Unum Provident's tactics. Therefore we cannot say that there was an "absence of evidence" supporting Merrick's claim that Paul Revere adopted Unum Provident's illicit behavior before the merger was finalized and applied it in this case.

Based upon the record, we cannot conclude that the district court's finding that the insurers withheld evidence is clearly erroneous. The insurers' pretrial behavior gives rise to such an inference. The insurers invoked the privilege in response to a specific document production request, and continued to do so even after the magistrate judge instructed them not to invoke the privilege unless the privilege was actually shielding documents. Their responses expressly objected on the basis of privilege and attested that "subject to these objections," their production was complete.[3] Only after the magistrate ordered the privileges waived (in response to Merrick's assertion that defendants were withholding evidence), and Merrick brought his motion in limine, did the insurers state unequivocally that no documents were withheld on the basis of privilege.[4] Even then, counsel's statement at the hearing could be understood as admitting the existence of withheld documents.

In addition, the existence of withheld documents may be inferred from the paucity of material actually produced. Although the insurers received over 3000 pages of documents pertaining to Merrick's claim after litigation began, it produced only three short memos analyzing this material, none

---

[3]As noted above, Unum Provident continued to use this language even after the magistrate judge ordered all privileges waived.

[4]Defendants claim they offered an unequivocal denial prior to the magistrate's ruling. The record does not support this assertion. The insurers' opposition to the motion to compel states that they "are not in possession of any additional documents responsive to these requests" as of May 31, 2001, but this statement is followed on the next page by a reiteration of the privilege with respect to this specific document request. We also note that subsequent events cast doubt upon the truth of that denial: following the hearing on the motion to compel, defendants produced a February 2, 2001 e-mail from Dr. Cusher to Dave Layden, the in-house counsel managing the Merrick file and a report from Dr. Cusher dated May 5, 2001. The dates on those documents strongly suggest that they were in the insurers' possession, but not disclosed, on May 31, 2001.

of which was generated by the attorneys who were actively managing the case file after Merrick filed his complaint.[5]

**[5]** Against these facts, the defendants offer only their sworn statement that documents were not withheld. While proving a negative is difficult, the defendants' pre-trial conduct and the dearth of documents actually produced support an inference that the defendants withheld documents in violation of the magistrate's order. Given the district court's superior position to adjudge the insurers' culpability, we conclude that the district court did not clearly err in so finding, and did not abuse its discretion in granting Merrick's motion in limine.

## C.  Punitive Damages Jury Instruction

Merrick's bad faith and punitive damages claims turned upon linking Paul Revere's handling of Merrick's claim to a decade of allegedly improper claims handling practices at Provident. Prater testified regarding Provident's practices in substantial detail. Concerned that the jury would punish them for Provident's history of improper behavior, the insurers requested the following instruction, which the district court denied:

> In deciding whether or in what amount to award punitive damages, you may consider only the specific conduct by Defendants that injured Plaintiff. You may not punish Defendants for conduct or practices that did not affect Plaintiff, even if you believe that such conduct or practices were wrongful or deserving of punishment. The law provides other means to punish wrongdoing unrelated to Plaintiff.

---

[5]One was an e-mail from Dr. Cusher to in-house counsel and therefore could have been considered privileged, as defendants noted in their disclosure.

The insurers claim that this denial abridged their Due Process rights by exposing them to unconstitutionally excessive punitive liability.

Initially, Merrick asserts that the insurers have waived the jury instruction issue. *Voohries-Larson v. Cessna Aircraft Co.*, 241 F.3d 707, 713 (9th Cir. 2001). We disagree. Although the Ninth Circuit is "the strictest enforcer of Rule 51," the record here shows that the insurers "objected at the time of trial on grounds that were sufficiently precise to alert the district court" to the specific nature of the defect. *Id.* at 713-14 (citation omitted). The insurers explicitly objected to the court's punitive damages instructions without "some limiting . . . instructions relative to the *Campbell* decision [*State Farm v. Campbell*, 538 U.S. 408 (2003)] in terms of what the jury can look at and not look at," and set forth five specific limiting instructions on those points. This objection is sufficiently precise to "bring into focus the precise nature of the alleged error" as being inconsistent with *Campbell. Voohries-Larson*, 241 F.3d at 714.

**[6]** The Due Process Clause "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties." *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007). As the Supreme Court has recently explained, such punishment runs afoul of the maxim that a state must afford a defendant an opportunity to present every available defense. *Id.* (citing *Lindsey v. Normer*, 405 U.S. 56, 66 (1972)). A defendant "threatened with punishment for injuring a nonparty victim" may be unable to present defenses applicable to the nonparty victim, if those defenses do not also coincide with those relevant to the plaintiff's claim. *Id.* In addition, punishment for nonparty injury adds "a near standardless dimension to the punitive damages equation," as jury speculation regarding the number of nonparties injured and the extent of their injuries magnifies traditional due process concerns regarding the arbitrariness, uncertainty, and lack of notice afflicting a punitive award.

**[7]** *Williams* clarified that a plaintiff may offer evidence of "harm to other victims" to show the reprehensibility of a defendant's conduct in this case. *Id.* at 1063-64. "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Williams,* 127 S. Ct at 1064. But "a jury may not go further than this and use a punitive damages verdict to punish a defendant *directly* on account of harms it is alleged to have visited on nonparties." *Id.* (emphasis added). Where there is a "significant" risk that the jury might do so—a risk generated, for example, by "the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury"—a court, upon request, must "provide *some* form of protection" to assure that juries "are not asking the wrong question." *Id.* at 1064, 1065.

**[8]** In this case, the evidence that was introduced at trial created a significant risk that the jury would punish the defendants for Provident's history of improper behavior and the damages this behavior caused to victims other than Merrick. Prater testified at length regarding Provident's practices based on his analysis of "over a hundred thousand" internal Provident documents written throughout the 1990s, many of which were entered into evidence. Prater and the memos describe Provident's decade-long scheme in great detail, highlighting unethical behavior by Provident that was unrelated to Paul Revere's handling of Merrick's claim.[6] For example, Provident held round-table discussions to terminate expensive policies, destroyed all records of the meetings and labeled them as "legal" solely to shield them by privilege. But Merrick offered no evidence that his claim was improperly "round-tabled." Prater also explained that Provident cultivated biased

---

[6]As noted above, Merrick showed that Paul Revere's handling of his claim displayed *some* of Provident's allegedly unethical practices, such as pressuring claimants to settle and insisting upon objective medical evidence of a claim.

independent medical examiners to support termination decisions, although Merrick seemingly did not allege that Dr. Donaldson's examination of him was biased. In his closing argument, Merrick's attorney repeatedly referenced Provident's pattern of allegedly unethical behavior, including practices not alleged to have occurred in Merrick's case. He also asked, in the context of punitive damages, "[h]ow do you punish a corporation that's making on the order of $132 million a quarter in terminations? That's what you have to decide." We conclude that the evidence offered here creates a "significant risk" that the jury would assess punitive damages to punish this pattern of unethical behavior rather than the conduct that affected Merrick specifically.[7]

[9] Merrick argues that, taken as a whole, the instructions adopted by the court adequately protected the insurers' due process rights. We disagree. The punitive damages instruction stated that "[y]ou may in your discretion award such damages, if, but only if, you find by a clear & convincing evidence that said defendant was guilty of oppression fraud or malice in the conduct upon which you base your finding of liability." The verdict form further asked whether the insurer "act[ed] with oppression, fraud, or mailice [sic], express or implied, in its dealings with plaintiff such to justify an award of punitive damages." At most, these instructions address *liability* for punitive damages but do not prevent the jury from setting an *amount* of damages that includes direct punishment for harm to others. *Williams* states clearly that "a jury may not . . . use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id.* at 1064. A jury instruction, like that presented here, that allows (or does not preclude) direct punishment for nonparty

---

[7]As the insurers note, the fact that the jury assessed $2 million in punitive damages against Paul Revere and $8 million against Unum/Provident —which did not handle Merrick's claim but was the primary focus of Prater's testimony—suggests that the jury did assess damages to punish Provident's conduct against nonparties.

harm runs afoul of this prohibition and invites precisely the improper jury speculation—as to, for example, the number of nonparty victims or the extent of their injury—that *Williams* sought to avoid. *Id.* at 1063; *see also Campbell*, 538 U.S. at 423 ("Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant.").

**[10]** More important, the instructions given did not provide the jury with clear direction regarding the proper and improper uses of Merrick's "bad company" evidence. As noted above, the jury was permitted to consider this evidence when determining the reprehensibility of the insurers' actions toward Merrick, but it could not directly punish the defendants for harm to victims other than Merrick. When evidence is admissible for a limited purpose, the opponent is entitled to a limiting instruction admonishing the jury not to use the evidence for a forbidden purpose. Fed. R. Evid. 105; *see Borunda v. Richmond*, 885 F.2d 1384, 1388 (9th Cir. 1988). No such instruction issued here. In light of *Williams'* statement that it is "*constitutionally* important for a court to provide assurance that the jury will ask the right question, not the wrong one," 127 S. Ct. at 1064 (emphasis added), we conclude that the instruction issued in this case was inadequate.

Merrick also argues that the court properly denied the proposed instruction because the insurers' instruction was misleading. *Mitchell v. Keith*, 752 F.2d 385, 388 (9th Cir. 1985). Merrick is correct that the first sentence of the proposed instruction is misleading because it fails to indicate that the jury may consider harm to others as part of its reprehensibility analysis. *Williams*, 127 S. Ct. at 1063-64. But the fact that the proposed instruction was misleading does not alone permit the district judge to summarily refuse to give any instruction on the topic. In *Mitchell*, the primary case upon which Merrick relies, the court affirmed the district court's denial because the proposed instruction was misleading *and* the existing instruction adequately addressed the movant's concern. *Mitchell*,

752 F.2d at 389. Where a proposed instruction is supported by law and *not* adequately covered by other instructions, the court should give a non-misleading instruction that captures the substance of the proposed instruction. *See Ragsdell v. Southern Pac. Transp. Co.*, 688 F.2d 1281, 1283 (9th Cir. 1982).

**[11]** We therefore conclude that the district court erred in failing to instruct the jury that it could not punish the defendants for conduct that harmed only nonparties. *Williams* suggests in passing that a panel may remedy this error either by granting a new trial or reducing the amount of punitive damages. *Williams*, 127 S. Ct. at 1065. While remittitur may remedy a jury award deemed unconstitutionally excessive, *see Planned Parenthood of Columbia/Willamette Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 963 (9th Cir. 2005), it seems less appropriate where the constitutional error stems from misguidance regarding the way the jury may use evidence in setting an amount. We therefore vacate the punitive damages verdict and remand the case for a new trial on punitive damages. *Larez v. Holcomb*, 16 F.3d 1513, 1520 (9th Cir. 1994). In light of this holding, we decline to reach the insurers' challenge that the punitive award was unconstitutionally excessive. *See Williams*, 127 S. Ct. at 1065.

## D. *Attorney's Fees*

**[12]** Merrick sought attorney's fees under Nevada Revised Statute § 18.010(2)(b), which permits a fee award only where the opposing party maintained the suit "without reasonable ground or to harass the prevailing party." At the post-trial hearing, the district court explicitly found that the evidence was such that "the case could have gone either way." But it nonetheless reluctantly awarded Merrick fees based upon its reading of *Farmers Home Mutual Insurance Co. v. Fiscus*, 725 P.2d 234 (Nev. 1986). In *Fiscus*, the Nevada Supreme Court affirmed the district court's award of attorney's fees in a bad faith insurance case. The district court here interpreted

*Fiscus* as creating a categorical rule that "a finding of bad faith against the insurance company was at least tantamount to finding that [insurer's] defense was maintained without reasonable ground." The trial judge stated clearly that "[w]ithout the *Fiscus* case, I don't think I would award attorneys' fees in this case."

The district court misread *Fiscus*, although its mistake was understandable. The trial court in *Fiscus* granted attorney's fees on the ground that where the bad faith ruling is based on an insurance company's unreasonable interpretation of a policy, then a defense based on the same unreasonable interpretation constitutes an unreasonable ground for maintaining the suit. *Fiscus*, 725 P.2d at 235-37. But the Nevada Supreme Court explicitly found that, in light of the district court's factual findings regarding the extent of Farmers' bad faith, it was "unnecessary" to address this legal conclusion. *Id.* at 237 n.3. *Fiscus* therefore declined to create a categorical rule. We note that four months after *Fiscus* was decided, the same court in another bad faith insurance case reviewed the trial court's bad faith and attorney fee findings separately; if *Fiscus* had indeed created a categorical rule there would have been no need to separate the analysis. *See Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352 (Nev. 1986). Moreover, even if *Fiscus* purported to create a categorical rule, it could not have, as Nevada law prohibits courts from expanding or altering legislative rules for fee-shifting. *See First Interstate Bank v. Green*, 694 P.2d 496, 498 (Nev. 1986).

**[13]** The district court's award was therefore based upon a misreading of *Fiscus*. The court explained that absent the *Fiscus* decision it would not have awarded fees, and Merrick seemingly does not challenge the court's finding that this case "could have gone either way." We therefore reverse the district court's attorney fee award.

### III.   Conclusion

We affirm the district court's denial of the insurers' motion for a new trial and its grant of Merrick's motion in limine. We

vacate the punitive damages verdict and remand for a new trial on punitive liability. We also reverse the attorney fee award. Each party shall bear its own costs on appeal.

AFFIRMED in part; REVERSED in part; VACATED in part, and REMANDED.

1  JULIE A. MERSCH, ESQ.
   Nevada Bar No. 004695
2  E-mail: juliemersch@hotmail.com
   GILLOCK, MARKLEY & KILLEBREW, P.C.
3  428 S. 4th Street
   Las Vegas, Nevada 89101
4  (702) 385-1482
   (702) 385-2608 (fax)
5
   RICHARD H. FRIEDMAN, ESQ.
6  Email: rfriedman@frwlaw.us
   FRIEDMAN, RUBIN & WHITE
7  1126 Highland Avenue
   Bremerton, Washington 98337
8  (360) 782-4300
   (360) 782-4358 (fax)
9
   Attorneys for Plaintiff,
10 G. CLINTON MERRICK, JR.

11              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
12
13 G. CLINTON MERRICK, JR.,            CASE NO. CV-S-00-0731-JCM-RJJ

14         Plaintiff,

15      vs.                            **MOTION TO ADMIT DEPOSITION OF
                                       DR. WILLIAM FEIST AND
   PAUL REVERE LIFE INSURANCE          SUPPORTING MEMORANDUM**
16 COMPANY, a Massachusetts corporation;
   UNUMPROVIDENT CORPORATION (d/b/a
17 UNUM LIFE INSURANCE COMPANY OF
   AMERICA and PROVIDENT LIFE AND
18 ACCIDENT INSURANCE COMPANY); and
   DOES I through X inclusive, and ROES I
19 through X, inclusive,

20         Defendants.

21
22
23                          -1-                              **172**
24

CV-S-00-0731-JCM-RJJ – Plaintiff's Motion To Admit Deposition of Dr. William Feist and Supporting Memorandum

## MOTION TO ADMIT DEPOSITION OF DR. WILLIAM FEIST

## AND SUPPORTING MEMORANDUM

Plaintiff, G. Clinton Merrick, Jr., through his counsel of record, Richard H. Friedman, moves the court for an order permitting use in this action of the videotaped deposition of William Feist, M.D., taken on May 22, 2001, in the matter entitled *Kramer v. The Paul Revere Life Insurance Company, et al.*, Case No. BC-197170, Superior Court of the State of California, County of Los Angeles, on the following grounds:

1.     Dr. Feist is unavailable to testify at trial within the meaning of Rule 804 of the Federal Rules of Evidence;

2.     The prior deposition is offered against the same party or predecessor in interest, which adjusted the disability claims both actions, namely Paul Revere, Provident and UnumProvident;

3.     There is a substantial identity of issues between the present action and the prior action as it relates to the substance of Dr. Feist's testimony;

4.     Defendants had full opportunity to cross-examine Drs. Feist.

In support of this motion, Plaintiff relies upon Rule 32(a) the Federal Rules of Civil Procedure, Rule 804(b)(1) of the Federal Rules of Evidence, the Affidavit of Richard H. Friedman, submitted herewith, and the following memorandum.

This motion is limited in scope. Plaintiff does not seek an advance ruling from the court that the deposition is admissible in its entirety. Instead, Plaintiff merely seeks a ruling

-2-

that the deposition can be treated like any other taken in the present action.[1]  The only defense objection Plaintiff seeks to foreclose is that the deposition is inadmissible on the grounds that they were not taken in the present action (essentially a hearsay objection).  On this point, there is ample authority supporting Plaintiff's request.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  SUMMARY OF ARGUMENT

Dr. Feist is a former medical director of Provident.  His testimony relates to a narrow factual issue -- the claims handling policies and practices at Provident during his employment. Dr. Feist's prior deposition testimony is admissible in this action pursuant to Federal Rule of Evidence 804 and Federal Rule of Civil Procedure 32.  Dr. Feist is "unavailable" within the meaning of FRE 804 and his deposition from the *Kramer* case meets the criteria set forth in FRCP 32 and caselaw interpreting the rule.  Finally, the 9th Circuit has already addressed this identical issue in other litigation and held that Dr. Feist's deposition testimony is admissible. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1018-1019 (9th Cir., 2004).

### II.  ARGUMENT

#### A.  Drs. Feist is unavailable

Rule 804 of the Federal Rules of Evidence defines "unavailability of a witness" to include situations where a witness is "absent from the hearing" and the proponent is "unable to procure . . . attendance."  According to the Advisory Committee Notes, "[a]bsence from the

---

[1] Plaintiff has designated portions of Dr. Feist's examination, See Friedman Affidavit, Exhibit A and B. As with other depositions, Defendants may object to this designation and submit their counter-designation of testimony. Plaintiff may then assert objections to such designations.

-3-

1  hearing coupled with inability to compel attendance by process or other reasonable means also

2  satisfies the [unavailability] requirement."

3      Dr. William Feist resides at 5216 English Way, Birmingham, Alabama. See Friedman

4  Affidavit, ¶ 5. Consequently, he is beyond the subpoena power of this court and cannot be

5  compelled to attend the trial of this matter. Accordingly, Dr. Feist is "unavailable" within the

6  meaning of FRE 804. See, *Hangarter*, 373 F.3d at 1018-1019 (witness is "unavailable" when

7  beyond the reach of subpoena).

8      **B.      The rules permit use of prior depositions**

9      When a witness is unavailable, the federal rules permit use of prior deposition

10  testimony.      FRCP 32(a) provides in pertinent part:

11          [W]hen an action has been brought in any court of the United
            States or of any State and another action involving the same
12          subject matter is afterward brought between the same parties or
            their representatives or successors in interest, <u>all depositions</u>
13          <u>lawfully taken and duly filed in the former action may be used in</u>
            <u>the latter as if originally taken therefor. A deposition previously</u>
14          <u>taken may also be used as permitted by the Federal Rules of</u>
            <u>Evidence</u>.
15
16  (emphasis supplied).

17      According to Wright & Miller, *Federal Practice and Procedure*, § 2150, it is generally

18  accepted that so long as the deposition is offered against the same party and that there is a

19  substantial identity of issues, it is admissible even though it is offered by a different party. *Id.*

20  at § 2150 citing *Ikerd v. Lapworth*, 435 F.2d 197 (7th Cir. 1970); *Rivera v. America Export*

21  *Lines, Inc.*, 13 F.R.D. 27 (D.C.N.Y. 1952); *Insul-Wool Insulation Corp. v. Home Insulation,*

22  *Inc.*, 176 F.2d 502 (10th Cir. 1949); *Copeland v. Petroleum Transit Co.*, 32 F.R.D. 445

23  (D.C.S.C. 1963); *Aileen Mills Co. v. Ojay Mills, Inc.*, 192 F.Supp. 131 (D.C.N.Y. 1960);

24                                  -4-

1   *Moultrie Nat. Bank v. Travelers Indem. Co.*, 181 F.Supp. 444 (D.C.Ga. 1959); and *Tobacco &*

2   *Allied Stocks v. Transamerica Corp.*, 16 F.R.D. 545 (D.C.Del. 1954).

3          With regard to the Rule 32(a) requirement that the earlier action must have been one

4   "involving the same subject matter." the courts look not to the subject matter as such but to the

5   issues. See Wright & Miller, *Federal Practice and Procedure* § 2150. Depositions from an

6   earlier action cannot be used if the issues were different, but a "substantial identity of issues."

7   rather than precisely the same subject matter, is all that is required. *Id.* at § 2150 citing *Ikerd v.*

8   *Lapworth*, 435 F.2d 197, 205-206 (7th Cir. 1970); *Batelli v. Kagan & Gaines Co.*, 236 F.2d 167,

9   169 (9th Cir. 1956); *Kipnis v. Antoine*, 472 F.Supp. 215, 219, (D.C.Miss. 1979); and *Fullerform*

10  *Continuous Pipe Corp. v. American Pipe & Const. Co.*, D.C.Ariz.1968, 44 F.R.D. 453, 455.

11         These judicial pronouncements were reinforced by the 1980 amendment to FRCP Rule

12  32 as noted by the Advisory Committee:

13         The final sentence is added to reflect the fact that the Federal Rules
       of Evidence permit a broader use of depositions previously taken
14     under certain circumstances. For example, Rule 804(b)(1)
       provides that if a witness is unavailable, as that term is defined by
15     the rule, his deposition in any earlier proceeding can be used
       against a party to the prior proceeding who had an opportunity and
16     similar motive to develop the testimony of the witness.

17         FRE 804(b)(1) specifically permits the use of an earlier "deposition taken in compliance

18  with law in the course of the same or another proceeding, if the party against whom the

19  testimony is now offered, . . . had an opportunity and similar motive to develop the testimony

20  by direct, cross, or redirect examination." (emphasis supplied). Taken together, FRCP 32(a)

21  and FRE 804(b)(1) provide the legal basis for admitting the deposition testimony of Dr. Feist in

22  this case.

23                                        -5-

24

1    **C.**    <u>**The deposition is offered against the same party**</u>

2        The party against whom testimony is offered is Paul Revere, which is a wholly owned

3    subsidiary of UnumProvident. This is same entity that adjusted the claim in the *Kramer* case

4    and it is the same entity that adjusted the disability claim in the present action.

5    **D.**    <u>**There is a substantial identity of issues**</u>

6        The issues addressed by the prior deposition of Drs. Feist are substantially identical to

7    the issues sought to be addressed here. In fact, Dr. Feist had been deposed more than a dozen

8    times regarding this same general subject matter prior to his deposition in the <u>*Kramer*</u> case.

9    There is no need to repeat deposition testimony that the parties by now can practically recite by

10   heart. Moreover, Plaintiff's counsel has previously sought to admit Dr. Feist's testimony from

11   the *Kramer* case in other litigation. In *Ceimo v. Paul Revere Life, Provident Life and Accident,*

12   *and General American Life*, USDC Arizona, Civ. No. 00-1386-PHX-FJM, the district court

13   granted this request. A true copy of that court's Order of July 30, 2002 is attached to the

14   Friedman Affidavit as Exhibit C.[1]

15       Drs. Feist's testimony relates to a fairly narrow factual issue, namely the claims

16   handling policies and practices at Provident during his period of employment. His testimony is

17   not specific to the plaintiff's claim in the *Kramer* case, as he had no involvement with that

18   claim. Instead, his testimony relates entirely to the corporate philosophy, policies and claims

19   practices at Provident.

20       A brief summary of Dr. Feist's direct testimony in the *Kramer* deposition follows:

21   _____

22   [1] Although the Court's initial order in *Ceimo* only addressed the hearsay issue, at trial virtually
     all of plaintiff's designations of Feist's testimony were played to the jury. Friedman Affidavit,
23   ¶4.

24                                                    -6-

1    Dr. Feist was employed by Provident for a period of 14 years. Feist Dep., 6/7. During

2    this period he worked in the medical department that evaluated disability claims. Id. at 18/21.

3    He advanced from assistant medical director to associate medical director in 1985, and then to

4    medical director and vice president in 1990, ultimately leaving the company in 1996. Id. at

5    22/17. He testified to a change of corporate philosophy in which Provident went from a caring

6    company to a company pressing the bottom line. Id. at 26/19. This change began when Mr.

7    Chandler became CEO of Provident in 1993. Id. at 28/2. About this time, Mr. Mohney came

8    to the claims side of Provident. Id. at 57/17. He had very little experience in disability claims.

9    Id. Mohney criticized Dr. Feist for making notations on claim files noting his conclusion that

10   the insured was disabled and directed Feist to discontinue this longstanding practice. Id. at

11   49/10 to 57/16. Before Mohney took over, attending physicians opinions were respected, but

12   not afterward. 62/5. Before 1993 the insureds had been given the benefit of the doubt, but

13   after 1993 the close calls would go to the company. Id. at 136/10. Prior to 1993 equal weight

14   was given to treating physicians and IME doctors and dialog with those doctors was sought to

15   arrive at a fair decision to the insured, but not afterward. Id. at 142/13. In 1995, Provident

16   instituted a special review process called "round table" review. Id. at 72/6. The purpose of

17   those meetings were to terminate high dollar claims and roll that money to the bottom line. Id.

18   at 84/9. There was no concern for the individual, just the bottom line. Id. at 87/5. Own

19   occupation disability policies had been oversold and improperly underwritten and Mr. Chandler

20   felt it was his responsibility to make them profitable. Id. at 124/12. Dr. Feist left the company

21   in 1996.

22

23

24                                          -7-

1        The testimony of Dr. Feist corroborates documentary evidence and other testimony that

2   Plaintiff will offer reflecting defendants' changing corporate philosophy and claim practices.

3   This testimony is as relevant in this action as it was in the *Kramer* and *Ceimo* cases.  More

4   importantly, the 9th Circuit has recognized the relevance of Dr. Feist's revelations regarding

5   these defendants in similar litigation.  *Hangarter v. Provident Life And Accident Insurance*

6   *Company, Paul Revere Life Insurance Company and UnumProvident Corp.*, 373 F.3d 998,

7   1018-1019 (9th Cir., 2004).

8        As in this case, the claimant in *Hangarter* purchased a disability policy from Paul

9   Revere Life Insurance Co. in 1989. Id. At 1003-1004.  As here, Paul Revere paid Hangarter

10  benefits for a period of time and then terminated benefits based upon the opinion of its medical

11  examiners and claim investigators that the insured was no longer "totally disabled". *Id.* at

12  1004.

13       The 9th Circuit's opinion addressed Dr. Feist's qualifications, the admissibility of his

14  deposition testimony under FRCP 32 and FRE 804, and its relevance under FRE 402 and 403.

15       With regard to Dr. Feist's qualifications, the 9th Circuit noted that his

16  training and experience were more than adequate to qualify him to testify to the

17  insurer's claims practices.

18            Feist, a board-certified specialist in insurance medicine and
    Provident's vice-president and director of its medical department

19  through 1996, has been educated on insurance policy law and
    disability policy language. At Provident he was active in the

20  practice of claims adjudication where he participated in round
    tables in which Provident employees discussed terminating

21  disability policies.  He is also familiar with insurance policy ethics
    from educational and practical experience.

22

23

24   -8-

1    The district court therefore did not abuse its discretion in finding
     Feist qualified to discuss Provident's handling of disability claims.

2  *Id.* at 1018-1019.

3      With regard to the criteria for admitting Feist's deposition testimony under

4  FRCP 32 and FRE 804, the court concluded that Feist was "unavailable" because

5  he resided beyond subpoena range.  The court further found that the defendants

6  had "ample opportunity to cross examine Feist in the earlier deposition."  *Id.*

7      In addressing the relevance of Feist's testimony under Fed. R. Evid. 402

8  and 403, the court stated:

9
            Defendants argue that Feist's testimony regarding the claims-
10          handling procedures at Provident should have been excluded
            because it bore no direct relationship to Paul Revere's handling of
11          Hangarter's claim and was therefore irrelevant and prejudicial.

12          The jury could have reasonably inferred that the claims handling
            procedures at Provident were carried over to Paul Revere as a
13          subsidiary of UnumProvident after Unum and Provident merged.
            This inference was not unwarranted given that Ralph Mohney
14          controlled claims-handling at both Provident and Paul Revere and
            Paul Revere's handling of Hangarter's claim employed practices
15          similar to those used at Provident. See *Murray v. Toyota Motor
            Distribs., Inc.*, 664 F.2d 1377, 1379-80 (9th Cir. 1982) (ruling
16          admissible deposition testimony of an unavailable former
            employee of a company against an affiliated company with a
17          similar motive where both affiliates were controlled by the same
            parent company). Moreover, the deposition was corroborated by a
18          number of internal Provident and Paul Revere documents, and by
            the testimony of [other witnesses]. Any possible prejudice caused
19          by the deposition was thus marginal.

20          The district court therefore did not abuse its discretion in
            concluding that Feist's deposition was relevant to Hangarter's
21          claims.

22  *Id.*

23

24                               -9-

As in *Hangarter*, Dr. Feist's testimony regarding Defendants' corporate policies and procedures are corroborated by numerous documents and other testimony in this case.[1] The issues being identical and the proof similar, there is no question that Dr. Feist's testimony is as relevant here as it was in *Hangarter, Ceimo,* or *Kramer*.

**E.    Defendants had a full opportunity to cross-examine Drs. Feist**

Dr. Feist's deposition in *Kramer* took place May 22, 2001. At that time, he had already testified in 12 to 14 similar previous cases against UnumProvident or its predecessor or its subsidiaries, all <u>without</u> compensation. Feist Dep. at 159/10. Defendants had the benefit of that prior testimony when they deposed Dr. Feist in <u>*Kramer*</u>. Defendants had the same law firm representing them in the *Kramer* case as they do now. The cross-examination was extensive. While Dr. Feist's direct examination in <u>*Kramer*</u> comprised 152 pages, Defendants' initial cross went to page 346 and redirect and re-cross continued to page 400. Clearly, Defendants had similar motivation and fully exercised their opportunity to extensively cross-examine Dr. Feist in the <u>*Kramer*</u> action. Thus, there is no compelling reason why Dr. Feist's deposition should have to be repeated yet another time.

**III.    CONCLUSION**

Based on the foregoing argument and authorities, Plaintiff's Motion to Admit the Deposition of Drs. William Feist should be granted.

---

[1] Plaintiff will present evidence that the bad faith claims handling practices developed at Provident, about which Dr. Feist testifies, were imported to Paul Revere and applied to this claim. This evidence will be similar to, but more extensive than the evidence submitted in *Hangarter*.

-10-

1    Respectfully submitted this ___ day of September, 2004.

2

3                                                      _____

4                                                      Richard H. Friedman
                                                       FRIEDMAN, RUBIN & WHITE
5                                                      1126 Highland Avenue
                                                       Bremerton, WA 98337
6                                                      (360) 782-4300
                                                       Counsel for Plaintiff

7    Copy of the foregoing mailed/
     delivered this 22 day of
8    September, 2004, to:

9    ROBERT J. McKENNON, ESQ.            James F. Pico
     ROBERT E. HESS, ESQ.                PICO & MITCHELL
10   19800 MacArthur Blvd., Ste. 800     2000 South Eastern Avenue
     Irvine, California 92612-2427       Las Vegas, NV  89104
11   Attorneys for Defendants            Attorney for Defendants

12                                       _____

13

14

15

16

17

18

19

20

21

22

23

24                                -11-

JULIE A. MERSCH, ESQ.
Nevada Bar No. 004695
E-mail: juliemersch@hotmail.com
GILLOCK, MARKLEY & KILLEBREW, P.C.
428 S. 4th Street
Las Vegas, Nevada 89101
(702) 385-1482
(702) 385-2608 (fax)

RICHARD H. FRIEDMAN, ESQ.
Email: rfriedman@frwlaw.us
FRIEDMAN, RUBIN & WHITE
1126 Highland Avenue
Bremerton, Washington 98337
(360) 782-4300
(360) 782-4358 (fax)

Attorneys for Plaintiff,
G. CLINTON MERRICK, JR.

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| G. CLINTON MERRICK, JR.. <br><br> Plaintiff, <br><br> vs. <br><br> PAUL REVERE LIFE INSURANCE COMPANY, a Massachusetts corporation; UNUMPROVIDENT CORPORATION (d/b/a UNUM LIFE INSURANCE COMPANY OF AMERICA and PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY); and DOES I through X inclusive, and ROES I through X, inclusive, <br><br> Defendants. | CASE NO. CV-S-00-0731-JCM-RJJ <br><br> **AFFIDAVIT OF RICHARD H. FRIEDMAN IN SUPPORT OF PLAINTIFF'S MOTION TO ADMIT DEPOSITION OF DR. FEIST** |

-1-

STATE OF WASHINGTON )
                         : ss.
COUNTY OF KITSAP     )

RICHARD H. FRIEDMAN, being first duly sworn, deposes and states as follows:

1.       I am one of the attorneys for plaintiff G. Clinton Merrick, Jr. in the above-captioned case, having been admitted *pro hac vice* by order of the court on December 3, 2003. I have personal knowledge of the matters set forth herein.

2.       Attached as Exhibit A is Plaintiff's Designation of Testimony from the deposition of William Feist, M.D. taken in *Kramer v. The Paul Revere Life Insurance Company, et al.*, Case No. BC-197170, Superior Court of the State of California, County of Los Angeles.

3.       Attached as Exhibit B is a true and accurate condensed copy Dr. Feist's deposition in the *Kramer* case. My co-counsel in the *Kramer* action, Martina A. Silas, took this deposition. BARGER & WOLEN, L.L.P., the same firm involved in the present action, represented Paul Revere at the deposition.

4.       Attached as Exhibit C is a true and correct copy of the July 30, 2002 Order entered in <u>*Ceimo v. General American Life Ins. Co.,*</u> et al, USDC Arizona, Civ. No. 00-1386-PHX-FJM, wherein the district court granted my request to admit the deposition of Dr. Feist from the *Kramer* case. Although Judge Martone in Ceimo originally reserved ruling on other objections the defense might make to Dr. Feist's deposition, ultimately, the court allowed virtually all of plaintiff's designations of that deposition to be played to the jury. My recollection is that the Court excluded only one, or possibly two minor portions of the deposition.

-2-

1    5.    Dr. Feist lives at 5216 English Way, in Birmingham, Alabama. He is beyond

2    subpoena range of this court.

3    Further your affiant sayeth naught.

4

5    _____
     Richard H. Friedman

6    SUBSCRIBED AND SWORN TO before me this 22ᴿᴰ day of May, 2002

7

8    _____
     Janet Crook
     NOTARY PUBLIC - WASHINGTON

9

10   My Commission Expires: 11/9/07

11   Copy of the foregoing mailed/
     delivered this 22 day of

12   September, 2004, to:

13   ROBERT J. McKENNON, ESQ.          James F. Pico
     ROBERT E. HESS, ESQ.             PICO & MITCHELL

14   19800 MacArthur Blvd., Ste. 800   2000 South Eastern Avenue
     Irvine, California 92612-2427     Las Vegas, NV 89104

15   Attorneys for Defendants          Attorney for Defendants

16   _____

17

18

19

20

21

22

23

24                                    -3-

**L.** **Deposition Designation**

## PLAINTIFFS' DEPOSITION DESIGNATION

Designation of William Feist          Objections
    From *Kramer v. Paul Revere*

| | Objections |
|---|---|
| Page 6, line 7 through page 9, line 10 | |
| Page 9, line 13 through page 10, line 10 ending with the word "not" | |
| Page 11, line 13 from "how" through page 14, line 3 | |
| Page 14, line 11 through page 19, line 9 | |
| Page 19, line 14 through page 22, line 8 | |
| Page 22, line 13 through page 24, line 8 | |
| Page 24, line 17 from "in 1990" through page 27, line 9 | |
| Page 2o7, line 17 through page 30, line 16 | |
| Page 31, line 7 through page 33, line 9 | |
| Page 33, line 22 through page 34, line 21 | |
| Page 35, lines 4 through 12 | |
| Page 35, line 15 from "did you even" through page 36, line 12 | |
| Page 38, line 10 from "where" to line 14 | |
| Page 39, lines 1 through 15 | |

| | |
|---|---|
| Page 39, lines 19 through 23 | |
| Page 40, lines 15 through 23 | |
| Page 42, lines 5 from "Dr. Feist" through 12 | |
| Page 42, line 18 through page 46, line 15 | |
| Page 46, lines 19 through 22 ending with "came in" | |
| Page 47, lines 2 through 17 | |
| Page 48, line 2 from "from 1982" through page 50, line 23 | |
| Page 53, lines 15 through 20 | |
| Page 54 from "when Mr. Mohney" through page 55, line 18 | |
| Page 55, line 21 from "what was" through page 59, line 11 | |
| Page 60, line 4 from "prior to" through 62, line 17 | |
| Page 63, lines 14 from "why" through 16 | |
| Page 64, lines 3 through 21 | |
| Page 66, line 8 | |
| Page 66, lines 17 through 19 | |
| Page 67, lines 3 through 16 | |

| | |
|---|---|
| Page 68, lines 15 through 18 at "92" | |
| Page 71, line 1 from "it's" through page 72, line 22 | |
| Page 73, line 5 through page 78, line 7 | |
| Page 79, line 4 through page 82, line 23 | |
| Page 83, lines 5 through 9 | |
| Page 83, line 13 through page 84, line 6 | |
| Page 84, line 9 through page 85, line 6 | |
| Page 85, line 21 through page 86, line 2 to "was" | |
| Page 86, line 5 | |
| Page 86, lines 12 from "what" through line 13 | |
| Page 86, line 19 through page 87, line 11 | |
| Page 88, lines 10 from "Dr. Feist" through 14 | |
| Page 88, line 22 through page 89, line 2 | |
| Page 89, line 5 through page 92, line 4 | |
| Page 92, line 19 "from "were" to page 93, line 11 | |
| Page 93, lines 19 through 22 | |
| Page 94, line 12 from "did" through page 95, line 1 | |

| | |
|---|---|
| Page 97, lines 5 through 17 | |
| Page 98, line 12 through page 99, line 1 | |
| Page 99, line 21 from "did you" through page 101, line 7 | |
| Page 101, line 10 through page 102, line 16 | |
| Page 102, line 19 through page 103, line 14 | |
| Page 103, line 17 through page 104, line 2 | |
| Page 104, line 17 through page 109, line 13 | |
| Page 109, lines 15 from "as" through 21 | |
| Page 111, line 18 from "what" through page 112, line 6 | |
| Page 113, lines 15 through 20 | |
| Page 113, line 23 through page 116, line 10 | |
| Page 116, line 17 from "do you" through page 117, line 16 | |
| Page 118, lines 1 from "is it" through 6 | |
| Page 118, lines 10 through 14 | |
| Page 119, line 1 from "are you" through page 121, line 1 | |
| Page 121, line 3 from "did anyone" through page 123, line 19 | |

| | |
|---|---|
| Page 124, line 3 from "what kinds" through page 125, line 13 | |
| Page 125, line 22 through page 127, line 9 | |
| Page 127, line 14 through page 128, line 15 | |
| Page 128, line 16 through page 130, line 7 | |
| Page 131, line 7 through page 133, line 8 | |
| Page 136, line 4 through page 137, line 18 | |
| Page 138, lines 2 through 12 | |
| Page 138, line 15 through page 139, line 5 | |
| Page 140, lines 7 through 18 | |
| Page 141, line 2 from "prior to" to page 143, line 5 | |
| Page 143, line 11 through page 144, line 20 | |
| Page 149, line 20 through page 150, line 21 | |
| Page 349, line 11 from "did you" through page 351, line 2 | |
| Page 351, lines 9 from "based on" through 13 | |
| Page 351, lines 20 through 23 | |
| Page 352, lines 19 from "did you" through 21 | |
| Page 353, lines 1 | |

| | |
|---|---|
| Page 354, line 5 through page 355, line 9 | |
| Page 355, line 13 from "were" through 356, line 6 | |
| Page 356, lines 9 through 19 | |
| Page 356, line 23 through page 357, line 4 | |
| Page 357, line 13 from "on the" through 358, line 18 | |
| Page 358, line 22 through page 360, line 2 | |
| Page 360, line 5 through page 361, line 7 | |
| Page 361, line 11 through page 362, line 10 | |
| Page 362, line 15 through page 363, line 2 | |
| Page 363, line 5 through page 364, line 8 | |
| Page 364, lines 11 through 23 | |
| Page 365, line 4 from "did you" through page 366, line 12 | |
| Page 367, line 25 through page 368, line 15 | |
| Page 368, line 19 through page 371, line 9 ending with "not" | |
| Page 371, lines 11 through 14 | |
| Page 372, lines 8 through 10 | |
| Page 375, lines 14 through 19 | |

| | |
|---|---|
| Page 375, line 22 through page 376, line 5 | |
| Page 376, line 15 through page 377, line 5 | |
| Page 377, lines 8 from "were you" through 13 | |
| Page 378, lines 1 through 9 | |
| Page 378, lines 13 through 20 | |
| Page 379, lines 2 through 5 ending with "no" | |
| Page 397, line 8 through page 398, line 11 | |
| Page 398, line 14 through page 399, line 14 | |
| Page 399, lines 16 from "you" through 23 ending with "no" | |

AVERY

## FOSHEE & TURNER COURT REPORTERS

1

1       IN THE SUPERIOR COURT OF

2       THE STATE OF CALIFORNIA

3       FOR THE COUNTY OF

4       LOS ANGELES

5

6   MICHAEL L. KRAMER, an individual,

7       Plaintiff,

8   vs.                CASE NO.:

9                      BC-197170

10  THE PAUL REVERE LIFE INSURANCE COMPANY,

11  et seq.,

12      Defendant.

13

14

15   VIDEO DEPOSITION OF DR. WILLIAM FEIST

16

17          The videotaped deposition of

18  DR. WILLIAM FEIST was taken before

19  Traci Watkins, on May 22, 2001, at the

20  offices of Foshee & Turner, Birmingham,

21  Alabama, commencing at 12:30 p.m.

22  pursuant to the stipulations set forth

23  herein:

# FOSHEE & TURNER COURT REPORTERS

**1**

```
 1         IN THE SUPERIOR COURT OF
 2          THE STATE OF CALIFORNIA
 3           FOR THE COUNTY OF
 4              LOS ANGELES
 5
 6   MICHAEL L. KRAMER, an individual,
 7        Plaintiff,
 8   vs.        CASE NO :
 9              BC-197170
10   THE PAUL REVERE LIFE INSURANCE COMPANY,
11   et seq ,
12        Defendant
13
14
15   VIDEO DEPOSITION OF DR. WILLIAM FEIST
16
17        The videotaped deposition of
18   DR. WILLIAM FEIST was taken before
19   Traci Watkins, on May 22, 2001, at the
20   offices of Foshee & Turner, Birmingham,
21   Alabama, commencing at 12:30 p.m.,
22   pursuant to the stipulations set forth
23   herein:
```

**2**

```
 1        A P P E A R A N C E S
 2
 3   Appearing for the Plaintiff:
 4        LAW OFFICES OF MARTINA A
 5        SILAS
 6        BY: MARTINA A. SILAS
 7        16601 Ventura Boulevard
 8        Suite 400
 9        Encino, California 91436
10
11   Appearing for the Defendants:
12        BARGER & WOLEN
13        BY: EDWIN OSTER
14        19800 MacArthur Boulevard
15        Suite 800
16        Irvine, California 92612
17
18
19
20
21
22   Reported By:
23        Traci Watkins
```

**3**

```
 1          I N D E X
 2
 3   EXAMINATION OF DR. WILLIAM FEIST
 4
 5   EXAMINATION BY:      PAGE NUMBER:
 6   MS SILAS. . . . .  6, 349, 397
 7   MR OSTER           151, 379
 8
 9
10   DEPOSITION EXHIBITS:
11   Plaintiff's 1 - Memo       151
12   Defendant's 2 - Affidavit  176
13
14
15
16
17
18
19
20
21
22
23
```

**4**

```
 1        S T I P U L A T I O N S
 2
 3        IT IS STIPULATED AND AGREED by
 4   and between the parties through their
 5   respective counsel, that the deposition
 6   of DR. WILLIAM FEIST may be taken
 7   before Traci Watkins, Notary Public,
 8   State of Alabama at Large, at the
 9   offices of Foshee & Turner, Birmingham,
10   Alabama, on May 22, 2001
11
12        IT IS FURTHER STIPULATED AND
13   AGREED that the signature to and the
14   reading of the deposition by the
15   witness is not waived, the deposition
16   to have the same force and effect as if
17   full compliance had been had with all
18   laws and rules of Court relating to the
19   taking of depositions
20
21        IT IS FURTHER STIPULATED AND
22   AGREED that it shall not be necessary
23   for any objections to be made by
```

**5**

```
 1   counsel to any questions, except as to
 2   the form or leading questions, and that
 3   counsel for the parties may make
 4   objections and assign grounds at the
 5   time of trial, or at the time said
 6   deposition is offered in evidence, or
 7   prior thereto.
 8
 9        IT IS FURTHER STIPULATED AND
10   AGREED that notice of filing of the
11   deposition by the Commissioner is
12   waived
13
14
15        . . . . .
16
17
18
19
20
21
22
23
```

**6**

```
 1   DR. WILLIAM FEIST,
 2   having first been duly sworn, was
 3   examined and testified as follows:
 4
 5   EXAMINATION BY MS. SILAS:
 6
 7        Q   Dr Feist, by whom are you
 8   currently employed?
 9        A   I'm employed by the
10   Protective Life Insurance Company here
11   in Birmingham
12        Q   How long have you been
13   employed by Protective Life?
14        A   A little over five years.
15        Q   Who was your immediately
16   previous employer?
17        A   Provident Life and
18   Accident in Chattanooga.
19        Q   For how long did you work
20   for Provident Life and Accident?
21        A   I worked from July of 1982
22   to the end of February of 1996, almost
23   14 years
```

# FOSHEE & TURNER COURT REPORTERS

**7**

1  Q   And what was your title
2  when you left Provident?
3    A   Medical -- probably vice
4  president and medical director.
5    Q   What were the general
6  duties of a vice president and medical
7  director?
8    A   Basically administering
9  the medical department, which had
10  variously several positions, overseeing
11  the company infirmary which had a
12  full-time nurse, some administrative
13  duties in terms of budgeting and
14  performance appraisals and so forth.
15    Q   Did you leave -- I'm
16  sorry. Did you leave anything out?
17    A   I was going to say we had
18  responsibility in the medical
19  department to do underwriting and
20  claims work for the corporation.
21    Q   Did you leave Provident
22  voluntarily?
23    A   Yes, I did.

**8**

1    Q   And are you currently
2  collecting any kind of a pension from
3  Provident?
4    A   I am collecting a pension
5  from Provident.
6    Q   Were you ever subject to
7  any kind of disciplinary action while
8  you were at Provident?
9    A   No, I was not.
10    Q   Are you here today
11  pursuant to a subpoena?
12    A   Yes, I am.
13    Q   And was that a subpoena
14  issued by my law offices?
15    A   Yes, it was.
16    Q   And are you being
17  compensated for your appearance here
18  today?
19    A   No, I'm not.
20    Q   Did you receive any kind
21  of a witness fee, like a statutory
22  witness fee?
23    A   I got a $35 statutory

**9**

1  witness fee, yes.
2    Q   Okay. And what do you
3  intend to do with that witness fee?
4    A   I'm going to contribute
5  that to a charity of my choice.
6    Q   Have you ever accepted any
7  monetary compensation for testifying in
8  cases against any Provident insurance
9  entity?
10    A   No, I have not.
11    MR. OSTER: Objection,
12  assumes facts not in evidence.
13    Q   I'm sorry. Your answer?
14    A   No, I have not.
15    Q   Did my office offer you
16  any monetary compensation other than
17  the statutory witness fee for your
18  testifying here today?
19    A   No, you did not.
20    Q   Have you ever asked for
21  any monetary compensation for
22  testifying against any Provident
23  entity?

**10**

1    A   No, I have not.
2    Q   Have you ever given a
3  deposition before in a case filed
4  against any Provident insurance entity?
5    A   Yes, I have given
6  depositions in a number of cases over
7  the last four years against Provident.
8    Q   Is that anything you
9  aspired to do when you left Provident?
10    A   No, it was not. The
11  initial case that I gave a deposition
12  on was a Dr. Norman Nee (phonetic) who
13  is a colleague and he is an insurance
14  medical director for a company in
15  Philadelphia and his claim -- his
16  disability claim had been paid for a
17  number of years and had been
18  discontinued about six months after I
19  left Provident and his lawyer called me
20  and asked me to give a deposition in
21  that case, which as I recall that was
22  in December of 1997 so it was
23  approximately 18 months after I left

**11**

1  Provident.
2    MR. OSTER: Move to strike
3  everything after the word no as
4  nonresponsive and I would encourage,
5  you, Doctor, although you are not my
6  witness here today to please answer
7  just the question asked and we will all
8  get out of here a lot earlier.
9    THE WITNESS: I will do my
10  best, sir.
11    MR. OSTER: Thank you.
12    Q   (By Ms. Silas) I'll go
13  ahead and ask the next question. How
14  did you first become involved in a
15  witness in any case testifying against
16  Provident Insurance?
17    A   It was in the Dr. Norman
18  Nee case at the behest of his attorney
19  Mr. Miller and I basically did it as a
20  colleague feeling that Dr. Nee had been
21  unjustly terminated from his Provident
22  claim and that deposition started the
23  whole cascade of depositions over the

**12**

1  last four and a half years, I guess.
2    Q   When you say cascade of
3  depositions are you referring to
4  depositions in other cases filed by
5  policyholders who claimed they were
6  wrongfully terminated of their
7  benefits?
8    A   Oh, yes. I have given
9  depositions in probably 12 or 14 cases
10  over the last four and a half years.
11    Q   Do you aspire to become a
12  professional witness?
13    A   Absolutely not.
14    Q   I'm going to take you,
15  Doctor, through some of your
16  professional background and training if
17  I may. First of all, can you summarize
18  for me your education up until you
19  became an MD?
20    A   Undergraduate degree at
21  University of Kansas in Lawrence in
22  1962; medical school at University of
23  Kansas, Kansas City 1966; internship at

# FOSHEE & TURNER COURT REPORTERS

**13**

1  St. Luke's Hospital, Kansas City,
2  Missouri, '66, '67; two-year hiatus
3  with the military Air Force as a
4  medical officer in Mexico; came back to
5  finish residency in July of 1972 in
6  internal medicine at St. Luke's
7  Hospital in Kansas City, Missouri.
8      Q     Prior to going to work for
9  an insurance company did you have a
10  clinical practice as a physician?
11     A    I practiced internal
12  medicine from July of 1972 until
13  October of 1977.
14     Q     And what type of a
15  practice did you have?
16     A    It was a general internal
17  medicine practice.
18     Q     And what did you do in
19  October of 1977?
20     A    October and November and
21  December of 1977 I worked briefly for
22  an emergency room partnership in an
23  emergency room, suburban Kansas City,

**16**

1  work?  What did that involve?
2      A    It was fairly minimal
3  there, mostly early death claims,
4  somebody had taken a policy and hadn't
5  disclosed full information  BMA or
6  Businessman's Assurance at that time
7  did very little disability income so
8  there might have been a few disability
9  income claims but very minimal
10     Q     How long did you stay at
11  Businessman's Assurance?
12     A    I was there from January
13  of 1978 to June of 1982.
14     Q     And was your next job at
15  Provident Life and Accident?
16     A    Yes, it was
17     Q     Was that in Chattanooga,
18  Tennessee?
19     A    Yes, it was.
20     Q     What was your first
21  position at Provident?
22     A    I was assistant medical
23  director at Provident

**14**

1  and then in January of 1978 I went with
2  Businessman's Assurance as an associate
3  medical director
4      Q     You might want to keep
5  your voice up just a little bit --
6      A    I'm sorry
7      Q     -- for the cameras  Is it
8  picking it up?  Thank you so much
9      A    It picks up whispers
10  apparently.
11     Q     When you say internal
12  medicine what types of ailments would
13  you see in your clinical practice?
14     A    Basically medical
15  impairments of adults, no surgery and
16  no obstetrics and obviously no
17  pediatric practice.
18     Q     And when you went to
19  Businessman's Assurance what was your
20  first title there?
21     A    I was assistant medical
22  director
23     Q     What kind of duties did

**17**

1      Q     What does an assistant
2  medical director do?
3      A    In that setting we would
4  primarily -- well, at the time I hired
5  into Provident there were three
6  physicians in the corporate medical
7  department and we did basically, the
8  three of us, all the underwriting for
9  life and disability insurance and some
10  health insurance and all the claims
11  work for all those departments and it
12  was pretty much a, I would say, random
13  basis but all three of us did pretty
14  much the same thing, just an as-needed
15  basis  I also had the responsibility
16  of the infirmary during that time.
17     Q     Speaking about the
18  infirmary both at Businessman's
19  Assurance and at Provident did that
20  involve actually seeing and treating
21  employees?
22     A    Yes, uh-huh  Typically
23  the company nurse would screen the

**15**

1  you have as an assistant medical
2  director?
3      A    Mostly underwriting of
4  life insurance cases, some claims work
5  for early death claims  I was
6  responsible for the in-house infirmary
7  as far as on-the-job illnesses of
8  employees.
9      Q     Okay  In underwriting did
10  that involve reviewing and evaluating
11  insureds' medical records?
12     A    Yes, basically,
13  determining their risk for insurance
14     Q     In determining the risk
15  when you worked in underwriting
16  evaluations, did you have to figure out
17  the medical history and medical
18  condition of the insured?
19     A    Yes, that's basically what
20  underwriting is is assessing the risk
21  for that individual for whatever type
22  of insurance one is underwriting for
23     Q     What about the claims

**18**

1  patients and then if she felt that the
2  physician should see the patients she
3  would call me.
4      Q     Was that usually someone
5  who was either ill or injured at work?
6      A    Yes, uh-huh  Typically,
7  yes
8      Q     Did you continue working
9  the infirmary the entire time -- the
10  entire approximate 14 years you were at
11  Provident?
12     A    I was basically
13  responsible from 1982 to 1990 and also
14  overseeing it from 1990 to 1996
15  although I had less direct involvement
16  in the fairly early part of '93 but --
17  I mean the 1990's but in essence either
18  I was working the infirmary or
19  responsible for the coverage in the
20  infirmary.
21     Q     And you said you also did
22  some claims work.  What type of claims
23  work did you do at that time?

# FOSHEE & TURNER COURT REPORTERS

**19**

```
1        A    Typically it was
2   disability income claims, long-term
3   disability claims, some life claims
4   It was sort of a cross section of all
5   the types of activities that the
6   corporation did in insurance matters.
7        Q    You weren't a claims
8   adjustor, correct?
9        A    That's correct.
10       Q    Was there a particular
11  department that you worked up to 1990?
12       A    I don't understand your
13  question  I'm sorry.
14       Q    Was there a medical
15  department or a claims department; in
16  other words, did the company department
17  in which you worked have a particular
18  name?
19       A    Well, yes.  The medical
20  department basically was the physicians
21  and the associate persons who served as
22  medical consultants to the -- the way
23  it was structured for most of the time
```

**20**

```
1   I was at Provident there was the life
2   department which sold and administered
3   life insurance.  There was a disability
4   income department or accident
5   department which had disability income
6   and they had the group department which
7   had the health care insurance and the
8   medical department during most of that
9   time was basically serving as a
10  consultant to all those areas.
11       Q    When you say serving as a
12  consultant what types of things when
13  you first came on the scene of
14  Provident were you asked to do as a
15  physician in the claims area?
16       A    In the claims area, well,
17  it would be evaluating disability
18  income claims or long-term disability
19  claims.  Typically the claims adjustor
20  would have a case that he or she would
21  send to us with a referral sheet and
22  ask specific questions for us to answer
23  in regard to that particular case.
```

**21**

```
1        Q    When you say disability
2   income claims are you referring to
3   claims on policies where someone buys a
4   monthly benefit in the event they are
5   unable to work?
6        A    Yes.
7        Q    Were you ever asked to
8   make a determination for Provident
9   regarding whether the person was
10  medically impaired from performing the
11  normal duties of their occupation?
12       A    Oh, yes.  Most if not all
13  the time when I would get a claim that
14  was the basic underlying question.
15       Q    Did the company allow you
16  to make those sort of determinations
17  when you first arrived?
18       A    Yes
19       Q    Now, in the 14 years you
20  worked for Provident Life and Accident
21  Company did you have any sort of
22  regular reviews of your performance?
23       A    Yes, uh-huh  Yes,
```

**22**

```
1   annually we would have performance
2   reviews from 1982 to 1990.  The then
3   medical director Dr. Harry Hawkins did
4   those reviews
5        Q    Did you ever receive a
6   negative performance review the entire
7   time you were there?
8        A    No.
9            MR. OSTER:  Objection,
10  best evidence rule
11       Q    You can answer.  I'm
12  sorry.
13       A    No, I did not.
14       Q    Did you receive any
15  promotions in the 14 years you were
16  there?
17       A    Yes  I hired in in 1982
18  as assistant medical director and I was
19  made associate medical director in 1985
20  and then became a vice president and
21  corporate medical director in 1990 when
22  Dr. Hawkins retired.
23       Q    Was vice president and
```

**23**

```
1   corporate medical director the title
2   that you had until you left Provident?
3        A    That is correct.
4        Q    Now what year did you
5   leave?
6        A    I left -- well, my last
7   day of work at Provident was February
8   29th, 1996
9        Q    Now, I want to talk about
10  your job as associate medical director.
11  In what way did your duties change if
12  any when you went into that position?
13       A    Virtually none.
14       Q    So you were still doing
15  some claims work in that period of
16  time?
17       A    Yes
18       Q    Still working in the
19  infirmary?
20       A    Yes.  It was more of a
21  title change than anything else.  I
22  didn't even get any increase in salary.
23       Q    And what year was it that
```

**24**

```
1   you became the vice president and
2   corporate medical director?
3        A    It was July 1st, 1990.
4        Q    Who was the president and
5   CEO of Provident Life and Accident at
6   that time?
7        A    Mr  Winston W  Walker,
8   III
9        Q    Is that the same person
10  that was the president and CEO in 1982
11  when you came on board?
12       A    No, the CEO when I came on
13  board was Mr. Kerry Handlin.
14       Q    In 1990 when you became
15  the vice president and corporate
16  medical director how if any -- let me
17  back up and try that again  In 1990
18  when you became the vice president and
19  corporate medical director how did your
20  duties change if they changed?
21       A    Well, in addition to the
22  other duties that I had which were
23  mentioned before, I had the
```

# FOSHEE & TURNER COURT REPORTERS

**25**

1  administrative duty of the medical
2  department in terms of personnel,
3  staffing, performance reviews annually
4  on typically six or eight individuals
5  and also the annual budgeting process
6  I had to submit a budget every year so
7  virtually no change except for the
8  administrative duties.
9      Q   Were you at that time the
10 top person in the medical department?
11     A   Yes.
12     Q   And were you the only
13 person with the title of vice
14 president -- I'm sorry -- corporate
15 vice president and medical director?
16     A   Yes.
17     Q   You said you did
18 performance reviews for six to eight
19 people  What types of jobs did those
20 people have?
21     A   Well, typically we'd have
22 two or three other physicians besides
23 myself  We would have a secretary, a

**26**

1  full-time secretary and perhaps a
2  part-time secretary, and then we had a
3  nurse who ran the infirmary and
4  typically either a full or part-time
5  assistant to her, so basically
6  professional people.
7      Q   Did you have -- were you
8  supervisory over the other physicians
9  there at the time?
10     A   Yes.
11     Q   And you held that title of
12 corporate vice president and medical
13 director from 1990 until the time you
14 left?
15     A   That is correct.
16     Q   Okay  Why did you leave
17 Provident Life and Accident Company in
18 1996?
19     A   Well, there were a number
20 of factors.  Probably the basic reason
21 was the discomfort I had with the
22 corporate philosophy that came in with
23 Harold Chandler  I saw Provident go

**27**

1  from a very caring company maybe for
2  lack of a better word that tried to do
3  what was right for the customer to a
4  company that tried to press the bottom
5  line, and a lot of individuals my age
6  were being rifted out and it was
7  uncomfortable to be one of the oldest
8  persons in a corporation setting, and
9  that's probably the highlights.
10     MR. OSTER: Can I have the
11 answer reread, please
12
13     (The desired portion of testimony was
14 read back by the court reporter.)
15
16     MR. OSTER: Thank you
17     Q   Prior to -- well, first of
18 all, were you referring to Harold
19 Chandler when you were talking about
20 Mr. Chandler?
21     A   Mr. Harold Chandler the
22 CEO, yes.
23     Q   And when did Mr. Chandler

**28**

1  become the CEO of Provident?
2      A   November 15th, 1993.
3      Q   Do you know if Mr.
4  Chandler was employed previously by
5  Provident when he came in as the
6  president and CEO?
7      A   My recollection of Mr.
8  Chandler was he had a career up to
9  that time in banking and this was just
10 his first insurance CEO job.
11     Q   Let me take you back first
12 to the time before Mr. Chandler arrived
13 at the company when Mr. Walker was the
14 president and CEO  During that period
15 of time as a corporate vice president
16 did you attend regular meetings of
17 company vice presidents?
18     A   Yes. Mr. Walker when he
19 came to the CEO position in, if memory
20 serves me correctly, '87, '88 he
21 started having monthly vice presidents
22 meetings and then when I became a vice
23 president in 1990 I was obligated to

**29**

1  attend those meetings
2      Q   And did you regularly
3  attend those meetings?
4      A   Attendance was mandatory.
5      Q   What types of things
6  generally were discussed at the vice
7  presidents meetings when Mr. Walker was
8  the president?
9      A   I think Mr. Walker used
10 that forum to discuss current issues in
11 the insurance industry, legislative
12 situations, sometimes they would have
13 new products  People would present new
14 products that were being developed and
15 so forth  I think basically my
16 understanding was that Mr. Walker
17 wanted to have a forum to keep the vice
18 presidents informed of what was going
19 on in the company and I guess he could
20 get feedback from the vice presidents
21 about those things as well
22     Q   During any of the vice
23 presidents meetings that you attended

**30**

1  do you ever recall any discussion of
2  the issue of profitability of
3  own-occupation individual disability
4  income policies?
5      A   You're talking any time?
6      Q   Any time up to the time
7  Mr  Chandler arrived
8      A   Up until Mr  Chandler
9  arrived, no, I do not.
10     Q   After Mr. Chandler arrived
11 in November or 1993 did you continue to
12 attend vice president meetings?
13     A   Yes, I did.
14     Q   And were those held
15 regularly?
16     A   Yes.
17     Q   And what types of issues
18 if you recall any were discussed say in
19 the calendar year 1993?
20     A   Well, the year 1993 and
21 graduating into 1994 --
22     Q   Well, you know, before you
23 go on maybe I will strike the question

# FOSHEE & TURNER COURT REPORTERS

**31**

1  and ask it for '93 and '94 so Mr. Oster
2  doesn't move to strike your response --
3      A    Well, I think --
4      Q    -- to the question as
5  nonresponsive. Let me just go ahead
6  because it's going to be edited.
7      Do you recall any of the
8  main issues that were discussed at vice
9  president meetings in the calendar
10  years 1993 and/or 1994 after Mr.
11  Chandler came in as the CEO?
12      A    Well, yes. I think the
13  major issue that Mr. Chandler had to
14  deal with immediately when he came was
15  the rather large write-down that the
16  accident department had to take to
17  cover their claims situation.
18      Q    When you say write-down
19  what do you mean?
20      A    Well, basically the
21  corporation was $275 million into the
22  accident department's kitty so to speak
23  so the accident department couldn't pay

**32**

1  their claims that were coming due, and
2  then leading on into 1994 there was a
3  discussion in the vice president
4  meetings about discontinuing selling
5  the own-oc policies and going more to a
6  income protection type policy, so what
7  I'm saying is is that Chandler had to
8  deal with this financial situation in
9  the accident claims department and
10  several meetings that I recall -- vice
11  president meetings were to discuss that
12  situation.
13      Q    Let me talk about you made
14  a reference to the term own-oc
15  policies. Is that an own-occupation
16  policy?
17      A    Yes, indeed. I'm sorry.
18      Q    What is your understanding
19  of what type of coverage an
20  own-occupation policy is?
21      A    My understanding of an
22  own-occupation policy is one in which a
23  person if he or she becomes unable to

**33**

1  do the substantial material duties of
2  his or her own occupation, then he or
3  she is disabled.
4      Q    Does that mean for example
5  if you are a brain surgeon and you
6  can't be a brain surgeon anymore but
7  you can work at McDonald's you are
8  still considered disabled?
9      A    That is correct.
10      Q    Did the company to your
11  knowledge also sell policies at that
12  time that covered someone only if they
13  were disabled from doing any
14  occupation?
15      A    I'm sure they did. That
16  was probably a minor part of their
17  sales. They majored on the own-oc
18  policy but I suspect for some of the
19  blue collar workers and tradesman type
20  folks they had the any-oc type
21  policies.
22      Q    At any of the vice
23  presidents meetings after Mr. Chandler

**34**

1  came in, do you remember any
2  discussions about any particular type
3  of insured that was causing the company
4  financial problems?
5      A    Well, the big claims block
6  that came into the -- that became a
7  problem in late 1993 was basically by
8  and large professional people
9  positions, lawyers, executives, persons
10  who had bought disability policies to
11  protect themselves against disability.
12  By and large these folks had only their
13  professional skills, whatever that
14  might be, as a means of making a
15  livelihood and if they were unable to
16  practice that particular occupation,
17  they were disabled.
18      Q    What types of concerns did
19  you hear expressed at vice presidents
20  meetings regarding claims on policies
21  sold to professional people?
22      A    Well, in general they were
23  just --

**35**

1      MR. OSTER:  Excuse me.
2  Objection, leading.
3      Q    You can answer.
4      A    Well, I think -- my
5  understanding was is that Provident
6  over the 1970 and 1980 timeframe had
7  sold a lot of policies to professional
8  people. That was their target
9  clientele if you will and then these
10  claims started to come in in the
11  early -- well, mid to late 80's and
12  early 90's and then became a problem.
13      Q    Did you ever hear any
14  discussions regarding -- let me start
15  over there. Did you ever hear the term
16  non-cancelable own-occupation policies?
17      A    Yes, that typically was a
18  policy sold meaning that the company
19  Provident could not cancel a
20  policyholder for anything short of
21  nonpayment of premium.
22      Q    Did you ever hear any
23  discussions at any time between

**36**

1  November of 1993 when Mr. Chandler came
2  in and the time you left regarding
3  whether the inability to cancel
4  own-occupation policies was causing any
5  financial problems for the company?
6      A    That may not have been
7  discussed specifically but I think in
8  general that was one of the things that
9  Mr. Chandler mentioned that these
10  policies had been sold and there was
11  really no way for the company to -- no
12  easy way to get out of paying them
13      Q    May I ask you --
14      MR. OSTER:  Objection. I
15  will move to strike for purposes of
16  interposing an objection of leading. I
17  also move to strike the answer as
18  nonresponsive.
19      MS. SILAS:  I was just
20  going to overrule your objection but
21  that's okay.
22      Q    (By Ms Silas)  Let me ask
23  you about this write-down. I'm not an

# FOSHEE & TURNER COURT REPORTERS

**37**

1  accountant so I wanted to get some
2  sense of it. You said the company had
3  to deposit something over $200 million.
4  Do you know where that money came from?
5      A. Well, again, my
6  understanding is that there is a large
7  corporation at Provident Life and
8  Accident Corporation that has financial
9  assets, that basically the subsidiary
10  if you wish to call it that of the
11  accident department of the corporation
12  needed money. It was like -- it was
13  almost like getting a loan or something
14  from somebody to pay off a debt and of
15  course it was statutory that they had
16  to pay these claims -- had to have
17  these reserves to pay the claims so
18  basically as I saw it it was just a
19  shifting of resources from the
20  corporation to the accident department
21      MR. OSTER: Move to strike
22  as nonresponsive.
23      MS. SILAS: I'm sorry.

**38**

1  Could I have the question back? I
2  wanted to see if it was nonresponsive
3
4  (The desired portion of testimony was
5  read back by the court reporter.)
6
7      Q. I guess that was a yes or
8  no question so I hate to make you go
9  through that again but I asked if you
10  knew. Where to your understanding did
11  the money come -- the two hundred
12  and -- I'm sorry. How much did you say
13  it was?
14      A. 275 million.
15      Q. Where to your
16  understanding did the $275 million come
17  from that had to be deposited in the
18  early 1990's?
19      MR. OSTER: Objection.
20  His understanding is irrelevant
21      Q. I can rephrase it. Since
22  we won't have you at the trial I only
23  get one shot at asking the questions.

**39**

1  Did you actually yourself hear Mr.
2  Chandler discuss this $275 million what
3  you called a write-down at any
4  meetings?
5      A. I recall at one of the
6  vice president meetings that he was
7  discussing that and that that had to be
8  done to --
9      Q. And you recall hearing him
10  discuss that issue yourself?
11      A. I do, yes.
12      Q. Okay. Then I will ask it
13  again. The $275 million deposit that
14  you referred to as a write-down, would
15  you explain where that money came from?
16      MR. OSTER: Objection,
17  assumes facts not in evidence, lacks
18  foundation.
19      A. Well, again, my
20  understanding was that the corporation
21  had to infuse some capital into a
22  subordinate department to maintain
23  their financial viability or stability.

**40**

1      MR. OSTER: Move to strike
2  as nonresponsive.
3      Q. Do you know, did they have
4  some bank account or credit line from
5  where -- I'm trying to figure out if
6  this was just a paper transaction or if
7  there was some money borrowed and moved
8  from somewhere. What was your
9  understanding if any about where that
10  came from?
11      MR. OSTER: Objection.
12  His understanding is irrelevant
13      A. I don't have any
14  information about that
15      Q. In any event do you
16  specifically recall hearing Mr.
17  Chandler discuss the fact that the
18  company had to make a deposit of $275
19  million?
20      A. Oh, yes, it was common
21  knowledge throughout the company and
22  was discussed in at least one or more
23  of the vice presidents meetings

**41**

1      Q. And was that money -- was
2  the $275 (sic) monies that was required
3  to pay outstanding or future claims?
4      A. Well, my understanding
5  was --
6      MR. OSTER: Objection,
7  lacks foundation, assumes facts not in
8  evidence. Go ahead and answer.
9      A. Well, again, my
10  understanding is is that the accident
11  department, the disability income
12  department, had to maintain a financial
13  reserve to maintain financial stability
14  to maintain their license to sell
15  insurance in the state of Tennessee, so
16  basically I guess they were given $275
17  million by the corporation to keep
18  themselves afloat. I mean, that may be
19  oversimplified but I think that's
20  basically what it was
21      MR. OSTER: Move to strike
22  as nonresponsive. Further his
23  understanding is irrelevant

**42**

1      MS. SILAS: Just for the
2  record that's an admission by someone
3  at the corporation.
4      Q. I just want to make
5  certain on the foundation issue, Dr.
6  Feist. The information to which you're
7  testifying, you personally were present
8  and heard it coming from Harold
9  Chandler's mouth at the meetings?
10      A. I did, yes. Again, it was
11  common knowledge throughout the
12  corporation
13      Q. You mentioned the term --
14      MR. OSTER: Objection,
15  move to strike the latter part of the
16  answer as speculation regarding common
17  knowledge.
18      Q. (By Ms Silas) You
19  mentioned the term reserves, Doctor.
20  What is your understanding of what that
21  means in the insurance industry?
22      A. Well, my understanding is
23  that an insurance company that sells

# FOSHEE & TURNER COURT REPORTERS

**43**

1 life insurance or any other kind has to
2 have a financial reserve available to
3 pay any potential claims and typically
4 that's statutory by the state insurance
5 commissioner's office of the state in
6 which they're domiciled.
7     Q   Are you aware of from
8 your -- well, first of all, how many
9 years have you worked in the insurance
10 industry?
11     A   24 years, I think -- 24
12 years, yeah
13     Q   And in that time have you
14 worked in both the underwriting side
15 and the claims side?
16     A   Yes.
17     Q   Do you have any
18 understanding regarding whether an
19 amount an insurance company holds in
20 reserves is a liability when counting
21 up the balance sheet of the company?
22     A   That is my understanding,
23 yes

**44**

1     Q   What is your understanding
2 in that regard?
3     A   Well, basically if an
4 insurance company has a disability
5 income claimant on disability, they
6 have to have a reserve fund or
7 liability fund set aside to cover that
8 and my understanding would be that they
9 would have to carry that as a liability
10 on their balance sheet
11     Q   Do you have any personal
12 knowledge from your 24 years in the
13 insurance industry regarding what
14 financially happens with a reserve when
15 a claim is closed?
16     A   Well, my understanding
17 would be that when a claim is closed
18 that that reserve would fall to, quote,
19 the bottom line, and would be taken off
20 the liability and I guess put to
21 assets
22     Q   Is it your understanding
23 that that would then appear as a profit

**45**

1 to the company?
2     A   That is my understanding,
3 yes
4     Q   You talked about Mr.
5 Chandler coming in.  You had the date
6 pretty exact there, November 15th --
7     A   I remember it well
8     Q   -- 1993  First of all,
9 why do you remember it so exactly?
10     A   It was like a C change  I
11 mean, you know, it was like
12 affectionately called BC and AC, before
13 Chandler and after Chandler.  I mean,
14 it was almost like, you know, BC and
15 AD
16     Q   What changes did you
17 notice at your employer when Mr
18 Chandler came in as the CEO and
19 president?
20     A   Well, again I mentioned a
21 cultural change in the company.  The
22 company when I came in '82 was
23 basically one in which an individual if

**46**

1 he or she worked well and didn't
2 embezzle funds or didn't sexually
3 harass a coworker could count on
4 retiring from Provident, and after
5 Chandler came in he -- his first year
6 or so, first six months, rifted out
7 several hundred people.  Typically
8 those that he rifted out were those who
9 had experience in the insurance
10 industry.  It was almost as if he
11 didn't want their experience and
12 expertise and it just became totally
13 bottom line.  Everything is a business
14 decision and really nothing else
15 mattered.
16     MR. OSTER:  Objection,
17 move to strike as nonresponsive,
18 speculative, lacks foundation.
19     Q   Doctor, did you notice any
20 change in the -- in your employer's
21 attitude towards its customers when Mr
22 Chandler came in?  That's a yes or no
23 I'll have to ask the follow-up

**47**

1 question
2     A   Okay  Yes.
3     Q   What did you notice in
4 that regard?
5     A   Well, I think the aspect
6 that is probably the most germane to
7 this discussion is that prior to Mr.
8 Chandler coming in and Mr. Mohney
9 taking -- and Ralph Mohney taking over
10 the accident department claims section,
11 the claimants were evaluated fairly and
12 if there was a gray area the claimant
13 was given the benefit of the doubt.
14 After Chandler came in it was, you
15 know, everything has got to go for the
16 company if we possibly can, not give
17 the claimant the benefit of the doubt
18     MR. OSTER:  Objection,
19 move to strike impermissible opinion,
20 lacks foundation, speculation
21     Q   Let me actually back up
22 and -- without agreeing with the
23 objection I'm going to back up for a

**48**

1 second.  In -- well, let's put it this
2 way.  From 1982 when you arrived at
3 Provident until 1993 when Mr. Chandler
4 came in did you regularly interface
5 with people in the claims department?
6     A   Yes.
7     Q   And can you describe for
8 me what your involvement was with
9 claims representatives or adjustors
10 pre-Chandler?
11     A   Well, typically the claims
12 adjustor would work -- would be working
13 a file and they would have some
14 questions and they typically would send
15 a referral form and I guess for lack of a
16 better word in which they would outline
17 the situation and then have some
18 questions that they would want the
19 medical director to answer in terms of
20 medical impairments, is this person
21 disabled or not, would an IME be
22 helpful, if so what specialty, and
23 before Chandler I think I felt

# FOSHEE & TURNER COURT REPORTERS

**49**

1  personally that my opinions were
2  respected and by and large followed  I
3  think that changed after Chandler
4      Q   Let me ask you about your
5  opinions being respected. Prior to Mr.
6  Chandler coming on the scene, did you
7  ever write on a file that the insured
8  was impaired from the normal duties of
9  his or her occupation?
10     A   Yes, I did fairly
11  routinely and it was my understanding
12  that the claims adjustor wished me as
13  medical director and my colleagues that
14  were doing similar type work to make
15  that call.
16     Q   Were you ever criticized
17  for finding a policyholder to be
18  impaired prior to 1993?
19     A   No, I was not.
20     Q   Were you ever criticized
21  after 1993 -- in or after 1993 for
22  indicating on a claim file that a
23  policyholder was impaired from the

**50**

1  normal duties of their occupation?
2      A   I remember very well in
3  the fall of 1993 being called into
4  Ralph Mohney's office on the carpet for
5  writing on a file that the claimant was
6  disabled and his point -- Mr. Mohney
7  made the point that only the claims
8  department could make that call, that
9  the medical consultant, medical
10  director was just to outline the
11  problem and maybe outline the severity
12  of it and that the final decision for
13  disability was up to the claims
14  department, and I felt that was grossly
15  unfair because the claimant was a
16  45-year-old man who had intractable
17  angina  He could not walk across a
18  room without getting chest pain and I
19  felt that the only fair thing to that
20  claimant was to write on there that
21  this person is apparently totally
22  disabled and I was criticized by Mr
23  Mohney by writing that down

**51**

1      Q   Did Mr. Mohney --
2      MR. OSTER: Can I have the
3  question and answer reread, please
4      MS. SILAS: I'm just going
5  to make him say it again so you can go
6  ahead and move to strike.
7
8  (The desired portion of testimony was
9  read back by the court reporter )
10
11      MR. OSTER: Hold on,
12  please.
13      MS. SILAS: You're going
14  to make a motion?
15      MR. OSTER: Thank you, Ms
16  Court Reporter  I move to strike
17  everything after the testimony
18  regarding Mr. Mohney instructing Dr
19  Feist -- it is pronounced Feist; is
20  that correct?
21      THE WITNESS: That is
22  correct, yes, sir.
23      MR. OSTER: -- instructing

**52**

1  Dr. Feist that the final decision was
2  to be made by the claims department.
3      Q   (By Ms Silas) Well, let
4  me ask it this way.  First I'm going to
5  ask you -- and pardon me for making you
6  do this  Mr Oster is doing his job
7  today --
8      A   Well, I felt like I
9  answered it appropriately but if he
10  objects that's his prerogative
11      Q   If it's a yes or no, I may
12  ask you to elaborate just so we have
13  the question and a fully responsive
14  answer, and it is just legal stuff, so
15  sorry
16      Could you describe --
17  well, you are going to say yes or no
18  Describe for me please any occasions
19  you can recall in which Ralph Mohney or
20  anybody else at Provident Life and
21  Accident criticized you for indicating
22  on a file that an insured was disabled
23  from their occupation

**53**

1      A   I remember the case of the
2  individual that had intractable angina
3  that I had written that he was totally
4  and permanently disabled and I was
5  criticized by Mr. Mohney by writing
6  that.
7      Q   And what specifically did
8  Mr. Mohney say to you on that file?
9      A   My recollection was that
10  the final call for disability on a
11  claimant was the prerogative of the
12  claims department and that a medical
13  consultant was not to make that
14  decision
15      Q   Do you recall when about
16  what occurred?  Actually I'm going to
17  stop asking yes or no questions
18      A   November -- I'm sorry.  It
19  would have been November of '94, I'm
20  sorry, yeah
21      Q   To your knowledge in
22  November of 1994 were there any medical
23  doctors employed as claims adjustors at

**54**

1  Provident?
2      A   Well, Dr  Fred O'Connell
3  was a medical director who was
4  dedicated to claims work in the
5  accident department
6      Q   I guess what I'm asking is
7  when Mr. Mohney said to you that only
8  the claims department could write that
9  someone was disabled -- is that your
10  recollection?
11      A   Yeah, well I think he
12  meant that the claims adjustor and not
13  a medical -- not a physician, not a
14  medically trained person.
15      Q   That's my question  Do
16  you know of any claims adjustors in
17  November of 1994 at Provident that had
18  MD's?
19      A   No, there were none
20      Q   Do you know of any
21  adjustors at Provident in November of
22  1994 that were licensed psychologists?
23      A   I don't think there were

# FOSHEE & TURNER COURT REPORTERS

---

**55**

1  any licensed psychologists, no.
2      Q   You mentioned that the
3  policyholder on whose file you wrote
4  that they were disabled under the terms
5  of the policy had angina  What kind of
6  a condition is that?
7      A   It's coronary disease in
8  which he had had several heart attacks,
9  had several bypasses and it was just
10  one of those situations where nothing
11  was helping and he would get crushing
12  chest pain if he did any exertion other
13  than just remaining in repose or rest.
14      Q   Did you have any doubt
15  whatsoever as a doctor that that
16  insured based on the information you
17  had reviewed was medically disabled?
18      A   I had no doubt whatsoever.
19      Q   What was Mr. Mohney's --
20  and just for the court reporter that's
21  M-o-h-n-e-y.  What was Mr. Mohney's
22  demeanor if you recall at the meeting
23  where you discussed that file?

---

**56**

1      A   As I recall Mr. Mohney was
2  very angry that I had had the audacity
3  to write that on a file  I think he
4  was very -- felt very strongly that
5  that was outside my prerogative to do
6  that
7      Q   Is that something that you
8  were able to do prior to November of
9  1993; and by is that, I mean indicate
10  in writing on a file that your opinion
11  was that someone was disabled?
12      A   That was routine  We did
13  it almost as a -- I can't say every
14  file that we looked at but routinely on
15  files we would be asked to make that
16  call and I think that decision was
17  honored by the claims people by and
18  large before Mr  Mohney took over the
19  claims section
20      Q   Were you ever criticized
21  by anyone at Provident for writing on a
22  file that someone was not impaired?
23      A   Not that I recall.

---

**57**

1      Q   You talked some about, I
2  think you called it, a C change in
3  1993?  Is that what you referred to it
4  as?
5      A   C change, cultural change,
6  yeah.
7      Q   I want to talk to you
8  about some other people that worked for
9  Mr  Chandler  You mentioned Ralph
10  Mohney  Do you know if Mr  Mohney was
11  in the claims department before Mr
12  Chandler came in in 1993?
13      A   My recollection is that
14  Mr  Mohney was not in the claims
15  department prior to coming into that
16  position sometime in '94.
17      Q   Did Mr  Mohney come to the
18  claims side of the company after Mr.
19  Chandler became the president and CEO?
20      A   Yes, he did.
21      Q   Was Mr  Mohney one of
22  those people you referred to as
23  inexperienced?

---

**58**

1      A   Well, I would say Mr.
2  Mohney had had a fairly lengthy career
3  at Provident but it was not in
4  disability claims.  It was
5  administrative and probably middle
6  management  Coming to the vice
7  president of claims was the highest
8  position he had ever had  He had very
9  little or no experience in disability
10  claims
11      Q   Is that something that you
12  learned -- well, how did you learn the
13  information you just gave me?
14      A   Well, my personal
15  observation from working at Provident
16  from 1982 to 1996
17      Q   Do you know who Mr. Tom
18  Heys is?
19      A   Mr Heys at the time I was
20  there was the senior vice president
21  over the claims and the underwriting
22  functions of Provident.
23      Q   Now was Mr Heys with the

---

**59**

1  company to your knowledge prior to
2  1993?
3      A   Yes, he was there a number
4  of years. I can't tell you exactly --
5  he was there when I came to Provident
6  in 1982 so he was there a long time
7      Q   Was he the senior vice
8  president of claims and underwriting
9  before Mr Chandler came in?
10      A   I don't believe so  I
11  can't -- I don't think so
12      Q   Prior to November of 1993
13  do you recall how the company viewed
14  treating physicians?  By that, I mean
15  did they generally accept what an
16  insured's treating physician had to
17  say?
18          MR. OSTER:  Objection,
19  calls for speculation and overbroad,
20  lacks foundation
21      Q   You know what, let me
22  withdraw the question and ask it
23  better --

---

**60**

1      A   All right.
2      Q   -- without conceding to
3  Mr. Oster.  I can ask it this way
4  First of all, prior to 1993 when you
5  would interface with the claims
6  department did any part of your job
7  include reviewing clinical data from an
8  insured's treating physician or
9  psychologist?
10      A   Well, typically on a claim
11  situation -- in a claim situation the
12  file would be sent to me to review
13  Typically it would be the attending
14  physician's records on that individual,
15  and maybe if the individual had to see
16  another specialist, psychologist or
17  other specialist, that would be
18  available and by and large I would make
19  the decision based on that information.
20      Q   Prior to 1993 did the
21  company occasionally do what is called
22  an IME?
23      A   IME, yes

---

# FOSHEE & TURNER COURT REPORTERS

61

1  Q  What is an IME?
2  A  An IME is an independent
3  medical evaluation and --
4  Q  Is that done by a doctor
5  hired by the insurance company as
6  opposed to a treating doctor?
7  A  Typically the IME is a
8  physician who is board certified in a
9  given specialty and the insurance
10  company asks him or her to evaluate the
11  claimant in regard to disability
12  relevant to that specialty
13  Q  Were you ever asked to
14  evaluate -- well, first of all, were
15  you ever asked by Provident while you
16  were there to evaluate reports from the
17  IME physicians?
18  A  Yes, on many occasions.
19  Q  And were you also asked to
20  review data that came in from the
21  treating physicians?
22  A  Yes, uh-huh.
23  Q  Absent some suspected

62

1  fraud, did the company prior to 1993
2  ever indicate that treating physicians
3  weren't to be believed when their
4  reports came in?
5  A  My recollection by and
6  large is that Provident respected the
7  attending physician's statement and Dr
8  Hawkins my boss during that time said,
9  you know, that treating physician is
10  seeing that patient one on one and that
11  treating physician probably knows the
12  patient for long periods of treating
13  the individual and generally the
14  treating physician has got the best
15  idea about the physician -- about the
16  claimant from terms of his or her
17  disability.
18  MR. OSTER: Move to strike
19  everything after yes as nonresponsive.
20  MS. SILAS: I'm sorry.
21  Can I hear the question again?
22
23  (The desired portion of testimony was

63

1  read back by the court reporter.)
2
3  MS. SILAS: What was the
4  first word in the answer?
5
6  (The desired portion of testimony was
7  read back by the court reporter.)
8
9  MR. OSTER: My objection
10  should be as to motion to strike as to
11  everything after his first sentence.
12  Q  Well, let's ask it this
13  way instead of an abundance of
14  caution  Why generally speaking before
15  1993 did the company respect the
16  reports of the attending physicians?
17  MR. OSTER: Objection,
18  calls for speculation  He can testify
19  as to his understanding only and if you
20  would ask questions in that regard I
21  wouldn't have a problem with it.
22  MS. SILAS: I think you
23  have a problem with any question I ask

64

1  at this deposition but you can go ahead
2  and answer, Doctor.
3  A  Well, I think by and large
4  there is a trust developed between a
5  patient and his or her physician and by
6  and large physicians are honest people
7  I won't say all treating physicians are
8  honest but by and large they are and
9  they want to evaluate their patients
10  objectively, and up until Ralph Mohney
11  took over the accident report claims
12  the treating physicians were respected
13  with integrity and accuracy
14  Q  In your years of working
15  in medical departments of insurance
16  companies, have you developed any
17  experience in who is in a better
18  position to evaluate an insured or
19  between an IME physician who meets them
20  once and a treating physician, all
21  other things being equal?
22  MR. OSTER: Objection,
23  irrelevant  This is not an expert

65

1  witness deposition.
2  Q  You can answer  It is yes
3  or no  Otherwise you have to make you
4  say it twice  Did you develop an
5  opinion one way or the other regarding
6  that?
7  A  Well, I think --
8  Q  You have to say yes or no
9  and then I have to ask the follow-up
10  question to satisfy Mr. Oster.
11  A  Repeat the question,
12  please.
13  MS. SILAS: We're going to
14  have to go through the little song and
15  dance  You can go ahead and read it
16  back.
17  THE WITNESS: Yeah
18  MS. SILAS: I'm going to
19  have to start wording my questions more
20  precisely
21
22  (The desired portion of testimony was
23  read back by the court reporter.)

66

1
2  A  I would say the attending
3  physician in that scenario.
4  Q  To satisfy Mr. Oster I
5  think you have to say yes or no whether
6  you have an opinion, then I'll ask
7  you --
8  A  Yes, I have an opinion.
9  Q  And what is your opinion
10  in that regard?
11  A  Well, by and large --
12  MR. OSTER: Objection.
13  Excuse me.  Objection, irrelevant.
14  This is not an expert witness
15  deposition
16  Q  Let me ask it this way.
17  What is your experience as a former
18  corporate vice president and medical
19  director of Provident in that regard?
20  MR. OSTER: Objection.
21  His experience is irrelevant and it is
22  a back door attempt to get at his
23  opinion  He is not an expert witness

# FOSHEE & TURNER COURT REPORTERS

67

1  Q  You can answer the
2  question of what your opinion is.
3  A  Well, I think the
4  attending physician is probably better
5  able to evaluate that.
6  Q  Why is that?
7  A  Well, again, because the
8  attending physician typically has seen
9  this individual perhaps in a scenario
10  wherein the person has been working
11  actively and then becomes disabled for
12  whatever reason.  The physician who has
13  treated this person over that length of
14  time can see the difference and say,
15  well, this person has become disabled
16  because of this impairment.
17      MR. OSTER:  I move to
18  strike the entire line of questioning
19  and response and I don't mean to
20  interrupt you anymore so if you will
21  accept that continuing objection if you
22  want to keep going on this topic we'll
23  do that.  Is that all right?

68

1      MS. SILAS:  Well, I don't
2  know to which question there is going
3  to be an objection on the record so I
4  guess --
5      MR. OSTER:  All right.
6      MS. SILAS:  So let's go
7  along and see how we do.  I'm not going
8  to spend that much time on it in any
9  event.  You know what, can we go off
10  the record for just like less than five
11  minutes
12
13  (Whereupon, a break was taken.)
14
15  Q  (By Ms Silas)  Dr Feist,
16  I'm going to show you a document that
17  has been marked as Trial Exhibit Number
18  92.  Did I give the court reporter one
19  that maybe Mr. Oster can look at?  This
20  is the special review process memo.  I
21  think we only made one.  Do you want me
22  to have another copy made?
23      MR. OSTER:  Well, I have a

69

1  question for you here.  I honestly
2  don't know the answer to this.  This
3  is --
4      MS. SILAS:  I scribbled on
5  it and I don't plan on -- I actually
6  have a copy that is not scribbled on
7  that we can identify.
8      MR. OSTER:  Yeah, if you
9  could provide him with, if you can
10  been scribbled on that would be best, I
11  would request, but it's your
12  deposition.  You can show him whatever
13  you want.
14      MS. SILAS:  Sure, I'll
15  hand him -- except the problem is that
16  the print on this thing -- well, I
17  mean, he's not going to be able to make
18  it out.  It's not my writing to him.
19  It is just gibberish so this is the
20  only decent copy that I have
21      MR. OSTER:  But it will
22  come in as a trial exhibit potentially
23      MS. SILAS:  Not the one

70

1  attached to the deposition, though.  He
2  can authenticate the memo and a blank
3  one can come in.
4      MR. OSTER:  Again, I can't
5  control what you show the witness and
6  what you make an exhibit to the
7  deposition or not.  I mean, that's
8  entirely up to you
9      MS. SILAS:  Let me look at
10  it for one second.  Actually I think 1
11  was scribbling on here what some other
12  witness was testifying to.
13  Q  (By Ms Silas)  Well, you
14  know what, I'll just ask you disregard
15  any scribbling on there.  I will
16  represent to the witness that is not
17  how the document originally looked; is
18  that fair enough?
19  A  All right.  Fair enough.
20  I remember how it originally looked.
21  Q  This was just a working
22  copy that I had but I'm going to show
23  the witness what we had marked as Trial

71

1  Exhibit Number 92.  It's entitled
2  Provident internal memorandum dated
3  April 24th, 1995 and this document
4  consists of five pages.  Doctor, have
5  you ever seen this memo before?
6  A  Yes, I have.
7  Q  Is this a memo on which
8  you were copied?
9  A  Yes, it was.
10  Q  I direct your attention to
11  the second page of the document where
12  it has a CC list.
13  A  Uh-huh.
14  Q  And it appears to say
15  Harold Chandler is on there, Tom Heys.
16  One of the names is Tom Watjen,
17  W-a-t-j-e-n.  Do you know what his
18  position with the company given in 1995?
19  A  He was chief financial
20  officer
21  Q  And then the last name is
22  Dr Feist  Does that refer to you to
23  your knowledge?

72

1  A  Yes, that refers to me
2  Q  Was it your recollection
3  that you were in fact copied on this
4  memo in or about April of 1995?
5  A  Yes
6  Q  Doctor, the memo refers to
7  a special review process.  Do you have
8  a recollection of the company
9  instituting a special review process in
10  1995?
11  A  Yes, I remember it well in
12  April of 1995.
13  Q  Have you ever heard that
14  process described as a round-table
15  review?
16  A  That designation was how
17  it was commonly known in the company,
18  yes.
19  Q  Prior to April of 1995 did
20  the insurance company have a process
21  they called the round-table review?
22  A  Not to my knowledge
23  Q  Do you recall a process

# FOSHEE & TURNER COURT REPORTERS

73

1 referred to within the company as the
2 Scurb, S-c-u-r-b?
3     A   I do not recall   I was
4 not involved in that
5     Q   The memorandum Exhibit
6 Number 92 at the very bottom there is a
7 bullet point and it says, strengthen
8 medical support: On an interim basis
9 we have arranged for Dr. Feist to be
10 available to individual disability
11 claims on a half day basis beginning
12 Monday April 24th   First of all as to
13 that part of the memo were you asked in
14 April of 1995 to make yourself
15 available to the individual disability
16 claims department?
17     A   Yes, I was.
18     Q   What was your
19 understanding of the purpose of being
20 asked to do that?
21     A   Well, my understanding was
22 that the -- actually the claims
23 department needed some medical

74

1 expertise and I was asked to help.
2 Actually there were five different
3 sections which I would visit on a
4 different day of the week and made
5 myself available to review claims and
6 give advice either on a one-on-one
7 discussion basis with the claim
8 adjustors or a formal written question
9 and answer response type format.
10     Q   When you said you would go
11 to the adjustors did you actually have
12 to leave your office area and go
13 physically to the adjustors
14 departments?
15     A   Yes.  Typically I would go
16 from my office to that particular
17 section.  At that point in time the
18 claims department was actually housed
19 in several different locations in the
20 office complex and I would typically go
21 day by day to a different section
22     Q   When you say sections what
23 sections was the claims department

75

1 divided into?
2     A   I think they allude to it
3 here on -- well, like the north unit,
4 the south unit, the psych unit, the
5 residual unit, special handling units,
6 high litigation risk unit.  There was a
7 process of bringing in the claims
8 operation from the field offices into
9 the home office and for various reasons
10 the physical housing of that was
11 scattered at that time in the building
12 complex so I basically had sort of a
13 circuit ride.  I would go day by day,
14 week by week to these various sections
15     Q   Did you actually -- when
16 you went to the different sections of
17 the claims departments, did you
18 actually review claim files?
19     A   Yes.
20     Q   And were you asked for
21 your medical advice on those claim
22 files?
23     A   Yes, I was.

76

1     Q   You mentioned the psych
2 unit.  Is that a unit that was devoted
3 to handling solely psychiatric claims?
4     A   Yes
5     Q   Were you ever asked to
6 render opinions on psychiatric claims?
7     A   Yes, on a regular basis.
8     Q   How many years experience
9 do you have within the insurance
10 industry reviewing psychiatric claim
11 files?
12     A   Well, that would be hard
13 to quantify but obviously in the years
14 that I did disability income claims,
15 basically from '82 to '96 with some
16 hiatus in the middle, a good percentage
17 of the claims would have been
18 psychiatric claims  That's a very
19 common impairment that comes to claim
20 and I would fancy myself as having some
21 expertise in that area
22     Q   You said there was a
23 hiatus  Was there some period of time

77

1 between 1982 and 1996 where you were
2 not actually involved in handling
3 claims?
4     A   From about the middle of
5 1990 until April of 1995 I was not
6 directly involved in claims.  That
7 disability claim section was moved out
8 from the medical department so I didn't
9 have direct responsibility there.
10     Q   Were you involved with
11 claims from 1995 through the time you
12 left in February of 1996?
13     A   Yes, I was.
14     Q   I'm going to ask you -- in
15 the next sentence under that strengthen
16 medical support it says, in addition
17 Dr. Feist will be participating in one
18 of the two special review process
19 meetings each week  Do you have a
20 recollection of being asked to
21 participate in a once a week meeting?
22     A   Yes, I do
23     Q   What day of the week did

78

1 you generally attend the round-table
2 review meetings?
3     A   Typically on Thursday
4 evenings.
5     Q   Did they review
6 psychiatric claims on Thursday evening?
7     A   Yes, uh-huh
8     Q   Do you know who
9 HealthSource is?  That's one word with
10 a capital H
11     A   HealthSource -- where does
12 it say that?
13     Q   It's referenced on the
14 last line there.
15     A   Yeah, the HealthSource was
16 an HMO company that purchased the group
17 department of Provident sometime after
18 Harold Chandler came there I'm thinking
19 the year of '93 but I'm not sure
20 HealthSource had basically purchased
21 the health department and I think that
22 reference there is to maybe some of the
23 physicians working with HealthSource

# FOSHEE & TURNER COURT REPORTERS

79

1 would help with the claims but their
2 price was too high and that never came
3 to fruition.
4    Q   I'm going to ask you about
5 these round-table review meetings on
6 Thursday night. Other than -- well,
7 did you attend on a regular basis these
8 meetings?
9    A   Yes, I did. I attended
10 every Thursday night except the week
11 that I had my cataract operation in
12 June of 1995 and the week I attended
13 the medical directors meeting also at
14 the end of June of 1995.
15    Q   And over what period of
16 time did you attend these Thursday
17 nights meetings?
18    A   April of 1995 to February
19 of 1996.
20    Q   Other than you were there
21 any other Provident management
22 individuals who regularly attended the
23 Thursday night round-table review

80

1 meetings?
2    A   Typically that meeting
3 would be chaired by Mr. Ralph Mohney.
4 Typically Jeff McCall his assistant
5 would be there. Typically it would be
6 two or three corporate attorneys
7 attending and then the other
8 participants would be the claims
9 adjustor who was working the actual
10 case being discussed and usually his or
11 her supervisors and for example if it
12 was a psych case it might be one of the
13 claims adjustors who had special
14 expertise in psychiatric claims.
15    Q   Do you have any
16 recollection during these meetings of
17 Jeffrey McCall taking notes at the
18 meeting?
19    A   My recollection was that
20 Mr. McCall took notes during those --
21 during the meetings.
22    Q   Do you have an
23 understanding as to what the purpose

81

1 was for having you attend those
2 meetings?
3    A   My understanding was to
4 provide medical expertise. In terms of
5 a discussion typically it would be
6 related to maybe explaining impairment
7 that was under discussion, I guess the
8 availability for any medical questions
9 that might come up during the
10 discussion.
11    Q   I'm trying to get a sense
12 of what type of a procedure they used
13 at these meetings. First of all, were
14 claims files physically brought into
15 the meetings?
16    A   Yes. Typically the claims
17 adjustor who was presenting the case
18 would bring the file to the meeting and
19 then present the overview and then
20 discussion would then be engendered
21 from that presentation.
22    Q   Would the claims adjustor
23 describe what was wrong with the

82

1 person; in other words, did they
2 describe first the type of file that it
3 was?
4    A   Well, typically it would
5 give the history in terms of the
6 impairment, how long the person had
7 been disabled, when payments started
8 and so forth.
9    Q   Were the files presented
10 one at a time?
11    A   Yes.
12    Q   And is it your
13 recollection that for each file there
14 would be an announcement of how long
15 the person had been disabled?
16    A   Typically there would be
17 at the beginning of the discussion of a
18 given case the financial -- the dollar
19 reserve that was set aside for that
20 person was discussed and typically how
21 long the person had been disabled or
22 had been on claim sort of as a backdrop
23 to the discussion.

83

1    Q   At the --
2       MR. OSTER:  Move to the
3 strike as nonresponsive with respect to
4 reserves.
5    Q   At the round-table
6 meetings was the general practice of
7 the company to identify in discussing a
8 file how much reserves had been posted
9 to that file?
10       MR. OSTER:  Objection,
11 leading.
12    Q   You can answer.
13    A   Well, I mean there was a
14 printout if you will that was brought
15 to the meeting of all the active claim
16 files and for the particular file that
17 was being discussed the individual
18 would literally read off the printout
19 if you will what the -- number of
20 policies, the reserves, et cetera, et
21 cetera. I mean, it was a part of the
22 discussion.
23    Q   And as someone who at that

84

1 time was the corporate medical vice
2 president and medical director of the
3 company were you aware of any medical
4 reason that one would have to look at a
5 reserve in order to determine whether
6 the person was impaired or not?
7       MR. OSTER:  Objection,
8 assumes facts not in evidence.
9    A   Well, from an evaluation
10 and from my perspective as a medical
11 director the issue is disability
12 according to the impairment and whether
13 -- and what the reserve is is totally
14 irrelevant.
15    Q   Did you ever hear Mr.
16 Mohney or anybody else state why the
17 reserves were being discussed in these
18 round-table review meetings?
19    A   Well, I don't think he
20 specifically said -- Mr. Mohney said
21 that particularly, specifically, but I
22 think the implication is that in this
23 process of round-table discussion if

# FOSHEE & TURNER COURT REPORTERS

85

1  Provident could write off or terminate,
2  terminate those claims the terms -- the
3  claims that have the high dollar
4  reserves would give the best bang for
5  the buck so to speak in terms of
6  profitability for the company.
7      MR. OSTER: Objection,
8  move to strike as nonresponsive. Dr
9  Feist, the question calls for a yes or
10 no answer.
11     A  Well --
12     Q  (By Ms. Silas) Is your
13 answer to my last question --
14     MS. SILAS: Let me hear
15 the question. I can't remember if it
16 was yes or no.
17
18 (The desired portion of testimony was
19 read back by the court reporter.)
20
21     Q  (By Ms. Silas) Did you
22 over the course of the months that you
23 attended the round-table meetings get a

86

1  feel for what the actual purpose of
2  those meetings was? And it has to be a
3  yes or a no whether you got a feel for
4  it.
5      A  Yes, I did.
6      Q  What feeling did you come
7  away with from those meetings?
8      MR. OSTER: Objection.
9  His feeling is an opinion and is
10 irrelevant.
11     Q  Let me ask it a different
12 way. What impressions did you come
13 away from the meetings with?
14     MR. OSTER: Objection.
15 His impression is his opinion stated
16 differently and is irrelevant.
17     Q  You can answer the
18 question.
19     A  My impression is -- was
20 and is is that the round-table
21 discussions were set up to try to
22 terminate those claims, particularly
23 the ones that had the highest dollar

87

1  reserve, to roll that money to the
2  bottom line for profit of the company.
3      Q  And on what do you base
4  that feeling or impression?
5      A  Well, the tone of the
6  meeting, the personnel that were
7  brought to the meeting. The expertise
8  in those meetings was phenomenal and
9  the fact that they went with the high
10 dollar reserves first rather than just
11 randomly picking cases.
12     Q  Let me take those first of
13 all a couple at a time. With respect
14 to the tone of the meeting did you ever
15 hear any management personnel from
16 Provident at those meetings express any
17 kinds of genuine concerns for the
18 medical condition of the insured?
19     MR. OSTER: Excuse me.
20     A  No, that was irrelevant --
21     MR. OSTER: Excuse me,
22 please. It's best to have one of us
23 talking at a time.

88

1      THE WITNESS: I
2  understand.
3      MR. OSTER: Objection as
4  to the use of the term genuine concern,
5  calls for an opinion, lacks foundation,
6  is irrelevant. You may answer, Dr
7  Feist.
8      Q  (By Ms. Silas) I'll ask
9  the question differently so I don't
10 have to ask it twice. Dr. Feist, did
11 you ever hear at any round-table review
12 meeting Mr. Mohney express any
13 sympathetic words toward the insured in
14 terms of their medical conditions?
15     A  No, I did not.
16     MR. OSTER: Excuse me.
17 Objection, calls for an interpretation
18 by this lay witness, lacks foundation,
19 is irrelevant.
20     Q  (By Ms. Silas) I'm sorry.
21 Your answer again?
22     A  No, I did not. There was
23 no concern for the individual. It was

89

1  just bottom line. If we can terminate
2  this file, we're going to do it.
3      MR. OSTER: Move to strike
4  as nonresponsive.
5      Q  When you stated that part
6  of your opinion that the purpose of
7  round-table meetings was to focus on
8  terminating claims you mentioned the
9  identity of the personnel at the
10 meeting. What is it about the type of
11 personnel at the meeting that
12 contributed to your impression?
13     A  Well, I think in all
14 fairness to Mr. Mohney and Mr. Chandler
15 they really did this well. Bring in a
16 medical consultant, bring in attorneys
17 who are experienced in disability
18 claims. Typically the attorneys were
19 those who were versed in the law of the
20 particular state in which the claimant
21 resided. The claims adjustors had many
22 of them years of experience. You know,
23 for the objective of what they were

90

1  trying to do they amassed probably the
2  best personnel that they had available
3  in Provident at that time.
4      Q  Did anyone ever explain to
5  you why attorneys with expertise --
6  well, first of all, when you say
7  attorneys had expertise in particular
8  areas, do you recall whether attorneys
9  having expertise in particular states
10 and jurisdictions were brought in?
11     A  Yes, that's what I meant.
12 For example, if it were a California
13 case it would be the attorney or
14 attorneys whatever the case may be who
15 worked California or worked claims from
16 California. They were typically well
17 versed in the law of California and
18 basically I think they were there --
19 the lawyers were there to say, you
20 know, California law says this, we can
21 only go so far and we can't go any
22 further.
23     Q  When you say lawyers were

# FOSHEE & TURNER COURT REPORTERS

91

1 these employees of Provident?
2   A   Yes, they were Provident
3 corporate attorneys.
4   Q   What kinds of statements
5 did you hear the corporate attorneys
6 making in terms of the laws and various
7 jurisdictions?
8   A   I think they were
9 generally pretty forthright in saying,
10 you know, the law of California says
11 this and we can't do that. I think
12 that was an important part of the
13 discussion to know what the California
14 law is and to see how far they could go
15 with it.
16   Q   When you say how far they
17 could go with it, what was the context
18 of the discussions? In other words --
19 well, we'll go ahead and just ask it
20 that way. What was the context of the
21 discussions?
22   A   Well, again, trying to
23 terminate the claim and seeing if there

92

1 was some legal loophole that could be
2 worked in a given state, apropos to
3 having the lawyers there to tell you if
4 there is one.
5   MR. OSTER: Are you done?
6   THE WITNESS: I think so.
7   MR. OSTER: Okay. Thank
8 you. I didn't want to interrupt
9 Objection, move to strike for purposes
10 of interposing the objection of
11 ambiguity and uncertainty. Further the
12 answer is speculative, lacks
13 foundation, and constitutes
14 impermissible opinion from a lay
15 witness.
16   MS. SILAS: Can I proceed?
17 Thanks.
18   Q   (By Ms. Silas) Let me
19 back up for just a second. Were you
20 present and actually heard the
21 interaction between the corporate legal
22 people and Mr. Mohney at these
23 round-table meetings?

93

1   A   Yes.
2   Q   Did you ever hear any
3 statement by Mr. Mohney to the effect
4 that, and I'm paraphrasing, how much
5 can we get away with in California as
6 opposed to are we violating the law in
7 California?
8   A   I think that's kind of a
9 fine line. I think Mohney was
10 basically looking to see what he could
11 get away with in California.
12   MR. OSTER: Move to strike
13 as nonresponsive. The question called
14 for a yes or no. You can state the
15 basis of your opinion or your belief if
16 you wish in response to a question I
17 might add.
18   Q   Let me ask it this way.
19 Did you specifically hear Mr. Mohney
20 making statements to that effect of
21 what we just described?
22   A   Yes.
23   MR. OSTER: Would you mark

94

1 that in the deposition transcript,
2 please. I would like to come back to
3 that.
4   MS. SILAS: That's all
5 you're going to come back to?
6   THE WITNESS: Just one of
7 many.
8   MS. SILAS: I just like to
9 jerk his chain and he knows it. Let me
10 proceed.
11   Q   (By Ms. Silas) In all
12 seriousness, did Mr. Chandler ever make
13 an appearance at any of these
14 round-table review meetings?
15   A   As I recall Mr. Chandler
16 coming two or three times during that
17 nine month interval. Typically it
18 would be just to what I call a cameo
19 appearance. Basically he obviously
20 didn't participate in the discussion
21 too much but just was there and I think
22 his presence was there or by his
23 presence he was giving approval to the

95

1 proceedings, procedures in the meeting.
2   MR. OSTER: Move to strike
3 as nonresponsive. She simply asked if
4 Mr. Chandler came to the meetings or
5 not. Please keep your editorial
6 comments to yourself, Dr. Feist.
7   MS. SILAS: Counsel, why
8 don't you also keep your tone a little
9 more civil to Dr. Feist? As he stated
10 he is not a professional witness and
11 he's doing his best and he's here with
12 no compensation under subpoena.
13   THE WITNESS: If I
14 couldn't be referred to as a lay
15 witness -- I would be preferred to be
16 called a professional witness if I
17 could have that courtesy as well.
18   MR. OSTER: Dr. Feist, I
19 will say this very briefly. I respect
20 your expertise as a professional as a
21 doctor and when I refer to you as a lay
22 witness I only mean that you are not a
23 designated expert witness in this case.

96

1 That is all that I mean.
2   THE WITNESS: Well, I
3 would really again prefer that you not
4 use that term because I'm a board
5 certified insurance medicine doctor. I
6 have worked 22 years in this field and
7 I just resent being called a lay
8 witness.
9   MS. SILAS: I guess
10 preceptiant witness. Why don't we use
11 that as he is describing events he
12 personally witnessed which makes him
13 preceptiant.
14   MR. OSTER: What I will
15 try to do, Dr. Feist, as a courtesy to
16 you is to indicate that you are
17 testifying as one who has not been
18 designated as an expert witness in this
19 case. It is a technicality with
20 respect to the state rules of evidence
21 and civil procedure in the state of
22 California. It is not a reflection on
23 your credibility or your qualifications

# FOSHEE & TURNER COURT REPORTERS

**97**

1 or your background or experience  All
2 right?
3      THE WITNESS:  That's fine,
4 yes, sir.  I'll accept that.
5      Q  (By Ms. Silas)  During any
6 time when Mr. Chandler attended a
7 round-table review meeting did you ever
8 hear him express any displeasure with
9 the fact that the meeting was taking
10 place?
11      A  No, I think Mr. Chandler
12 thought it was a good process  He was
13 in favor of it.
14      Q  Did you come to that
15 observation by observing his demeanor
16 at the meetings?
17      A  Yes, I would say so
18      Q  What about Mr. Heys?
19 Did Mr. Heys ever put in an
20 appearance --
21      A  Mr. Heys came as well
22      Q  I'm sorry.  I did forget
23 to give you the admonition that you

**98**

1 have to wait until I finish my
2 question --
3      A  I'm sorry.
4      Q  -- before you answer --
5      A  I'm sorry
6      Q  -- just because the
7 videotape is going to be sliced and
8 diced and edited back together and I
9 have seen bad ones so it is not your
10 fault.
11      A  Sure.
12      Q  So did Mr. Heys ever put
13 in an appearance at these meetings?
14      A  Yes, he did
15      Q  And on how many occasions
16 did you see Mr Heys at a round-table
17 meeting?
18      A  My recollection is two or
19 three in that nine-month interval.
20      Q  Did you ever see Mr Heys
21 express any dismay or displeasure with
22 what was going on at the meetings?
23      A  No, he seemed fully

**99**

1 supportive of it.
2      Q  Were there any particular
3 type of claims -- let me strike that.
4 Going back to April of 1995 when these
5 round-table meetings began, were there
6 any particular types of claims that
7 were being targeted if you will for the
8 round-table based on your observation?
9      A  Well, the round-tables
10 that I attended of course were heavily
11 in the psych unit but typically they
12 were claims that were subjective
13 impairments, where there was not a real
14 black and white, a gray area I call it,
15 where there could be some subjective
16 differences of opinion I guess for lack
17 of a better word.
18      Q  Were there any types of
19 reserves that appeared to be being
20 reviewed -- that was grammatically
21 horrid  Let me start over  Did you
22 have any observations about the
23 reserves on files that were selected

**100**

1 for the round-table process starting
2 back in 1995?
3      A  Typically there were cases
4 where there was a higher reserve, a
5 million and a half to two million or
6 more dollars in reserve
7      Q  Were the cases that were
8 selected for the round-table meetings
9 that you attended typically cases on
10 which benefits had been paid over a
11 period of time previously?
12      A  My recollection is that
13 all the cases that were discussed in
14 that nine-month period were cases where
15 the individuals were on claim and had
16 come to the round-table for discussion
17 of termination of that claim.
18      Q  Did you see any claim
19 files whatsoever at the round-table
20 meeting that had been closed and were
21 being reviewed for the process of
22 determining whether they had been
23 wrongfully closed?

**101**

1      A  None whatsoever.
2      Q  Were all the claims claims
3 that were open and a determination was
4 being made regarding whether they
5 should remain open?
6      A  That is my understanding,
7 yes.
8 (Whereupon, a break was taken )
9
10      Q  Did you ever hear with
11 respect to particular claim files with
12 a round-table meeting any plans as to
13 what would be done with a particular
14 file; in other words, whether it would
15 be sent to surveillance, medical
16 examination or something else?
17      A  Yes, a good bit of the
18 discussion would be to maybe come up
19 with some modalities that might allow
20 the claim to be closed  That typically
21 might be surveillance, getting another
22 IME, checking the financial records and
23 making sure that the person didn't

**102**

1 misstate his or her income when they
2 took the policy.  A number of
3 modalities were discussed.
4      Q  Was there usually some
5 recommendation to do one -- at least
6 one of the things you just mentioned,
7 either a medical exam, a financial
8 check, surveillance, et cetera?
9      A  Generally so, yes
10      Q  If you can give me this
11 figure, if you can't that is fine but
12 on what percentage of the claims would
13 you state that you saw reviewed at a
14 round-table would they just say I think
15 this person is impaired and we should
16 just do nothing and keep paying them?
17      MR OSTER:  Objection,
18 lacks foundation.
19      A  I don't think that
20 statement was ever made to my
21 recollection
22      Q  In your experience was
23 there generally some of what you are

# FOSHEE & TURNER COURT REPORTERS

### 103

1  calling a modality that would be
2  recommended on each file?
3      A    Generally so, yes.
4      Q    At the round-table
5  meetings did you ever hear discussions
6  about treating physicians and their
7  opinions?
8      A    On occasion there was some
9  discussion at the round-table about
10  treating physicians not being reliable
11  or lacking integrity and his
12  implication was that they were weren't
13  giving reliable information about the
14  claimant.
15      MR. OSTER: Move to strike
16  as nonresponsive, speculative
17      Q    The comments that you just
18  made, are those comments that you
19  actually heard expressed at round-table
20  meetings?
21      A    Yes, I did.
22      Q    Were such comments ever
23  expressed by management individuals at

### 104

1  Provident?
2      A    Yes.
3      Q    Did you ever hear Ralph
4  Mohney making comments to the effect
5  that treating physicians should not be
6  viewed as reliable or that they should
7  be viewed as lacking in integrity?
8      A    I don't recall him saying
9  that specifically but I think the
10  implication in some of the discussion
11  was that he felt that way.
12      MR. OSTER: Move to strike
13  everything after I do not recall him
14  saying that specifically but the
15  implication -- starting with but the
16  implication
17      Q    On what do you base your
18  statement earlier that the treating
19  physicians were somehow viewed as not
20  reliable or not honest?
21      A    Well, I remember one
22  particular case they were discussing
23  and the comment was made that Dr. so

### 105

1  and so in a given city had several
2  patients who were on claim with
3  Provident and the implication was,
4  well, this doctor is really not
5  reliable and that he he as I recall was
6  not giving correct information and to
7  me that is denigrating a health care
8  professional without any valid evidence
9  that that was happening.
10      Q    In your experience you
11  have reviewed reports of what we are
12  referring to as IME doctors?
13      A    Yes, I have
14      Q    In your experience are
15  doctors who do IME's also treating
16  physicians in other contexts to other
17  people?
18      A    Typically they are
19  Typically the IME physician is a board
20  certified individual in that specialty
21  and ideally they would have an active
22  clinical practice as well as doing IME
23  evaluations

### 106

1      Q    Did you ever hear similar
2  statements being made that IME doctors
3  lacked integrity?
4      A    I don't think I ever heard
5  that statement
6      Q    In your attending of the
7  round-table meetings, did you feel
8  comfortable with the attitude expressed
9  toward treating physicians?
10      A    No, I did not
11      Q    Why not?
12      A    Well, I think physicians
13  by and large are honest and have
14  integrity and try to do what is right
15  for their patient and not to say that
16  all physicians are completely honest
17  but I think you have to assume that
18  they are until something -- you know,
19  solid evidence that they do not have
20  integrity
21      Q    Was it your attitude when
22  you were reviewing the clinical data on
23  claims that attending physicians were

### 107

1  for lack of a better word in cahoots
2  with the insured to submit their claim?
3      A    I never had that feeling.
4  I think again most physicians honestly
5  want to do what's right for their
6  patients and if that patient is
7  malingering I think the attending
8  physician has the duty to say that. If
9  a claimant is truly disabled the
10  attending physician should recognize it
11  and certify it.
12      Q    Did Mr. Mohney ever share
13  with you that same sentiment about
14  treating physicians?
15      A    I don't recall that he
16  did.
17      Q    Did you ever complain to
18  Provident about the way the round-table
19  review meetings were being conducted?
20      A    No, I did not.
21      Q    Why didn't you complain
22  about it if you didn't agree with it?
23      A    Well, probably two basic

### 108

1  reasons. One, I felt that it probably
2  wouldn't do any good, that the process
3  was going forward and would go forward
4  irrespective of what I did, and that
5  had I made some sort of unfavorable
6  comment I probably would have been
7  dismissed summarily With a family to
8  support I didn't feel comfortable doing
9  that
10      Q    When you say it wouldn't
11  do any good why did you get that
12  impression?
13      A    Well, I think as we have
14  alluded to this afternoon the
15  round-table discussion meeting with the
16  personnel with the energy and all the
17  resources put to it, obviously Mr.
18  Chandler and Mohney and Heys felt this
19  was the way to go and my criticism of
20  it would have been -- would have gone
21  on deaf ears I'm sure.
22      Q    You stated that lawyers
23  employed by Provident were asked to

# FOSHEE & TURNER COURT REPORTERS

**109**

1  make comments at the round-table
2  meeting. Were you asked to make
3  comments as well at the round-table
4  meeting?
5      A   Yes. Typically if there
6  were some medical impairment that was
7  being discussed that some of the
8  participants may not have had a very
9  adequate knowledge about, I would go to
10  a blackboard and discuss the situation
11  and try to enlighten them about the
12  situation, about the medical
13  impairment
14      Q   Did you participate --
15  well, let me ask it this way. As
16  between you and the legal people in the
17  company, who had more participation in
18  the discussions on the claim file?
19      A   My recollection would be
20  that the legal personnel had more input
21  than I did.
22      Q   Did you ever hear the term
23  subjective claims used at a round-table

**110**

1  meeting?
2      A   I don't know if that term
3  was actually used per se but I think
4  particularly in the psychiatric realm
5  or psychiatric claims that was
6  typically what the situation involved
7      Q   Do you know if the company
8  viewed psychiatric claims as ones that
9  were more difficult for the insured to
10  prove up?
11      MR. OSTER: Just so we can
12  avoid an objection here because I'm not
13  trying to interrupt your flow here,
14  you're talking about --
15      MS. SILAS: I didn't know
16  I had a flow.
17      MR. OSTER: You're talking
18  about a particular frame of time; is
19  that right, a timeframe when you say
20  the company because he started in '82
21  and --
22      MS SILAS: Oh, actually,
23  you know, that's a good point so I can

**111**

1  actually narrow that down.
2      Q   (By Ms Silas) I'm
3  talking about during the pendency of
4  the round-table process, so April of
5  1995 through the end of your tenure in
6  February of '96 did you ever hear
7  anyone at a round-table meeting
8  specifically express the fact that a
9  psychiatric claim is a harder one for
10  the insured to prove up?
11      A   I think so. I think that
12  is inherent in the nature of
13  psychiatric impairments is that they
14  are subjective and it is hard to get
15  objective data about them.
16      Q   What kinds of comments
17  were made about what would be done --
18  let me back up for a second  What
19  comments if any did you hear about how
20  psychiatric claims should be handled in
21  view of the fact that they are somewhat
22  harder to establish?
23      A   Well, I think the

**112**

1  implication would be that one could get
2  as much information as one could in
3  terms of IME's and maybe questioning
4  the attending physician and many times
5  I think they got IME's just to get the
6  answer that they wished to get.
7      Q   Why do you say that?
8      MR. OSTER: Excuse me
9  Let me back up  Were you done with
10  your answer a moment ago?
11      THE WITNESS: Yes.
12      MR. OSTER: Move to strike
13  as nonresponsive  She asked you for
14  comments that you heard, not
15  implications
16      A   Can you rephrase the
17  question?
18      Q   I don't necessarily agree
19  with Mr. Oster but let me ask it this
20  way  I don't think it's speculation
21  What was the overall mood that you
22  observed at these meetings?
23      MR. OSTER: Excuse me

**113**

1  Objection, lacks foundation, overbroad,
2  calls for opinion from an individual
3  not designated as an expert witness in
4  this case.
5      MS. SILAS: You know what,
6  I'm going to withdraw it because unlike
7  Provident in-house psychologists, I'm
8  not going to presume to project Mr.
9  Mohney's mood so I'm going to ask it a
10  different way. I know that Dr. Kusher
11  is able to determine my client's mood
12  without meeting him but I don't want to
13  do that to Mr  Hardy so let me ask it
14  this way
15      Q   (By Ms  Silas) Was there
16  an underlying theme that you noticed in
17  the theme or tone in the discussions
18  that took place at these round-table
19  review meetings during the time you
20  were attending them?
21      MR. OSTER: Same
22  objection.
23      A   Well, again, I think I've

**114**

1  alluded to it earlier, just reviewing
2  these claims in a basic respect was
3  trying to find some way to terminate
4  the claim, to roll that cash reserve if
5  you will to the bottom line, to the
6  profit line.
7      Q   And I know I asked you
8  this before and I'm beating a dead
9  horse but other than what you have
10  already said, what specific reasons did
11  you -- are you basing your statement
12  that the purpose of the round-table was
13  to terminate claims?
14      A   Well, again the whole
15  tenor of the discussion, the personnel
16  brought to the discussion, the fact
17  that these individuals were on claim
18  typically months to years and to my
19  recollection there was never a
20  discussion or evidence -- there was
21  never evidence that the medical
22  impairment for which the person had
23  been put on claim initially had

# FOSHEE & TURNER COURT REPORTERS

**115**

1 changed. It was the implication that
2 there had been some mistake made in the
3 initial claim adjudication and it was
4 the charge of the round-table if you
5 will to ferret that out and to find
6 some mistake that had been made, some
7 way to terminate the claim, to again
8 roll that cash reserve, finance reserve
9 down to the bottom line to show as
10 profit.
11     Q    Were you ever asked to
12 opine whether the medical condition had
13 actually changed from the time of the
14 initial determination?
15     A    I don't think that ever
16 came up in my recollection.
17     Q    Do you have a recollection
18 of any claims being reviewed at the
19 round-table meetings where the
20 impairment was a major depressive
21 disorder?
22     A    I'm sure there must have
23 been. I can't recall specifically a

**116**

1 case at this point but just the fact
2 that major depression is a common
3 disorder I'm sure there would have been
4 in that nine-month period.
5     Q    Irrespective of whether
6 it's a major depressive disorder do you
7 have a recollection of claims involving
8 an impairment being a mental depression
9 being reviewed?
10     A    Oh, yes, sure.
11         MR. OSTER: You're
12 referring to discussed at the
13 round-table I assume?
14         MS. SILAS: Yeah
15     Q    (By Ms. Silas) As a
16 matter of fact, just so we have a clear
17 clean record, do you recall claims
18 involving an impairment of mental
19 depression being discussed at the
20 round-table review meetings?
21     A    Yes
22     Q    Let me ask you based on
23 your experience as a medical doctor,

**117**

1 have you ever heard that all
2 depressions have to resolve within a
3 particular period of time?
4     A    Well, I think that's a
5 misstatement. I think if you say all
6 depressions have to resolve within a
7 certain period of time, that is
8 inappropriate and incorrect. I think
9 from my perspective probably a fair --
10 probably even the majority of cases
11 will resolve within a few weeks or a
12 few months but there are intractable
13 persons who have depression for a
14 lifetime and, you know, there are some
15 notable persons who have lifelong
16 depression.
17         MR. OSTER: I'll move to
18 strike on the grounds to the extent
19 that that may be construed as an expert
20 opinion from a nondesignated or a
21 person who has not been designated as
22 an expert witness in this case and it
23 would be inappropriate

**118**

1     Q    Let me ask you this  Is
2 it generally understood in the medical
3 community that major depressive
4 disorders don't generally resolve
5 within a given period of time in all
6 cases?
7         MR. OSTER: Lacks
8 foundation, same objections as stated a
9 moment ago.
10     A    Well, I think it's well
11 known in the medical community that
12 some major depressions go on for
13 decades and they are refractory to
14 treatment.
15     Q    Did you ever hear any
16 discussion at the round-table review
17 meetings regarding an opinion Provident
18 management had with respect to how long
19 someone should be impaired by a
20 depression?
21     A    I did not hear that
22 discussion.
23     Q    I forgot to ask you at the

**119**

1 beginning  Are you board certified in
2 any medical specialties?
3     A    Board certified in
4 insurance medicine in 1985
5     Q    What is required to become
6 board certified in insurance medicine?
7     A    One has to take a number
8 of insurance industry courses in terms
9 of basic insurance procedures and so
10 forth and then take a written and oral
11 exam in insurance medicine and serve
12 four years in the industry before one
13 can sit for the written and then the
14 oral examinations
15     Q    And I take it you passed
16 both the written and the oral
17 examinations?
18     A    Yes
19     Q    Are you board eligible in
20 any medical specialties?
21     A    Internal medicine
22     Q    And what does the term
23 board eligible mean?

**120**

1     A    It means one has taken the
2 residency training but has not passed
3 the actual written examination.
4     Q    What is internal medicine
5 comprised of?
6     A    Internal medicine?
7     Q    In other words, what kind
8 of medicine do board certified internal
9 medicine doctors practice?
10     A    Well, again they treat
11 adults' medical impairments  They do
12 not do surgery by and large, maybe
13 minor surgery  They don't do
14 obstetrics and they don't treat
15 children so virtually everything else
16 is in the field of internal medicine
17     Q    So do they have to have
18 expertise in impairments of the entire
19 body?
20     A    Yes, basically
21     Q    Other than obstetric ones?
22     A    Don't deliver babies,
23 don't treat children, and don't do

# FOSHEE & TURNER COURT REPORTERS

121

1 surgery. Everything else is fair game
2    Q   Let me put a sentence
3 together that makes sense. Did anyone
4 attending the round-table review
5 meetings have a responsibility to
6 follow up on the modalities that were
7 suggested?
8    A   My understanding is Mr
9 Jeff McCall was responsible on each of
10 the cases discussed to follow up with
11 the appropriate individuals to see that
12 those modalities were carried through
13    Q   During the round-table --
14 during the period of time from April
15 24th, 1995 through the time you left in
16 February of 1996 were you still
17 attending the vice presidents meetings?
18    A   Yes.
19    Q   Did Ralph Mohney also --
20 I'm sorry -- did Harold Chandler also
21 attend those vice presidents meetings?
22    A   Yes
23    Q   What about Ralph Money?

122

1    A   From my recollection he
2 did, yes
3    Q   What about Tom Heys?
4    A   Yes.
5    Q   How often were those
6 meetings?
7    A   My recollection was that
8 they were quarterly but they might have
9 been more frequently on occasion but
10 typically quarterly
11    Q   Was the issue of the
12 company's profitability ever discussed
13 at these meetings?
14    A   Well, yes. I think on
15 several occasions the situation with
16 the claims and the disability income
17 that we've talked about, the revamping
18 of some of the products to basically
19 discontinue the own-oc policies, the
20 change of products to income protection
21 and so forth, those were all discussed,
22 and certain strategies and whatnot were
23 discussed in those meetings

123

1    Q   Did you ever hear either
2 Harold Chandler or any of the vice
3 presidents discussing the reasons the
4 company had become disenchanted with
5 the own-occupation policy?
6    A   Well, I think the
7 discussion basically was that the
8 own-oc policies were too broad, they
9 weren't probably underwritten very
10 carefully during the 1980's They were
11 underpriced and it was sort of in a way
12 denigrating I guess the people in the
13 1980's and early 1990's that had sold
14 all of this own-oc non-cancelable
15 disability income policy to these
16 professionals and now they were
17 becoming disabled and all these claims
18 were coming back to them and giving
19 them problems.
20    MR OSTER: Move to strike
21 as nonresponsive. Move to strike for
22 purposes of interposing the objection
23 of lack of foundation, speculation.

124

1    Q   I hate to make you repeat
2 yourself, but that was my poor wording
3 to the question. What kinds of
4 comments did you hear made by
5 management personnel at the vice
6 president or president level at the
7 vice president meetings after 1993 and
8 before you left regarding why the
9 company had become disenchanted with
10 the own-occupation income disability
11 policies?
12    A   Well, in a word they had
13 been oversold, underpriced, improperly
14 underwritten, and Harold Chandler felt
15 like he had the unpleasant
16 responsibility to fix all that
17    Q   When you say too broad, do
18 you mean they were too generous to the
19 customers?
20    A   Well, I think in the
21 1980's the own-oc policies were
22 specifically sold to individuals so
23 that if they couldn't perform the

125

1 duties of their own occupation they
2 were disabled. The example of the
3 neurosurgeon, I mean if the
4 neurosurgeon has a hand injury, he
5 can't operate and he was disabled from
6 an own-oc policy
7    Q   You stated earlier that
8 you felt that you might lose your job
9 if you complained about certain
10 activities under the Chandler regime.
11 Why did you feel that way?
12    A   Well, I saw it happen on
13 several occasions.
14    MS SILAS: We have a
15 five-minute warning While my brain
16 recharges why don't we go ahead and go
17 off record and change the tape so you
18 don't have to warn me twice
19
20 (Whereupon, a break was taken.)
21
22    Q   Dr Feist, you mentioned a
23 Jeff McCall being at the round-table

126

1 meetings. What was your understanding
2 of Mr McCall's position in the company
3 on or about April of 1995?
4    A   At that time Mr McCall
5 was -- I think his title was
6 administrative assistant to Mr. Ralph
7 Mohney and I think he basically just
8 did special projects and assignments
9 that Mr Mohney wished him to do.
10    Q   Were there any
11 psychiatrists at the round-table
12 meetings?
13    A   Not to my recollection
14    Q   Is that true even for
15 nights on which psychiatric claims were
16 being discussed?
17    A   That is correct.
18    Q   Were there any licensed
19 psychologists present at any
20 round-table meetings you attended in
21 which psychiatric claims were
22 discussed?
23    A   Not to my recollection

# FOSHEE & TURNER COURT REPORTERS

127

1 Q Did you ever hear the term
2 termination or terminating claims
3 mentioned at a round-table meeting?
4 A I think the implication
5 was there if not the specific term.
6 Q What about the term
7 resolving or resolution of a claim?
8 A That was pretty commonly
9 mentioned.
10 MR OSTER: Move to strike
11 with respect to your response to the
12 question regarding termination as
13 nonresponsive
14 Q Do you have a specific
15 recollection of the term resolving the
16 claim discussed?
17 A Yes.
18 Q What was your
19 understanding of what resolving a claim
20 means?
21 A My understanding would be
22 that a claim is resolved when it's
23 removed from the claims reserve status

128

1 if you will be to be terminated and that
2 claim reserve being released
3 Q Do you have any
4 understanding regarding whether when a
5 claim is resolved the reserve appears
6 as profit to the company?
7 A That is my understanding
8 that once a claim is resolved or
9 terminated that reserve goes directly
10 to the bottom line and shown as profit
11 Q Is reserve a simple way of
12 saying monies that have to be held
13 aside for payment of pending claims?
14 A Yes, I would say that is a
15 correct.
16 Q Let me ask you to review a
17 particular passage in this -- sorry,
18 I'm going to have to move and get close
19 to you again. Well, maybe not. On
20 page 3190 -- I'm talking about the
21 little pages on the bottom there --
22 A 3190?
23 Q And I think it's just the

129

1 second page of the memo
2 A Uh-huh.
3 Q Well, I take that back.
4 It might be the third page. It says
5 special review process across the top
6 Do you see the first section says
7 review process?
8 A I do
9 Q The third bullet point --
10 I'm sorry -- the fourth bullet point
11 says, a key to the success of this
12 process is the commitment by all
13 participants to focus on how to resolve
14 the claim currently versus finding
15 fault with previous handling. Did you
16 have an understanding when you received
17 this memo of what that meant?
18 A My understanding of that
19 paragraph is that the purpose of the
20 round-table is to terminate claims and,
21 you know, and not spend a lot of time
22 in trying to determine why a person had
23 been put on claim initially but to go

130

1 ahead and try to terminate it in the
2 round-table process.
3 Q When it said the focus on
4 how to resolve the claim currently, did
5 you understand the term resolve to mean
6 terminate the benefits?
7 A I did.
8 Q Was the -- were the
9 discussions at the round-table review
10 meetings that you attended consistent
11 with the sentiments expressed in this
12 bullet point?
13 MR OSTER: Excuse me
14 May I have the question read back
15 again, please?
16
17 (The desired portion of testimony was
18 read back by the court reporter )
19
20 MR OSTER: Objection as
21 to lacking foundation, ambiguous,
22 alternatively calling for an opinion
23 from an individual not designated as an

131

1 expert witness in this case
2 MS SILAS: And I'm going
3 to sustain your objection and go ahead
4 and ask it a different way if I may put
5 on my robe for a minute
6 A Okay.
7 Q (By Ms. Silas) We were
8 talking about this fourth bullet point
9 under review process where there is a
10 mention that all participants in the
11 round-table meeting were to focus on
12 how to resolve the claim currently
13 Did the participants in the round-table
14 review meetings focus on how to resolve
15 the claims that they were reviewing?
16 A Yes, I think they did
17 Q Let me ask you to look at
18 another bullet point under file
19 selection The second point says, for
20 the first several weeks claims will be
21 selected based on the
22 manager/consultant's knowledge of high
23 impact problematic claims -

132

1 particularly those with significant
2 legal issues Did you have an
3 understanding when you got this memo of
4 what constituted a high impact
5 problematic claim and if so please tell
6 us what is it
7 A It's obviously somewhat
8 vague and could be open to
9 interpretation but I think the
10 implication was those cases where there
11 was a high dollar reserve and where
12 there were gray areas or subjective
13 areas where those subjective areas
14 could be used to terminate the claim
15 Q When you say there was an
16 implication that claims
17 reviewed at the round-table meetings
18 early on had high monthly benefits?
19 A Yes, indeed
20 Q Did you have any
21 observations regarding whether claims
22 were reviewed that looked like the
23 insured was going to be collecting

133

1 benefits for a long period of time as
2 opposed to a short period of time?
3       A.   Well, yes, the individuals
4 discussed, the claimants discussed were
5 being paid as if they were going to be
6 disabled indefinitely and that's the
7 way the reserve is set up at a certain
8 point.
9       Q.   Did you have knowledge of
10 whether when a claim was opened the
11 reserve would be set up taking into
12 account the projected length of
13 disability?
14      A.   Yes.  I'm not an actuary
15 but from discussing that point with a
16 friend who is an actuary and worked at
17 one time at Protective -- I mean, he
18 works at Protective now but worked at
19 Provident then.  When somebody comes on
20 claim, an initial claim, the claim is
21 paid for a certain number of months and
22 after a certain point of time when the
23 claim is determined to be permanent and

134

1 ongoing, then the actuary determines
2 the cash reserve that is needed for
3 that claim, i.e., if somebody is just
4 on a claim for three to six months that
5 wouldn't kick in but if they were going
6 to be permanently disabled then the
7 reserve would be set up based on the
8 age and the projected life span of the
9 individual and of course the monthly
10 benefit and all that is rolled into
11 that reserve number.
12      Q.   When you -- you testified
13 earlier --
14           MR. OSTER:  Excuse me.
15 I'm sorry.
16           MS. SILAS:  Go ahead.  I
17 didn't mean to jump on your toes there.
18           MR. OSTER:  No, you
19 didn't.  I move to strike as
20 nonresponsive to the extent the
21 question asked about his knowledge of
22 reserves while at Provident and he
23 described something he learned while at

135

1 Protective Life.
2           MS. SILAS:  I think he
3 said he learned it from a guy who was
4 at Provident --
5           THE WITNESS:  Well, I
6 think my point was, sir, that the
7 individual who told me that worked at
8 Provident during the same timeframe
9 that I was there and he currently works
10 at Protective.  He is an actuary and he
11 worked not specifically in this area
12 but he knows the process and he told me
13 and I think that is reliable on how it
14 is done and again that's not my
15 opinion.  That's what he told me.  He
16 is a certified actuary.
17           MR. OSTER:  I really don't
18 mean to get into a debate with you
19 about how a company actually set
20 reserves back in 1993, 1994, and 1995
21 based upon some conversation that
22 you've had years afterward so --
23           MS. SILAS:  Why don't I

136

1 just go ahead and ask the next question
2 and we can move on.
3           THE WITNESS:  Yeah.
4           Q.   (By Ms. Silas)  Just to
5 backtrack a bit your recollection was
6 that each claim that was discussed at
7 the round-table meetings you attended
8 the person would state what the reserve
9 on the file was at that time?
10      A.   Yes, that was the opening
11 part of the discussion.  You know, Dr.
12 Jim Jones, this is his reserve, this is
13 how many policies he has.  He has been
14 on disability X number of months or
15 years.  That was part of the
16 discussion.
17      Q.   At the round-table review
18 meetings you attended between April of
19 1995 and February of 1996 did you ever
20 hear Ralph Mohney make some statement
21 to the effect of, well, if it's a close
22 call we should give the benefit of the
23 doubt to the insured?

137

1       A.   I never heard him make
2 that statement.  He never made that
3 statement in my presence.
4       Q.   Did you ever hear
5 statements to that effect made by any
6 management at Provident before November
7 of 1993?
8       A.   Yes, I think it was
9 during -- before Mr. Mohney took over
10 the claims section I think the
11 philosophy was if there was a close
12 call, give the call to the claimant.
13      Q.   Was the company's general
14 business practice in your experience
15 before 1993 to give the benefit of the
16 doubt to the claimant in the event it's
17 a close call as to whether they were
18 impaired or not?
19      A.   That was my --
20           MR. OSTER:  Objection,
21 lacks foundation, overbroad, calls for
22 an opinion from an individual not
23 designated as an expert witness in this

138

1 case.  You may answer.
2       A.   My answer is and my
3 perception and recollection is that
4 prior to Mr. Mohney taking over the
5 claims section of Provident that if
6 there was a close call it was given to
7 the claimant.  That was company
8 philosophy.
9       Q.   Was that in your
10 experience generally the way that the
11 company was approaching claims handling
12 prior to 1993?
13           MR. OSTER:  Excuse me,
14 exact same objections.
15      A.   In my recollection and my
16 impression that's the way it was
17 handled, yes.
18      Q.   Did you ever hear Mr.
19 Mohney or anyone else in management
20 express a philosophy after November of
21 1993 regarding what to do if there is a
22 close call medically regarding whether
23 the insured is disabled as defined

# FOSHEE & TURNER COURT REPORTERS

139

1 under the terms of the policy?
2      A   I didn't hear him
3 specifically state but I think the
4 implication was that if there was a
5 close call it would go to the company
6      MR. OSTER:  Move to strike
7 as nonresponsive.
8      Q   Why did you feel that
9 there was a philosophy -- what causes
10 you to feel that there was a philosophy
11 at the company after 1993 that a close
12 call should be resolved in favor of the
13 company rather than the policyholder?
14      A   I think just the track
15 record of Provident from late '93
16 onward.
17      Q   What do you mean by track
18 record?
19      A   Well, your claimant, your
20 client, just case after case when there
21 was a close call they would go with the
22 company and, you know, obviously the
23 ones that I know most specifically

140

1 about are the cases I have given
2 depositions over the last four or five
3 years and basically without exception
4 those cases were called for the company
5 and the individual had to sue Provident
6 to get redress.
7      Q   When you attended the
8 round-table meetings did they actually
9 terminate the claims at the meeting?
10      A   No.  In my recollection
11 there never was any termination of
12 claims at the round-table meetings
13 discussion
14      Q   Is your recollection that
15 there would just be some action plan on
16 the claim by the end of the meetings?
17      A   Yes, some action plan that
18 again Mr. McCall would follow up on
19      Q   Before 1993 do you recall
20 ever coming across a claim where an
21 attending physician stated that the
22 claimant couldn't perform their
23 occupation but an IME said that the

141

1 claimant -- I'm sorry.  Let me start
2 that over again.  Prior to 1993 did you
3 ever come across a file that you
4 reviewed where the attending physician
5 was saying that their patient was
6 disabled but an IME had stated the
7 patient was not disabled?
8      A   I can't give you a
9 specific case but I think that did
10 happen.
11      Q   What did you do if you
12 were confronted with a situation where
13 an IME was saying, you know, it's not
14 covered and the treating physician were
15 saying they were disabled?
16      A   Well, typically before
17 1993 one medical director would let the
18 attending physician see the IME's
19 report and make comment about it and
20 try to make some resolution based on
21 both the attending physician's
22 statement and the IME's statement
23 basically to try to -- what's the word

142

1 I'm trying to say -- come to some
2 resolution between them in terms of
3 whether the person was or wasn't
4 disabled but giving each -- giving the
5 attending physician and the IME the
6 chance to interact with each other in
7 terms of the information about the
8 claimant
9      Q   When you were evaluating
10 clinical data coming in from both an
11 IME physician and a treating physician
12 did you generally give equal weight to
13 what the attending physician said?
14      A   I think so  I think the
15 IME typically is most useful when it
16 gives additional information about an
17 impairment  For example, if the
18 IME's -- I mean if the attending
19 physician is a family practitioner for
20 example and the impairment is a
21 psychiatric impairment and the
22 psychiatrist gives an opinion, the
23 family practitioner would probably

143

1 defer to the psychiatrist knowing that
2 he has the more expertise in that given
3 area and I think together they can come
4 to a resolution that the person is or
5 is not disabled
6      Q   In your experience when
7 there was some disagreement regarding
8 the level of impairment between the
9 treating physician and the IME -- let
10 me start that question over again.
11 Prior to November of 1993 when you were
12 reviewing claims in which the IME and
13 the treating physician disagreed did
14 the company seek input from the
15 treating physician before sending a
16 denial letter or termination?
17      A   Oh, absolutely, yes  The
18 attending physician would have the
19 opportunity to review the IME report
20 and make any comment.  It wouldn't just
21 be summarily acted upon without the
22 attending physician having some
23 knowledge and opportunity to comment.

144

1      Q   Why was that done?
2      A   I think that's courtesy
3 and I think that's appropriate for the
4 attending physician who knows this
5 patient probably better than the IME
6 physician can just on a brief visit,
7 again with the proviso that sometimes
8 additional expertise is needed, but I
9 think in a reasonable approach to this
10 the IME and the attending physician
11 should come to some common agreement
12 that they both concur with and are
13 comfortable with and is appropriate and
14 fair for the claimant.
15      Q   When you were working at
16 Provident did you view depression as a
17 real illness?
18      A   Oh, absolutely.  It's a
19 very valid and very important
20 impairment
21      Q   Did you ever hear Ralph
22 Mohney use the term, and I'm quoting,
23 quick hits to resolve claims?

# FOSHEE & TURNER COURT REPORTERS

145

1     A    Quick hits?
2     Q    Quick hits. Did you ever
3  hear that phrase used?
4     A    I'm not sure that I did.
5  I suspect it would be one -- a claim
6  that would be easily terminated but I'm
7  not really sure what he meant by that.
8     Q    Let me ask you a little
9  bit about Social Security benefits. In
10 your background as a physician working
11 in the insurance industry did you
12 become familiar with the requirements
13 of the Social Security Administration
14 in having someone collect disability
15 benefits?
16    A    Yes, I was.
17    Q    In your work were you ever
18 required to read guidelines of the
19 Social Security Administration in
20 determining whether someone is
21 disabled?
22    A    Yes, indeed.
23    Q    Were the requirements to

146

1  prove a disability under Social
2  Security in your experience more
3  stringent than those required to prove
4  a disability under an own-occupation
5  policy?
6     A    Yes.
7     MR. OSTER: Pardon me.
8  Objection, lacks foundation, vague as
9  to time.
10    MS. SILAS: You can
11 answer.
12    MR. OSTER: Hold on,
13 please. Improper attempt to solicit an
14 expert opinion from a witness who has
15 not been designated as an expert in
16 this case.
17    Q    You can answer.
18    A    Yes, I have a very
19 definite opinion about it. Social
20 Security disability by law requires
21 that someone is permanently and totally
22 disabled for a period of no less than
23 12 months which is much more stringent

147

1  than the typical private carrier
2  disability insurance, so basically if
3  one is disabled by Social Security
4  criteria I cannot imagine that he would
5  not be disabled by a private insurance
6  carrier language. I just -- that just
7  doesn't seem possible.
8     Q    How did Provident pre-1993
9  handle the determination of whether
10 someone is impaired in those cases in
11 which the Social Security
12 Administration had already made a
13 determination that the person was
14 disabled?
15    MR. OSTER: Objection,
16 irrelevant, lacks foundation, also
17 calls for an expert opinion from an
18 individual not designated as an expert
19 witness to testify in this case.
20    A    Well, to me it would be a
21 no-brainer. If the Social Security
22 Administration says this person is
23 disabled, I mean, I think there would

148

1  be no reason why Provident Life and
2  Accident wouldn't consider them
3  disabled as well.
4     Q    Is that how they handled
5  the claims?
6     A    To my recollection that is
7  how that was handled.
8     MR. OSTER: For the record
9  I'm going to object to the entire line
10 of questioning having to do with Social
11 Security.
12    MS. SILAS: Okay.
13    THE WITNESS: Well, I
14 mean --
15    MS. SILAS: Well, that's
16 fine.
17    THE WITNESS: I have had
18 some expertise with it, I mean, plus as
19 a practicing physician for five years
20 and in insurance, I mean, it's -- you
21 can go to the Social Security
22 Administration and see those guidelines
23 printed out in a brochure. I mean,

149

1  it's not -- it's common knowledge.
2     MS. SILAS: By the way,
3  it's going to be offered as state of
4  mind evidence, not for the truth of the
5  matter stated.
6     Q    (By Ms. Silas) Do you
7  know whether Provident -- well, whether
8  the management at Provident Life and
9  Accident was generally familiar with
10 the requirements of the Social Security
11 Administration?
12    A    They were working in
13 disability claims. They would have to
14 be aware of that. I mean, again it's
15 common knowledge. One could go down to
16 the local Social Security
17 Administration office and get a
18 brochure that would specifically state
19 that.
20    Q    What are your current
21 duties at Protective -- is it
22 Protective --
23    A    Protective Life.

150

1     Q    -- Life Insurance Company?
2     A    Yes. Current duties are
3  underwriting life insurance policies
4  primarily and also I work some in the
5  company infirmary. We again have a
6  full-time company nurse who handles
7  most of the problems but if she is away
8  on vacation or some emergency comes up,
9  I'm called to help.
10    Q    Are you happy working at
11 Protective Life Insurance?
12    A    Yes, I have enjoyed it
13 very much.
14    Q    Do you have any ax to
15 grind with the insurance industry?
16    A    No, it has been very good
17 to me over the years I worked in it and
18 I've enjoyed working in insurance.
19    Q    Have you ever personally
20 sued any Provident entity?
21    A    No, I have not.
22    Q    I have no further
23 questions right now, Dr. Feist. Thank

# FOSHEE & TURNER COURT REPORTERS

151

1  you so much.
2      A   Thank you  Appreciate it
3
4  (Whereupon, a break was taken )
5
6  (Plaintiff's Exhibit No. 1 marked for
7  identification and the same is
8  attached hereto )
9
10     MS. SILAS:  Just for the
11 record I'm going to mark this trial
12 Exhibit 92, the April 24th, 1995
13 special review process memo as I guess
14 Plaintiff's Exhibit 1 to the
15 deposition  It's all yours  I have no
16 further questions.
17
18 EXAMINATION BY MR  OSTER:
19
20     Q   Dr. Feist, what if
21 anything did you do to prepare for your
22 testimony today?
23     A   Basically I talked with

152

1  Attorney Silas a couple of times on the
2  phone. My first -- my recollection is
3  in early April she called me about
4  giving the deposition which was
5  originally scheduled for the 27th I
6  think and then she called me on or
7  about that day telling me that the
8  deposition had been changed to this
9  date, and other than that I've done no
10 preparation.
11     Q   Did you review any
12 documents in connection with today's
13 deposition?
14     A   No, I did not.
15     Q   Have you reviewed any
16 prior deposition testimony that you
17 have given in cases in which Provident
18 or one of the Provident companies was
19 being sued in preparation for today's
20 deposition?
21     A   No, I did not
22     Q   Have you reviewed any
23 prior affidavits or memoranda offered

153

1  by you in connection with any
2  litigation pending against Provident
3  for purposes of today's deposition?
4      A   No.
5      Q   Do you know who Michael
6  Kramer is?
7      A   No, I do not.
8      Q   Do you know anything about
9  his claim with the Paul Revere Life
10 Insurance Company?
11     A   Well, the only thing I
12 know about that is that Mr  Kramer was
13 on a disability claim for some period
14 of time before Provident took over Paul
15 Revere in April of 1997 and then a few
16 months after that he was -- his claim
17 was terminated.
18     Q   And do you know that of
19 your personal knowledge?
20     A   That's what Attorney Silas
21 told me in discussion
22     Q   So the answer is no you do
23 not know if of your personal knowledge,

154

1  is that true?
2      A   Well, only on the
3  reliability of Attorney Silas
4      Q   So, for example, you've
5  never seen the Michael Kramer claim or
6  claim file, true?
7      A   That's correct
8      Q   You've never seen his
9  policy, true?
10     A   That's correct.
11     Q   You wouldn't recognize Mr.
12 Kramer if he bumped into you, correct?
13     A   I would certainly not.
14     Q   And with respect to the
15 propriety of the handling of his claim
16 or impropriety you are in no position
17 to express an opinion one way or
18 another, would you agree?
19     A   Well, I would say that I'm
20 testifying to the protocol of the
21 round-table discussions and to the
22 handling of Mr. Kramer's file,
23 obviously, I have no direct knowledge

155

1      Q   In fact you have no
2  personal knowledge about the handling
3  of the Kramer claim at all, do you?
4      A   No direct involvement, no,
5  sir.
6      Q   Do you have an indirect
7  involvement with the Kramer claim?
8      A   Well --
9      MS. SILAS:  I'm going to
10 object as argumentative  The tone is
11 argumentative
12     A   Indirectly in the fact
13 that I've been called to testify about
14 the round-table discussion but directly
15 I have not seen Mr  Kramer's file.
16     Q   All right  Was Mr.
17 Kramer's file ever part of the
18 round-table process that you
19 participated in while you were at
20 Provident?
21     A   No.
22     Q   To your knowledge was the
23 Kramer claim ever subjected to any

156

1  round-table discussion regardless of
2  time or place or location?
3      MS. SILAS:  Objection,
4  calls for speculation.
5      MR. OSTER:  I asked for
6  his knowledge. Hopefully he doesn't
7  have to speculate as to his own
8  knowledge.
9      MS SILAS:  Well, just for
10 the record, object as irrelevant and
11 that that's not the -- no one has ever
12 contended that Dr. Feist handled the
13 Kramer claim  He is here for company
14 wide practices so I don't know how long
15 you intend to cross him on the Kramer
16 claim so I would object as
17 argumentative and speculative
18     A   Well, again, I'm
19 commenting about the round-table
20 process  Whether Mr. Kramer's file
21 ever came to that I have no knowledge
22     Q   I want you -- so the
23 connection in your mind between your

# FOSHEE & TURNER COURT REPORTERS

157

1  testimony as a witness and the Kramer
2  claim which is in this litigation right
3  now is the round-table process?
4     MS. SILAS: Objection,
5  irrelevant. Regarding this witness's
6  understanding of why he was subpoenaed
7  as a witness is irrelevant, calls for
8  speculation as to why I subpoenaed him
9  here and asked him questions. Whether
10  or not he knows legally what kind of
11  company wide practices constitute bad
12  faith and malicious, fraudulent, and
13  oppressive behavior is not relevant to
14  the proceeding but I can't instruct you
15  not to answer.
16     A   Rephrase the question,
17  please, sir, or repeat the question.
18     Q   Sure if our court reporter
19  would be so kind, please
20
21     (The desired portion of testimony was
22  read back by the court reporter.)
23

158

1     MS. SILAS: Also just to
2  throw in another objection,
3  mischaracterizes the testimony which
4  involved many things which may shed
5  light on the Kramer claim.
6     A   Well, I think the answer
7  is that I testified about the
8  round-table process which was
9  established by Mr. Mohney and others in
10  April of 1995 which obviously has
11  continued to this day and apparently
12  been rolled into the Paul Revere and
13  later the Unum and the fact that Mr.
14  Mohney is still head of that unit tells
15  me that process has been ongoing
16  and enhanced over the last few years.
17  Now again whether Mr. Kramer was ever
18  involved in that process I have no
19  knowledge.
20     Q   (By Mr. Oster) I'm going
21  to move to strike your answer as
22  nonresponsive but let me ask you this
23  You just testified that the process is

159

1  ongoing today. Do you have any
2  knowledge of that?
3     A   Well, again, no direct
4  knowledge but again Mr. Mohney is still
5  there --
6     Q   Do you know one way or the
7  other whether the round-table process
8  is being used by UnumProvident
9  Corporation anywhere today?
10     A   Well, I assume if Mr.
11  Mohney is still the head of that
12  department, which I believe he is, I
13  assume that the round-table has been
14  continued, enhanced, and refined over
15  the last five years.
16     Q   I appreciate that, Dr.
17  Feist, and I'm not trying to be hard on
18  you but I'm not asking for your
19  assumption. I'm asking for your
20  knowledge. I'm asking for facts. Do
21  you have any facts that the round-table
22  process in any form is being used by
23  UnumProvident Corporation anywhere

160

1  within the company today?
2     MS. SILAS: Direct or
3  indirect knowledge? You mean from any
4  source?
5     MR. OSTER: No.
6     MS. SILAS: Well, that's
7  not the way you asked it. You said any
8  knowledge.
9     MR. OSTER: That's right.
10     Q   Any knowledge period?
11     A   I have been away from
12  Provident for five years. I don't know
13  what they are doing
14     Q   So the answer is no, you
15  don't know?
16     A   The answer is no, yes,
17  sir.
18     Q   All right. Thank you.
19  Now have you ever given -- you said
20  you've testified in approximately 12 to
21  14 cases in which Provident was being
22  sued by a policyholder. Is that about
23  right?

161

1     A   To the best of my
2  recollection that is correct.
3     Q   And each of these was an
4  instance in which an attorney for the
5  claimant contacted you and made
6  arrangements for your deposition
7  testimony; is that true?
8     MS. SILAS: I'll object to
9  the term made arrangements as
10  overbroad
11     A   I would say requested me
12  to give a deposition. In some cases I
13  have actually reviewed the actual file
14  but most of the time I have testified
15  to the round-table process and the
16  other processes that I observed in that
17  timeframe at Provident.
18     Q   All right  Well, I
19  appreciate the amplification but what
20  I'm trying to focus in on for a moment
21  is that you have been testifying at the
22  request of plaintiffs, true?
23     A   Yes

162

1     Q   And you are doing so
2  without compensation, correct?
3     A   That is correct, yes, sir.
4     Q   And the reason you are
5  doing this is to redress a wrong, you
6  think?
7     A   Redress a what?
8     Q   To redress a wrong?
9     A   Yes.
10     MS. SILAS: I'm going to
11  object as -- well, just for the record
12  it's vague and ambiguous as to what you
13  mean by redress a wrong
14     A   Well, I think in all the
15  cases that I have given depositions
16  about, the individual was on a claim
17  and then for various reasons was
18  terminated claims and I felt unjustly
19  and I came to tell about the processes
20  and the procedures and on a couple of
21  occasions I actually reviewed the
22  records and made comments about the
23  actual situation

# FOSHEE & TURNER COURT REPORTERS

163

```
1       Q   So that's the reason you
2   have testified in all these cases?
3       MS. SILAS:  Objection.
4   It mischaracterizes his testimony and
5   it's argumentative.
6       A   I think as I alluded to
7   earlier today I initially got into this
8   with Dr. Nee who is a colleague.  He is
9   a practicing physician in another
10  insurance company and he was wronged on
11  his claim and I gave a deposition for
12  him and obviously once that deposition
13  is out in the lawyer milieu, other
14  attorneys pick up and want to use me as
15  a witness and I think that's fine  I
16  have no problem with that.
17      Q   I will move to strike as
18  nonresponsive.  I'll just ask a direct
19  question here.  Dr. Feist, do you think
20  that Michael Kramer's claim was
21  wrongfully terminated by the Provident
22  Companies, Inc., Provident Life And
23  accident, UnumProvident Corporation?
```

164

```
1       MS SILAS:  Objection,
2   calls for speculation, calls for an
3   expert opinion by an expert not
4   designated in insurance bad faith
5       A   I think I would say this,
6   sir, that in all the cases that I've
7   had any involvement with the individual
8   claimant was determined to be disabled
9   at one point and was paid as being
10  disabled from one point and at no time
11  in any of the cases that I can recall
12  was there ever a change in that
13  individual's medical impairment from
14  the time they were deemed disabled to
15  the time they were terminated.  It was
16  something that the Provident, the Unum,
17  the Paul Revere came up with, either at
18  the round-table or whatever procedure
19  to find a way to terminate the claim,
20  and I don't think you can show me any
21  shred of evidence that any of these
22  persons who had been on a claim had any
23  change in their medical condition
```

165

```
1   during that process time.
2       Q   Let me move to strike as
3   nonresponsive  Dr. Feist, please,
4   listen to my questions and I want to be
5   as respectful as I possibly can and I'm
6   urging you to do so.  I'm not trying to
7   get into a debate with you or to make
8   this process anymore onerous than it is
9   or can be at times.  Do you think the
10  Michael Kramer claim was wrongfully
11  handled by the Paul Revere Life
12  Insurance Company?
13      MS. SILAS:  I'm sorry
14  Can I hear the question he claims that
15  the answer was nonresponsive to because
16  I think that was a different question?
17  I may be well wrong
18
19  (The desired portion of testimony was
20  read back by the court reporter )
21
22      MS. SILAS:  I need to
23  interpose another objection just for
```

166

```
1   the record here.  Objection  It goes
2   beyond the scope of direct and I will
3   specifically state on the record I
4   didn't ask Dr. Feist any questions
5   about the Kramer claim.  He has already
6   testified he didn't review Mr Kramer's
7   file  He is not an expert in the
8   Kramer claim.  We are not contending he
9   has an opinion with respect to the
10  handling of the Kramer claim  He has
11  only given testimony on direct about
12  certain policies and procedures and
13  things that he observed at the company
14  I might advise him if you are going to
15  ask him his opinion regarding the
16  quality of the claims handling, that is
17  seeking an expert opinion and you can
18  compensate him for whatever a bad faith
19  expert would be paid although I'm sure
20  he wouldn't accept it and he would
21  probably donate it to charity, but I'll
22  advise the witness right on the record
23  that he is not required to give expert
```

167

```
1   opinions on the validity of the
2   handling of the Kramer claim because
3   that's not what he is here to do, but
4   anyway with that having been said you
5   can read back the question and do what
6   you want with it
7       Q   (By Mr. Oster) Do you
8   have the question in mind, Dr. Feist?
9       A   You better ask it again
10  I've lost the train of thought.
11      Q   The question was do you
12  think that the Michael Kramer claim was
13  wrongfully handled by the insurance
14  company?
15      MS. SILAS:  I'll
16  incorporate all of the previous
17  objections
18      A   Well, yeah, obviously if
19  Mr Kramer was judged to be disabled by
20  the Paul Revere at some point in time,
21  I don't know when that was, and then
22  another company takes over and then
23  within a few months he is terminated
```

168

```
1   and no one has demonstrated to me that
2   there was any change in his medical
3   opinion, medical impairment, it seems
4   to me there's bad faith practices by
5   the Provident Life and Accident
6       Q   But you don't know
7   anything factually about the Provident
8   claim, is that true?
9       MS. SILAS:  Objection,
10  argumentative, also mischaracterizes
11  his testimony where he stated he was
12  told the facts of the claim
13      A   Yeah, again, as you stated
14  before I'm not an expert in Mr.
15  Kramer's file  I don't know
16      Q   I guess what I'm trying to
17  get at, Dr. Feist, is this, is that you
18  say you testify in these cases to
19  redress wrong and I want to know what
20  wrong you know of in the Kramer file
21  that cause you to give your testimony
22  here today.
23      MS. SILAS:  Hold it
```

# FOSHEE & TURNER COURT REPORTERS

169

1 Objection. Your question was whether
2 he was here to redress a wrong. He
3 didn't testify that he was here to
4 redress a wrong unless I'm sorely
5 mistaken.
6      MR. OSTER: The record
7 will reflect what his answer was.
8      THE WITNESS: Well --
9      MS. SILAS: That's your
10 terminology, not his.
11      A   Well, again, if somebody
12 is disabled by one company and nothing
13 changes in that individual's impairment
14 and another company comes along with
15 different procedures and terminates
16 him, to me that's inappropriate.
17      Q   Are you assuming anything
18 in that, Dr. Feist?
19      A   Well, I'm assuming just
20 for the timeframe that that happened,
21 but again I don't know specifically
22 about Mr. Kramer's claim.
23      Q   Would it be fair to say if

170

1 we can put this issue to rest for a
2 moment that you don't have an opinion
3 one way or the other about the
4 specific -- about the propriety of the
5 handling of the Michael Kramer claim
6 based upon what you personally know?
7      A   I think that's correct.
8      Q   All right. Fair enough.
9 Now in the 12 to 14 cases that you have
10 provided deposition testimony have you
11 also provided affidavits?
12      MS. SILAS: Did he provide
13 them in each of those 12 to 14 cases?
14      A   Each of those depositions
15 or in addition to the depositions?
16      Q   In addition to the
17 deposition and in any or all of the
18 cases
19      A   Well, I have given
20 affidavits on cases that I didn't give
21 depositions. I don't think I have ever
22 given affidavits on cases I have given
23 depositions

171

1      Q   Have you ever given false
2 deposition testimony in any of the 12
3 to 14 cases?
4      MS. SILAS: Objection,
5 argumentative. God, I don't even know
6 how to object to that
7      A   Not to my knowledge
8      MS. SILAS: It's
9 argumentative, it's vague and
10 ambiguous, and are you counting as
11 false something he inadvertently might
12 have said about Paul Revere that an
13 attorney prepared and he signed or are
14 you talking about deposition testimony?
15      MR. OSTER: We all know
16 what I'm talking about.
17      MS. SILAS: I know exactly
18 what you're talking about. You're
19 talking about a declaration where he
20 inadvertently missed the fact that Paul
21 Revere was mentioned.
22      THE WITNESS: Yeah
23      MS. SILAS: If you're

172

1 calling that a false testimony --
2      THE WITNESS: That was on
3 an affidavit. You said deposition --
4      MS. SILAS: Let me just
5 finish. As you know, counsel, that was
6 drafted by an attorney. It was not
7 testimony given by Dr. Feist and he has
8 testified on numerous occasions that he
9 has subsequently retracted it because
10 it was inadvertent so under California
11 law false testimony is the willful
12 giving of false information as you
13 know, not the inadvertent giving of
14 inaccurate information but you can
15 proceed with your expected
16 cross-examination
17      A   You also said depositions
18 I think in my depositions I was
19 correct  Now in that affidavit on
20 the -- I can't remember the
21 individual's name.
22      Q   Let me stop you right
23 there, Dr. Feist. You're absolutely

173

1 right. I asked about deposition
2 testimony. I didn't say a word about
3 affidavits at all not withstanding the
4 nice little recitation that we just
5 got.
6      A   Well, I think her comment
7 was relevant. There is a misstatement
8 on an affidavit but to my recollection
9 there is no deposition inaccuracies.
10      Q   Excuse me, Dr. Feist
11 When I want to know about an affidavit
12 I'll ask you about an affidavit  My
13 question is with respect to depositions
14 and I'll rephrase it  Have you ever
15 given incorrect deposition testimony?
16      MS. SILAS: Object as
17 vague, ambiguous, and argumentative
18      A   Well, to the best of my
19 knowledge I have given accurate and
20 correct information
21      Q   Now, you executed an
22 affidavit in the King case. Let's talk
23 about affidavits. I'm shifting the

174

1 topic.
2      A   Affidavits, okay  In the
3 Terry -- is it Terry Kane?
4      Q   Yeah, the Terry Kane case,
5 correct?
6      A   Terry Kane case, right,
7 and Bob Holstein was the attorney that
8 prepared the affidavit.
9      Q   Okay. And this was an
10 affidavit that was signed by you but it
11 was subscribed and sworn to before a
12 notary public on February 18 of 1999
13 Now we've all seen this affidavit --
14      A   February of 99?
15      Q   I will make it an exhibit
16 to this deposition. We can call it
17 Exhibit Number 2. It is three pages in
18 length and it states district court,
19 district of Nevada, Equitable Life
20 Assurance Society of the United States,
21 plaintiff, versus Terry Kane,
22 defendant, three pages in length and I
23 guess this would be Exhibit Number 2

# FOSHEE & TURNER COURT REPORTERS

175

1  All right  Would you like to see it?
2      A   I can quote what you're
3  going to ask, I'm sure
4      Q   When you're done with it,
5  please give it to me
6          MS  SILAS: Can I see it
7  as well?
8          THE WITNESS: Sure.
9  Paragraph 12 is what he's going to ask
10 about
11         MS. SILAS: Well, go ahead
12 and let him have his fun
13         THE WITNESS: Yeah,
14 paragraph 12.
15         MS. SILAS: The print is
16 pretty small or else I need reading
17 glasses.
18         THE WITNESS: Yeah,
19 magnifying glasses would help
20
21 (Whereupon, a discussion was held off
22 the record.)
23

176

1  (Defendant's Exhibit No  2 marked for
2  identification and the same is
3  attached hereto )
4
5      Q   (By Mr. Oster)  You are of
6  course well familiar with the contents
7  of this affidavit, true?
8      A   I have seen it several
9  times, yes, sir.
10     Q   And in depositions just
11 like this you have been questioned
12 about the content of this affidavit,
13 correct?
14     A   Several times, yes  I can
15 almost tell you how many
16     Q   And in this affidavit you
17 reviewed this affidavit before you
18 signed it, correct?
19     A   I obviously did  I had it
20 notarized and I signed it, sure
21     Q   And it states here in
22 paragraph 12 the following, quote, the
23 insured persons whose claims files I

177

1  reviewed had been collecting disability
2  benefits from Provident, Equitable or
3  Paul Revere insurance policies for an
4  extended period of months or years. I
5  will stop right there, period, closed
6  quote. As of the time -- that is your
7  statement, correct?
8      A   That is correct.
9      Q   Your statement under oath
10 which you reviewed?
11     A   Yes, sir.
12     Q   As of the date you swore
13 to this affidavit, February 18, 1999,
14 had you ever reviewed any Paul Revere
15 insurance policy claim files for
16 claimants?
17     A   No, I had not because
18 Provident hadn't taken over Paul Revere
19 when I left Provident in 1996.
20     Q   Up to the point in time
21 when you executed this affidavit had
22 you ever reviewed a claim file for an
23 insured person who was insured by

178

1  Equitable?
2      A   No.
3      Q   Would you agree then that
4  to the extent that your affidavit
5  states to the contrary, namely that you
6  reviewed Equitable claim files or Paul
7  Revere claim files, it is mistaken?
8      A   That is correct.
9      Q   You corrected that
10 mistake, didn't you?
11     A   Yes, I did.
12     Q   When did you correct it?
13     A   In April of '99 if memory
14 serves me correctly.
15     Q   And what form did your
16 correction take?
17     A   Well, basically filing the
18 affidavit that that was incorrect and
19 then also admitting in subsequent
20 depositions that it was incorrect and,
21 again, it was not an intentional error.
22 It was a slip on the part of the
23 attorney that prepared it and it was a

179

1  slip on my part to not carefully read
2  that section.
3      Q   Now, let's if we may go
4  back over some of the testimony which
5  you have given here and amplify it a
6  little bit if we may. You started in
7  1982, correct?
8      A   At Provident?
9      Q   Yes.
10     A   Yes, sir.
11     Q   And your last date was
12 February 26th -- pardon me -- February
13 29 of 1996?
14     A   29, yes
15     Q   And you haven't had
16 anything to do with Provident, Paul
17 Revere, UnumProvident, claims files,
18 anything since that time, correct?
19     A   That's correct.
20     Q   Ever set foot in Wurster?
21     A   No, I have not.
22     Q   Ever set foot in Portland,
23 Maine?

180

1      A   No, I haven't been there
2  either
3      Q   Have you ever talked to
4  any of the people who handled the
5  Michael Kramer file?
6      A   Not to my recollection
7          MS. SILAS: You mean,
8  other than -- well, to his knowledge
9  other than Jeff McCall because I don't
10 think he knows that Jeff McCall handled
11 the claim file.  Just his knowledge?
12         MR OSTER: I don't think
13 Jeff McCall did handle the Kramer file
14 but in any event --
15         MS SILAS: That is a
16 point of dispute, I guess
17     Q   (By Mr. Oster)  To your
18 knowledge have you ever talked to
19 anybody that had anything to do with
20 the Kramer claim file?
21     A   No
22     Q   Now, you started in 1982
23 with Provident and in 1990 you were

# FOSHEE & TURNER COURT REPORTERS

**181**

1 promoted to an assistant vice
2 president; is that correct?
3    A    No, vice president and
4 corporate medical director in 1990
5    Q    Do you recall when that
6 was in 1990?
7    A    July 1st
8    Q    And as of July 1st, 1990
9 what were you doing for the company?
10    A    What was I doing?
11    Q    Yes.
12    A    I was serving as corporate
13 medical director running the medical
14 department, the infirmary, and all the
15 related administrative duties.
16    Q    As of July 1st, 1990 were
17 you involved in the handling of claims?
18    A    No.
19    Q    Is it accurate to state
20 that -- well, when was the last time
21 prior to July 1 of 1990 that you had a
22 claims function with the company?
23    A    The last time prior to

**182**

1 that?
2    Q    Yes
3    A    I don't understand your
4 question  I'm sorry.
5    Q    Well, at some point prior
6 to July 1, 1990 were you involved in
7 the handling of claims on behalf of
8 Provident?
9    A    Yes, from July 1 of 1982
10 to July 1 of 1990 I was involved in
11 claims.
12    Q    So as of July 1, 1990 you
13 were in a position where you were not
14 involved in the handling of claims,
15 true?
16    A    That's correct
17    Q    And you were not involved
18 in the handling of claims from July 1
19 of 1990 through and continuing to April
20 of 1995; is that also true?
21    A    That's correct.
22    Q    Do you know what was
23 happening with the company in terms of

**183**

1 claims in 1994?
2    MS. SILAS:  I object as
3 vague and ambiguous with respect to
4 what was happening with the company.
5    A    Well, I think I have a
6 reasonably good idea.  I wasn't
7 directly involved but as a vice
8 president I was aware of what was going
9 on in the company.  After Harold
10 Chandler came in on board in November
11 of 1993 Ralph Mohney was brought in to
12 be vice president of claims  One of
13 Mohney --
14    Q    I'm not asking for
15 specific knowledge.  Let me rephrase my
16 question because maybe I led you
17 astray  You weren't working with
18 claims between July of 1990 and April
19 of 1995, correct?
20    A    That is correct.
21    Q    So you weren't involved in
22 day-to-day handling of claims, decision
23 making with respect to claims, true?

**184**

1    A    That's correct
2    Q    So the only thing that you
3 knew about claims during that timeframe
4 was not what you observed with your own
5 eyes but what other people told you; is
6 that true?
7    MS SILAS:  Object,
8 mischaracterizes his testimony as to
9 what other people told him.  I believe
10 his testimony was that he observed vice
11 presidents and presidents --
12    A    I went to vice president
13 meetings, some of these procedural
14 things were discussed in terms of
15 bringing the claims function into the
16 home office.  Fred O'Connell was the --
17 first Dr. Charles Legus and then Fred
18 O'Connell --
19    Q    Dr. Feist, please listen
20 to my question.
21    A    I'm trying to answer it,
22 sir.  They were colleagues.  I would
23 discuss things with them.  I didn't

**185**

1 have direct involvement in claims
2 functions but I knew what was going on
3 as a corporate vice president
4    Q    Now, you mentioned that
5 you were called on the carpet, I think,
6 or maybe that was --
7    A    I would call it that, yes,
8 sir.
9    Q    And that was in 1994?
10    A    I made a mistake.  That
11 should have been November of 1995  I
12 stepped back into claims operations in
13 April of '95.  This event that I talked
14 about was in November of '95.  I think
15 in my prior testimony I said '94 so it
16 should be November of '95 about six
17 months into the claims function that I
18 took over in April of '95 and probably
19 three months, four months before I left
20 Provident.
21    Q    Well, in terms of your
22 direct experience with the claims
23 department, and I mean direct, I mean

**186**

1 you worked on claims, you worked side
2 by side with people who were trying to
3 investigate claims; are you with me so
4 far?
5    A    I got you, yes, sir.
6    Q    None of that took place
7 between July 1st of 1990 and April of
8 1995, true?
9    A    That is correct
10    Q    However, in April of 1995
11 as we have seen reflected in a
12 memorandum you began being available to
13 the disability claims group on a
14 half-time basis, correct?
15    A    That's correct, per the
16 invitation of Mr. Ralph Mohney
17    Q    Right.  Plus you were
18 attending the special review sessions
19 also called round-tables?
20    A    That's correct, yes, sir
21    Q    So in terms of what was
22 happening that you have personal
23 knowledge of because you participated

# FOSHEE & TURNER COURT REPORTERS

187

1  in it, that wouldn't start after Mr.
2  Chandler arrives in November of 1993,
3  that really starts in April of 1995; is
4  that true?
5      MS SILAS: Object as
6  vague and ambiguous, mischaracterizes
7  his testimony.
8      A   Well, I mean, in terms of
9  actually being involved I was -- my
10 expertise if you will was recognized by
11 Mr. Mohney even though I had had a
12 hiatus of several years of not working
13 in it to bring me back into it  I
14 think that's in a way a backhanded
15 compliment that he would ask me to do
16 that. I think he recognized my
17 expertise even though it hadn't been
18 active for a number of years.
19     Q   Dr Feist, I'm not asking
20 about your expertise. Okay? I'm
21 asking about your direct involvement,
22 your direct involvement in terms of
23 handling claims

188

1      A   I said I was not involved
2  from 1990 to April of 1995
3      MS SILAS: Well, I'm
4  going to interpose an objection.
5  You've already asked whether he was
6  involved in claims I think six times --
7      THE WITNESS: At least
8  five or six times, yeah.
9      MS SILAS: -- and at
10 least six times he's said that, no,
11 between 1990 and April of '95 he was
12 not. That's how he's testified --
13     A   I don't know how else I
14 can answer it, sir
15     Q   (By Mr Oster) And the
16 claim involvement that you had post --
17 well, goes then between April of 1995
18 and February of 1996, true?
19     A   That's correct.
20     Q   And during that timeframe
21 you participated in the round-table
22 reviews?
23     A   That is correct

189

1      Q   And is it the round-table
2  reviews -- let me back up for just a
3  moment. You believe that the
4  round-table reviews were improper?
5      A   I do. I did and I do.
6      Q   And with respect to these
7  round-table reviews, do you know if the
8  round-table review process resulted in
9  any claim being wrongfully terminated?
10     A   The Martin Fowler case in
11 California.
12     Q   Okay. The Martin Fowler
13 case --
14     A   The Martin Fowler case in
15 California.
16     Q   Okay That's one case
17 Do you have another?
18     A   I don't have any others
19 I didn't keep records  I had no way of
20 knowing at the time.
21     Q   I didn't ask you if you
22 kept records. You know of one case
23 that you believe that was wrongfully

190

1  terminated as a result of the
2  round-table process; is that right?
3      MS SILAS: Objection,
4  calls for speculation and that the
5  witness has already testified that they
6  didn't make the termination decisions
7  at the round-table meetings  You can
8  answer.
9      A   Yeah, well, the Martin
10 Fowler is case is one that went to the
11 round-table and I was there at the
12 round-table and then I later after I
13 left Provident gave a deposition in the
14 Martin Fowler case and the round-table
15 discussion led to his termination of
16 claim.
17     Q   Okay. I've got that
18 That's one case
19     A   That's one case. Now
20 admittedly I don't know of any others,
21 no.
22     Q   And how many cases were
23 reviewed approximately at round-table

191

1  during the nine to ten months that you
2  were participating in them?
3      A   I have no accurate way of
4  knowing. I have seen numbers in
5  various depositions from 100 to 120.
6      Q   Does that sound about
7  right to you?
8      A   I think it's reasonable,
9  yes, sir.
10     Q   Okay. About how many
11 cases were reviewed typically at a
12 round-table session on a Thursday that
13 you attended?
14     A   Typically four to six.
15     Q   So of the roughly 100 to
16 120 you know of one that you think in
17 your opinion was wrongfully terminated,
18 correct?
19     A   That I can document  I'm
20 sure there are others
21     Q   Now, aside from cases that
22 were appearing at round-tables how many
23 other claims on the average were being

192

1  adjudicated or determined or handled by
2  Provident on a monthly basis during
3  this timeframe?
4      MS SILAS: Objection,
5  irrelevant, calls for speculation.
6  It's not relevant that they treat some
7  of their policyholders one way and many
8  of them another way.
9      A   Well, the answer is about
10 ten thousand per month but I think the
11 basic concern is that every case be
12 handled properly, not, you know --
13     Q   Dr Feist, this may
14 surprise you --
15     A   Not, you know, 9,500. You
16 know, to me every case should be
17 properly handled, not just, you know,
18 statistically how many are gone
19 through
20     Q   I couldn't agree with you
21 more  I couldn't agree with you more
22 I'm trying to get an idea of this
23 impact of the C change that you talked

**193**

1  about and --
2  MS SILAS: Then read
3  Ralph Mohney's memoranda.
4  THE WITNESS: Yeah,
5  exactly.
6  Q   (By Mr Oster) What we
7  have is one case, the Fowler case, and
8  you talked about the -- in fact, I
9  should probably go to it directly  Do
10 you recall the topic earlier of close
11 calls pre-1993 going in favor of the
12 insured?
13 A   I do.
14 Q   And it is your belief that
15 the company position, philosophy,
16 whatever you wish to describe it prior
17 to the arrival of Mr. Chandler was that
18 close calls would go to the insured,
19 true?
20 A   That is correct  That is
21 correct, yes, sir, I do think that.
22 Q   And it's your impression
23 or -- I don't want to put words in your

**194**

1  mouth -- impression, belief, testimony
2  that there was a change after the
3  arrival of Mr. Chandler with respect to
4  that policy, true?
5  A   I think that is correct,
6  sir, yes.
7  Q   And the change is that
8  post Chandler the close calls did not
9  go to the insured?
10 A   That's correct.
11 Q   And you said -- and I
12 wrote this down  Tell me if this is
13 incorrect  You say that based upon the
14 track record of the company?
15 A   Exactly.
16 Q   What track record are you
17 referring to?
18 A   Well, the write-down of
19 claims that occurred in the April of
20 '95 timeframe to this day.
21 Q   I'm sorry  The
22 write-down?
23 A   The write-down, the

**195**

1  termination, the round-tables.  That
2  whole process had been ongoing since
3  April of '95.
4  Q   You've told me that you
5  are personally aware of one claim that
6  you think was wrongfully terminated,
7  the Fowler claim  Are you aware of any
8  other claims or statistics in the post
9  Chandler era from November of '93
10 forward that constitutes the track
11 record demonstrating that close calls
12 did not go to the insured?
13 MS SILAS: Objection,
14 assumes facts not in evidence, calls
15 for speculation, presumes that the
16 close calls -- well, calls for
17 speculation, overbroad, argumentative
18 A   Well, I think obviously I
19 don't have any specific data but the
20 write-down of claims '95, '96 that I
21 have seen data on were very
22 significant
23 Q   When you say the

**196**

1  write-down of claims can you tell me
2  what you mean by that?
3  A   I'm sorry  The
4  termination of claims, writing off
5  claims, cancelling claims, writing into
6  the profit margin.  In 1995 Provident
7  reported $135 million of profit on
8  their statement which came from claims
9  terminations.
10 Q   Okay.  How do you know
11 that?  How do you know that?
12 A   I have seen financial
13 statements in their company annual
14 statements
15 Q   Is it your testimony that
16 $135 million of claims were wrongfully
17 terminated?
18 A   Yes, it is
19 Q   And what do you base that
20 on?  I'm looking for facts here.
21 A   I'm talking about the
22 round-table and all that procedures and
23 so forth that went on during that

**197**

1  timeframe during the year 1995.
2  Q   Isn't it more accurate to
3  state, Dr. Feist, that you're assuming
4  that a write-down was a wrongfully
5  terminated claim?
6  A   I think the only way a
7  company can get to that volume of
8  write-down on claims that have already
9  been in existence is inappropriate.  I
10 think -- I cannot think any other way.
11 Q   Let's try to keep it on
12 this plane  I'm looking for any facts
13 that you can give me that demonstrate
14 that post-1993 close calls no
15 longer went to the insured.  Please --
16 and we will just do them one at a time
17 Please tell me the facts
18 A   I have no statistics other
19 than the financial report that reported
20 that
21 Q   And what report are you
22 talking about?
23 A   I'm talking about the

**198**

1  annual report --
2  Q   Which annual report?
3  A   The annual report of the
4  Provident Life and Accident
5  Corporation
6  Q   What year?
7  A   1995.
8  Q   And in 1995, 1995 reported
9  what?
10 A   Reported a profit of the
11 accident department of 235 million of
12 which only 35 million was new sales and
13 the difference was claims terminations
14 Now, you can't tell me that you can
15 write off that many claims and not be
16 doing it inappropriately, and that's
17 the only thing I can give you numbers
18 but in my heart of hearts I think
19 that's the only way they could get that
20 much.
21 Q   So that's your conclusion
22 that because of the fact they showed a
23 profit, that meant that valid claims,

# FOSHEE & TURNER COURT REPORTERS

199

1  you are generalizing that valid claims
2  were denied; is that true?
3         MS. SILAS: Hold it
4  Objection. You're mischaracterizing
5  his testimony. He didn't say because
6  they showed a profit. He said because
7  they showed a $135 million profit from
8  terminating claims.
9         THE WITNESS: Exactly,
10  yes
11         MS. SILAS: So you're just
12  mischaracterizing his testimony.
13     A   I mean, to me it's
14  misleading for a company to report $235
15  million of profit, only $35 million of
16  which is from sales on new products and
17  the additional -- the difference is
18  write-down of claims. That's got to
19  be -- that cannot be possible unless
20  the company is consciously working to
21  do that and I think they did in the
22  year 1995 which is the only number I
23  have.

200

1     Q   Now, do you know where the
2  numbers came from for that $135
3  million?
4     A   It came out of the annual
5  statement of the Provident Corporation
6  It's right in the black and white
7  numbers
8     Q   I understand that, Dr
9  Feist.
10    A   I mean, it's published. I
11  mean, it's on record. You could
12  probably get it if you wanted it.
13    Q   Anything else that you
14  base it on, Dr. Feist?
15    A   Well, I think that's a
16  good reason to base it on. Other than
17  that, again, I don't have any direct
18  knowledge.
19    Q   You don't have knowledge
20  of any of the claim files that make up
21  these 135 profit from improper -- what
22  you believe are improper write-downs;
23  is that true?

201

1     A   I have no knowledge of
2  that information, no, you know, I
3  wasn't privy to those numbers but
4  that's my impression.
5     Q   All right. Let's go back
6  to a little bit of your earlier
7  testimony. You were uncomfortable
8  after the arrival of Mr. Chandler
9  because of what you perceived to be his
10  philosophy and because of the fact that
11  older people were being rifted out of
12  the company?
13    A   That's correct
14    Q   You were concerned about
15  your own welfare?
16    A   Well, in a word, yes.
17    Q   And you started looking
18  for new employment sometime in November
19  of 1994, true?
20    A   I made a visit to a
21  professional headhunter in November of
22  1994 basically getting my resume up to
23  speed and hadn't done it for a number

202

1  of years. I did make one visit in
2  October of '94 but I was not seriously
3  looking for another job until early in
4  1995.
5     Q   Now in 1994 when you were
6  just I guess exploring other
7  employment -- in 1994, is that right,
8  is that how you would characterize it?
9     A   Well, I think you'd have
10  to characterize it as being nervous
11  after some very high level executives
12  were summarily fired, you know, like
13  clean out your desk and be gone as soon
14  as you get your personal effects out of
15  your office  One has a little
16  nervousness about that and one needs to
17  explore the options of finding
18  employment outside of Provident.
19    Q   Okay  Was that your
20  primary concern; that is to say, is the
21  primary reason you were looking for
22  employment at that point in time or
23  exploring employment or the primary

203

1  reason that you were nervous is because
2  you thought you might be let go?
3     A   Well, in the 1994, early
4  '95 timeframe, yes I think that
5  changed in April of '95 when I was
6  asked to do the claim thing and the
7  round-table and I felt that I was not
8  comfortable with that philosophy so
9  that set my resolve in April or
10  actually the spring of '95 that I
11  needed to leave
12    Q   Now, prior to that and
13  during the time before Mr. Chandler
14  came in in November of 1993 you stated
15  that you couldn't recall any discussion
16  about profitability at any of these
17  vice presidents meetings that you
18  attended; is that true?
19        MS. SILAS: I object  I
20  think that mischaracterizes his
21  testimony. He didn't say they didn't
22  discuss anything about profitability
23  unless my memory is going caput

204

1     A   Well, I think that's true.
2  I don't think that during the tenure of
3  Winston Walker, III that that ever came
4  up and then, of course, after the --
5  after Mr. Chandler came on board in
6  November of '93 and all the claims
7  problem in the accident department that
8  became a very important issue
9     Q   Just so I understand your
10  position, do you believe there is
11  something wrong with talking about
12  profitability at meetings such as you
13  attended?
14        MS. SILAS: I object. He
15  didn't state it was his position. He
16  was just stating it was his testimony
17        MR. OSTER: Well, I'm
18  trying to find out his position --
19        MS. SILAS: He doesn't
20  have a position  He's a subpoenaed
21  witness
22     A   Well, I think the point is
23  is that that's true there is nothing

# FOSHEE & TURNER COURT REPORTERS

205

1  wrong with talking about
2  profitability --
3      Q    All right  Thank you.
4      A    -- but what one does in
5  trying to correct the profitability
6  problem is what I had the problem with
7  I think the way Mr. Chandler went about
8  correcting the profitability problem in
9  the accident department was wrong and I
10  still think that to this day.
11      Q    And I will give you plenty
12  of opportunity to talk about it, Dr.
13  Feist, when I ask you about it, so I
14  move to strike all of your answer after
15  where you responded where I think you're
16  something wrong with talking about
17  profitability.
18      MS. SILAS: Counsel, I'm
19  going to object to your tone and your
20  sarcasm with the witness  You know,
21  he's here testifying and I think you're
22  being kind of disrespectful to him.
23  Anyways, you can answer.

206

1      Q    You were asked about a
2  $275 million figure that somehow
3  represented an increase to reserves?
4      A    Yes, we discussed that.
5      Q    All right  Let's talk
6  about that a little bit more  At some
7  point in time $275 million was added to
8  reserves; is that your belief?
9      A    That's my understanding
10  that those monies were given to or put
11  in the accident department kitty if you
12  will for claims and reserves, yes
13      Q    And when did that take
14  place?
15      A    November of 1993 shortly
16  before Mr. Chandler came on board.
17      Q    Well, that was before Mr
18  Chandler came on board?
19      A    Well, Mr. Walker left
20  October the 1st of '93 and Mr. Chandler
21  came on board in November on November
22  the 15th and sometime in that six weeks
23  timeframe is when that was done.

207

1      Q    And is there in your view
2  anything wrong one way or the other
3  with $275 million being added to the
4  reserves?
5      MS. SILAS: Objection,
6  calls for expert opinion --
7      THE WITNESS: Well, I
8  think it --
9      MS. SILAS: -- and it
10  furthermore contradicts his testimony
11  which was not that the write-down was
12  wrong  The response to it was wrong
13      THE WITNESS: Well, I
14  think that the write-down --
15      MS. SILAS: Just for the
16  record -- I'm sorry  I didn't mean to
17  step on your toes.
18      THE WITNESS: I'm sorry
19  I'm sorry
20      MS. SILAS: We just have
21  to make the objections for the record
22      THE WITNESS: Yeah
23      MS. SILAS: Just for the

208

1  record your question also assumes facts
2  not in evidence; to wit, that this
3  witness testified that the write-down
4  in and of itself was wrong so I will
5  object on that basis.
6      MR. OSTER: Actually if
7  you'd listen to my question the
8  question was whether it was wrong
9      Q    (By Mr. Oster)  Do you
10  remember the question --
11      MS. SILAS: Object as
12  irrelevant.  His opinion regarding
13  whether it was wrong is also
14  irrelevant.
15      A    Well, I think it was
16  mandated by the insurance department of
17  the State of Tennessee
18      Q    Do you know?
19      A    Well, from my general
20  knowledge of insurance, an insurance
21  company has to maintain appropriate
22  financial reserves with the state
23  commissioner's office in which they are

209

1  domiciled to stay in business so it
2  wouldn't have mattered if Provident
3  wanted to do that  They had to do it
4  to stay in business.
5      Q    Do you know that for a
6  fact?
7      A    Well, that's my firm
8  belief, yes, sir
9      Q    Okay.  I'm asking now not
10  for your belief  I'm asking for a
11  fact, Dr. Feist.
12      A    Well --
13      Q    Do you know -- listen to
14  my question -- do you know if the State
15  of Tennessee required Provident Life
16  and Accident Company to add $275
17  million in reserves?  Do you know that
18  as a fact?
19      A    That is my understanding,
20  yes, sir
21      Q    Okay. And what is your
22  understanding based upon?
23      A    The fact that it was done

210

1      Q    You don't know whether the
2  company did that voluntarily or not?
3      A    The implication was that
4  they had to do it to stay in business
5      Q    I'm not asking for an
6  implication. I'm asking if you know.
7  Do you know for a fact whether it was
8  required by the State of Tennessee
9  Department of Insurance or whether it
10  was voluntary?
11      A    It was required by the
12  State of Tennessee
13      Q    And what do you base that
14  upon? Do you have a document, an
15  announcement, a bulletin?
16      A    I don't have any of those
17  It has been seven years ago but my
18  understanding of insurance companies is
19  that they have got to maintain
20  financial stability and have enough
21  reserves to cover the claims and
22  Provident, they had no choice but to do
23  that.

# FOSHEE & TURNER COURT REPORTERS

211

1     Q. Dr. Feist, can you point
2 me to a single fact in support of your
3 belief that the State of Tennessee
4 required Provident to set aside or to
5 to strengthen the reserves by $275
6 million?
7     A. Only by common knowledge
8 and what was, you know, in the
9 discussion of the company and also what
10 one read in the local newspaper. I
11 mean, it was common knowledge that they
12 had to do that.
13     Q. Okay. I'm going to move
14 to strike as nonresponsive. You don't
15 have any specific facts, do you, Dr.
16 Feist?
17     A. I don't have any specific
18 document but I think certain things are
19 common knowledge in a community when a
20 company has that situation.
21     Q. Okay. You talked also
22 about some big claim block that came in
23 in 1993 that by and large was

212

1 professionals. Do you recall your
2 comment about that topic?
3     A. I do --
4     MS. SILAS: Objection,
5 mischaracterizes his testimony. I
6 think he said it was in the early 80's
7 and 90's.
8     A. Well, if I may, the block
9 of business was sold in the 80's or
10 maybe the 70's, and then the claims
11 started coming in in the early 90's.
12     Q. Which is I believe what
13 the question was. The big claim block
14 came in in 1993; is that correct?
15     A. Well, let's say early
16 90's. I don't know particularly when
17 it was.
18     Q. Early 90's?
19     A. Yeah.
20     Q. And when you refer to it
21 as a big claim block coming in in 1993
22 what kind of numbers are we talking
23 about, Dr. Feist?

213

1     A. The big numbers that
2 required the $275 million write-down.
3     Q. A block of claims. How
4 many claims? What dollar value? What
5 can you give me in terms of specifics?
6     MS. SILAS: Objection,
7 compound. Which of those three
8 questions did you want him to answer?
9     MR. OSTER: Any of them.
10     A. Yeah, probably the answer
11 is $275 million. You know, I don't
12 know any way of knowing the answer but
13 my implication there, my thought is is
14 that they had a big block that's coming
15 due in 1993, $275 million covers it. I
16 don't think they had taken anymore or
17 any less than the State of Tennessee
18 Insurance Department mandated them to
19 do. I mean, they're not going to do
20 any more or any less than they have to,
21 for sure.
22     Q. What facts can you point
23 me to in support of your statement that

214

1 a big block of claims from
2 professionals, lawyers, doctors, came
3 in in 1993 beyond --
4     MS. SILAS: Object --
5     MR. OSTER: Excuse me
6     MS. SILAS: Don't glare at
7 me, counsel, and don't yell at the
8 witness.
9     A. Well, it was common
10 knowledge --
11     MS. SILAS: Why don't you
12 start the question over again
13     MR. OSTER: I'll be happy
14 to
15     MS. SILAS: Okay.
16     A. It was discussed in the
17 vice presidents meetings. I mean, it
18 wasn't a secret.
19     Q. (By Mr. Oster) Dr. Feist,
20 what I'm looking for is not general
21 impressions or implications. I'm
22 looking for whatever facts you can give
23 us. If you have facts please give them

215

1 and if you don't that's fine. Just say
2 so, too.
3     A. Well --
4     MS. SILAS: Counsel, hold
5 it. I'm going to object to -- the
6 whole deposition he just said it was
7 discussed at vice presidents meetings
8 and under the California Evidence Code
9 those are party admissions and you
10 asked him like he didn't give you an
11 answer already. I'm also going to
12 object to that under the case of
13 Rifkind -- R-i-f-k-i-n-d -- versus
14 Superior Court in the California Court
15 of Appeal. You are not allowed to ask
16 a witness or a party a contention
17 interrogatory such as what facts do you
18 have to give me to back up your
19 testimony. That's asking for
20 contentions. It is actually an
21 interrogatory and it's inappropriate as
22 to the form of the question. Anyway,
23 is there a question pending?

216

1     THE WITNESS: I haven't a
2 clue.
3     MR. OSTER: You know, I've
4 have never heard anyone say in a
5 deposition that asking a witness for
6 facts in support of the witness's
7 testimony somehow constitutes asking a
8 contention interrogatory of a party.
9     Q. (By Mr. Oster) But, Dr.
10 Feist, regardless of the difference of
11 opinion that I have with counsel, let
12 me ask you this. Can you give me any
13 numbers at all in support of the
14 statement you made that a big block of
15 claims mostly from professionals --
16 pardon me -- was by and large doctors,
17 lawyers that came in in 1993? Can you
18 give me any numbers?
19     A. Well, as I have said, the
20 write-down would indicate that that is
21 about the size of the block of time.
22     Q. The write-down, you mean
23 the strengthening the reserves?

# FOSHEE & TURNER COURT REPORTERS

217

1  A  The strengthening, I'm
2  sorry. The strengthening of reserves
3  would indicate that that's about the
4  size of the block. I have no more
5  information or specifics than that.
6  Q  Okay. Now, you stated
7  that after November of 1993 that there
8  was first a cultural change at
9  Provident having to do with rifting out
10 long time employees?
11 A  Yes, I said that
12 Q  Secondly you said there
13 was an attitude towards customers and I
14 assume you mean insureds which changed;
15 is that true?
16 A  That's correct
17 Q  And you say that the
18 benefit of the doubt no longer went to
19 the insured and something about a gray
20 area, that claims were pursued?
21 A  Uh-huh
22 Q  And this started in 1993;
23 is that right, or at the end 1993?

218

1  A  Probably the end of '93
2  going maybe into '94, in that
3  timeframe, that
4  Q  Now was this attitude
5  towards customers changing, was that
6  reflected in any kind of statistics at
7  all?
8  MS SILAS: I'm going to
9  object to vague and ambiguous --
10 A  Well, I ---
11 MS. SILAS: Well, it
12 assumes it has to be reflected
13 statistically. It also calls for
14 speculation
15 A  I have no statistics  I
16 was not in that area to deal with that
17 sort of thing.
18 Q  Specifically what I'm
19 trying to find out is if there is any
20 kind of factual basis for your belief
21 that the attitude towards the customer
22 changed. Were more claims being denied
23 on a percentage basis as a result of

219

1  this attitude towards customers
2  changing?
3  A  Well, again, that is my
4  perception in terms of the round-table
5  and so forth  The actual day-to-day
6  claims I had no statistics to know
7  about.
8  Q  The truth of the matter is
9  you don't know one way or the other; is
10 that true?
11 MS. SILAS: Wait I'm
12 sorry. Objection. Vague and
13 ambiguous  You don't know one way or
14 the other what?
15 MR OSTER: Whether
16 percentage of claims paid changed after
17 1993
18 MS SILAS: Objection.
19 Vague and ambiguous, percentage of
20 claims meaning amount of reserves?
21 Number of claims? It's irrelevant.
22 I'm sure you're going to bring up the
23 bogus 93 percent figure and some other

220

1  things but irrelevant to --
2  A  I was not privy to those
3  numbers.
4  Q  (By Mr. Oster) Okay. All
5  I'm trying to find out, Dr. Feist, is
6  this, is if there is something that we
7  can look at that would tend to support
8  or perhaps not support one way or the
9  other your belief that there was a
10 change in the attitude towards
11 customers that found its way into
12 claims-making decisions. That's what
13 I'm trying to find out
14 MS SILAS: Object as to
15 the form of the question, that it's an
16 interrogatory, calls for an opinion.
17 Asking him whether there is any
18 evidence is an inappropriate question
19 and it also calls for speculation
20 There's evidence --
21 A  I can't give you any
22 statistics but my impression is that it
23 was a cultural change after Chandler

221

1  came in into the administration
2  Q  Would you agree with me --
3  would your opinion change any, Dr.
4  Feist, if you learned that the -- both
5  the dollar value and the number of
6  claims that were actually paid
7  increased after Mr. Chandler arrived?
8  MS SILAS: Objection,
9  whether his opinion would change is
10 irrelevant, also assumes facts not in
11 evidence  It's a hypothetical to a
12 preceptiant witness. Also -- I'm
13 sorry. Are you saying the percentage
14 of payment of claims increased?
15 MR OSTER: Percentage or
16 dollar amount.
17 MS SILAS: And this is
18 based on Mr. Rutledge's opinion that
19 every month you pay a claim it's a new
20 paid claim? I just want to make sure
21 MR OSTER: Well --
22 MS. SILAS: Well, I'm
23 going to object. I --

222

1  MR OSTER: State your
2  objection and we'll go on  Okay?
3  MS SILAS: I'm sorry.
4  That's not what you did, counsel. I'm
5  not going to have you giving the
6  witness false information  It's a
7  hypothetical question, Doctor. Unless
8  you're compensated by Mr. Oster for
9  giving your professional opinions, I
10 don't know if you are required to
11 respond. It is also an incomplete
12 hypothetical --
13 THE WITNESS: Oh, yeah, I
14 would agree.
15 MS. SILAS: -- and it
16 assumes facts which I know not to be
17 true.
18 A  Well, I think it's an
19 erroneous question because if you take
20 Provident, Paul Revere and Unum, you
21 are taking three companies and you
22 could say, well, yeah, X number of
23 claims were paid from 1993 when Mr

# FOSHEE & TURNER COURT REPORTERS

223

1 Chandler came on board to when they
2 took Paul Revere, when they took over
3 Paul Revere, so you basically got a
4 company three times as big as when or
5 maybe bigger than that, more than that,
6 when Mr. Chandler took over so, sure,
7 they're paying more claims but you have
8 got three companies rolled into one so,
9 sure, they've got to be paying more
10 claims. They are selling more
11 disability insurance
12     Q    Anything else?
13     A    That's all I can say about
14 it
15     Q    Dr. Feist, respectfully I
16 am going to move to strike everything
17 you just had to say there. I hadn't
18 even asked a question yet.
19         MS. SILAS: You asked if
20 his opinion would change  It sounds
21 like his answer is no
22     A    Well, I thought you were
23 asking me about, you know, whether Mr.

224

1 Chandler had increased the payment
2 claims or the numbers --
3         MS. SILAS: No, you did --
4 I'm sorry  I didn't mean to interrupt
5 you. There was a question pending,
6 would your opinion change if I told
7 you --
8         THE WITNESS: Yeah,
9 exactly --
10        MS. SILAS: -- and you
11 gave him some statistics
12        THE WITNESS: -- that's
13 what I answered and I think you're not
14 comparing the same thing  You're
15 taking one company and comparing it to
16 a much larger company that's a
17 component of at least three smaller
18 companies.
19        MS. SILAS: Before you ask
20 another question I need a very fast
21 restroom break
22
23 (Whereupon, a break was taken )

225

1
2     Q    Dr. Feist, do you know the
3 percentage of claims on a percentage
4 basis only, not dollar volume, that was
5 paid by the company Provident Life and
6 Accident for the year 1992?
7         MS. SILAS: Objection,
8 irrelevant, vague and ambiguous as to
9 what is meant by a percentage of
10 claims, goes beyond the scope of direct
11 examination.
12    A    Well, I have no idea. You
13 alluded to it earlier that I was not
14 even in claims from 1990 to 1995.
15    Q    How about 1993, same
16 answer?
17    A    Same answer.
18        MS. SILAS: Same
19 objection  Well, let me incorporate by
20 reference --
21    A    Same objection, same
22 answer, yes.
23        MS. SILAS: Let me

226

1 incorporate by reference my previous
2 objection.
3         MR. OSTER: Fair enough
4 You can incorporate all of them.
5     Q    (By Mr. Oster)  How about
6 1994?
7         MS. SILAS: Same
8 objection.
9     A    Same question -- same
10 answer
11    Q    And how about 1995?
12        MS. SILAS: Same
13 objection.
14    A    I have no knowledge of
15 those statistics
16    Q    Would it be fair to say
17 that during the timeframe that I just
18 mentioned 1992 through the end of 1995
19 you don't know if on a percentage basis
20 it went up or down, true?
21        MS. SILAS: Objection,
22 irrelevant --
23    A    I have no idea

227

1         MS. SILAS: Also vague and
2 ambiguous and goes beyond the scope of
3 direct
4     A    I have no idea
5     Q    Now with respect to the
6 dollar amount of claims paid in the
7 interest of saving time, if I asked you
8 all the same questions do you know the
9 dollar amount that was paid in 1992, 3,
10 4, 5, your answer would be the same,
11 you don't know?
12    A    Well, obviously I was not
13 involved in that.
14        MS. SILAS: Wait. Hold
15 it. I have to for the record object
16 Object as irrelevant  It's also vague
17 and ambiguous.
18    Q    (By Mr. Oster)  Okay. Let
19 me restate my question  Let her do her
20 objection and then your answer  Okay?
21    A    It's getting to be a
22 routine, yeah
23    Q    My question is this: It's

228

1 true, is it not, that you do not know
2 the dollar volume of the claims paid
3 for the years 1992, 1993, 1994, 1995,
4 correct?
5         MS. SILAS: I'll just
6 incorporate by reference my previous
7 objection.
8     A    That's correct.
9     Q    And you don't know if that
10 number went up or down during the same
11 timeframe?
12        MS. SILAS: Incorporate by
13 reference my previous objection
14    A    I have no idea, sir. I
15 told you I was not involved in that. I
16 don't know
17    Q    Is it your
18 understanding -- or let me back up
19 Let's go back to the timeframe when you
20 were working at Provident. You were
21 upset because Mr. Mohney didn't want
22 you making claims decisions, true?
23    A    That's correct

# FOSHEE & TURNER COURT REPORTERS

**229**

1  Q   And you had been making
2  claims decisions in the past, correct?
3      A   That's correct.
4      Q   Did you feel it was wrong
5  for Mr. Mohney to instruct you not to
6  make claims decisions?
7      A   Yes, I did and I still do
8  because I think the -- it's somewhat of
9  a subtle philosophy but I think Mr.
10  Mohney's philosophy was that --
11      Q   Okay   Stop for a
12  moment --
13      A   Let me answer my
14  question -- answer your question
15      Q   You did.
16      A   No, I want to answer your
17  question   Mr. Mohney's philosophy was
18  that the claims personnel made the
19  final decision   My philosophy was that
20  if a person is disabled medically that
21  should be written on the file and that
22  was written on the file routinely
23  before Mr. Mohney came on board and

**230**

1  then when Mr. Mohney criticized me for
2  writing on a file that the person was
3  totally and permanently disabled I
4  thought that was totally wrong.
5      Q   Dr. Feist, is it your
6  testimony or your belief or your
7  position, however you wish to
8  characterize it, that because someone
9  is medically disabled automatically
10  they are entitled to policy benefits?
11      A   If the policy specifically
12  states that a person is disabled and
13  unable to perform his job, yes,
14  absolutely.
15      Q   Well, actually, you have
16  changed my question   Please listen to
17  my question, Dr. Feist   I will
18  rephrase it this way.  Simply because
19  someone is medically disabled doesn't
20  automatically mean that they are
21  entitled to benefits, true?
22      A   I think in most cases the
23  person who is medically disabled should

**231**

1  get the benefits, yes   I really do
2  think so.
3      Q   I'm not talking about most
4  cases.  Listen to my question, please,
5  Dr. Feist   Is it true to state that
6  simply because somebody is medically
7  disabled does not automatically, that
8  is to say a hundred percent of the
9  time, mean that they are entitled to
10  benefits under the policy?
11      A   I would say --
12      MS SILAS: Objection,
13  vague and ambiguous   I don't even know
14  what you're asking him and it calls for
15  an opinion of my contract
16  interpretation
17      A   My opinion is if the
18  contract says on an own-oc policy that
19  the person cannot perform the
20  occupation because of a medical
21  disability, he should be paid a hundred
22  percent, yes, I do think so
23      Q   Okay   Dr. Feist, I move

**232**

1  to strike because you are changing my
2  question   Let me rephrase it in a way
3  that maybe you can deal with   A person
4  can be disabled from performing their
5  occupation but if it's a self-inflicted
6  injury it wouldn't be covered under any
7  of the Provident policies that you
8  worked with, true?
9      MS SILAS: Objection,
10  asking a hypothetical --
11      A   Oh, that's ridiculous
12      MS SILAS: Wait just a
13  minute.  Wait before you answer.  A
14  hypothetical question to a preceptiant
15  witness
16      A   You didn't ask --
17      MS SILAS: It's asking
18  for an application of facts to the
19  contract and other things
20      A   Yeah, you misled me, sir.
21  I think you asked me about a medical
22  impairment and, of course, if somebody
23  tries to commit suicide and doesn't

**233**

1  succeed that's not going to be payable
2  but I'm talking about a medical
3  impairment short of a self-inflicted
4  would.
5      Q   All right   Let me ask the
6  question a little bit differently and
7  maybe we can find some common ground
8  Would you agree, Dr. Feist, based upon
9  your experience with the Provident
10  companies that the determination of
11  whether one is entitled to benefits
12  under a policy may be impacted by
13  factors other than exclusively the
14  medical condition?
15      A   Well, of course, but I
16  think there is another philosophical
17  thing I think we haven't discussed
18  today and I would like to discuss it
19  now if I may.
20      Q   Well, no, you may not.
21      MS SILAS: He won't let
22  you   I'll come back to it.
23      THE WITNESS:  Yeah.

**234**

1      Q   So, for example, one of
2  the nonmedical factors that can impact
3  entitlement to benefits is for example
4  the duration of the policy term for
5  indemnity, true?
6      A   Well, you're just going to
7  go into hypotheticals.  I mean, I don't
8  understand what you're trying to say.
9  Obviously if a person is disabled and
10  it's only for, you know, 20 months,
11  well, sure, but I mean if we're talking
12  lifetime benefits and own-oc
13  occupation, they should be paid for
14  that
15      Q   Dr. Feist, you would agree
16  that regardless of -- and based upon
17  your experience regardless of someone's
18  medical condition if they're not
19  entitled to benefits under the policy
20  regardless of the reason it shouldn't
21  be paid?
22      MS SILAS: Objection,
23  calls for an opinion

# FOSHEE & TURNER COURT REPORTERS

235

1  A  Well, obviously so but I
2  think --
3  Q  And you agree that the
4  obligation of the company is to pay all
5  valid claims; you would agree with
6  that, wouldn't you?
7  A  Of course.
8  Q  And you don't feel that
9  there's any obligation on the part of
10  the company to pay invalid claims;
11  would you also agree with that?
12  A  Yes.
13  Q  And with respect to the
14  validity or invalidity of claims would
15  you agree there are factors that are
16  involved in that determination that can
17  be other than purely medical factors?
18  A  Of course, but I think
19  you're overlooking a point that I'd
20  like to make now if I may.
21  MS. SILAS: He doesn't
22  want you to say anything that he
23  doesn't want to hear.

236

1  A  Well, obviously. I
2  think -- I think --
3  Q  Dr. Feist, please. This
4  is not a lecture.
5  A  Well, I understand that
6  but I think you're missing a point that
7  I'd like to bring out and I think it's
8  relevant to your line of questioning
9  MS. SILAS: I'll ask you
10  later about it.
11  Q  Well, Dr Feist, then Ms.
12  Silas can ask it
13  A  All right.
14  Q  You were asked your
15  knowledge of Mr. Mohney's experience
16  with the company and I believe you gave
17  us what you know about his background.
18  I want to be a bit more specific
19  now. Do you know the various types of
20  training that Mr. Mohney has engaged in
21  over the years specifically with
22  respect to claim handling?
23  MS SILAS: I'm going to

237

1  object, assumes facts not in evidence;
2  to wit, that Mohney has had any
3  training over the years in claims
4  handing
5  A  Let me say that I knew Mr.
6  Mohney from early -- well, '82 when I
7  came there and he was in the group
8  department as mid level administrator
9  and then later on --
10  Q  You said the group claims
11  department?
12  A  Group claims department.
13  Q  And what did he do in the
14  group claims department?
15  A  I think he was just an
16  administrator. I don't think he had
17  any particular claims experience.
18  Q  Do you know?
19  A  I don't know. Then he
20  became head of a --
21  Q  Excuse me.
22  A  -- select group department
23  and then he came to the claims

238

1  department and to my knowledge had very
2  little or any training in claims before
3  coming to that and what he has done
4  since then I have no idea.
5  Q  Do you know what Mr
6  Mohney did before you came to the
7  company in 1982?
8  A  I have no idea.
9  Q  Do you know what kind of
10  training he had with the company prior
11  to when you started with the company in
12  1982?
13  A  I have no way of knowing.
14  Q  Is it fair to say that you
15  can't sit bare of your own personal
16  knowledge and tell us what kind of
17  training Mr. Mohney has or has not had
18  with respect to the handling of claims?
19  MS. SILAS: Objection,
20  argumentative.
21  A  During the time that I
22  knew Mr. Mohney I didn't know that he
23  had any training in claims. If he has

239

1  had some since I have no way of
2  knowing
3  Q  Okay. What I'm trying to
4  be precise about, Dr. Feist, is this
5  Simply because you don't know about it
6  doesn't mean that Mr. Mohney hasn't had
7  some training, would you agree?
8  MS. SILAS: Objection,
9  calls for speculation It's
10  argumentative.
11  A  Well, I think if an
12  individual is working in a certain area
13  and then is moved to another area where
14  he has had no training, I mean, it's
15  obvious that he has no training in that
16  area.
17  Q  Dr. Feist, please listen
18  to my question. I'm trying to find out
19  what your testimony really is. What
20  you're telling us I think is that you
21  don't know if Mr. Mohney has had claims
22  handling -- of your knowledge you can't
23  say, yes, he has had training or, yes,

240

1  he hasn't had training  You just don't
2  know one way or the other; isn't that
3  true?
4  MS. SILAS: Objection,
5  argumentative and I don't know which
6  part of that was a question and which
7  part of it was an argument.
8  A  I don't either but I think
9  my understanding of Mr. Mohney was that
10  he had no claims experience of any
11  direct sort until he came to the
12  present job
13  Q  Do you know one way or the
14  other? Did he ever tell you?
15  A  Well, you know, I just
16  observed him in the company and I
17  didn't know him personally until 1995.
18  Q  You don't know if he
19  sought other training or not, do you?
20  A  Well, obviously, I don't
21  know.
22  Q  Mr. Mohney worked in the
23  group claims department  These were

# FOSHEE & TURNER COURT REPORTERS

**241**

1  group disability claims, correct?
2      A    Well, if you say so.  I --
3      Q    Do you know?
4      A    Well, he worked in the
5  group department.  What he specifically
6  did, I don't really know.
7      Q    Do you know how long he
8  worked in that department?
9      A    My guess would be from
10  whenever he came in the 1970's to
11  probably middle of the 80's when he did
12  some other duties.
13      Q    So let's work with that.
14  Are you comfortable with a ten-year
15  period?
16      A    I would guess so.
17      Q    Do you know what he did in
18  the group claims department during that
19  ten-year period?
20      A    My understanding was he
21  worked in administration of group
22  claims and I'm not sure that he
23  actually did claims himself.  I think

**242**

1  he supervised individuals who did pay
2  claims.
3      Q    Do you know how many
4  individual claims or group claims Mr.
5  Mohney reviewed during that timeframe?
6      A    I have no idea.
7      Q    You don't know one way or
8  the other, do you?
9      A    I don't know what Mr.
10  Mohney did.  My impression was he had
11  very little actual claims experience
12  but again I don't know directly.
13      Q    Okay.  I'm going to move
14  to strike your impression.  I'm trying
15  to figure out what facts you have that
16  you can tell us.  Do you have any facts
17  that you can tell us of your knowledge
18  of what Mr. Mohney did with respect to
19  group claims during roughly the ten
20  years that he was involved in it
21  according to your best recollection?
22      A    My best recollection is
23  that he was administrator in that

**243**

1  section.  Whether he actually paid
2  claims or supervised persons who did, I
3  really don't know.
4      Q    Okay.  Thank you.  Now,
5  let's turn our attention if we may to
6  the round-table meetings.  Is it
7  accurate to state, Dr. Feist, that no
8  actual claim decisions were made at the
9  round-table meetings?
10      A    That's correct.
11      Q    I think you were asked, in
12  fact, I'm sure -- well, you were
13  questioned on whether or not Mr. Mohney
14  at any of these round-table meetings
15  ever made a statement to the effect
16  that this claimant is impaired and
17  should be paid and you said you don't
18  recall him ever making such a
19  statement, true?
20      A    That's correct, yes, sir.
21      Q    In fact he didn't make a
22  statement one way or the other about
23  whether a claim should be paid at the

**244**

1  meeting because no decisions were
2  reached, true?
3      A    That's correct.  No
4  decisions were made at the round-table
5      Q    And he never stated one
6  way or another whether a claimant
7  should be paid at a round-table
8  meeting, true also?
9      A    That's correct.
10      Q    Now you have participated
11  in these round-table discussions; is
12  that right?
13      A    Yeah, I did for about nine
14  months, yes, sir.
15      Q    And did you see anything
16  wrong going on at these round-table
17  meetings that you brought to anybody's
18  attention?
19      A    No.  I was uncomfortable
20  with the round-table process but again
21  as I alluded to in earlier testimony
22  today, the process was ongoing and
23  whatever I said would not have changed

**245**

1  it and if I had made a criticism of it
2  I probably would have been out on the
3  street without a job.
4          MS. SILAS:  I'm going to
5  make a belated objection that the
6  question as compound.  As to whether he
7  saw anything wrong and whether he
8  reported on it is compound
9      Q    Did you see anything wrong
10  that you thought was wrong that
11  happened at the round-table meetings?
12      A    Well, I think just the
13  fact of the round-table meetings and
14  discussing persons who are on
15  disability claims and who had not
16  been -- there had been no change in
17  their medical impairment was a wrong
18  process.
19      Q    Is it your belief, Dr
20  Feist, that --
21          MS. SILAS:  Feist
22          MR. OSTER:  Pardon me
23  I'll back up and start again

**246**

1      A    That's all right.  I
2  answer to either one  It doesn't make
3  any difference.
4      Q    Would you agree, Dr
5  Feist, that there is nothing inherently
6  wrong at looking at a claim that has
7  been on the books for a number of
8  years?
9      A    Well, there is nothing
10  wrong with it if you're looking in the
11  right way.  I think --
12      Q    So let me stop you right
13  there.  So it depends upon the purpose,
14  would you agree?
15      A    Absolutely.
16      Q    Okay  Now let's go
17  through each of these things.  The
18  round-table process itself, there is
19  nothing inherently evil with the
20  round-table process itself, it depends
21  upon the purpose, would you agree?
22      A    I think that's correct
23      Q    And so for example if the

# FOSHEE & TURNER COURT REPORTERS

247

1  round-table process results in a
2  recommendation that an IME be conducted
3  there is nothing inherently wrong with
4  that, true?
5      A  That's correct.
6      Q  And the same thing if the
7  round-table process says we should
8  conduct surveillance, there is nothing
9  inherently evil about that, true?
10     A  Again, in the mode and
11 manner in which it's done is the
12 important thing.
13     MS. SILAS: Hold it  I'm
14 going to object --
15     Q  So that is a yes?
16     MS. SILAS: May I
17 interpose an objection, counsel, as I
18 allowed you to?
19     MR. OSTER: Excuse me  Go
20 right ahead.
21     MS. SILAS: Move to strike
22 in that it is an incomplete
23 hypothetical. Conducting surveillance

248

1  on people is an invasion of their
2  privacy and your question assumes that
3  it would be done correctly and so it's
4  an incomplete hypothetical and it's
5  vague and ambiguous as to what you mean
6  by surveillance. It also might be
7  illegal in some instances so with that
8  in mind go ahead
9      A  Is there --
10     Q  There is nothing
11 inherently wrong, would you agree, in a
12 recommendation from a round-table
13 review that additional financial
14 information be obtained from an
15 insured? There is nothing inherently
16 wrong, would you agree?
17     A  That's correct.
18     Q  And you would also agree
19 that a round-table recommendation that
20 would result in further contact with
21 the attending physician to obtain more
22 information and update a medical
23 review, there is nothing inherently

249

1  wrong with that, agreed?
2      A  Well, that's an ongoing
3  process  In a typical scenario where
4  somebody is on claim a physician has to
5  verify and certify discontinued
6  disability on a periodic basis so if
7  that's going on there's no need to do
8  that
9      Q  Let me ask the question
10 again  If there is a round-table
11 recommendation that the attending
12 physician be contacted to obtain
13 updated information about a claimant
14 you would agree, would you not, that
15 there is nothing inherently wrong with
16 that?
17     MS. SILAS: Objection. It
18 calls for a hypothetical from a
19 preceptiant witness, calls for an
20 expert opinion and it's an incomplete
21 hypothetical
22     A  Well, I think, again, the
23 whole modality, the modalities

250

1  themselves are fine and I think are
2  traditionally and appropriately used by
3  insurance companies.
4      Q  Excuse me just one moment,
5  please. Just for the benefit of
6  whoever might read this or listen to
7  this, when you say modalities you are
8  talking about things like contacting
9  the physician, getting records, getting
10 financial records, potentially IME's,
11 potentially surveillance, things of
12 that nature, correct?
13     A  Yes, yes.
14     Q  So those are the
15 modalities --
16     A  Those modalities are
17 traditionally used by insurance
18 companies --
19     Q  Or tools, investigatory
20 tools?
21     A  Yes, and used
22 appropriately are appropriate but used
23 inappropriately are inappropriate.

251

1      Q  All right  Thank you.
2  And whether something was used
3  appropriately or inappropriately is in
4  part determined by the result?
5      MS. SILAS: Objection.
6  That really is vague and ambiguous  I
7  have no idea what you're talking about.
8      A  That's --
9      MS. SILAS: Hold it
10 Yeah, you know what, it's vague,
11 ambiguous, calls for an opinion and
12 it's unintelligible.
13     MR. OSTER: All right.
14     MS. SILAS: If you spy on
15 an insured in their home or accuse them
16 of being a liar and ultimately pay the
17 claim -- I just want clarification.
18 Your question is is that appropriate
19 anyway because you paid the claim? I
20 just want to understand what you're
21 asking
22     MR. OSTER: Please make
23 your objection  A dialogue between the

252

1  two of us is not going to accomplish a
2  lot except wasting time.
3      MS. SILAS: Well, I don't
4  know what you're talking about --
5      A  Yeah, please re-ask the
6  question.
7      MS. SILAS: -- so I
8  deserve as opposing counsel to know
9  what the question is.
10     MR. OSTER: Sure  I'm
11 happy to  Okay?
12     Q  (By Mr. Oster) I suppose
13 in the interest of saving time, I could
14 ask it this way  All of the things
15 that we have been discussing, the
16 different tools or modalities to use
17 your expression, are not in and of
18 themselves particularly good or
19 particularly bad; what's critical in
20 your mind is the purpose with which
21 they are utilized, would you agree with
22 that?
23     A  That is correct, sir, yes,

# FOSHEE & TURNER COURT REPORTERS

253

1 yes
2 Q You were asked about a
3 conversation that you heard at these
4 round-tables concerning attending
5 physicians. Do you recall that topic?
6 A Uh-huh.
7 Q And I believe you
8 testified to the effect that the
9 attending physicians were criticized?
10 A I remember several
11 occasions where attending physicians
12 were criticized, in particular an
13 occasion where an attending physician
14 in a given city had certified
15 disability on several of his patients
16 and there was some discussion, well,
17 this physician is providing false
18 information about his patients and
19 therefore he should be discredited and
20 I think that's the wrong approach to
21 take.
22 Q Do you know whether it was
23 true that the doctor was providing

254

1 false information about the patients?
2 A I have no way to verify
3 one way or the other.
4 Q Did you assume that that
5 accusation was a false accusation
6 against the attending physician?
7 A I did.
8 Q Do you know the name of
9 the doctor involved?
10 A No, I do not.
11 Q Do you know the name of
12 the case that was being discussed at
13 the round-table?
14 A We are talking seven or
15 eight years ago. No, I don't remember
16 that.
17 Q You just thought in
18 general the tone pertaining to the
19 attending physicians was disrespectful?
20 A I did.
21 Q Do you recall testifying
22 that you believe that an attending
23 physician should be an advocate on

255

1 behalf of his patient?
2 A I think that's part of a
3 physician's role. He should be an
4 advocate for his patient. He should be
5 fair to his patient. He should be fair
6 to the insurance company and anybody
7 involved, and I think by and large
8 physicians are, not to say that all
9 physicians are but by and large
10 physicians are ethical and credible.
11 Q Thank you. For the moment
12 my question was focusing on advocacy.
13 You do believe that a physician should
14 be an advocate on behalf of his
15 patient, true?
16 A An advocate and a fair
17 representative of what his patient's
18 condition is.
19 Q All right. I will move to
20 strike the last part of it. Now, who
21 should he be an advocate to?
22 A Well, basically he wants
23 to be fair to his patient and he also

256

1 has the obligation to be ethical and
2 report to a insurance company for
3 example whether his patient is or is
4 not disabled, and I think any physician
5 worth his salt should be able to
6 determine whether a person is
7 malingering or not. Again, typically
8 these physicians know these people,
9 have seen them in their practice for a
10 number of years and they know that a
11 person is disabled. If they were
12 actively working and then for some
13 reason become disabled they have seen
14 the difference.
15 Q I'm going to move to
16 strike as nonresponsive and I don't
17 mean to be disrespectful when I do
18 that, Dr. Feist. We just have a
19 difference of opinion about the scope
20 of the answers. That's --
21 MS. SILAS: I think based
22 on your tone, counsel, respectfully
23 you do mean to be disrespectful.

257

1 You've said you don't mean to be
2 disrespectful a number of times but
3 your tone states otherwise.
4 Q (By Mr. Oster) Did you
5 ever come across a circumstance, Dr
6 Feist, in the round-table discussions
7 where you believed that this lack of
8 respect for attending physicians that
9 you have described resulted in a
10 wrongful termination of a claim?
11 A Well, I have no way of
12 knowing. Again, as you pointed out
13 earlier the decisions were not made at
14 the round-table. The decisions about
15 these cases were made in closed session
16 and only the persons involved knew what
17 the decisions were.
18 Q So the answer to my
19 question is no?
20 A That's correct.
21 Q When you were at the
22 round-table discussions do you recall
23 ever saying anything to the other

258

1 participants like what you have been
2 testifying here; that is to say, hey,
3 you know, they know the patients and we
4 ought to be giving more weight to their
5 testimony, something like that?
6 A I don't recall saying
7 that. It probably wouldn't have done
8 any good had I done that.
9 Q With respect to the cases
10 that were discussed at round-table, I'm
11 gathering from your testimony that what
12 took place was that some action plan
13 was adopted as a result of the
14 round-table?
15 A Well, action plan or some
16 plan to try to terminate the claim,
17 yes.
18 Q And you were asked before
19 about equating terminations and
20 resolutions and so forth. What you
21 mean generally speaking is to get the
22 claim off the books?
23 A Exactly

# FOSHEE & TURNER COURT REPORTERS

259

1  Q  Now, there are a number of
2  ways that a claim can be gotten off the
3  books, would you agree?
4  A  Of course.
5  Q  One way is to advance pay
6  the claim a lump sum, right?
7  A  Correct.
8  Q  Do you have any knowledge
9  of whether or not that happened during
10  your time at Provident?
11  A  I think it was happening
12  pretty routine, yeah  Again, I was not
13  involved in that directly but I'm sure
14  it was done.
15  Q  Okay. So it routinely
16  happened that they would advance pay a
17  claim and it would be off the books,
18  right?
19  A  Yes, correct.
20  Q  Anything wrong with that?
21  A  If the claimant is
22  satisfied with it, that's okay.
23  Q  All right  And that would

260

1  result in a reduction of reserves,
2  right?
3  A  Yes.
4  Q  And that would be a
5  termination, right?
6  A  Uh-huh.
7  Q  So simply because of the
8  fact that a claim is gotten off the
9  books, there is a termination, there is
10  a reduction of reserves doesn't mean
11  something bad has happened, would you
12  agree?
13  MS. SILAS: I'm going to
14  object as to incomplete hypothetical
15  and it is a hypothetical and it calls
16  for an opinion.
17  A  Again, it's the intent.
18  You know, if somebody dies he's not
19  going to be disabled any longer.  If he
20  goes back to work he is not disabled,
21  if he takes a lump sum payment, but if
22  he's still disabled and being denied
23  because of some technicality or some

261

1  other modality that's wrong.
2  Q  You're changing my
3  question, Dr. Feist. Please, just
4  listen to it. I'm just trying to
5  establish a point with you to see if
6  you agree that if you have a lump sum
7  payment it means the claim is off the
8  book, the reserves go down, the insured
9  is satisfied and happy, was properly
10  treated; that's all right, isn't it?
11  MS. SILAS: Objection.
12  It's compound, calls for an opinion,
13  it's a hypothetical and it's an
14  incomplete hypothetical.
15  A  Well, again, if the
16  claimant is satisfied with it and the
17  company is satisfied with it, that's
18  fine, but the problem comes when the
19  claimant is not satisfied with it
20  Q  So at least in the
21  situation that I described for you that
22  kind of termination would be an okay
23  termination?

262

1  MS. SILAS: Objection.
2  Same objection as I made last time.
3  A  Of course
4  Q  All right  And let's say
5  the example that you brought up a
6  moment ago  Let's say that claimant
7  passes away. Now that's somebody who
8  is no longer on the books, correct?
9  A  Yeah.
10  Q  Nothing wrong with that,
11  is there?
12  A  Well, life is a hundred
13  percent fatal, yes  It happens to
14  everybody.
15  Q  And terminations also
16  arise from people returning to work,
17  correct?
18  A  Of course.
19  Q  And if someone returns to
20  work, wants to return to work, is fully
21  capable of returning to work, not
22  pressured to return to work, they just
23  return to work because as you testified

263

1  most people like to --
2  A  Most people want to go to
3  work  I think most people want to get
4  up every morning and go to a job and be
5  productive
6  Q  And they do it on their
7  own volition in this circumstance that
8  I'm describing to you. They want to
9  and so forth  They are satisfied with
10  the company but they decide they're
11  returning to work; there's nothing
12  wrong with that, is there?
13  A  Oh, absolutely.
14  Q  And that's a termination,
15  right?
16  MS. SILAS: Objection.
17  MR OSTER: Pardon me.
18  MS. SILAS: Never mind the
19  objection.
20  A  Well, yeah, obviously
21  you're stretching the definition of
22  termination but that's okay.
23  Q  Well, that's a

264

1  termination, is it not?
2  A  Yeah
3  Q  And that results in a
4  reduction of reserves?
5  A  Yeah
6  Q  And that's a claim that is
7  off the books?
8  A  It's off the books, yes.
9  MS. SILAS: Can I just
10  have a running objection to his
11  opinions regarding what is and is not
12  proper --
13  THE WITNESS: Yeah
14  MS. SILAS: -- as calling
15  for a hypothetical, constituting
16  incomplete hypothetical discussions of
17  nonexistent claim files and calling for
18  an opinion and an expert opinion to
19  this whole line of questioning
20  MR. OSTER: You can
21  object  That's fine.
22  MS. SILAS: I'm not
23  waiving that objection

# FOSHEE & TURNER COURT REPORTERS

265

```
 1      A   Yeah, I think --
 2      Q   (By Mr. Oster)  Now, at
 3  the round-table meetings there was
 4  discussion -- pardon me  Was there
 5  discussion according to your
 6  recollection of getting people to
 7  return to work?
 8      MS. SILAS: Objection,
 9  irrelevant and this case does not
10  involve a return to work
11      A   Yeah, yeah, I think you're
12  missing the whole point of the
13  round-table.  Persons who go back to
14  work, who die --
15      Q   Dr. Feist -- Dr. Feist --
16      A   -- et cetera, they don't
17  come to round-table
18      Q   Dr. Feist, my question was
19  at the round-tables was there
20  discussion of getting people to return
21  to work?
22      MS SILAS: Object as
23  vague and ambiguous.
```

266

```
 1      A   The discussion was
 2  basically getting them off claim.
 3  Whether they went back to work or not,
 4  they really didn't discuss that or care
 5  I don't think.
 6      Q   So your testimony then is
 7  that there was no discussion at
 8  round-table at least that you're aware
 9  of about getting people back to work?
10      A   That is correct
11      Q   And at the round-tables
12  during the time that you were there did
13  you ever hear of a circumstance
14  where -- well, let me just back up for
15  just a moment.  The terminations that
16  we have are return to work, somebody
17  passing away, lump sum payment in
18  advance, then there are terminations
19  that result from matters where the
20  policy benefits have been exhausted,
21  correct?
22      A   Uh-huh  Yes.
23      Q   And that is according to
```

267

```
 1  policy terms, right?
 2      A   Well, of course, according
 3  to policy language that's the way it
 4  works
 5      Q   And there's nothing wrong
 6  with that, is there?
 7      A   If the applicant takes a
 8  policy and accepts those conditions of
 9  the policy, it's a contract and if the
10  insurance company fulfills its contract
11  that's the end of it.
12      Q   So there is nothing wrong
13  with the company stopping to pay
14  benefits when the policy term is over,
15  correct?
16      A   It's appropriate
17      Q   Now, you told us that you
18  thought it was inappropriate, just
19  general words, you thought it was
20  inappropriate to examine open claims
21  where there was no change in the
22  medical condition, is that right?
23      A   That's correct  That's my
```

268

```
 1  firm belief.
 2      Q   Okay  Now, as a general
 3  proposition or a specific proposition,
 4  whichever you wish, Dr. Feist, in your
 5  experience as a medical doctor, are
 6  there conditions which can temporarily
 7  totally disable a claimant that you
 8  would ordinarily based upon experience
 9  expect to improve over time?
10      MS. SILAS: Hold it.
11  Objection, calls for an expert opinion
12  It's an incomplete hypothetical  It's
13  vague and ambiguous and it's also a
14  hypothetical question to a preceptiant
15  witness
16      A   Well, the answer is yes
17  but --
18      Q   All right.  And let's say
19  for example that someone has a broken
20  leg and that broken leg is going to be
21  expected to sideline them for a period
22  of time.  That would be an ordinary
23  expectation, pretty normal, right?
```

269

```
 1      A   Yeah, that's pretty
 2  routine, yes, sir
 3      Q   Now, regardless of what
 4  the specific condition might be, let's
 5  just accept the proposition that there
 6  are some conditions that one would
 7  expect to improve over time.  Is it in
 8  your view unreasonable for someone to
 9  take a second look at a claim that is
10  expected to improve over time but for
11  whatever reason hasn't?
12      A   Well, let me give you this
13  little talk.
14      Q   I don't want a little
15  talk.
16      A   I'm going to give it now
17  or later.  I think --
18      Q   Dr. Feist, I'd like an
19  answer to my question, please.  The
20  judge is not going to let you give a
21  little talk to a jury and this is going
22  to be played for the benefit of the
23  jury
```

270

```
 1      A   I understand that.
 2      MS. SILAS: Counsel, very
 3  little of your arguing with the witness
 4  is going to be played for a jury
 5      A   I think -- I think --
 6      MS. SILAS: Let me just
 7  interpose an objection  It again is an
 8  incomplete hypothetical and I doubt
 9  very much anyone with a broken leg was
10  brought to round-table  You can answer
11  him yes or no and I'll ask the
12  follow-up later so he doesn't --
13      A   Okay.  My position is that
14  when a claim comes in de novo, all
15  modalities should be used; financial,
16  contractual, medical, legal --
17      Q   Dr. Feist, I'm going to
18  stop you right there.  Please, I've
19  read the speech.  Okay?
20      A   Well, I want to give the
21  speech
22      MS. SILAS: Counsel, watch
23  it  How many times did I have to
```

# FOSHEE & TURNER COURT REPORTERS

271

1 listen to Ralph Mohney say how fair,
2 objective, and thorough he is? You
3 know, if it's good for the goose, it's
4 good for the gander
5     A   You know, I'm answering
6 your question, sir. It may take a
7 little longer than you wish  All those
8 modalities should be brought out the
9 first three months of the (inaudible)
10 claim. Once that person has been
11 judged disabled he or she has to have
12 periodic reviews and unless -- by an
13 attending physician. Unless there is
14 any medical change in that condition
15 that person is disabled. Now all the
16 cases that I recall at round-table had
17 been persons who had been judged
18 initially to be disabled but had been
19 brought to round-table to try to find
20 some way to terminate the claim and I
21 think that was totally wrong.
22 Modalities are fine but the way they
23 were used were incorrect.

272

1       I think we've got a
2 signal
3
4 (Whereupon, a break was taken )
5
6     Q   (By Mr. Oster) Before we
7 went off the record for the tape change
8 and so forth, Dr. Feist, you gave a
9 response which I move to strike as
10 nonresponsive  I will try to ask the
11 question a little bit differently. In
12 a circumstance where one would
13 ordinarily expect based upon medical
14 experience a claimant's condition to
15 change, is it in your view inherently
16 wrong for a company to relook at a
17 claim in the event of no change?
18     MS SILAS: I object as
19 vague and ambiguous and it's a
20 hypothetical and incomplete
21 hypothetical.
22     A   Well, I think you've got a
23 mechanism in place traditionally in

273

1 disability insurance where the
2 attending physician certifies
3 disability and as long as the physician
4 certifies disability there is no reason
5 to relook.
6     Q   So your answer is yes it
7 is inherently wrong?
8     A   Yes, that's correct
9     Q   Now, in your experience
10 attending physicians make mistakes,
11 don't they?
12     A   Well, I think that's a
13 loaded question, sir  I think
14 attending physicians are human beings
15 who have medical training  They try to
16 do the best in their training and
17 experience to do what is correct and
18 make the right diagnosis and right
19 treatments but physicians are not
20 infallible.
21     Q   So attending physicians do
22 make mistakes, do you agree?
23     A   Attending physicians are

274

1 human, yes, sir
2     Q   And would you also agree
3 that simply because an attending
4 physician states his or her opinion
5 that a claimant is medically impaired
6 doesn't automatically mean that the
7 individual in question is entitled to
8 disability benefits under the policy?
9     MS SILAS: Objection.
10 It's a hypothetical. It's an
11 incomplete hypothetical, vague and
12 ambiguous and seeks improperly an
13 opinion
14     A   What I have testified
15 today, sir, is that if there is no
16 medical change in the claimant's
17 condition, there should be no re-look
18     Q   Ever?
19     A   Ever because --
20     Q   Excuse me. Under any
21 circumstances?
22     A   Because if you've looked
23 at everything initially, that's

275

1 correct.
2     Q   So you cannot -- in your
3 view once the attending physician
4 continues to certify disability and
5 there is no change in the company's
6 knowledge about a medical condition the
7 claim should be paid indefinitely?
8     A   Yes, sir, I do.
9     MS SILAS: I would
10 incorporate by reference my previous
11 objection and it misstated his prior
12 answer
13     Q   And regardless of what the
14 company may learn through surveillance
15 or Social Security records or anything
16 else, you believe that as long as there
17 is no change in the medical condition
18 and the attending physician continues
19 to certify to a disability, the company
20 is obligated to keep paying; is that
21 true?
22     MS SILAS: Objection,
23 assumes facts not in evidence  It's an

276

1 incomplete hypothetical. It is a
2 hypothetical question  It is
3 argumentative.
4     A   I think so  I think
5 apropos to what I said earlier  All of
6 those modalities were looked at before
7 the person was put on disability and if
8 there is no change in the medical
9 condition, there is no reason to look
10 at it
11     Q   You've seen circumstances,
12 of course, have you not, where the
13 insurance company made a mistake the
14 first time around in certifying
15 disability; that has happened, hasn't
16 it?
17     A   Well, I'm sure it has but
18 again that three to six month window
19 when the claim initially comes in, all
20 modalities should be pulled out and
21 that decision should be made correctly
22     Q   Well, I guess what I'm
23 trying to ask is this, assume for me

# FOSHEE & TURNER COURT REPORTERS

**277**

1  as we did a moment ago that the
2  insurance company made a mistake and
3  determined somebody to be totally
4  disabled and later on they corrected
5  it. Simply because of the fact that
6  they didn't do the job the first time
7  around in your view they are prevented
8  from rectifying the situation; is that
9  your belief?
10      MS. SILAS: Hold it.
11  Objection, argumentative. It's an
12  incomplete hypothetical. It misstates
13  his testimony and it also is
14  inconsistent with Ralph Mohney's own
15  memorandum which states that they
16  should never admit that they made a
17  mistake in initially putting a person
18  on claim. All right. You can answer
19  the question.
20      A  I think in a correctly run
21  claims operation everything should be
22  done initially so that there are no
23  mistakes and that's the way it should

**278**

1  be.
2      Q  I don't disagree with you,
3  Dr. Feist, but I'm what trying to find
4  out, though, is this, is that if the
5  company makes a mistake in the first
6  instance are they prohibited later on
7  from trying to rectify that?
8      A  If there was fraud on the
9  basis of the claimant, sure
10      Q  Is that the only
11  circumstance, fraud?
12      MS. SILAS: I'm going to
13  object again. It's an incomplete
14  hypothetical --
15      A  I would think so
16      MS. SILAS: Vague and
17  ambiguous, calls for an opinion and
18  argumentative.
19      A  Yeah, I think so.
20      Q  Now, what if there was no
21  initial fraud but there is malingering
22  thereafter?
23      MS. SILAS: Objection.

**279**

1  Same -- I'm just going to incorporate
2  for the court reporter's benefit --
3      A  Yeah, I was going to say,
4  well --
5      MS. SILAS: Wait one
6  second because she can't take us both
7  down. I'll just incorporate by
8  reference my previous objections
9  regarding hypothetical and improper
10  opinion and argumentative.
11      A  Please repeat the
12  question. I've lost it.
13      Q  (By Mr. Oster) Have you
14  ever seen situations where a claimant
15  is disabled initially and then prolongs
16  disability for reasons of secondary
17  gain?
18      A  Well, statistically that
19  happens but I think it happens so
20  infrequently and I think again your
21  failsafe in the malinger is your
22  attending physician's statement. He
23  knows whether the individual is

**280**

1  malingering or not.
2      Q  It can happen, can't it?
3      MS. SILAS: Objection, it
4  calls for speculation as to --
5      A  Well, obviously it can
6  happen but again it would seem to me to
7  be so rare as to be inconsequential
8      Q  Do you believe that an
9  insurer such as Paul Revere has the
10  right to investigate if the claimant is
11  malingering?
12      A  In the initial process,
13  yes.
14      Q  And no time thereafter?
15      MS. SILAS: Objection,
16  calls for an opinion regarding claims
17  handling procedures from a preceptiant
18  witness It's also -- and again I hate
19  to keep repeating myself but I guess I
20  have to for the record. It's a
21  hypothetical. It's irrelevant and goes
22  far beyond the scope of direct.
23      A  I think the answer is yes

**281**

1      Q  I want to make sure that I
2  understand that. Suppose that the
3  claim was investigated up front. The
4  company is paying the claim.
5      A  Uh-huh.
6      Q  Are you saying that the
7  company thereafter never has the right
8  to investigate whether a claimant is
9  unduly prolonging their disability?
10      MS. SILAS: Objection,
11  vague and ambiguous, calls for an
12  expert opinion regarding good faith
13  claim handling procedures from a
14  preceptiant witness and it's also an
15  improper hypothetical and an incomplete
16  hypothetical.
17      A  I think again the failsafe
18  is the attending physician's statement
19  and if he continues to certify this
20  individual disabled, he is disabled
21      Q  Dr. Feist, you were
22  previously asked the following question
23  and gave the following response and I'm

**282**

1  trying to find out if you're going to
2  stand by your testimony, and wait
3  before you begin an answer because I'm
4  sure I'm going to get an objection
5      MS. SILAS: You sure are.
6      Q  The question -- this is
7  from your deposition testimony taken
8  right here in the Herman versus
9  Provident case and this was on March
10  21st of the year 2000.
11      A  March 21 of the year 2000
12  The Herman case? What's the first name
13  on that, do you know?
14      Q  Sheldon.
15      MS. SILAS: That's Dan
16  Graham from California.
17      THE WITNESS: Okay. I'm
18  getting the right perspective here
19      Q  Question: Okay. And
20  supposing that they investigated the
21  claim up front and began paying the
22  claim, are you saying that Provident
23  never has the right to investigate to

# FOSHEE & TURNER COURT REPORTERS

283

1　see whether a claimant is unduly
2　prolonging their disability? Answer:
3　If there is some reason to suspect that
4　a person is malingering it should be
5　investigated but if there is no
6　evidence of malingering there is no
7　reason to investigate -- reinvestigate
8　is my point. Question: Supposing
9　there is evidence of malingering?
10　Answer: If there is evidence of
11　malingering that comes up, that should
12　be investigated.
13　　　That appears at page 153
14　lines 5 through 21　Do you stand by
15　that testimony?
16　　　MS. SILAS: Object as
17　argumentative.
18　　　A　Yeah, absolutely, but I
19　think if I made it whatever date that
20　was, I have to stand by it.
21　　　Q　Was one of the things that
22　made you uncomfortable at the
23　round-table meetings or with the

284

1　round-table process the fact that there
2　were claims with large reserves being
3　discussed?
4　　　A　I don't think as much the
5　large claims　I think the fact that it
6　was inappropriate. These individuals
7　were on claim, had been on claim for a
8　number of months or years, and there
9　was no objective evidence that I was
10　ever given in the cases discussed that
11　there was any change in the medical
12　impairment from the time they were
13　judged disabled.
14　　　Q　All right　I appreciate
15　that but I'm going to move to strike
16　everything after the part having to do
17　with my question relating to the size
18　of the reserve, and if we may, please,
19　let's concentrate on that for just a
20　moment. I want to establish whether or
21　not you think that it was somehow wrong
22　for the company to address in
23　round-table the claims that have large

285

1　reserves; just the fact of the reserve
2　itself, did that bother you?
3　　　MS. SILAS: Objection as
4　to virtually every question you have
5　asked since you started cross-examining
6　Dr. Feist as to whether in his opinion
7　this or that was wrong. I asked him on
8　direct certain facts and things that
9　had occurred. Whether it's wrong is
10　going to be for a jury to decide --
11　　　THE WITNESS: Yeah
12　　　MS. SILAS: So to the
13　whole line of questioning as to whether
14　this or that fact to which he testified
15　in isolation is wrong I object and --
16　　　A　Well, I think the thing
17　about the reserves is that they
18　typically at the round-table
19　discussions hit the cases with the
20　highest reserves again as I said
21　earlier today to get the biggest bang
22　for the buck　If they brought up a
23　claim that's got a $2 million reserve

286

1　that's better for the company than if
2　it's only got a $500,000 reserve.
3　　　Q　I'm going to move to
4　strike again as nonresponsive　I
5　thought you told me before that I
6　wasn't the fact of the reserve or the
7　amount of the reserve but the fact that
8　they were trying to terminate the
9　claim; is that what bothered you?
10　　　MS. SILAS: I'm going to
11　object. I don't recall that being what
12　he told you.
13　　　A　Well, I think the process
14　is what I objected to. The --
15　　　Q　So the amount of the
16　reserve is irrelevant?
17　　　A　No, I think --
18　　　MS. SILAS: Objection
19　again　First of all, objection to his
20　opinion regarding whether it is
21　relevant or not is itself irrelevant,
22　calls for an expert opinion. I just --
23　maybe you're confused, Mr. Oster. This

287

1　witness was not designated by me as a
2　claims handling expert but as a witness
3　to certain things that happened so --
4　　　A　Right　I think the answer
5　to your question is that the object
6　of the round-table was to cut off the
7　high dollar claims　I objected to the
8　process and I objected to the basic
9　process. Again I think the high dollar
10　claims were targeted because they would
11　give the best, most efficient claims
12　write-down
13　　　Q　I'm going to move to
14　strike as nonresponsive　You weren't
15　paid any extra money for attending the
16　round-table meetings, were you?
17　　　A　I was not
18　　　Q　How many extra hours did
19　you have to work per week after April
20　of 1995 compared to what you were
21　working beforehand?
22　　　A　Roughly 18 to 20.
23　　　Q　And for this additional 18

288

1　to 20 hours per week you did not
2　receive any additional compensation,
3　true?
4　　　A　That's correct.
5　　　Q　And you resented that, did
6　you not?
7　　　A　Yes, I did
8　　　Q　Did you ever tell anyone
9　about that?
10　　　A　No, and it would not have
11　done any good. I think the thing that
12　I resented the most --
13　　　Q　Did you ever ask for any
14　additional compensation?
15　　　A　No　Let me answer the
16　question, sir.
17　　　Q　Did you ever ask to be
18　relieved of your responsibilities with
19　respect to round-table?
20　　　A　No.
21　　　Q　Did you ever ask for any
22　additional recognition or anything in
23　connection with the additional work

# FOSHEE & TURNER COURT REPORTERS

**289**

1 that you were being asked to do?
2     A No, I was not but I think
3 the thing that probably bothered me the
4 most was that Mohney took advantage of
5 my expertise even though there was a
6 hiatus of some four years to fill a
7 void that he needed to fill that he
8 should have filled with another
9 physician and he did a year or so
10 later, and the other factor of that is
11 that the round-tables were
12 uncomfortable for me and I just felt
13 that I was being taken advantage of
14 frankly.
15     Q I don't mean to dwell on
16 this, Dr Feist, but I have read
17 testimony and you are obviously
18 familiar with the testimony concerning
19 your attendance at these meetings?
20     A Uh-huh.
21     Q These meetings took place
22 starting in late afternoon typically?
23     A Typically 4:00 or 5:00

**290**

1 o'clock in the evening, yes, sir
2     Q And they would last
3 sometimes to what 8:00 o'clock or 9:00
4 o'clock at night?
5     A Well, if they started at
6 4:00 they would usually be over by 7:30
7 or 8:00, yeah
8     Q And were there times that
9 you slept during the meetings?
10     A I napped on occasion but I
11 don't think that that interfered with
12 my participation
13     Q When you say napped on
14 occasion can you give me some idea of
15 what you mean? Were out for an hour,
16 45 minutes?
17     A Probably five or ten
18 minutes at a time.
19     Q Do you know?
20     MS. SILAS: No longer than
21 I've been at this deposition, I'm sure.
22     A I have no way of knowing.
23 I'm sure somebody probably has written

**291**

1 down someplace or another how many
2 minutes I slept in the nine months but
3 I have no idea. I think all I have said
4 in other depositions that the meetings
5 were uncomfortable for me I really
6 had very little participation and
7 typically I would go back to my office
8 and work another two or three hours
9 after the meeting so to catch a little
10 few-minute nap was refreshing.
11     Q I appreciate that but I'm
12 going to move to strike regardless
13 With respect to your participation in
14 the round-table meetings, you recall
15 them discussing fraudulent claims
16 during the meeting, don't you?
17     A Fraudulent claims?
18     Q Yes, claims that were
19 suspected as involving fraud.
20     A I would have to think
21 about that a moment. I can't recall
22 right off the bag so to speak. Define
23 what you mean by fraudulent claims

**292**

1     Q A claim that is not valid,
2 that's illegitimate and knowingly so by
3 a claimant.
4     A I don't think we discussed
5 that specifically.
6     Q Well, you discussed
7 surveillance, correct?
8     A Well, sometimes
9 surveillance was suggested, yes.
10     Q Did you ever make a
11 recommendation for surveillance being
12 conducted?
13     MS. SILAS: Wait. At a
14 round-table meeting or ever in his
15 life?
16     MR OSTER: At a
17 round-table
18     A At a round-table, no, I
19 did not
20     Q What kind of
21 recommendations if any did you make
22 while you participated in the
23 round-table meetings?

**293**

1     A Well, I think my role was
2 as a medical consultant to provide
3 information to the participants of the
4 round-table about the discussed medical
5 impairment. I don't think I had any
6 role in discussing the legal or the
7 financial or the surveillance or any of
8 the other modalities. I was just there
9 for the medical part.
10     Q Did you ever make any
11 recommendations of any nature?
12     A No.
13     Q Did you ever express any
14 opinions?
15     A I expressed medical
16 opinions in terms of describing the
17 medical impairment and what -- you
18 know, the prognosis and the describing
19 the medical impairment and so forth
20     Q Do you ever recall
21 participating in a round-table meeting
22 and giving an opinion that you thought
23 that the claimant was not medically

**294**

1 impaired from performing his or her
2 occupation?
3     A Say that last again. I
4 didn't hear you.
5     Q Sure Did you ever
6 participate in a round-table discussion
7 where you gave a medical opinion that
8 the claimant was not impaired from
9 performing his or her occupation?
10     A No, I didn't do that.
11     Q Was it always your opinion
12 to the best of your recollection that
13 the claimant was in fact impaired from
14 performing his or her occupation?
15     A I think that is a correct
16 statement, yes, sir.
17     Q During the entire time
18 that you have been with Provident, did
19 you ever have contact with a claim or a
20 claim file where you felt that there
21 was some fraud involved with the claim?
22     A I did not
23     Q Not a single time?

# FOSHEE & TURNER COURT REPORTERS

295

```
1     A   Not to my recollection.
2     Q   Do you believe that there
3  are some disability claims that are
4  submitted that are in fact fraudulent?
5     A   Well, I'm sure there are
6  but again that initial process should
7  weed those out.
8     Q   At any of the -- at each
9  round-table meeting as best you can
10 recollect with respect to each of the
11 files that was discussed resulted in
12 some kind of action plan or
13 recommendation or some type of a
14 follow-up; is that true?
15    A   Each case?
16    Q   Yes.
17    A   I would have to say the
18 great majority. I can't say each case.
19 That has been some time ago.
20    Q   All right. Let's go --
21    A   The great majority. Most
22 of the cases, yes.
23    Q   Was there ever a time with
```

296

```
1  respect to any of the recommendations
2  that were made on these great majority
3  of cases that were discussed at the
4  round-tables that you participated in
5  where you said anything to the effect
6  of, no, that's wrong, we shouldn't be
7  doing this?
8     A   No. Again I've told you I
9  would have, one, lost my job summarily
10 had I done that. Until I had a job in
11 hand I attended the round-tables.
12    Q   Going back to Exhibit 2
13 for just a moment here on page 4, item
14 number 16 of your affidavit, you state
15 as follows, in my opinion based upon my
16 education, training, and experience,
17 the panel meetings resulted in the
18 illegitimate denial of continued
19 disability payments to insured persons
20 of Provident, Equitable, and Paul
21 Revere. Let's stop there for a moment,
22 closed quotes. Are you aware of any
23 round-table discussion that in your
```

297

```
1  view resulted in the illegitimate
2  denial of continued disability payments
3  to anyone other than the claimant named
4  Fowler?
5     A   Well, I think the
6  depositions that I have given would
7  fall under that category
8     Q   Is it -- I want to be very
9  careful about this. You think that the
10 round-table discussions that you
11 participated in resulted in the --
12    A   Oh, okay. Round-table
13 discussion, okay.
14    Q   -- wrongful denial or the
15 illegitimate denial of continued
16 disability payments to the people in
17 whose cases you have testified; is that
18 what you're saying?
19    A   No I'm sorry  I
20 misunderstood you  The only one -- the
21 only case that I've given a deposition
22 on that I know that was presented to
23 the round-table when I was there was
```

298

```
1  the Fowler case but I think the
2  other -- a part of that's correct.
3     Q   You think that included
4  insured persons of Equitable and Paul
5  Revere?
6     A   Well, no. The first
7  phrase of about the illegitimate
8  denial. Obviously the reference to
9  Paul Revere and Equitable isn't correct
10 but the other part of the statement I
11 think is correct.
12    Q   So if one was going to be
13 entirely accurate with respect to this
14 paragraph 16 it should read as follows:
15 In my opinion based upon my education,
16 training, and experience the panel
17 meetings resulted in the illegitimate
18 denial of continued disability payments
19 to the Fowler claimant, period,
20 correct?
21       MS. SILAS: Well, can I
22 read what it does say in --
23       THE WITNESS: Yes, that's
```

299

```
1  what it says --
2     A   Well, technically you are
3  correct but I think the point is that
4  the round-table procedure was designed
5  to do just exactly what that statement
6  says.
7     Q   And you know of the Fowler
8  case. Do you know of any others?
9     A   No.
10    Q   Now there were about 100
11 to 120 that you were exposed to, right?
12    A   To the best of my
13 recollection, that's correct.
14    Q   And have you been
15 contacted by 100 to 120 attorneys to
16 give depositions with respect to those
17 claims?
18       MS. SILAS: I'm going to
19 object as irrelevant and Provident
20 certainly has never identified Dr.
21 Feist as a witness so probably half of
22 those claimants never heard of him.
23 That's irrelevant and calls for
```

300

```
1  speculation.
2     A   I have not been contacted
3  by 120, probably a fourth of that
4  probably.
5
6  (Whereupon, a discussion was held off
7  the record )
8
9     Q   Okay  You ordered IME's
10 or you suggested the use of IME's --
11    A   Yes
12    Q   -- from time to time while
13 you were at Provident; correct?
14    A   That's correct, yes
15    Q   And when you were involved
16 in the handling of a claim that
17 involved an IME you would review it,
18 would you not?
19    A   Yes, of course
20    Q   Did you ever in the entire
21 time that you were with Provident come
22 across an IME that was -- that you
23 thought was a dishonest IME or
```

# FOSHEE & TURNER COURT REPORTERS

**301**

1  something wrong with it, intentionally
2  wrong with it, skewed somehow?
3      MS. SILAS: Object as
4  vague, ambiguous and unintelligible.
5      A  I don't recall any IME's
6  that were as you described. I think
7  the IME physicians evaluated the
8  claimant as best they could and gave
9  their best opinion.
10      Q  Okay. And how many IME
11  reports, ballpark, would you
12  guesstimate that you have reviewed for
13  Provident over the years?
14      MS. SILAS: Did you say
15  estimate or guesstimate?
16      THE WITNESS: It would be
17  about the same.
18      A  It would be a hard number
19  to come to because one doesn't use an
20  IME in every case but I would say maybe
21  10 or 15 percent of the cases I
22  reviewed over my career at Provident
23  we probably got IME's on.

**302**

1      Q  Potentially hundreds then
2  or would it be in the thousands?
3      A  Hundreds probably.
4      Q  And would it be accurate
5  to state that insofar as you are aware
6  in none of those potentially hundreds
7  of IME's that Provident ordered it was
8  a rigged or deceitful IME so far as you
9  were aware?
10      MS. SILAS: I'm going to
11  object as vague, ambiguous --
12      THE WITNESS: Yeah, sure,
13  yeah --
14      MS. SILAS: -- and it
15  calls for speculation as to whether it
16  was later determined to be skewed --
17      A  Well, I think during my
18  experience with claims prior to 1993
19  Provident used like a consulting firm
20  where, you know, if you have an IME in
21  a given city, you would call up and say
22  I want an IME of this applicant by an
23  orthopedist and they would provide it.

**303**

1  I think the practice after Mohney came
2  on in '94, '93 is that Provident would
3  pick an IME that they knew or thought
4  would give the answer they wanted. I
5  think before Mohney took over the
6  claims I think IME's were basically
7  objective and fair and I think after
8  that IME's in the last few years have
9  been used to get the answer that
10  Provident wants.
11      Q  I move to strike, Dr.
12  Feist. Please listen to my question.
13  I will ask the court reporter to reread
14  my question.
15      MS. SILAS: I think it was
16  responsive.
17      THE WITNESS: I tried to
18  answer the best I could, sir.
19
20  (The desired portion of testimony was
21  read back by the court reporter.)
22
23      A  Well, I think the answer

**304**

1  is that --
2      MS. SILAS: Oh, wait.
3  I'm sorry. I didn't mean to
4  interrupt --
5      THE WITNESS: I'm sorry.
6      MS. SILAS: -- but when
7  she gets her paper back in I need to
8  make a quick addition to my
9  objection --
10      THE WITNESS: I'm sorry.
11      MS. SILAS: -- that it's
12  ambiguous and it assumes -- it has a
13  false assumption that you can tell from
14  the face of the IME that it is rigged.
15      A  Well, I think during my
16  tenure in claims I don't recall seeing
17  a rigged IME, and again I think the
18  protocol was to get an independent
19  agency. There are agencies that will
20  arrange for IME's for insurance
21  companies in given cities objectively
22  done, and then in the last few years I
23  think Provident has used physicians to

**305**

1  give IME's to give the answer that
2  Provident, Unum, Protective -- I mean
3  not Protective -- Unum and Paul Revere
4  and Provident that they wanted.
5      Q  Okay. I'm going to move
6  to strike the last part of your answer
7  but I do want to do you this courtesy,
8  Dr. Feist. You say the last few years.
9  Are you talking about the last few
10  years you were there?
11      A  Well, I think, yeah --
12  well --
13      Q  I mean, you don't mean the
14  year 2000 or 1999 because you weren't
15  there?
16      A  Well, I think '94, '95,
17  and '96 and then in the depositions
18  that I have seen subsequent to when I
19  left Provident, many of those cases
20  were terminated after -- in the
21  depositions they were terminated after
22  an IME was obtained that Provident
23  wanted to get to terminate the claim.

**306**

1      Q  Let's take this a step at
2  a time. You believe -- pardon me -- do
3  you believe that in the quote last few
4  years, close quotes, that you were with
5  Provident, Provident was trying to get
6  IME's that it wanted as opposed to fair
7  objective IME's; is that your belief?
8      A  I believe that and it was
9  incipient then but I think it was
10  there.
11      Q  All right. Now, can you
12  recall a single example of where that
13  occurred according to your belief?
14      A  When I was there?
15      Q  Yes.
16      A  Well, again, my role as a
17  medical consultant was to give an
18  opinion and --
19      Q  Dr. Feist, can you recall
20  a single example while you were there?
21      A  -- I would rarely see
22  the -- I might advise an IME but I
23  might not have seen the final decision.

# FOSHEE & TURNER COURT REPORTERS

307

```
1    Q   So the answer to my
2  question is no?
3         MS SILAS: Objection.
4  The question calls for speculation and
5  that the witness has already stated he
6  didn't see the final claim
7  determination; therefore, the question
8  is misleading.
9    A   Well, to my knowledge I
10 don't recall during my tenure at
11 Provident the last nine months at Provident.
12   Q   Do you recall at any time
13 seeing an IME that Provident requested
14 in a case either while you were at
15 Provident or thereafter where you
16 thought the physician providing the IME
17 was being dishonest?
18   A   Yes, I do.
19   Q   Okay And what case was
20 that?
21   A   That was in the Dr. Lynn
22 Thompson case out of Austin, Texas.
23   Q   And when was that case
```

310

```
1  you were not involved in the claims
2  handling of that in any way whatsoever?
3    A   That's true but I thought
4  we were talking about IME's in that
5  case.
6    Q   All right  Now, did you
7  serve as an expert witness in that
8  case?
9    A   Yes, I did
10   Q   And with respect to that
11 case in terms of the role between the
12 IME physician and Provident, is it your
13 testimony that Provident ordered a
14 false IME from the IME physician?
15   A   Yes, it is, sir.
16   Q   And who was the physician
17 that was involved there?
18   A   I can't give you that
19 name.  The situation was that Dr.
20 Thompson has a severe eye problem and
21 he was not able to do periodontic work
22 and his attending physician said that
23 he was disabled from periodontics and
```

308

```
1  adjudicated?
2    A   That's a tough question.
3  Probably early '99 if my memory serves
4  me correctly.
5    Q   And that was a case where
6  in your mind there was collusion
7  between the IME physician and
8  Provident?
9    A   Yes, indeed.
10   Q   And in addition to the
11 Thompson case, any other case that you
12 can think of?
13   A   Any other cases? Well,
14 again, I would have to go back and
15 review the depositions but I think as I
16 alluded to earlier I think in the
17 last — since I left Provident and
18 based on the depositions that I have
19 seen I think the practice of Provident
20 getting the IME that they want has been
21 used very frequently.
22   Q   Now what is it about the
23 Thompson case that causes you to
```

311

```
1  the IME that Provident hired if you
2  will said he was not disabled and
3  Provident terminated his claim.
4    Q   And was there any other
5  evidence that the termination was based
6  upon?
7    A   To my knowledge the only
8  other evidence was disputation about
9  his visible abilities.
10   Q   And were you given the
11 entire file to review?
12   A   To my recollection, yes,
13 sir.
14   Q   Who gave you that file?
15   A   The attorney for the
16 plaintiff
17   Q   You don't know if there
18 was other evidence other than what the
19 plaintiff's attorney gave to you; isn't
20 that true?
21        MS. SILAS: I would object
22 to going into the details of another
23 case as irrelevant.
```

309

```
1  believe that the IME physician in that
2  case was dishonest?
3    A   Well, because Dr. Thompson
4  is a dentist, a periodontist by
5  training, and he has a severe visual
6  problem and as you know in --
7    Q   Let me back up for just a
8  moment by the way  Was the Thompson
9  case something that you were involved
10 in while you were at Provident?
11   A   No, but I got deposed on
12 it since I left Provident.
13   Q   And so you didn't work on
14 the Thompson case, you don't have any
15 personal involvement in the Thompson
16 case other than post litigation; is
17 that true?
18   A   Well, I'm not sure what
19 you mean by post litigation.  I'm
20 talking about the deposition and
21 leading up to the settlement.
22   Q   Right  Let's take this a
23 step at a time.  In the Thompson case
```

312

```
1    A   Well, I think to my
2  knowledge and my understanding I was
3  given all the claims file that was
4  available on Dr. Thompson.
5    Q   Okay. But you don't know
6  that that was all of the evidence, do
7  you; isn't that true?
8    A   My understanding, sir, was
9  that it was all the evidence.
10   Q   Do you know that for a
11 fact?
12   A   I believe in my heart of
13 hearts it was the all the evidence in
14 the file.
15   Q   Which you can't prove one
16 way or the other, can you?
17        MS. SILAS: Objection,
18 argumentative.
19   A   Well, I mean, if an
20 attorney for either side says this was
21 the entire file on this claimant,
22 please review it and give an opinion, I
23 have to take it on faith that that's
```

**A Legalink Company * 2001 Park Place, Suite 220 * Birmingham, AL 35203 * www.foshee-turner.com**
## 1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

313

1 the entire file
2    Q    And the reason you
3 believe -- if we can just establish
4 this, Dr Feist, the reason that you
5 believe that it was a collusive IME, a
6 phony IME, is because of the conclusion
7 reached by the IME physician?
8    A    I do, yes, sir.
9    Q    Was there anything else
10 other than the conclusion?
11    A    What do you mean by that?
12    Q    Well, for example, were
13 you aware of the fact that this
14 physician whose name you can't recall
15 at the moment but that this physician,
16 Dr -- we'll just call him this doctor,
17 this family physician --
18    A    Jones. Dr -- you're
19 taking about the IME physician?
20    Q    That's correct. That he
21 was somehow on the take or the payroll
22 of Paul Revere or of Provident --
23    A    It was Provident.

314

1    Q    -- or of UnumProvident or
2 anything like that?
3    MS. SILAS: Hold it.
4 Objection of the term on the take. I
5 don't think there was any testimony at
6 least not so far in this deposition
7 that he was on the take.
8    Q    All right. Let's just
9 back up.
10    MS. SILAS: Maybe he was.
11    MR. OSTER: Maybe I could
12 just ask it this way to save some time
13    MS. SILAS: Well, it's too
14 late to save some time. We're way past
15 that
16    THE WITNESS: We're beyond
17 that.
18    Q    Dr Feist, is it your
19 opinion -- pardon me -- is your opinion
20 that the IME was dishonest based upon
21 the fact of what the conclusion of the
22 IME was that there was no disability?
23    A    I do, yes, sir

315

1    Q    And you believe that the
2 IME physician intentionally created a
3 false report?
4    A    I would say an inaccurate
5 report, yes, sir.
6    Q    Intentionally?
7    MS. SILAS: I'm going to
8 object, calls for speculation as to the
9 IME physician's state of mind.
10    A    I don't know his intention
11 but I think the fact was that once this
12 IME was rendered, Dr. Thompson's
13 benefits were terminated
14    Q    What I'm trying to find
15 out, Dr. Feist, is really -- I mean,
16 this is a very serious charge you are
17 making here about there being a
18 collusive IME I'm trying to find out
19 if you're really saying not that this
20 IME physician was inaccurate but that
21 he was intentionally putting together a
22 false report because he was somehow in
23 league with Provident; is that what you

316

1 are saying?
2    MS. SILAS: I'm going to
3 object and I don't think that was his
4 testimony, counsel. I think that was
5 your testimony. He is not making an
6 accusation.
7    A    I have no knowledge of
8 that IME's intent. I just know that
9 the report was inaccurate and was not
10 thorough enough to really evaluate Dr.
11 Thompson's problem
12    Q    And based upon that you
13 believe it to be a fraud?
14    MS. SILAS: Objection. He
15 never said that.
16    A    I never said that.
17    MS. SILAS: He said ten
18 times it's not his intent, counsel.
19    A    I think what I'm saying is
20 Dr. Thompson was being paid as being
21 disabled and then when this IME said he
22 was not disabled he was terminated and
23 there wasn't a process of trying to

317

1 reconcile the differences of opinion
2 upon the various physicians
3    Q    Okay. What I'm trying to
4 find out is this. Put aside for the
5 moment the payment or nonpayment of
6 benefits to Dr. Thompson the claimant
7 All right?
8    A    Uh-huh.
9    Q    I'm trying to explore here
10 to find out if you really believe that
11 the IME physician was intentionally
12 trying to create a false report; is
13 that your testimony?
14    MS. SILAS: Objection,
15 mischaracterizes his testimony. When
16 you say really believe, I don't believe
17 he has said anything about the
18 intentions of the IME physician
19    A    I have no way of knowing
20 the intention of the IME physician I
21 just know that he gave an inaccurate
22 and not detailed enough evaluation of
23 Dr Thompson and that inaccurate and

318

1 lack of detailed report was used I
2 think inappropriately by Provident.
3 Now whether that physician got a little
4 money under the table, I have no idea.
5 I would not want to insinuate that in
6 any way.
7    Q    That's fine, Dr Feist
8 I'm just trying to find out because I
9 got the mistaken impression and I will
10 call it my mistake that you were in
11 essence saying that there was a
12 dishonest IME physician who was acting
13 at the behest of Provident. Let me
14 restate the question this way. With
15 respect to the Thompson case is it your
16 belief not that the IME physician was
17 dishonest but that Provident misused
18 his report; is that what you're saying?
19    A    I think that's probably
20 appropriate
21    Q    So we don't have a
22 dishonest IME physician, we have an
23 inappropriate use of the IME; is that

# FOSHEE & TURNER COURT REPORTERS

319

1 fair?
2     A   That's correct, yeah, I
3 think that's fair.
4     Q   Now, putting aside for a
5 moment the Thompson case, what I'm
6 trying to concentrate on, Dr Feist, is
7 any examples or cases or facts that
8 tend to shed light on the notion that
9 Provident was going out and trying to
10 get rigged IME's, IME's that would come
11 back just one way in the favor of the
12 company and against the claimant Are
13 we on the same page?
14     A   Yes, sir, we are
15     Q   What can you tell me that
16 you know that would tend to support
17 that statement?
18     A   Well, I can't give you --
19     MS. SILAS: I'm going to
20 object -- well, it asks for an
21 interrogatory, asks for an evaluation
22 of evidence, calls for a narrative.
23     A   I think another one of the

320

1 cases that I gave a deposition on that
2 I can't recall at this moment which one
3 it was, it was probably out of Austin,
4 Texas as well in that same Lynn
5 Thompson deposition, was an
6 anesthesiologist who had had trouble
7 with alcohol and drug addiction and had
8 been judged disabled by his attending
9 physician but was sent to an IME who
10 said, no, you can practice
11 anesthesiology even though you have had
12 alcohol and drug abuse problems, not a
13 problem, which I think was totally
14 inappropriate, again, using an IME to
15 get the answer that Provident wanted to
16 get to terminate a claim
17     Q   Now what I'm trying to
18 find out -- and maybe I'm just not
19 explaining this. I do understand that
20 you feel that there were circumstances
21 that Provident took an IME after it got
22 it and then misused it I understand
23 that What I'm trying to focus on is

321

1 setting up a phony IME in the first
2 instance. Do you have that distinction
3 in mind?
4     A   Uh-huh.
5     Q   You do?
6     A   Yeah
7     Q   All right. And are you
8 aware of an instance or example where
9 Provident tried to set up a phony or
10 rigged or predetermined IME in the
11 first instance?
12     MS. SILAS: Objection,
13 calls for speculation and that this
14 witness wasn't privy to Ralph Mohney's
15 discussion with any IME physicians or
16 the adjustors' discussions with any IME
17 physicians so that he might not be in a
18 position to know whether it's actually
19 rigged or not You can answer
20     A   The one case that came to
21 mind was the Joe Wallace case out of
22 Austin, Texas Provident sent him to
23 an IME that gave them the answer they

322

1 wanted Now whether that was rigged or
2 set up or whatever, to me it's just
3 inappropriate.
4     Q   I appreciate that but you
5 don't know one way or another -- are
6 you saying that the IME physician in
7 the Wallace case was dishonest?
8     A   Yes, I think so, simply
9 because of his answer and his response
10 saying that a physician who has had
11 alcohol and drug addiction can practice
12 anesthesiology is inappropriate
13     Q   And that was rigged in
14 advance with Provident?
15     A   I believe so, yes, sir
16     Q   Okay It's your belief.
17 Do you have anything beyond the fact of
18 the opinion and your disagreement with
19 the conclusion, anything beyond that?
20     A   I think it's just out of
21 the realm of common sense to say that,
22 that a physician who has had alcohol
23 and drug addiction can practice

323

1 anesthesiology is totally
2 inappropriate.
3     Q   Have you ever seen an
4 example, by the way -- have you ever
5 seen an example of where an attending
6 physician was wrong about the condition
7 of his patient?
8     A   Well, I mean, if you say
9 has any physician ever been wrong,
10 well, as I indicated earlier physicians
11 are human beings I think they
12 honestly try to evaluate every patient
13 they see and treat them appropriately
14 and honestly evaluate individuals who
15 claim they're disabled, but I think by
16 and large physicians try to reflect
17 their opinions the best they can on the
18 facts of the case Now obviously there
19 may be cases where that is
20 inappropriate and that's not been done
21 but it can't be very often
22     Q   How about your experience
23 personally, you? Have you ever

324

1 believed based upon your view of file
2 materials that an attending physician
3 was wrong about the attending
4 physician's belief that an insured was
5 disabled?
6     A   I don't recall a case of
7 that nature, no.
8     Q   So a hundred percent of
9 the time in your experience the
10 attending physician was always right;
11 is that true?
12     MS. SILAS: Objection,
13 mischaracterizes his testimony. He
14 said he doesn't remember a particular
15 case, not that they've never been
16 wrong
17     THE WITNESS: I think
18 that's true.
19     MS. SILAS: You're
20 misquoting him --
21     THE WITNESS: Yeah, I
22 think --
23     MS. SILAS: -- and you are

# FOSHEE & TURNER COURT REPORTERS

**325**

1  harassing him.
2     A   Obviously, my experience
3  is my experience and, you know, not to
4  say that there aren't malingerers but I
5  think most physicians are able to
6  ferret that out.
7     Q   I'm going to move as
8  nonresponsive.  If there is something
9  about my question you don't understand
10  I'm happy to rephrase it.  All I'm
11  trying to find out is this, is your
12  experience, and have you ever believed
13  that an attending physician was wrong
14  about the attending physician's
15  diagnosis of his insured as being
16  disabled?
17     A   I don't recall an instance
18  where I felt that.
19     Q   To your belief or
20  knowledge or recollection did you ever
21  give any advice at a round-table
22  discussion that was not followed?
23     A   Given any advice that was

**326**

1  not followed?
2     Q   That is correct.
3     A   Not that I recall.
4     Q   Do you ever recall there
5  being action taken -- recommended or
6  taken at a round-table meeting that was
7  contrary to something you had
8  expressed?
9     A   Not that I recall.
10
11     (Whereupon, a break was taken.)
12
13     (By Mr. Oster)  A few
14  remaining topics, Dr. Feist.  With
15  respect to the round-table meetings you
16  told us earlier about the typical
17  length of meetings
18     A   Uh-huh.
19     Q   You also told us generally
20  the number of files discussed at each
21  meeting.  Realizing this is an average,
22  realizing also we're talking about
23  something that took place five years

**327**

1  ago or more, is it your recollection
2  that each file as it was presented was
3  discussed for and arranged between say
4  30 and 50 minutes?
5     A   I would say on average
6  each file was probably discussed 20 to
7  30 minutes probably, yeah.
8     Q   Do you recall that entire
9  time Mr. Mohney directing that anything
10  be done with any file?
11     A   My recollection was that
12  Mr. Mohney was the moderator and kept
13  the discussion going and one person
14  talking at a time but I don't recall
15  his ever in that round-table format
16  expressing an opinion about the claim
17  favorably or unfavorably.
18     Q   And did he in your view
19  say anything to direct how the claim
20  should be handled or was his role there
21  simply as a moderator?
22     A   Basically as a moderator.
23     Q   Did you think that his

**328**

1  participation in the process was in any
2  way wrongful?
3     A   Well, I think basically he
4  had conceived the idea and had set it
5  up and was running it so it was
6  appropriate for him to be there.
7     Q   Did you ever learn the
8  results of -- during the time that you
9  were with Provident and in this nine,
10  ten-month period between April of '95
11  and February of '96 did Provident at
12  that time have an SIU unit, special
13  investigations unit?
14     A   I believe they did.  I
15  think it was incipient at that time but
16  I think it was in existence during that
17  time, yes
18     Q   And were matters referred
19  from round-table to SIU?
20     A   My recollection is that
21  they were, yes.
22     Q   And did you ever learn the
23  results of any of the SIU

**329**

1  investigations while you were with
2  Provident?
3     A   No, I did not.
4     Q   And I think you have
5  already established and there is no
6  need to go over this again, but as a
7  general proposition you don't know what
8  the results were of the various
9  follow-ups that were discussed or
10  recommended or planned as a result of
11  the individual round-table meetings; is
12  that true?
13     A   That's correct.
14     Q   Very briefly with respect
15  to the topic of reserves, while you
16  were there at Provident, say, during
17  the timeframe of 1990 right up through
18  the time you left in February of 1996,
19  did you know in fact how reserves were
20  set on files?
21     A   Well, I had a general idea
22  how they were in terms of basically
23  setting up a reserve for the monthly

**330**

1  indemnity and the expected life
2  expectancy of the claimant
3     Q   It was not your
4  responsibility, true?
5     A   That's correct.
6     Q   It was not your area of
7  expertise, correct?
8     A   That's correct.
9     Q   And you had no training in
10  establishing reserves, correct?
11     A   I had no training in it,
12  that's correct.
13     Q   In fact you didn't provide
14  any input to establishing the reserves,
15  true?
16     A   That's correct.
17     Q   Do you know whether there
18  was a reserve established immediately
19  upon the opening of the claim?
20     A   Well, as I had indicated
21  earlier from discussing with a
22  colleague who is an actuary, initially
23  when a claim comes in --

# FOSHEE & TURNER COURT REPORTERS

331

```
1     Q  Excuse me --
2     A  -- it's made month by
3  month and then after the person has
4  been -- totally been determined to be
5  disabled that reserve is set up
6  according to the indemnity and the
7  expectancy of the duration.
8     Q  Okay.  Let me go back and
9  remind you I'm asking for the timeframe
10 while you were at Provident.  Okay?
11 While you were at Provident did you
12 know whether a reserve was set up as
13 soon as a claim was opened?  Did you
14 know that?
15    A  I was not aware of it at
16 the time.
17    Q  Do you know whether
18 reserves were set up at different
19 points in time throughout the life of
20 the claim?  Do you know that?
21    A  Well, from discussing with
22 my colleague --
23    Q  During the time you were
```

332

```
1  there at Provident.
2     A  During the time I was
3  there -- well, in general I knew that
4  once a person was disabled you could
5  take the monthly indemnity and figure
6  out the length of the contract and
7  roughly figure that out.
8     Q  Is it your testimony
9  that -- see what I'm trying to get at
10 in part here is you made a comment that
11 reserves are established as though a
12 claim is going to be paid indefinitely?
13    A  Well, sure, it has to be
14 once the person has been determined to
15 be disabled permanently.
16    Q  Do you know what a
17 statutory reserve is?
18    A  A statutory reserve?
19    Q  Correct.
20    A  I don't know the
21 definition of that.
22    Q  Do you know what a GAAP, a
23 G-A-A-P, reserve is?
```

333

```
1     A  Those are terms that are
2  bandied about and I haven't a clue
3  about them.
4     Q  Do you know what the
5  reserve policy was for Provident during
6  the time that you were with Provident,
7  say, the period 1990 through 1995 in
8  terms of establishing reserves for an
9  indefinite duration or for an
10 anticipated resolution date, do you
11 know?
12    A  No, I don't know.  I don't
13 have that information.
14    Q  You don't know of any
15 formula that was in fact used by
16 Provident during the timeframe that you
17 were associated with Provident, true?
18    A  That is true.
19    Q  And you don't know whether
20 or not Provident set reserves as though
21 the claim was going to be paid
22 indefinitely, do you?  You don't know
23 that?
```

334

```
1     A  Well, I would think one
2  would have to assume that if one had
3  a -- if the claimant --
4     Q  I don't want an
5  assumption, please.
6     A  No, let me answer it.  If
7  a claimant has a million and a half,
8  one and a half million or two million
9  dollar reserve, it would make sense to
10 me that the actuary who set that
11 reserve up assumes that that person is
12 going to be permanently disabled during
13 the length of the contract.  There
14 would be no other reason to set up that
15 reserve in that amount.
16    Q  You don't know for a fact
17 that during the time that you were at
18 Provident reserves were established
19 with the idea in mind that somebody was
20 going to be indefinitely disabled, do
21 you?
22    A  I think it makes common
23 sense that they would have to do it
```

335

```
1  that way but I don't know the specific
2  formula or the protocol or anything of
3  that sort.
4     Q  Do you know, Dr. Feist,
5  whether or not a statutory reserve is
6  required to be carried on a claim even
7  if it is closed, that is terminated for
8  a period of time?  Do you know that one
9  way or the other?
10    MS. SILAS:  I'm going to
11 object as calling for an expert
12 opinions, goes far beyond the scope of
13 direct, calls for an expert opinion.
14    A  I haven't a clue.
15    Q  Do you know what a reopen
16 is?
17    A  A reopen?
18    Q  That's right.
19    A  Define that.
20    Q  A claim that had been
21 closed and is reopened.
22    A  A claim that is closed and
23 reopened.  I can't imagine why that
```

336

```
1  would happen but maybe you can
2  enlighten me.
3     Q  Have you ever in your
4  experience at the time that you were
5  with Provident seen a circumstance
6  where a claim was closed, additional
7  information came in, and it was
8  reopened?
9     A  I can't recall that that
10 happened.  I guess theoretically it
11 could happen.
12    Q  All right.  Then let's
13 work with theory for just a moment.
14    MS. SILAS:  Well, I'm
15 going to object to working with theory
16 again.  I don't want to talk about a
17 hypothetical world, counsel.  If he
18 says he's not familiar with it, I don't
19 think you should go into it.
20    Q  Do you know anything at
21 all about the policy or practice of
22 Provident while you were with Provident
23 about setting reserves for potential
```

# FOSHEE & TURNER COURT REPORTERS

**337**

1 reopens?
2    A    No, I'm not aware of that.
3    Q    Now you made the statement
4 earlier, please phrase it however you
5 wish because I might misstate what you
6 said.
7         MS. SILAS:  Gee, I can't
8 imagine that.
9    Q    Words to the effect, Dr.
10 Feist, that when a reserve is released,
11 it's profit that goes straight to the
12 bottom line, do you recall that?
13    A    That's my understanding,
14 yes, sir.
15    Q    Is it your testimony that
16 every time a release -- pardon me -- a
17 reserve is released that the company is
18 that much more profitable by the exact
19 amount of the reserve?
20         MS. SILAS:  I object.  It
21 mischaracterizes his testimony which is
22 that they were fictionally more
23 profitable, not actually more

**338**

1 profitable.  You can answer the
2 question.
3    A    Well, I think the concept
4 is that if a claim is terminated that
5 amount of reserve goes to the bottom
6 line.  There may be some factor that
7 has to be factored in or some timeframe
8 before that happens of which I'm not
9 aware of.
10    Q    Tell me what you mean by
11 bottom line then.  If a reserve on a
12 claim was a $100,000 and the claim was
13 terminated, what does that do to the
14 bottom line according to your
15 understanding?
16    A    It adds a $100,000 to the
17 bottom line.
18    Q    Okay.  And what does the
19 bottom line mean?  Is that profit?
20    A    That is profit for the
21 company for that reporting period.
22    Q    Now, have you ever seen
23 anything, anything in writing from

**339**

1 Provident, an annual statement,
2 bulletins to vice presidents that says
3 that what a reserve is released it
4 equates to profit?
5    A    I haven't seen any memos
6 to that effect but that is my
7 understanding of what happens.
8    Q    Well, as a matter of fact,
9 isn't your understanding that there are
10 a whole host and variety of factors
11 which affect the profitability of an
12 insurance company, not just the
13 reserves?
14         MS. SILAS:  I'm going to
15 object again.  It mischaracterizes his
16 testimony, misleading.  He didn't state
17 reserves are the only thing that affect
18 the bottom line.  He testified that of
19 the two hundred and some million
20 dollars they made, only -- well, not
21 only but 135 million of that -- you are
22 mischaracterizing what he said.
23    A    You are mischaracterizing

**340**

1 my testimony.  I'm just saying that in
2 that particular timeframe in 1995 when
3 Provident reported for the accident
4 department a $235 million profit, only
5 35 million of it was new sales.  The
6 rest of it was closing of claims.
7    Q    I'm going to move to
8 strike as nonresponsive.  I'm not
9 asking about a specific example.  I'm
10 asking about your general understanding
11 about reserves as it affects the
12 overall profitability of the company.
13 My question to you is this:  Based upon
14 your 20 plus years in the insurance
15 industry is it your understanding -- is
16 it your understanding -- that there are
17 a variety of factors that affect the
18 profitability of a company in any given
19 year in addition to the reserves?
20    A    Well, of course.  The new
21 sales and investments and on and on.
22    Q    As a matter of fact, isn't
23 it your understanding that when there

**341**

1 are more sales, the statutory reserves
2 have to increase?
3    A    That is probably correct
4 but I have no knowledge of that.
5    Q    Last thing on the issue is
6 Social Security.  Do you know, Dr.
7 Feist, what evidence is relied upon by
8 the Social Security administration to
9 make the determination of whether a
10 claimant is entitled to benefits or
11 not?
12    A    My understanding is
13 that --
14    Q    Please, please.  That was
15 only a yes or no.  Do you know?
16    A    Yes.
17    Q    As of the present time or
18 as of all times?
19    A    What do you mean by all
20 times?
21         MS. SILAS:  Objection,
22 assumes facts not in evidence that it
23 changed.

**342**

1    A    Since the inception of
2 Social Security or when I was involved
3 in claims work?
4    Q    When you were involved in
5 claims work.
6    A    Well, my understanding of
7 Social Security is that if one applies
8 for benefits as being disabled through
9 the Social Security Administration,
10 they have physicians or nurses or
11 persons trained to read information
12 which is provided by those claimants
13 and make a determination based on those
14 records provided of whether the person
15 is disabled or not.
16    Q    And who determines what
17 information is sent to the Social
18 Security Administration; it comes from
19 the claimant, doesn't it?
20    A    Well, I think that's true.
21 I think the claimant has to submit all
22 medical records that he or she has in
23 regard to the claim, yes.

# FOSHEE & TURNER COURT REPORTERS

343

1 Q Now the Social Security
2 Administration doesn't investigate
3 claims -- disability claims like
4 worker's compensation carriers, does
5 it?
6 A I don't know.
7 Q The Social Security
8 Administration doesn't have a special
9 investigation unit like insurance
10 companies are required to have in the
11 state of California, does it?
12 A I don't think so.
13 Q The Social Security
14 Administration has no obligation to
15 investigate a claim for all aspects of
16 it like an insurance company does in
17 the state of California, true?
18 A Well, I think the point is
19 that I was making on the --
20 Q Is that true?
21 A Let me answer the
22 question
23 MS SILAS: Well, let me

344

1 just interpose the objection as vague
2 and ambiguous as to what is meant by
3 obligations to investigate Do you
4 mean whether they have a good faith
5 obligation to investigate or something
6 else? It's vague and ambiguous
7 A I think the Social
8 Security Administration -- and you
9 obviously know more about it in
10 California than I but I think the
11 Social Security Administration has such
12 strict criteria for one becoming
13 disabled that to be disabled you really
14 are disabled and the special
15 investigation units and on surveillance
16 and all that sort of thing is
17 irrelevant to the Social Security
18 Administration They don't need that.
19 Q The Social Security
20 Administration relies exclusively upon
21 information furnished by a claimant,
22 true?
23 A Information provided by

345

1 the physicians who have treated that
2 individual.
3 Q By the claimant, correct,
4 sent in? The physician is sending in
5 the records of the claimant as
6 requested by the claimant, correct?
7 A Well, of course. How else
8 could one apply for Social Security
9 disability?
10 Q And the Social Security
11 Administration doesn't conduct
12 independent medical evaluations, does
13 it?
14 A I don't think so but again
15 there would be no need to.
16 Q Now you've never worked
17 for the Social Security Administration,
18 have you?
19 A No, but I've had patients
20 when I was in practice who tried to get
21 Social Security Administration and they
22 couldn't get it because they didn't
23 meet the criteria

346

1 Q I'm going to move to
2 strike as nonresponsive You've never
3 worked for the Social Security
4 Administration. Have you ever been
5 trained as an administrative law judge
6 for the Social Security Administration?
7 MS. SILAS: Objection,
8 argumentative, compound, and I can't
9 tell whether the gratuitous sentence at
10 the beginning of the question is a
11 question or an editorial so I will move
12 to strike it.
13 A Well, obviously I've never
14 worked for the Social Security
15 Administration. I'm not an
16 administrative law judge. All I was
17 saying in my prior testimony is that
18 the criteria for -- as counsel asked
19 the criteria for Social Security
20 Administration are so strict that if
21 one meets the criteria for Social
22 Security Administration disability, a
23 private contract carrier disability

347

1 should be a no-brainer. If one is
2 disabled for Social Security, one is
3 disabled for private health care
4 coverage.
5 Q Dr. Feist, I'm going to
6 move to strike that as nonresponsive.
7 Thank you for your opinion but --
8 A I think that's my opinion
9 and if you strike it that's your
10 prerogative, sir.
11 MS. SILAS: Actually it's
12 the judge's prerogative if he so
13 chooses.
14 THE WITNESS: Yeah, I
15 think so and that's my firm opinion
16 that if one is -- and I've had
17 situations where people were truly
18 disabled --
19 Q (By Mr. Oster) I --
20 A -- but they couldn't meet
21 the criterion for 12 months of
22 continuous disability and no hope of
23 getting better. Now they may be sick

348

1 for six months or three months and
2 couldn't get it. They are so strict
3 that you cannot get it in Social
4 Security and not in private insurance
5 if the private insurance company is
6 doing what is right and proper.
7 Q (By Mr. Oster) I will
8 move to strike as nonresponsive. I
9 don't even recall there being a
10 question pending.
11 MS. SILAS: Counsel, you
12 know, it's inappropriate for you to
13 denigrate and argue with the witness
14 It really is I don't know, is this a
15 rule that you got to lecture but he
16 doesn't? I'm not sure --
17 A I was going to say you can
18 lecture me but I haven't had an
19 opportunity to speak my peace, sir I
20 mean --
21 Q I have no further
22 questions for now Thank you, Dr
23 Feist

# FOSHEE & TURNER COURT REPORTERS

349

1   A   Thank you, sir.
2
3   FURTHER EXAMINATION BY MS. SILAS:
4
5   Q   Dr. Feist, Mr. Oster was
6   asking you about so-called rigged
7   IME's. Do you recall that?
8   A   Uh-huh. Oh, I remember it
9   well, yes.
10   Q   Okay. Let me ask you
11   something. Did you ever hear anybody
12   at a round-table review meeting stating
13   that an IME should be conducted for
14   purposes of supporting a disability?
15   A   No, I never heard that.
16   The IME was basically given to or
17   suggested to disprove the claimant's
18   disability.
19   Q   Did you ever hear anyone
20   from Provident at a round-table review
21   meeting stating that the reason they
22   were seeking an IME was to be fair,
23   thorough, and objective?

350

1   A   I did not.
2   Q   Did you ever hear Ralph
3   Mohney state in the closed doors of a
4   round-table meeting that the claims
5   should be handled fairly, thoroughly,
6   and objectively and with the goal of
7   paying only valid claims and denying
8   only invalid claims?
9   A   I didn't have him say
10   that.
11   Q   How many round-table
12   meetings would you estimate you would
13   have attended in the time you were
14   attending them?
15   A   Oh, what weekly, nine
16   months, what, that's probably 30, 32,
17   something like that I would guess.
18   Q   And in that time did you
19   ever hear Mr. Mohney state the reason
20   we are here is to make sure all claims
21   are being handled thoroughly,
22   objectively, and that only invalid
23   claims should be terminated?

351

1   A   I did not hear him say
2   that.
3   Q   Talking about whether you
4   know of any claims that were terminated
5   as a result of the round-table review
6   meetings, let me ask you this. Did you
7   have any doubt that those claims on
8   which modalities -- well, let me start
9   it this way. Based on your
10   observations at the round-table review
11   meetings did you have any doubt where
12   claims on which IME's were suggested or
13   headed?
14   MR. OSTER: Objection. I
15   don't know what you mean by headed.
16   You may be calling for speculation
17   inherently. If so, I'll object on that
18   basis.
19   Q   You can answer.
20   A   Well, I think the idea of
21   getting an IME was trying to find an
22   opinion that would allow termination of
23   the claim.

352

1   Q   You testified that -- it
2   seems like a thousand years ago.
3   MR. OSTER: I will also
4   move to strike as nonresponsive.
5   Q   (By Ms. Silas) You know,
6   since it was a yes or no question, let
7   me ask to hear my question back and see
8   if your answer is yes or no.
9   MS. SILAS: Oh, I know
10   what the question was. Did you have
11   any doubt about where those claims were
12   headed.
13   THE COURT REPORTER: I
14   just found that.
15   MS. SILAS: Okay. Never
16   mind. I know what it was.
17   Q   (By Ms. Silas) I guess
18   for Mr. Oster's benefit, just yes or
19   no. Did you have any doubt as to what
20   the ultimate outcome was going to be of
21   those claims?
22   MR. OSTER: Objection,
23   calls for speculation inherently.

353

1   A   I had no doubt in my mind
2   Q   Let me ask you about
3   surveillance for a minute. Based on
4   your years of working for -- well, 24
5   years working in the insurance
6   industry, is it your opinion that an
7   insurance company would not secretly
8   run around videotaping its insured
9   absent some probable cause that a fraud
10   is being committed?
11   MR. OSTER: Objection,
12   irrelevant, particularly to this case
13   but also calls for -- impermissibly
14   calls for an opinion
15   MS. SILAS: I'm sorry
16   I'm just -- you opened the door by
17   asking him if he thought surveillance
18   was wrong so I'm going to ask him to
19   elaborate. Since you wanted his
20   opinion on that, I want his opinion.
21   A   Yeah, I think surveillance
22   if done appropriately is good but I
23   think surveillance done inappropriately

354

1   is invasion of privacy and trying to
2   catch a claimant doing something that
3   they can use to disavow a claim is
4   inappropriate, you know.
5   Q   Mr. Oster asked you about
6   various ways that claims might be
7   terminated absent an involuntary
8   termination such as benefits running
9   out. Do you recall that?
10   A   Yeah, uh-huh
11   Q   Do you recall any one
12   single claim that was brought to a
13   round-table you attended where the
14   policy benefits were about to run out
15   and that's why it was brought to a
16   round-table?
17   A   No, the policy benefits on
18   the claims that we discussed were
19   ongoing and the running out of the time
20   period was not an issue
21   Q   Was any claim that was
22   discussed at any round-table you
23   attended one where the insured had died

# FOSHEE & TURNER COURT REPORTERS

355

1 and that's why it was brought to a
2 round-table?
3    A   No, certainly not.
4    Q   Was there any discussion
5 at any of the round-tables regarding
6 ways in which the company might assist
7 the insured in helping them to return
8 back to work?
9    A   None that I recall.
10    Q   Were all of the
11 round-table cases that were discussed
12 cases in which the company was -- well,
13 let me ask it a different way  Were
14 all of the cases that the company was
15 discussing at round-table at the ones
16 that you attended cases in which the
17 insured and their attending physician
18 were both contending the insured was
19 disabled?
20    A   To the best of my
21 recollection that's true.
22    Q   You were asked about
23 whether attending physicians make

356

1 mistakes.  Based on your experience as
2 a physician, who was more likely to
3 make a mistake in a diagnosis, an IME
4 physician who meets the insured once or
5 a treating physician who is treating
6 the claimant ongoing?
7    MR. OSTER:  Objection,
8 calls for an impermissible opinion.
9    A   My impression is that the
10 attending physician who knows and has
11 seen this individual for some period of
12 time has a better idea of his or her
13 disability by and large.
14    Q   Is the reason you didn't
15 see a single so-called wrongful
16 termination arising out of a
17 round-table meeting was that you didn't
18 personally witness a later termination?
19    A   That's right.
20    MR. OSTER:  Objection,
21 leading.
22    Q   You can answer.
23    A   Well, I didn't see any

357

1 termination because those decisions
2 were made away from the round-table and
3 there was no way to know which ones
4 were actually terminated.
5    Q   Let me show you again this
6 memo which I have now scribbled all
7 over --
8    A   That's okay.
9    Q   -- so let me get the court
10 reporter's copy if I may  Turn to
11 page -- let me see where I was heading
12 Okay  Here is where I was going.  It's
13 coming back to me now.  On the
14 second -- make that the third page of
15 the memorandum at the top it says
16 special review process.
17    A   Uh-huh.
18    Q   Mr. Oster had asked you
19 earlier, Doctor, about whether there
20 are instances where a mistake is made
21 in initially paying a claim that the
22 company is trying to rectify.  Do you
23 recall that?

358

1    A   Uh-huh.  I do indeed, yes
2    Q   Do you see bullet point
3 number 4 under review process where it
4 says a key to the success of this
5 process is the commitment by all
6 participants to focus on how to resolve
7 the claim currently versus finding
8 fault with previous handling.  Based
9 upon your having received that memo,
10 did you see the company at round-table
11 review meetings admitting that they
12 were mistaken in their previous claims
13 handling?
14    A   No, definitely they
15 didn't -- well, they did not admit a
16 mistake.  It was just trying to find
17 out some way to terminate the claim at
18 the time of discussion
19    MR. OSTER:  Move to strike
20 as nonresponsive the second half of his
21 answer.
22    Q   Did you ever hear any
23 Provident management at any round-table

359

1 review meeting you attended state
2 perhaps we were wrong in initially
3 paying this claim?
4    A   I didn't ever hear that --
5 I do not recall that statement being
6 made.
7    Q   And in any claim where
8 some modality such as a surveillance or
9 an IME was recommended, did you ever
10 hear anyone recommending that because
11 they felt they'd made a mistake in
12 honoring the claim initially?
13    A   No, I did not hear that
14 comment.
15    Q   Now Mr. Oster asked you
16 about facts that, quote, unquote,
17 support your impression that the
18 purpose of the round-table meetings was
19 to terminate claims.  Did the language
20 of this memo including the commitment
21 by all participants to focus on how to
22 resolve the claim contribute to your
23 impression that the purpose of those

360

1 meetings was to terminate pending
2 claims?
3    MR. OSTER:  Objection,
4 leading
5    A   I think that was the
6 entire purpose or the sole purpose of
7 the round-table was to review these
8 claims that were being paid to see if
9 there was some way to be found to
10 terminate the claim
11    Q   And did this memo
12 contribute to your impression in that
13 regard?
14    A   Yes, it did.
15    Q   I'm going to ask you to
16 jump to the first bullet point on the
17 same page.  This is a long sentence so
18 bear with me  It says the executive
19 consultant slash claim consultant will
20 present each claim by reviewing the
21 specifics of the claim, summarizing the
22 conclusions of the investigation,
23 highlighting the issues to be resolved,

# FOSHEE & TURNER COURT REPORTERS

**361**

1　and making a recommendation for how to
2　resolve the claim  Was your reading of
3　that when you got the memo that the
4　recommendation for how to resolve the
5　claim was to make a recommendation on
6　how to close the claim?
7　　　A　Absolutely, yes.
8　　　MR. OSTER: Objection,
9　leading
10　　　Q　I'm sorry  Your answer?
11　　　A　Yes, I think the tenor and
12　the intent of the meeting was to
13　terminate the claims.
14　　　Q　And did the language that
15　I just read to you contribute to your
16　impression in that regard?
17　　　A　Yes, it did
18　　　Q　Under that file selection
19　there is a bullet point about -- the
20　second one down about high impact
21　problematic claims
22　　　A　Uh-huh
23　　　Q　Based on your years of

**362**

1　reviewing insurance files did you have
2　any impression regarding whether a
3　claim -- whether a claimant with a low
4　monthly benefit was more likely to be
5　disabled than someone with a high
6　monthly benefit?
7　　　A　To my experience or
8　recollection the amount of reserve has
9　nothing to do with whether the person
10　is disabled or not
11
12　(Whereupon, a discussion was held off
13　the record )
14
15　　　Q　In each of the cases in
16　which you have testified as a witness
17　at deposition, was the policyholder
18　claiming that they had been terminated
19　from benefits against their will?
20　　　A　Yes, indeed, in all the
21　cases that I was deposed they were.
22　　　Q　As far as you know in any
23　of those cases were they terminated

**363**

1　because their benefit period had run
2　out?
3　　　MR. OSTER: Objection,
4　lacks foundation
5　　　A　No, none of their periods
6　had run out.
7　　　Q　You were asked about your
8　opinion about a physician being an
9　advocate for their patient.  Why do you
10　think a physician should be an
11　advocate for their patient?
12　　　A　Well, I think that's part
13　of the physician's role to look out for
14　the benefit of his patient to try to
15　maintain their health as best and as
16　long as they can, and by and large the
17　attending physician can determine
18　whether somebody who has been active
19　and working in a given profession or
20　occupation has become disabled from an
21　impairment  I think he probably has
22　the best vantage point if you will to
23　make that call

**364**

1　　　Q　When you say advocate, you
2　don't mean to -- I just want to make
3　sure I understand your earlier
4　testimony and in a prior depo
5　deposition.  You don't mean to suggest
6　that a treating physician should
7　advocate for a patient they don't truly
8　believe is disabled, right?
9　　　MR. OSTER: Objection,
10　leading
11　　　A　Well, I think that's true
12　I think advocacy doesn't mean that
13　you're trying to get something for
14　somebody that he or she shouldn't have
15　I think it would mean to me that the
16　physician should get -- should try to
17　help his patient or her patient get
18　what rightfully belongs to them  If
19　they've got a disability policy that
20　pays own-oc and they're disabled
21　own-oc, the physician should do what he
22　can or she can to get that person's
23　disability benefits paid

**365**

1　　　Q　And don't strangle me but
2　just in case my objection to leading is
3　sustained, I hate to make you repeat
4　yourself, but did you mean by stating
5　that a physician should be an advocate
6　for their patient that they should
7　advocate for a patient they think is a
8　malingerer?
9　　　A　Oh, certainly not.
10　　　Q　Why not?
11　　　A　I think a physician who is
12　honest and has integrity will know that
13　his patient is malingering  And just
14　like you say, you know, you're
15　malingering, I'm not going to certify
16　your disability, and, you know, if
17　you're uncomfortable with that, well,
18　you know, find another physician
19　　　Q　Did you witness anyone at
20　the round-table review meetings acting
21　as an advocate for the policyholder?
22　　　A　None whatsoever
23　　　Q　Did you ever witness --

**366**

1　irrespective of whether an IME was
2　fraudulent or skewed or whatever, did
3　you ever witness an IME physician
4　acting as an advocate for the
5　policyholder?
6　　　A　Not that I recall
7　　　Q　Have you ever seen an IME
8　physician arguing with a Provident
9　employee in trying to convince a
10　Provident employee that an insured is
11　disabled?
12　　　A　Not that I recall.
13　　　Q　When you testified
14　earlier -- I'll wait until the blinds
15　are fixed
16
17　(Whereupon, a discussion was held off
18　the record )
19
20　　　Q　(By Ms. Silas) Pardon me
21　for jumping around topics.  This is
22　just as I scribbled them.  When you
23　said earlier about resenting Mr Mohney

# FOSHEE & TURNER COURT REPORTERS

367

1 because he took advantage of your
2 expertise, did you have any feeling
3 that the company was using you to do
4 their bidding at these round-table
5 review meetings?
6     A   I don't know that I felt
7 that I was doing their bidding. I
8 think they were using me as an expert
9 to provide medical input but --
10     Q   This issue about the
11 napping. Let me just ask you something
12 about that.
13     A   It sounded like I slept
14 the entire time and that's not true.
15     Q   During the training of
16 physicians are there times during a
17 physician's training when they are
18 required to be on call for more than 24
19 hours?
20     A   Oh, certainly, yeah
21     Q   Did that happen to you?
22     A   Oh, in internships and
23 residency, sure

368

1     Q   Did you have to learn how
2 to catch a quick 40 winks when you
3 could as a result of that?
4     A   Oh, absolutely, yeah,
5 sure. That was kind of what that was.
6     Q   Is one of the reasons you
7 fell asleep was that no one was seeking
8 your input?
9     A   They weren't seeking my
10 input and probably wouldn't have cared
11 what I said anyway.
12     Q   You have to speak up a
13 little bit.
14     A   They were not seeking my
15 input.
16     MR. OSTER: Objection, A,
17 leading, and, B, I move to strike as
18 nonresponsive
19     Q   Did anyone ever shake you
20 awake and say we've been trying to wake
21 you up for ten minutes?
22     A   No, no, I'm a very light
23 sleeper, years of training.

369

1     Q   Are doctors required to be
2 able to snap awake when something
3 arises?
4     A   Oh, absolutely. Yeah,
5 that's part of our training.
6     Q   You were asked some
7 questions about so-called fraudulent
8 claims. As a medical director was it
9 your job to ferret out insurance fraud
10 other than determining the clinical
11 condition of the insured?
12     A   Basically it was my job to
13 determine the clinical condition in
14 terms of disability and fraud was
15 really not an issue that I usually
16 dealt with. The claims adjustors would
17 be the ones that would deal with that.
18     Q   You were -- may I have
19 Exhibit 2? That's the declaration.
20 Mr. Oster was asking you about whether
21 a paragraph 12 of this declaration
22 provided in the Kane K-a-n-e case was
23 mistaken in terms of it including

370

1 Equitable and Paul Revere. Do you
2 recall that?
3     A   I recall that well, yes
4     Q   How many times has a
5 representative of Provident confronted
6 you with that same mistake in a
7 deposition?
8     A   At least four or five
9 times.
10     Q   And how many times have
11 you explained to a representative of
12 Provident that this was an inadvertent
13 error and not a fraudulent statement?
14     A   All of those four or five
15 times.
16     Q   Each time when you
17 explained it did the next Provident
18 attorney ask you about it again making
19 it appear as if you had made some
20 fraudulent statement?
21     A   Typically they ask me each
22 time.
23     Q   And each time they ask you

371

1 do you explain again?
2     A   I explain again, yes. It
3 seems to go on deaf ears, though.
4     Q   Did you have any intent to
5 try to trick Provident into making it
6 believe that it had actually purchased
7 Equitable and Paul Revere prior to
8 1997?
9     A   Absolutely not. It was
10 a --
11     Q   Did you have any reason to
12 believe that they wouldn't know when
13 they merged with Paul Revere and
14 Equitable -- I'm sorry -- Paul Revere?
15     A   I'm not sure that I
16 understand your question.
17     MR. OSTER: Objection. I
18 don't know what that has to do with
19 anything in his affidavit or anything
20 about the case.
21     MS. SILAS: Well, you made
22 some implication and several of your
23 fellow brethren that he committed some

372

1 sort of horrifying fraud by stating
2 Equitable and Paul Revere. I was just
3 wanting to know whether he was setting
4 out to trick them into thinking that
5 they had purchased the company earlier
6 than they had. That certainly goes to
7 that it's a mistake so --
8     A   Well, I think it was just
9 a mistake and not realizing the
10 timeframes of the various acquisitions.
11     Q   Did you draft this
12 document?
13     A   No, Mr. Bob Holstein an
14 attorney out of Chicago drafted that.
15     Q   In hindsight do you wish
16 you'd reviewed it more carefully?
17     A   Absolutely. It taught me
18 a lesson; one, read your affidavits
19 carefully, and all lawyers aren't
20 always exactly honest about what they
21 put on a piece of paper. That was
22 probably a valuable lesson.
23     Q   And have you ever given

# FOSHEE & TURNER COURT REPORTERS

**373**

1 testimony where you were actually being
2 posed direct questions that you have
3 reviewed Paul Revere and Equitable
4 funds?
5    A    Not that I recall.
6    Q    And after this mistake was
7 caught have you ever signed anything
8 that said something like that?
9    A    No, I have not
10   Q    Is the same thing true
11 with respect to paragraph number 16
12 where it says based on my education,
13 training, and experience the panel
14 meetings resulted in the illegitimate
15 denial of continued disability payments
16 to insured persons of Provident,
17 Equitable and Paul Revere?
18   A    That's correct.
19   Q    Let me go back to the
20 Social Security issue for a moment.
21 Have you ever come across a situation
22 for a clinical patient of yours that
23 you were treating where they were

**374**

1 denied Social Security benefits?
2    A    Well, I can't recall any
3 specific examples but I know a couple
4 of examples in the last year where
5 individuals who had cancer --
6    Q    Before you go on just so
7 it's responsive, do you personally know
8 any individuals who have been denied
9 Social Security benefits?
10   A    Yes, I do.
11   Q    What do know in that
12 regard?
13   A    Well, a couple of
14 individuals who I know that have had
15 cancer in the last couple of years are
16 disabled because of cancer treatment
17 for six months but did not get Social
18 Security benefits because they were
19 expected to recover and their
20 disability didn't last 12 months. I
21 think the point there is that Social
22 Security criteria is so strict that a
23 lot of people are disabled temporarily

**375**

1 so to speak but did not get the
2 benefits.
3    MR. OSTER: Move to strike
4 as nonresponsive after the initial
5 sentence.
6    Q    Have you ever experienced
7 the United States Government as wanting
8 to be excessively generous to people
9 making claims?
10   A    That's not one of their
11 fortes, I don't think.
12   MS. SILAS: Bear with me.
13 You can rest your hands at least
14   Q    You were asked various
15 reasons of why you have testified on
16 behalf of policyholders. Are you
17 testifying because you have -- because
18 you have some personal ax to grind with
19 the company?
20   MR. OSTER: Objection,
21 leading.
22   A    No, I have no personal ax
23 to grind against Provident or any

**376**

1 individuals who work there or have
2 worked there. I basically want to help
3 those individuals who I felt over the
4 last few years have been unjustly
5 denied claims by Provident.
6    Q    Do you genuinely believe
7 that the attitude towards policyholders
8 demonstrated at the round-table review
9 meetings was inappropriate?
10   MR. OSTER: Objection
11 leading
12   A    I did and I do, yes
13   Q    I'm sorry. You have to
14 repeat it without him talking
15   A    Yes, I think it was
16 inappropriate
17   Q    You said Mr. Mohney didn't
18 suggest modalities. Who generally was
19 the one who suggested whether an IME
20 should be done or a surveillance should
21 be done?
22   A    It would typically be the
23 claims personnel, claims adjustors and

**377**

1 supervisors and that sort of persons.
2    Q    Did you ever hear Mohney
3 express disagreement that any of the
4 modalities should be done?
5    A    No, I did not.
6    Q    Were you actually privy to
7 the discussions between the person --
8 let me strike that a second. Were you
9 actually privy to the discussions
10 between the person who sent the claim
11 to the IME doctor and the IME doctor?
12   A    No, generally not
13   Q    In other words you didn't
14 hear what they discussed one way or the
15 other?
16   A    No, I did not.
17   Q    Have you ever seen one
18 instance where an IME doctor said that
19 a claimant was not disabled and
20 Provident went ahead and paid the claim
21 anyway upon receipt of the IME?
22   A    I never saw that -- I did
23 not see that occurrence

**378**

1    Q    Do you know whether
2 Provident ultimately did pay Ms.
3 Thompson money after she sued?
4    A    The Lynn Thompson case?
5    Q    Correct.
6    A    Actually it's a male
7 physician, a dentist
8    Q    Oh, I'm sorry  Dr
9 Thompson
10   A    Dr. Thompson. It was --
11   MR. OSTER: Objection,
12 irrelevant
13   A    It was settled out of
14 court. It was going to go to trial and
15 the claimant settled with Provident.
16 Dr Thompson sent me a letter
17 subsequent to that settlement thanking
18 me for my deposition and praising me
19 for being honest enough to stand up and
20 fight against Provident.
21   Q    Did Mr Thompson send you
22 any --
23   MR. OSTER: Excuse me.

# FOSHEE & TURNER COURT REPORTERS

379

1 Move to strike as nonresponsive.
2      Q   Did Dr. Thompson share
3 with you any of the proceeds of his
4 settlement?
5      A   No. In fact I have no
6 idea what his settlement was but I
7 think the point is that he was
8 satisfied that he had achieved an
9 adequate settlement and he was thanking
10 me by letter for what little part I had
11 in that.
12      MR. OSTER:  Move to strike
13 everything after the word no as
14 nonresponsive.
15      Q   I have no further
16 questions.
17      A   Thank you.
18
19 FURTHER EXAMINATION BY MR. OSTER:
20
21      Q   Dr. Feist, briefly --
22      A   Is that possible?  That
23 would be a whole new experience

380

1      MS. SILAS:  Well, my plane
2 leaves in three minutes.
3      THE WITNESS:  You've got
4 five minutes to get there.
5      Q   (By Mr. Oster)  Your
6 position again, please, from April of
7 1995 through February of '96 was
8 assistant vice president?
9      A   No, vice president and
10 corporate medical director.
11      Q   All right  And as an
12 assistant vice president and --
13      A   Vice president, sir.
14      Q   I'm sorry  As vice
15 president and corporate medical --
16      A   Vice president and
17 corporate medical director.
18      Q   And you were spending half
19 of your time in claims or was it
20 greater than half?
21      MS. SILAS:  Are you
22 including the round-tables?
23      A   Are we talking my weekly

381

1 workload?
2      Q   Yes.
3      A   Well, I was spending 15
4 hours, maybe 15 to 20 hours in claims
5 and 35 to 40 hours in the rest of my
6 work so that made an overall workweek
7 of 55 to 60 hours a week.
8      Q   So you were spending 55 to
9 60 hours per week in claims?
10      A   No, I said my overall work
11 load. I said 15 to 20 hours in claims
12 and a total of 55 to 60 hours my total
13 work responsibility without any
14 remuneration added on because of my
15 claim responsibility.
16      Q   I'm trying to find out how
17 much time you spent between April of
18 1995 and February of 1996 involved with
19 claims  Can you give me an idea on a
20 weekly basis?
21      A   I said 15 to 20 hours per
22 week.
23      Q   And the other hours that

382

1 were not spent in claims were spent
2 doing what?
3      A   Administrating the medical
4 department and the performance reviews,
5 doing underwriting, basically the
6 claims responsibilities were just added
7 on to my other duties.
8      Q   What I'm trying to get an
9 idea of is -- I would like to go back
10 here for a moment to Exhibit 1.  Maybe
11 I had a misimpression here.  I'm
12 looking at the last paragraph on the
13 first page where it says, quote, on an
14 interim basis we have arranged for Dr.
15 Feist to be available to individual
16 disability claims on a half-day basis
17 beginning Monday April 24, close
18 quotes.  What I drew from that was that
19 you were spending half of your time
20 outside of the round-table on claims;
21 is that true or not?
22      A   Well, I was basically -- I
23 was spending about a third of my time

383

1 in claims overall time, you know, work
2 hours per week.  That's a little
3 misleading because I'm talking 12-hour
4 days and he's talking 8-hour days.
5      Q   All right  Now, what
6 access did you have to claims files
7 during this timeframe April of '95
8 through February of '96?
9      A   What access did I have?
10      Q   Yes.
11      A   Well, the only access I
12 would have would be when I made my
13 circuit riding visits to the various
14 departments when the claims adjustors
15 would bring me files and I would review
16 them and the round-table review.
17      Q   Were you prohibited from
18 going into claims files unless somebody
19 brought it to you?
20      A   Well, I don't know that
21 prohibition would be the answer but it
22 would have been -- it would have been
23 considered inappropriate for me to go

384

1 and search the files. I mean, that
2 would have been inappropriate  I mean,
3 if they bring the file to me and ask me
4 to review it and make a medical
5 opinion, that was my role. My role
6 wasn't to go and check on the claims
7 adjustors and see if they were doing
8 their job appropriately or not.
9      Q   As vice president in terms
10 of the data that was submitted to vice
11 presidents, what did you have access to
12 regarding the functioning of the claim
13 department, claims decisions and so
14 forth, what kind of information did you
15 have?
16      A   Virtually none.  I was the
17 medical director of the medical
18 department.  I had responsibilities
19 there and all the data that you refer
20 to I would not have been privy to.
21      Q   Well, weren't you going to
22 these, what was it, monthly vice
23 president meetings?

# FOSHEE & TURNER COURT REPORTERS

385

```
1     A   Vice presidents meeting,
2  yeah.
3     Q   And did they discuss at
4  these monthly vice president meetings
5  what was happening with the claims
6  department?
7     A   Well, in general terms but
8  not the specifics that you're alluding
9  to.
10    Q   Did they tell you that the
11 reserves were up, reserves were down,
12 anything of that nature?
13    A   I don't recall if they
14 did.  That has been five and six years
15 ago.
16    Q   Do you recall being told
17 about claim improvement initiatives
18 that Mr. Mohney wanted to introduce,
19 the round-table as being one of them?
20    A   I think I knew about them
21 in sort of a vague or nonspecific way.
22    Q   And were those discussed
23 at these vice president meetings?
```

386

```
1     A   I think Ralph Mohney made
2  a presentation at one of the meetings
3  about what he planned to do with the
4  claims department once he took over.
5     Q   And when was this, was
6  this in 1993, 1994?
7     A   Well, I would have to stop
8  and think a moment.  Ralph Mohney came
9  to that position in probably early --
10 the vice president of claims probably
11 early '94 so it would have been
12 probably -- I'm a little vague on time,
13 someplace in mid to late '94 probably
14 when Mohney was able to get all the
15 procedures and so forth that he wanted
16 to do together and make a presentation
17 about it.
18    Q   And you have no
19 recollection of being at any meeting,
20 vice president meeting or otherwise,
21 where the performance of the claims
22 department in terms of terminations,
23 resolutions, anything like that was --
```

387

```
1  impact on reserves, anything like that
2  was discussed?
3     A   Not to my recollection.
4     Q   But you do recall Harold
5  Chandler talking at meetings telling
6  about how they had to terminate more
7  claims?
8     MS. SILAS:  Objection.  I
9  think that mischaracterizes his
10 testimony.
11    THE WITNESS:  Yeah, I
12 agree.
13    MS. SILAS:  And,
14 objection, goes beyond the scope of
15 redirect.  You're reopening your
16 questions.
17    A   I think Harold Chandler
18 talked about in general terms about the
19 claims situation and Ralph Mohney being
20 brought in to upgrade and so forth but
21 it was -- you know, it was an open
22 meeting in general terms.  They are not
23 going to talk about specifics and data
```

388

```
1  and so forth.
2     Q   What I'm trying to get at,
3  Dr. Feist, is this, is that did you
4  have any idea based upon any of the
5  information that was provided to you at
6  the company or that you inadvertently
7  saw or from any source whatsoever of
8  what the impact was in terms of claims
9  decisions of this change in culture or
10 the round-tables or anything else that
11 was done as a result of things that
12 took place after November of 1993?  Did
13 you see any data at all from any
14 source?
15    A   No, I did not.
16    Q   So whether they were being
17 successful or not being successful you
18 wouldn't be able to tell us one way or
19 the other?
20    A   Well, I think again in
21 general terms, you know, the
22 discussions were made that the claims
23 were being -- that the processes were
```

389

```
1  being enhanced and so forth but
2  specifically they didn't talk about
3  those others.
4     Q   So you can't tell us one
5  way or the other, true?
6     A   That's correct.
7     Q   A very quick question
8  here.  With respect to the
9  recommendations that were made on files
10 that came up specifically at the
11 round-table meetings, did you make an
12 effort at any time during the nine to
13 ten-month period that you were there to
14 go yourself and find out what happened
15 with a particular claimant?
16    MS. SILAS:  Objection,
17 assumes he had some duty to make an
18 effort.  It's irrelevant.
19    A   Well, again, I did not and
20 I would see no point in doing that.  I
21 mean, if I'm working 55 to 60 hours a
22 week, do I have time to go over and
23 audit files?  I don't think so.
```

390

```
1     Q   I'm going to move to
2  strike  The answer is no; is that
3  right?
4     A   That's correct.
5     Q   My last topic.  You said
6  you --
7     MS. SILAS:  I'm going to
8  object to you having a new topic that I
9  didn't cover in redirect but go on.
10    MR OSTER:  That's for
11 trial.
12    MS. SILAS:  I still object
13 to a new topic being interjected.
14    Q   (By Mr. Oster)  Dr. Feist,
15 you mentioned that you had occasion
16 from time to time over the years to
17 review psychiatric claims where
18 depression was an issue, true?
19    A   That's correct.
20    MS. SILAS:  Objection,
21 beyond the scope of direct.
22    MR OSTER:  Object all you
23 want but it's a trial objection,
```

# FOSHEE & TURNER COURT REPORTERS

391

```
1   counsel
2        MS. SILAS: I'm still
3   making the objection.
4        Q   (By Mr Oster) Now, did
5   you ever have occasion to review
6   psychiatric claims where depression was
7   an issue where there had been a suicide
8   attempt by the claimant?
9        MS. SILAS: Objection,
10  irrelevant. It calls for a
11  hypothetical, beyond the cope of
12  direct. I don't know what else I could
13  object to.
14       A   Well, I'm sure I did. I
15  think the point that -- I think your
16  point is erroneous. I think the
17  suicide attempt in many cases is as a
18  result of the underlying illness and in
19  my mind that makes the depression worse
20  if somebody has a suicide attempt or
21  suicide ideation. That does not
22  discredit the claim just because
23  somebody contemplated or attempted
```

392

```
1   suicide.
2        MS. SILAS: I would
3   actually move to strike on the basis of
4   the question being just whether or not
5   you had ever seen a claim with a
6   suicide attempt and reiterate my
7   objection to the question
8        MR. OSTER: I wasn't aware
9   that I was trying to make a point  I
10  was trying to ask a question.
11       MS. SILAS: Well, I know
12  where you're going with it, counsel,
13  and this isn't the witness to do it
14  with your big conspiracy theory of
15  a suicide attempt
16       A   I think you have to -- in
17  reviewing a claim you have to look at
18  the entire thing --
19       Q   Excuse me --
20       A   And you can't just pull
21  out one aspect of it and say, okay,
22  this is this or that. You've got to
23  look at the whole picture as it's
```

393

```
1   presented.
2        Q   Dr. Feist, when you saw
3   mention of suicide -- a suicide attempt
4   by a claimant with a depression claim
5   that you were reviewing, did you
6   consider that to be something serious
7   that should be looked at?
8        MS. SILAS: Wait.
9   Objection. I don't think he has even
10  said he has any specific recollection
11  of reviewing a file with a suicide
12  attempt in if because you didn't have
13  an answer to that question yet
14       A   I think --
15       MS. SILAS: Hold it. It's
16  irrelevant. It's overbroad. It's
17  vague and ambiguous unless he can
18  recall a specific file right --
19       A   Well, I can't recall a
20  specific file but I think suicide
21  ideation, suicide attempt, suicide
22  gestures are often a part of the
23  symptom complex if you will of major
```

394

```
1   depression and one has to look at that
2   whole framework in making an evaluation
3   of disability
4        Q   I'm not sure I understand
5   your answer but that's neither here nor
6   there.
7        A   That's okay
8        MS. SILAS: This isn't the
9   witness to go into that whole spill
10  that you're going to do
11       A   Yeah, I was going to say,
12  I mean, I'm not sure it's appropriate
13  to ask me that question but that's all
14  right,
15       Q   Well, Dr Feist, let me
16  try to put it this way  Have you ever
17  seen a circumstance in handling a
18  psychiatric claim where the claimant
19  was presenting a case of depression,
20  claimed to be depressed, and the
21  claimant also alleges that he attempted
22  to commit suicide and there was no
23  mention of it in the clinical notes of
```

395

```
1   the treating physician, have you ever
2   seen that?
3        MS. SILAS: Objection. It
4   is an incomplete hypothetical. It's
5   irrelevant. It goes beyond the scope
6   of this witness' testimony and this
7   witness is neither a psychiatrist nor a
8   claims adjustor, calls for an expert
9   opinion and a million other things but
10  you can answer it
11       A   Well, I have not seen that
12  situation but I think that could occur.
13  I think that would just to me say that
14  this person has a severe depression and
15  why it's not on the doctor's records I
16  haven't any idea but --
17       Q   Would that give you any
18  reason to question the doctor's
19  capabilities?
20       A   Absolutely not
21       MS. SILAS: Objection
22  Wait a second. Objection  It's an
23  incomplete hypothetical, calls for an
```

396

```
1   expert opinion by this witness and
2   assumes that all psychiatrists write
3   every single thing in a file, assumes
4   that counsel has produced the entire
5   file that they are talking about. I
6   don't even know what you were asking
7   What was the question again?
8        A   Well, I think --
9        MS. SILAS: Wait. I'm
10  sorry. It also calls for improper
11  opinion testimony and calls for an
12  expert opinion regarding psychiatric
13  recordkeeping --
14       THE WITNESS: Yeah.
15       MS. SILAS: -- which is
16  beyond the scope of anything this
17  witness has --
18       A   Well, I think the fact
19  that an individual had a suicide
20  attempt and it did not appear in the
21  psychiatrist's records, to me that's
22  irrelevant. You still would look at
23  the major depression or the depression
```

# FOSHEE & TURNER COURT REPORTERS

397

1  symptoms and make a judgment on that.
2      Q    No further questions, Dr.
3  Feist. Thank you.
4      A    Thank you, sir
5
6  FURTHER EXAMINATION BY MS. SILAS:
7
8      Q    Have you had occasion, Dr.
9  Feist, to review records of treating
10  psychiatrists?
11      A    Yes, I have.
12      Q    Have you also had occasion
13  to review IME's by forensic
14  psychiatrists?
15      A    Yes, I have.
16      Q    In your experience do
17  treating psychiatrists write down every
18  single thing that a patient is saying
19  to them in a session as they are saying
20  it?
21      A    Typically psychiatrists
22  keep records in my experience very
23  brief. They typically use the

398

1  numerical psychiatric codes and many
2  psychiatrists will keep two records,
3  one that they provide for insurance
4  companies and one they keep in their
5  personal files because they're so
6  confidential that they don't want
7  the --
8      Q    Why in your experience
9  wouldn't a psychiatrist write down
10  every single thing that a person is
11  saying as they're saying it?
12      MR. OSTER: Objection,
13  calls for speculation
14      A    It's very sensitive
15  information, information that the
16  psychiatrist doesn't want to be
17  disseminated. The psychiatrist knows
18  that if he submits an attending
19  physician's statement to an insurance
20  company that a number of persons are
21  going to read that attending
22  physician's statement and many
23  psychiatrists are very sensitive about

399

1  that and rightly so.
2      Q    Do you think a claim
3  should be terminated if the doctor is
4  not a good recordkeeper?
5      A    Oh, absolutely not. I
6  think the merits of the case are what
7  one decides upon.
8      Q    In your experience are IME
9  reports generally more detailed than
10  treating psychiatric reports?
11      A    Typically they are, yes
12  The psychiatrist would hone in on the
13  issue and write down all of his or her
14  impressions about an individual.
15      Q    I won't keep you too long
16  I just have a couple more. You
17  testified earlier that I think that you
18  had some resentment that you were
19  working a lot of hours without being
20  compensated  Is that the reason that
21  you're giving the testimony that you're
22  giving in this case?
23      A    No  I was obviously --

400

1  felt like I was taken advantage of  I
2  felt that Ralph Mobney should have
3  hired another physician to do what I
4  was doing which he later did but, you
5  know, that's over and done with. I
6  think the thing that I've been trying
7  to do is to try to help individuals who
8  have been wrongly denied a claim by
9  Provident to get what is rightfully
10  theirs
11      MR. OSTER: Move to strike
12  as nonresponsive, cumulative
13      THE WITNESS:
14  Nonresponsive and cumulative?
15      MS. SILAS: Unlike your
16  five psychiatric witnesses who are all
17  testifying to the same thing  I don't
18  have any further questions  Thank you
19  so much, Doctor.
20      MR. OSTER: Nothing
21  further
22
23  (Whereupon, a discussion was held off

401

1  the record )
2
3      MS. SILAS: I propose that
4  we stipulate to relieve the court
5  reporter of whatever duty she has under
6  the California Rules of Civil Procedure
7  and whatever rules Alabama has with
8  respect to the custody and correction,
9  et cetera, of the transcript and that
10  instead we have the court reporter
11  transmit the original transcript
12  directly to Dr. Feist and Dr. Feist can
13  review it, sign it under penalty of
14  perjury, make any changes he deems
15  appropriate, send the original back to
16  me, and that he try to make those
17  changes within seven days of his
18  receipt of the transcript and after
19  that seven-day period if for whatever
20  reason the original is unavailable or
21  cannot be produced for trial, a
22  certified copy of it can be used for
23  all purposes for which the original

402

1  could have been used
2      MR. OSTER: That's fine.
3      MS. SILAS: Thank you so
4  much.
5      AND FURTHER DEPONENT SAITH NOT
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# FOSHEE & TURNER COURT REPORTERS

403

```
 1        DR. WILLIAM FEIST
 2
 3     INSTRUCTIONS TO WITNESS
 4
 5     PLEASE READ YOUR DEPOSITION
 6  OVER CAREFULLY BEFORE YOU SIGN IT. YOU
 7  SHOULD MAKE ALL YOUR CHANGES ON THE
 8  ATTACHED ERRATA SHEET. PLEASE DO NOT
 9  MARK ON THE ORIGINAL DEPOSITION.
10     AFTER MAKING ANY CHANGES WHICH
11  YOU HAVE NOTED ON THE ATTACHED ERRATA
12  SHEET, SIGN YOUR NAME ON THE ERRATA
13  SHEET AND DATE IT.
14     THEN SIGN YOUR DEPOSITION AT
15  THE END OF YOUR TESTIMONY IN THE SPACE
16  PROVIDED. YOU ARE SIGNING IT SUBJECT
17  TO THE CHANGES YOU HAVE MADE ON THE
18  ERRATA SHEET, WHICH WILL BE ATTACHED TO
19  THE DEPOSITION.
20     RETURN THE ORIGINAL ERRATA
21  SHEET AND TRANSCRIPT TO FOSHEE &
22  TURNER, SUITE 220 PARK PLACE TOWER,
23  2001 PARK PLACE NORTH, BIRMINGHAM,
```

404

```
 1  ALABAMA, 35203.
 2     ACCORDING TO RULES OF CIVIL
 3  PROCEDURE, YOU WILL HAVE THIRTY (30)
 4  DAYS FROM THE DATE YOU RECEIVE THIS
 5  DEPOSITION IN WHICH TO READ, SIGN, AND
 6  RETURN YOUR DEPOSITION TO THE ABOVE
 7  OFFICE. IF YOU FAIL TO DO SO, YOU
 8  AUTOMATICALLY WAIVE YOUR RIGHT TO MAKE
 9  ANY CORRECTIONS TO YOUR DEPOSITION
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

405

```
 1  PAGE  LINE     EXPLANATION
 2        -------------------------------
 3        -------------------------------
 4        -------------------------------
 5        -------------------------------
 6        -------------------------------
 7        -------------------------------
 8        -------------------------------
 9        -------------------------------
10        -------------------------------
11        -------------------------------
12        -------------------------------
13        -------------------------------
14        -------------------------------
15        -------------------------------
16        -------------------------------
17        -------------------------------
18        ---------
19     DEPONENT'S SIGNATURE
20        -------------------------------
21        DATE
22
23
```

406

```
 1        DR. WILLIAM FEIST
 2
 3        SIGNATURE PAGE
 4            OF
 5        DR. WILLIAM FEIST
 6
 7     I HEREBY ACKNOWLEDGE THAT I
 8  HAVE READ THE FOREGOING DEPOSITION AND
 9  THAT THE SAME IS A TRUE AND CORRECT
10  TRANSCRIPTION OF THE ANSWERS GIVEN BY
11  ME TO THE QUESTIONS PROPOUNDED, EXCEPT
12  FOR THE CHANGES, IF ANY, NOTED ON THE
13  ATTACHED ERRATA SHEET.
14
15  ---------------------
16        SIGNATURE
17  ---------------------
18        DATE
19
20
21
22
23
```

407

```
 1        C E R T I F I C A T E
 2
 3  STATE OF ALABAMA
 4  JEFFERSON COUNTY
 5
 6        I hereby certify that the
 7  above and foregoing deposition was
 8  taken down by me in stenotype and the
 9  questions and answers thereto were
10  transcribed by means of computer-aided
11  transcription, and that the foregoing
12  represents a true and correct
13  transcript of the testimony given by
14  said witness upon said hearing.
15        I further certify that I'm
16  neither of counsel, nor of kin to the
17  parties to the action, nor am I in
18  anywise interested in the result of
19  said cause.
20
21        TRACI WATKINS
22
23
```

A Legalink Company * 2001 Park Place, Suite 220 * Birmingham, AL 35203 * www.foshee-turner.com

## 1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

405

| 1 | PAGE | LINE | EXPLANATION |
|---|------|------|-------------|
| 2 | 10 | 17 | Dr. Norman Knee |
| 3 | 11 | 20 | Dr. Norman Knee |
| 4 | 24 | 13 | Mr. Cary Hanlin |
| 5 | 50 | 3 | fall of 1995 not 1993 |
| 6 | 53 | 19 | Nov 1995 not Nov 1994 |
| 7 | 53 | 22 | Nov 1995 not Nov 1994 |
| 8 | 54 | 17 | Nov 1995 not Nov 1994 |
| 9 | 56 | 9 | Nov 1995 |
| 10 | 163 | 8 | Dr. Knee |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |

17

18 Willie E. Austin

19 **DEPONENT'S SIGNATURE**

20 5-21-2001

21 **DATE**

22

23

# FOSHEE & TURNER COURT REPORTERS

405

| 1 | PAGE | LINE | EXPLANATION |
|---|------|------|-------------|
| 2 | 10 | 18 | Dr. Norman Knee |
| 3 | 11 | 20 | Dr. Norman Knee |
| 4 | 24 | 13 | Mr. Cary Hanlin |
| 5 | 50 | 3 | fall of 1995 not 1993 |
| 6 | 53 | 19 | Nov 1995, Not Nov 1994 |
| 7 | 53 | 22 | Nov 1995, Not Nov 1994 |
| 8 | 54 | 17 | Nov 1995, Not Nov 1994 |
| 9 | 56 | 9 | Nov 1995 |
| 10 | 163 | 8 | Dr. Knee |

17

18 _Willie E. Austin_

19 **DEPONENT'S SIGNATURE**

20 5-31-2001

21 **DATE**

22

23



Foshee & Turner

statewide & worldwide court reporting • legal videography • litigation support services

Alabama

Bermuda

Boston

Chicago

Cleveland

Dallas

Hong Kong

Houston

London

Los Angeles

New York

San Diego

San Francisco

Sydney

June 1, 2001

Martina Silas
Attorney at Law
16601 Ventura Blvd.
Suite 400
Encinco, CA 91436

In reply to: **Kramer vs Paul Rever Life Ins. Co.**

Mrs. Silas,

    Please find enclosed the original transcript, errata sheet and/or the signature page of the deposition of **Dr. William Feist** taken by Traci Watkins in the above mentioned matter. If you should have any questions, please contact us.

Sincerely,

*Bridget Stacey*

Foshee and Turner
Court Reporters

Enclosures
Cc: Edwin Oster

2001 Park Place, Suite 220  Birmingham  AL 35203
P.O. Box 370292  Birmingham  AL 35237-0292
Tel 205-251-4200  Fax 205-252-5644  1-800-888-3376(DEPO)

406

1              DR. WILLIAM FEIST

2

3            SIGNATURE PAGE

4                  OF

5            DR. WILLIAM FEIST

6

7        I HEREBY ACKNOWLEDGE THAT I

8   HAVE READ THE FOREGOING DEPOSITION AND

9   THAT THE SAME IS A TRUE AND CORRECT

10  TRANSCRIPTION OF THE ANSWERS GIVEN BY

11  ME TO THE QUESTIONS PROPOUNDED, EXCEPT

12  FOR THE CHANGES, IF ANY, NOTED ON THE

13  ATTACHED ERRATA SHEET.

14

15  _____

16            SIGNATURE

17  _____5-31-2001_____

18             DATE

19

20

21

22

23

Case 2:00-cv-01386-JMR--JMB Document 53 Document 1672-3 Filed 07/30/2002 Page 98 of 100

REC'D _7-30-02_

CAL/INT _____

C/C _____

VIA _____

File Copy - Brem

X FILED _____ LODGED
_____ RECEIVED _____ COPY

JUL 3 0 2002

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joanne Ceimo,<br><br>    Plaintiff,<br><br>vs.<br><br>General American Life Insurance<br>Company; The Paul Revere Insurance<br>Company; and Provident Life and<br>Accident Insurance Company,<br><br>    Defendants. | No. CIV 00-1386-PHX-FJM<br><br>**ORDER** |

The Court has before it Plaintiff's Motion to Admit Deposition of Dr. William Feist [Doc. 45], which appears at first to request a ruling to the effect that the deposition is wholesale admissible. In their Response, Defendants raise many substantive objections. Plaintiff's Reply sharply narrows the relief requested:

> Plaintiff does <u>not</u> seek an advance ruling from the court that the deposition is admissible in its entirety. Instead, plaintiff merely seeks a ruling that the deposition can be treated like any other taken in the present action. Plaintiff will make specific designations of testimony for this and other depositions at the appropriate time and defendants will have opportunity to voice their objections. The only defense objection plaintiff seeks to foreclose by this motion is that the deposition is inadmissible on the ground that it was not taken in the present action.

(Plaintiff's Reply, at 1-2.) Plaintiff bases her request on Rule 32(a) of the Federal Rules of Civil Procedure and on Rule 804(b)(1) of the Federal Rules of Evidence. The Court

53

1  construes Plaintiff's motion as one requesting only the circumscribed relief requested in

2  Plaintiff's Reply.

3      As Plaintiff notes, the final sentence of Rule 32(a)(4) reads: "A deposition previously

4  taken may also be used as permitted by the Federal Rules of Evidence." The Advisory

5  Committee Notes to the 1980 Amendments explain that this

6          final sentence was added to reflect the fact that the Federal Rules of Evidence
7          permit a broader use of depositions previously taken under certain
           circumstances. For example, Rule 804(b)(1) of the Federal Rules of Evidence
           provides that if a witness is unavailable, as that term is defined by the rule, his
8          deposition in any earlier proceeding can be used against a party to the prior
           proceeding who had an opportunity and similar motive to develop the
9          testimony of the witness.

10 A deposition taken in this case, in contrast, would be immune to a hearsay objection based

11 solely on the fact that the deposition is offered instead of live testimony, provided that one

12 of Rule 32(a)(3)(A) through (E)–the unavailability conditions–was satisfied. But such a

13 deposition would otherwise be subject to the Rules of Evidence.

14     The relief requested in Plaintiff's Reply appears to boil down to a request for a

15 resolution of the hearsay issue just discussed. Plaintiff can thus be understood as offering

16 two independent grounds for the requested relief: (1) the deposition testimony satisfies Rule

17 804(b)(1), and thus is not subject to the relevant hearsay objection, provided the deponent

18 is unavailable; and (2) the deposition testimony satisfies the requirements of Rule 32(a)(4),

19 and thus is not subject to the relevant hearsay objection, provided it also satisfies one of Rule

20 32's unavailability conditions.

21 A. Rule 804(b)(1)

22     Plaintiff indicates that Dr. Feist is beyond the subpoena power of this Court and has

23 refused voluntarily to testify at trial. Defendants contest this only by way of pointing out that

24 Plaintiff has not attempted to depose Dr. Feist in this case. It is clear, however, that Plaintiff

25 is attempting to ascertain, by means of this motion, whether indeed she must incur the

26 expense of deposing Dr. Feist. Judicial economy weighs heavily against the Defendants'

27 position. Dr. Feist is unavailable within the meaning of Rule 804, and since the other

28
                                      - 2 -

1 requirements of Rule 804(b)(1) appear to be met (and are not contested), the Court finds that

2 Dr. Feist's deposition falls within the hearsay exception stated in Rule 804(b)(1).

3 B. Rule 32

4   In light of the foregoing, there is no need to reach the Rule 32 ground for relief.

5 C. Cautionary Note

6   As noted above, Defendants raised numerous substantive, non-hearsay objections to

7 the admission of Dr. Feist's deposition testimony. Nothing in this Order should be construed

8 as deciding any of those issues. At the appropriate time, Defendants are free to object on

9 those (or any applicable) grounds to the admission of specified portions of Dr. Feist's

10 deposition testimony.

11   **IT IS THEREFORE ORDERED** granting, to the extent indicated above, Plaintiff's

12 Motion to Admit Deposition of Dr. William Feist [Doc. 45].

13

14   DATED this 26 day of July, 2002.

15

16

17

18   Frederick J. Martone
    United States District Judge

19

20

21

22

23

24

25

26

27

28

- 3 -

ORIGINAL

RECEIVED
AND FILED

2002 OCT 31 PM 3: 50

LANCE S. WILSON

BY_____
HZ

1  JULIE A. MERSCH, ESQ.
   Nevada Bar No. 004695
2  *e-mail juliemersch@hotmail.com*
   GILLOCK, MARKLEY & KILLEBREW, P.C.
3  428 S. 4th Street
   Las Vegas, Nevada 89101
4  (702) 385-1482
   (702) 385-2608 (fax)
5
   Charles McB. Sasser, Esq.
6  e-address Attorney1@AOL.com
   COX, GAGE & SASSER
7  227 W. Trade Street, Ste. 2160
   Charlotte, North Carolina 28202
8  (704) 342-4200
   (704) 342-0798 (fax)
9
   Attorneys for Plaintiff,
10 G. CLINTON MERRICK, JR.

11

12              **UNITED STATES DISTRICT COURT**

13                  **DISTRICT OF NEVADA**

14

15

16 G. CLINTON MERRICK, JR.,           )    CASE NO. CV-S-00-0731-JCM-RJJ
                                       )
17          Plaintiff,                 )
                                       )    **PLAINTIFF'S SUPPLEMENTAL**
18     vs.                             )    **RESPONSE TO DEFENDANTS'**
                                       )    **OBJECTIONS TO EVIDENCE**
19 PAUL REVERE LIFE                    )    **FILED OCTOBER 24, 2002**
   INSURANCE COMPANY,                  )
20 a Massachusetts corporation;        )
   UNUMPROVIDENT CORPORATION           )
21 (d/b/a UNUM LIFE INSURANCE          )
   COMPANY OF AMERICA and              )
22 PROVIDENT LIFE AND ACCIDENT         )
   INSURANCE COMPANY); and             )
23 DOES I through      X inclusive,    )
   and ROES I through X,               )
24 inclusive,                          )
                                       )
25          Defendants.                )
   _____)
26

27      COMES NOW, Plaintiff G. CLINTON MERRICK, JR., by and through his counsel of

28 record, and provides a supplemental response to Defendants' Objections to Evidence by Plaintiff in

143

1   Opposition to Defendants' Motion for Summary Judgment or, in the alternative, Partial Summary

2   Judgment. Plaintiff submits the following supplemental documentation in support of admitting his

3   exhibits to his Opposition.

4   <u>Exhibit 1</u>      <u>Paul Revere/UnumProvident Claim File</u>

5        Attached as <u>Exhibit 1c</u> is an affidavit by Julie A. Mersch setting forth her personal knowledge

6   that Defendants disclosed documents to Plaintiff which constitutes their claim file in the instant case.

7   <u>Exhibit 2</u>      <u>Report of Stephen Prater</u>

8        Attached as <u>Exhibit 2</u> is an affidavit by Stephen Prater which conforms to the requirements

9   of FRCP 56(e).

10        DATED this 31st day of October, 2002.

11                                 GILLOCK, MARKLEY & KILLEBREW, P.C.

12

13                       By: _____

                                  JULIE A. MERSCH, ESQ.

14                                   Nevada Bar No. 004695

                                  428 S. 4th Street

15                                   Las Vegas, Nevada 89101

                                  Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF MAILING

2  I HEREBY CERTIFY that on the 31st day of October, 2002, I mailed a true and correct copy

3  of the above and foregoing PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANTS'

4  OBJECTIONS TO EVIDENCE FILED OCTOBER 24, 2002  postage prepaid, addressed to the

5  following:

6

7  Robert J. McKennon, Esq.
   Robert E. Hess, Esq.
   BARGER & WOLEN LLP

8  19800 MacArthur Blvd., Ste. 800
   Irvine, California 92612-2427

9  Attorneys for Defendants

10

11  Charles McB. Sasser, Esq.
    COX, GAGE & SASSER
    227 W. Trade Street, Ste. 2160

12  Charlotte, North Carolina 28202

13

14  _Ingrid Decker_
    An employee of
    GILLOCK, MARKLEY & KILLEBREW, P.C.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1c

1    **AFFIDAVIT OF JULIE A. MERSCH, ESQ.**

2

3    STATE OF NEVADA        )
                                )
4    COUNTY OF CLARK        )

5

6         JULIE A. MERSCH, ESQ., being first duly sworn, under oath and penalties of perjury,

7    deposes and states that:

8         1. I am an attorney duly licensed to practice law in the State of Nevada, and a member of the

9    law firm of Gillock, Markley, and Killebrew, P.C., 428 S. 4th Street, Las Vegas, Nevada 89101.

10        2. I am one of the counsel of record in the matter entitled <u>Merrick v. Paul Revere Life</u>

11   <u>Insurance Company; UnumProvident Corporation (d/b/a Unum Life Insurance Company of America</u>

12   <u>and Provident Life and Accident Insurance Company</u>, Case No. CV-S-00-0731-PMP-RJJ.

13        3. I have personal knowledge that Defendants disclosed documents to Plaintiff which

14   constitutes their claim file in the instant case. On or about August 18, 2000, I received Defendants'

15   Initial Disclosure dated August 14, 2000 and the pre-litigation claim file including the subject policy

16   and application for the policy (bate numbers PRLSP 00001 - PRLSP 00030; PRLAP 00001 - PRLAP

17   00088; PRLCL 0001 - PRLCL 00937). <u>See</u> <u>Exhibit 1</u> at 6.   On September 15, 2000, I received

18   Notice of Taking Deposition of Non-Party Witness, The Custodian of Records for Northwestern

19   Mutual Life Insurance Company and Subpoena seeking documents related to Mr. Merrick' claim

20   with that company.  <u>See</u> <u>Exhibit 1a</u>.   On April 5, 2001, Defendants served Supplemental Initial

21   Disclosure dated April 4, 2001 attaching documents received pursuant to the Northwestern Mutual

22   subpoena.  <u>See</u> <u>Exhibit 1b</u>.  Those documents had also been bate-stamped by Defendants (bate

23   numbers PRLCL 00938-01901).

24        All references to the claim file in Plaintiff's Opposition to Defendants' Motion for Summary

25   Judgment or, in the Alternative, Partial Summary Judgment are by bate-number as supplied by

26   / / /

27   / / /

28   / / /

1   Defendants in their disclosures. Due to its size, Plaintiff did not attach the entire claim file to his

2   Opposition.

3        FURTHER AFFIANT SAYETH NAUGHT.

4
5                                                    JULIE A. MERSCH, ESQ.
6
7   SUBSCRIBED and SWORN to before
    me this 31st day of October, 2002.
8
9   NOTARY PUBLIC in and for said
    COUNTY and STATE.
10



NOTARY PUBLIC
County of Clark-State of Nevada
EMILY WATSON
No. 93-4594-1
My Appointment Expires Oct. 22, 2005

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

EX.2

1

## AFFIDAVIT OF STEPHEN D. PRATER.

2

3  STATE OF CALIFORNIA      )

4  COUNTY OF SANTA CLARA    )

5

6     STEPHEN D. PRATER, being first duly sworn, under oath and penalties of perjury,

7  deposes and states that:

8     1. I have been retained by the law firm of Gillock, Markley, and Killebrew, P.C. to

9  review documents and provide expert opinions in connection with the civil action entitled

10  Merrick v. Paul Revere Life Insurance Company; UnumProvident Corporation (d/b/a Unum Life

11  Insurance Company of America and Provident Life and Accident Insurance Company), Case No.

12  CV-S-00-0731-PMP-RJJ.

13     2. I am a 1980 cum laude graduate of the University of Santa Clara, school of law, and

14  am an attorney admitted to practice in California. I also have a Bachelor of Arts degree (awarded

15  in 1976 with great distinction), and an M.S. degree (awarded in 1978) from San Jose State

16  University.

17     3. From 1981 to 1988, I was employed full-time as General Counsel, Vice President/

18  General Counsel, and ultimately Sr. Vice President and General Counsel for Allied Management

19  Services, Inc. Allied owned and managed several corporations that were actively engaged in the

20  business of insurance. One of Allied's subsidiaries, Commercial & Industrial Administration

21  Co., Inc., adjusted and settled hundreds of thousands first-party claims.

22     4. I have been teaching insurance law at Santa Clara University School of Law for 18

23  years. Subjects include the structure and operation of insurance companies, claims handling,

24  standards and practices, insurance marketing, underwriting and related topics. I also supervise

25  advanced writing projects undertaken by students in the insurance field. I served on the

26  executive committee created by the law school to set up an institute for the advanced study of

27  insurance law and practice.

28  ///

5. I am a consultant on insurance law and practice, for insurance companies, insureds, governmental entities, employers and others. I have been retained as an expert by the California Department of Insurance, the Federal Government, the State of California, and the County of Los Angeles. I have dedicated thousands of hours reading, studying and examining documents pertaining to Defendants specifically, and the standards/practices and procedures in the disability insurance industry generally. My past and present insurance company clients include State Farm, Allstate, Farmers Insurance Group, 20th Century, CNA, Blue Cross/Blue Shield, Lloyds of London, The Hartford Group, Insurance Company of North America, Transamerica Occidental, and many others. I have read and studied the claims handling practices and procedures of more than 25 major insurers, including review of hundreds of thousands of documents such as claim manuals, policy memos and claim documents, relevant to the business of insurance.

6. I have been a featured /key-note speaker at more than 200 national, state and local insurance industry sponsored seminars and conventions over the years.

7. Currently, I am the training officer for Civil Service Employees Insurance Company (CSE), headquartered in San Francisco, and I am responsible for drafting claims handling standards, claims manuals and other training materials for the claims department. I also conduct training seminars for CSE's personnel.

8. I continuously review reported appellate opinions, statutory provisions and governmental regulations pertaining to insurance coverage, punitive damages, industry claim practices and the implied-in-law covenant of good faith and fair dealing in connection with my work as an adjunct professor of insurance law and ongoing consulting practice.

9. I have been retained many times by insurers, insureds, governmental agencies, private employers, attorneys and others as an expert on insurance law and practice. I have testified as an expert at trial in California, Nevada, Arizona, Idaho, Alaska, Hawaii, Alabama, Florida and other states, in both state and federal court. I have given 100's of depositions as an expert witness, and have testified approximately 50 times at trial in the last 15 years. I have testified on behalf of insurers and insureds, and have always been found to be qualified to testify.

/ / /

2

10. I have authored/co-authored a book and other articles and seminar materials pertinent to the business of insurance.

11. My opinions in this matter are based on my personal knowledge of the specific documents provided by counsel, including the claim file generated by Defendants (as outlined in my expert report produced pursuant to Fed. R. Civ. P. 26(2)(B)) and my review of the 100,000 plus additional institutional documents relating specifically to Defendants, my work on other cases involving Defendants, and my education, background and training and experience. I have dedicated over 20 years of my professional life to the field of insurance law and practice and am familiar with the standards and practices in the disability insurance industry.

12. I have been asked by Plaintiff's counsel, Julie A. Mersch, Esq. to opine regarding the propriety of Defendants' insistence that Mr. Merrick prove his disability by objective medical evidence. These opinions in this regard are set forth in my expert report, attached hereto, and are reproduced in relevant part through this affidavit. As stated, the full text of my opinions in this case are included in my expert report disclosed to Defendants on February 27, 2002, attached hereto.

13. It is my opinion, based on my review of the pre-litigation file provided, as well as my education, background, training and experience, that in the present case Defendants acted unreasonably in interpreting Mr. Merrick's insurance policy provisions so as to wrongfully withhold the payment of policy benefits due. Mr. Merrick purchased a "Cadillac" disability income policy from The Paul Revere Life Insurance Company, which was issued on December 18, 1989. The policy is non-cancelable, guaranteed continuable with no change in premium rates and insures Mr. Merrick for total or residual disability in his own occupation (e.g. the occupation that he was regularly engaged in at the time he became disabled). The policy requires Defendants to pay total disability benefits if, because of injury or sickness, Mr. Merrick is (1) unable to perform the important duties of his occupation and (2) he is under the regular and personal care of a physician. There is no requirement that the cause of the disability has to have a name - chronic fatigue syndrome (CFS), depression, or otherwise (It is well known in the insurance industry that many disabling conditions are idiopathic, and that somatoform disorders,

3

1  headaches, and pain ["subjective" experiences] can be disabling) . The policy does not require

2  proof by "objective evidence", nor does it require that an insured must provide clinical evidence

3  of the etiology of the "condition" that renders him disabled.  It is unreasonable for Defendants to

4  attempt to add additional terms or extra requirements into an insurance policy that is not

5  expressly part of it, and Defendants do this routinely as a matter of general business practice. (It

6  is a misrepresentation of fact and/or insurance policy provisions to tell an insured that a claim

7  must be proven by "objective" evidence when the policy itself does not require such proof.)  In

8  Mr. Merrick's case, Defendants utilized the purported lack of "objective" medical evidence

9  standards to deny Mr. Merrick's claim, and wrongfully withhold policy benefits due.  (See pre-

10 litigation claims file produced by Defendants with bate #'s beginning at PRL CL 279, 508, 534,

11 518-521, 525, 535, 536, 539, 543, 544, 550, 553, 611 attached hereto as Exhibit 2a.)

12     14. Reasonable insurance companies understand that if you deny a claim, you must have

13 a reasonable basis for the decision at the time the decision is made.  By requiring proof of

14 disability by "objective evidence", Defendants unreasonably added a requirement or standard that

15 is not part of Mr. Merrick's insurance policy.   Defendants' attempt to require "objective medical

16 evidence" of Mr. Merrick's claim is particularly troubling since CFS and depression are primarily

17 subjective in nature and cannot be seen on an x-ray, an MRI, or other "objective" medical tests.

18 It is well known and understood in the disability insurance industry that there is no definitive

19 litmus test for CFS, and that lab tests may be entirely normal.  Since CFS is such a new

20 syndrome (it wasn't even recognized as a disease until approximately 1988), definitive tests may

21 be many years away.  Moreover, as stated above, the name of the sickness giving rise to Mr.

22 Merrick's disability, or the exact cause or combination of causes that may be contributing to his

23 disability, is not the relevant focus under Mr. Merrick's policy provisions.  Simply stated, Mr.

24 Merrick is not required to prove that he has "CFS" or "depression" nor is he required to provide

25 "objective evidence" as a condition of eligibility for benefits under his policy.

26     15. It should also be noted that the policy contains no reference or definition of the

27 Defendants' "objective evidence standard", and Mr. Merrick pointed this out to Defendants on

28 repeated occasions.  He asked Defendants to tell him what medical tests he needed to have done

1  in order to satisfy Defendants, and he was told that Defendants could not recommend any test

2  that would satisfy their "objective" standard. (See pre-litigation claims file documents beginning

3  at PRL CL 518, 543, 550, 559 attached hereto as Exhibit 2b.) Requiring an insured like Mr.

4  Merrick to prove his or her claim by objective evidence, when not required by the policy and

5  when objective medical tests are not yet available to definitively diagnosis CFS, is unreasonable,

6  and consciously disregards an insured's rights and reasonable expectations of coverage.

7      16. An insurance company must fully and fairly investigate a claim prior to denying it.

8  This duty to investigate means that when an insurer makes a decision to pay or deny a claim, it

9  has sufficient information in the claim file at the time to support the decision. Otherwise, an

10  insurer could deny claims with little or no investigation, and then launch an exhaustive

11  investigation to support its denial after litigation has been filed. This fundamental tenet of

12  insurance claims practice has been recognized for decades. As stated in Ichthys, Inc. v.

13  Guarantee Insurance Company, 249 Cal.App.2d 555, 558 (1967), citing American Paint Service

14  v. Home Ins. Co., 246 F.2d 91 (3rd.Cir.1957), ". . . If the insurer denies liability and compels the

15  insured to bring suit, the rights of the parties are fixed as of that time for it is assumed that the

16  insurer, in good faith, then has sound reasons based upon the terms of the policy for denying the

17  claim of the insured."

18      17. Accordingly, the focus for judging Defendants' conduct in this case should be the

19  information relied on in the claim file to support their decision to terminate benefit payments and

20  close Mr. Merrick's claim in January 1997. As stated, supra, Defendants improperly utilized the

21  purported lack of "objective" medical evidence standards as the basis for terminating benefits.

22      18. Since suit has been filed, Defendants now have a post-litigation claims file and have

23  hired attorneys and new medical "experts" to support their decision to terminate Mr. Merrick's

24  claim years ago, in January 1997. They are attacking Mr. Merrick personally, scrutinizing

25  medical records that played no part in their decision to deny coverage, and doing everything in

26  their power to discredit, attack, harass and oppress Mr. Merrick – even though he is still paying

27  premiums to Defendants, and has not returned to his prior occupation as a venture capitalist.

28  Their focus (in defending their decision to terminate benefits) is on compiling information

through the litigation discovery process to support their denial in January 1997.

1        19. The attached Exhibit 2 is a true and correct copy of my written report dated February

2    25, 2002 as required under F.R.C.P. 26(2)(B). Because of their length, I have not attached all of

3    the exhibits to my written report but will do so as called upon by this Court.

4        FURTHER AFFIANT SAYETH NAUGHT.

5

6                                          STEPHEN D. PRATER

7

8

9    SUBSCRIBED and SWORN to before
me this _____ day of October, 2002.

10

11   NOTARY PUBLIC in and for said
COUNTY and STATE.

12

13

14   W:\MERRICK\motions\Affidavit.Prater-revised.wpd

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# EXPERT REPORT
### OF
# STEPHEN D. PRATER

I was requested by the law offices of Gillock, Markley & Killebrew and the law offices of Cox, Gage and Sasser, attorneys for plaintiff Clinton Merrick, to review documents and provide expert opinions in connection with the civil action of ***Merrick v. Paul Revere, et.al.*** (hereinafter referred to as defendants). The case specific documents provided for my review to date are listed in Exhibit "A", attached hereto and incorporated by reference.

In addition to the above documents, I have also read and considered more than 100,000 additional documents, depositions and other written materials produced in other cases around the country, including extensive documents produced in the following cases:

    (1) ***Bellone v. Provident***

    (2) The ***Jordan, Maglione and Snyder*** cases

    (3) ***Norcia v. Equitable, Paul Revere, et.al.***

    (4) ***Williams v. Equitable***

    (5) ***Dick v. Paul Revere***

    (6) ***McKendry v. Paul Revere***

    (7) ***Forest v. The Equitable***

    (8) ***Abramowitz v. Unum***

(9)   *Weisenberger v. Unum, Paul Revere, et. al.*

(10)   *Goldberg v. Paul Revere*

(11)   And many other cases involving defendants, where I have been retained as a confidential consultant and/or an expert witness.

Many of the documents listed above are the subject of confidentiality orders. In an effort to comply with these orders, I must be careful before describing specific documents and/or testimony without first checking with counsel, and receiving guidance from the Court. It is my intention to provide counsel with copies of all of the documents that I may want to refer to, or use as an exhibit, or aid at trial. Most of the documents come from the cases listed in (1), (2), (3) and (6) above. I have prepared Rule 26 Federal Court Reports and/or given depositions in many of the cases listed above and I hereby incorporate said reports by reference herein, but am not attaching copies at this time due to concerns about confidentiality. (Defendants have copies of said reports and are well aware of my opinions). In the unlikely event that defense counsel has not already received copies of said depositions and/or reports, I am attaching a copy of my **Amended** report in *Norcia v. Equitable, Paul Revere, et.al.* which I prepared December 4, 2000, by order of the court. (Attached hereto as Exhibit "F".) It is my understanding and belief that this copy of my amended *Norcia* report has already been redacted pursuant to the Norcia confidentiality agreement. (I have **not** included Exhibit "D" or "K" to my **Norcia Report**, or the footnotes to Exhibit H or I at this time since there are references to the **Bellone** documents.)

It is my sincere hope that counsel in the **Merrick** case can enter into some kind of stipulation, approved by the Court, which will

2

permit me to express my opinions and the basis for my opinions **accurately** and **completely.** (It should also be noted that defendants have taken my deposition on many occasions and have actual knowledge, possession and control over the documents referenced above.)

**I am also willing to provide defense counsel with complete copies of all of my reports/depositions referenced above if defendants authorize me to do so.**

My anticipated opinions in this matter are based on my review of the case specific documents provided by counsel and listed above, my review of the 100,000+ documents, my work on other cases involving defendants, and my education, background, training and experience. I have dedicated over 20 years of my professional life to field of insurance law and practice and am familiar with the standards and practices in the disability insurance industry.

I. My current Curriculum Vitae is attached hereto as "Exhibit B", which lists my formal degrees and highlights my professional background and experience. My CV contains reference to my available publications.

II. I may rely on any of the documents referenced above as exhibits or aids at trial.

III. I am being compensated for my professional services for consulting and document review at the rate of $325.00 per hour. My trial/deposition rate is $385.00 per hour. (video taped deposition testimony is $485.00 per hour).

IV. A list of cases where I have given deposition or trial testimony in the last 4 years is attached hereto as "Exhibit C".

V. My anticipated opinions in the above referenced case are as follows:

3

(1) I will be asked to provide basic tutorial opinions in order to assist the jury in understanding relevant standards/practices in the insurance industry.

An outline of these opinions is attached hereto as "Exhibit D" and incorporated herein by reference. These opinions are further described in my supplemental report in the **Norcia** case, attached hereto as Exhibit "F", and incorporated herein by reference.

(2) I will be asked to discuss defendant's general business practices and procedures, as discussed in my depositions in the cases listed in above. My reports, depositions and/or trial testimony in these matters are hereby incorporated herein by reference.

(3) Since discovery is ongoing, it is my understanding that I may be asked to look at additional documents yet to be produced by defendants. In the event that I do so, I will prepare a supplemental report.

(4) I expect that I may be asked at trial to respond to hypothetical questions and to discuss my experiences as an expert in other cases involving defendants, where I have provided expert testimony.

(5) I have been asked to assume for purposes of this report that Nevada law applies, although it is my view that the conduct of defendants in this Case falls well below the standard of care for disability insurers doing business in Connecticut and other states as well.

(6) In the present case, defendants acted unreasonably in interpreting Mr. Merrick's insurance policy provisions so as to wrongfully withhold the payment of policy benefits due. Mr. Merrick purchased a "Cadillac" disability

4

income policy from The Paul Revere Life Insurance Company, which was issued on December 18, 1989. The policy is non-cancelable, guaranteed continuable with no change in premium rates and insures Mr. Merrick for total or residual disability in his own occupation (e.g. the occupation that he was regularly engaged in at the time he became disabled). The policy requires defendants to pay total disability benefits if, because of injury or sickness, Mr. Merrick is (1) unable to perform the important duties of his own occupation and (2) he is under the regular and personal care of a physician. (Residual disability has a different definition, but the claims file reflects that defendants never even considered the possibility of coverage under this section of the policy – see policy, page 7). There is **no requirement** that the **cause** of the disability has to have a name – CFS, depression, or otherwise. (It is well known in the insurance industry that many disabling conditions are idiopathic, and that somatoform disorders, headaches, and pain ["subjective" experiences] can be disabling. See also Dr. Goldstein's testimony in McKendry, 5-19-99)) The policy does **not** require proof by **"objective evidence"**, nor does it require that an insured must provide clinical evidence of the etiology of the "condition" that renders him disabled. It is unreasonable for defendants to attempt to add additional terms or extra requirements into an insurance policy that is not expressly part of it, and defendants do this **routinely** as a matter of general business practice. (It is a misrepresentation of fact and/or insurance policy provisions to tell an insured that a claim must be proven by "objective" evidence when the policy itself does not require such proof.)

In Mr. Merrick's case, defendants uti..ed the purported lack of "objective" medical evidence standard to **deny** Mr. Merrick's claim, and wrongfully withhold policy benefits due. (See pre-litigation claims file produced by defendants, with bates #'s beginning at PRL CL 279, 508, 534, 518-521, 525, 535, 536, 539, 543, 544, 550, 553, 611)

**(7)** By requiring proof of disability by "objective evidence", defendants unreasonably added a requirement or standard that is **not** part of Mr. Merrick's insurance policy. Defendants attempt to require "objective medical evidence" of Mr. Merrick's claim is particularly troubling since Chronic Fatigue Syndrome (CFS) and depression are primarily **subjective** in nature and cannot be seen on an x-ray, an MRI, or other "objective" medical tests. It is well known and understood in the disability insurance industry that there is no definitive litmus test for CFS, and that lab tests may be entirely normal. Since CFS is such a new syndrome (it wasn't even recognized as a disease until approximately 1988), definitive tests may be many years away. Moreover, as discussed briefly in (6) above, the **name** of the sickness giving rise to Mr. Merrick's disability, or the **exact cause or combination of causes** that may be contributing to his disability is **not** the relevant focus under Mr. Merrick's policy provisions. Simply stated, Mr. Merrick is **not** required to prove that he has "CFS" or "depression" nor is he required to provide "objective evidence" as a condition of eligibility for benefits under his policy.

(8) It should also be noted that the policy contains no reference or definition of the defendants "objective evidence standard", and Mr. Merrick pointed this out to

6

defendants on repeated occasions. He asked defendants
to tell him what medical tests he needed to have done in
order to satisfy defendants, and he was told that
defendants could not recommend **any** test that would
satisfy their "objective" standard. (See pre-litigation
claims file documents beginning at PRL CL 518, 543,
550, 559). According to Mr. Merrick, he spent about
$20,000 on tests, doctors, etc to obtain a diagnosis and
support his claim, but he felt he was in a "Catch 22".
Defendants Medical Director, Dr. Goldstein, knows that
CFS is a disease that can cause disability, and that is not
uncommon for secondary depression to appear in
patients who are suffering from chronic illness. He
knows that CFS is a diagnosis of exclusion. (See Dr.
Goldstein's deposition testimony in **McKendry**). When
defendants claims department asked the Psych
Department for **specific tests** to be ordered to evaluate
CFS, the response was "I do not believe the DX of CFS
can be established or validated by neuro-psych testing".
The response also states, "Isn't it their responsibility to
present that data?" (PRL CL 343). **NOTE:** In defendants
Training Materials (PRL CL 152) there is a section
entitled *"Guidelines for Medical Review Requests"*. It
states, "Remember, the burden of proof falls on the
insured. IME's are not to be used as an information
gathering tool unless absolutely necessary." Requiring
an insured like Mr. Merrick to prove his or her claim by
**objective** evidence, when **not** required by the policy and
when **objective** medical tests are not yet available to
definitively diagnose CFS, is unreasonable, and
consciously disregards an insured's rights and
reasonable expectations of coverage. It should also be
noted that defendants have different definitions of what

7

constitutes objective evidence depending on who you ask and what case they are asked in. In ***Fontaine v. Provident,*** Chris Kinback said the IME report was "objective evidence". (See deposition testimony 4-30-98.) In ***Heine v. Provident*** he said IME's are more "objective" than an attending physician report. (See deposition testimony 1-27-99.) Mr. Ralph Mohney, who is ultimately in charge of defendants' claims functions, testified that an "objective" evaluation means an "unbiased" or "unpredisposed" one. (See my 7-25-01 report in the **Forest** case for further examples.)

**(9)** The policy has specific requirements pertaining to "claims" (page 16-17). The insured must (1) give written notice of claim...as soon as reasonably possible. (Section 9.2), (2) send in a claim form or written statement of the nature and extent of his loss (Section 9.3), and (3) send in a written proof of loss (Section 9.4). In the present case, the claims file clearly reflects that Mr. Merrick **satisfied all of his policy requirements** and was disabled within the meaning of his policy and entitled to policy benefits due. These benefits were unreasonably terminated, and Mr. Merrick was forced to file a lawsuit to collect policy benefits due.

**(10)** Defendants acted unreasonably and below the standard of care in the insurance industry when they denied Mr. Merrick's ongoing claim, closed his file, and refused to provide further policy benefits subsequent to their "closure" date of 12-27-96. Mr. Merrick submitted extensive evidence to support his claim, and gave defendants repeated opportunities to reconsider their decision to "cut off" his benefits, to no avail. Mr. Merrick was forced to file a lawsuit in April 2000.

8

(11) When making claims decisions, reasonable claims handlers know they have to weigh and balance the information received and make a decision promptly, fairly and in good faith. There are certain well-known and non-controversial standards of conduct that must be adhered to, and these standards are discussed in greater detail in my Amended **Norcia Report**, a copy of which is attached hereto as "Exhibit F" and incorporated herein by reference. (See "Exhibit "F" at pages 1-3, 32-44, and Exhibits I, K-T).

Claims handlers understand that they often have to weigh and balance information received in order to make a fair claims decision. Chris Kinback (and others) have testified on many occasions that "if the preponderance of the evidence suggests disability, we pay as expeditiously as we can" (See Kinback deposition in **_Heine v. Provident_** – 1/27/99). He also testified about defendant's corporate practices in **_Lawrence v. Provident_** (1-26-99) and conceded that if defendants make a decision to resolve a claim, **at that point** "we need to be prepared to support our decision based on those facts that we have". Stated another way, it is well known and understood in the insurance industry that when an insurance company makes a decision to deny a claim, they must first conduct a "good faith" investigation (see tutorial opinion outline, "Exhibit E"). Thereafter, they must fairly and objectively weigh the information received, and if they make a decision to **deny** benefits, there must be a reasonable basis for the decision **at the time the decision is made.** It is not proper for insurers to manufacture additional evidence or reasons for denial **after** the denial decision is already made in order to justify their decision.

9

In the present case, the facts **supporting** payment of Mr. Merrick's claim **outweighed** any possible speculation or conjecture to suggest Mr. Merrick was not disabled within the meaning of his policy. The information that **supported** Mr. Merrick's ongoing claim as of the time of the initial denial in January 1997, includes the following:

- Paul Revere accepted Mr. Merrick's claim forms and attending physician statements on repeated occasions, and made ongoing payments without reservation of rights. Defendants accepted his occupation as a venture capitalist, and agreed to use 6-30-94 as "date of disability". He received his first claim payment in April 1995 and his future premium payments were waived. Payments continued without reservation until January 1996 when defendants determined that there was no objective evidence that Mr. Merrick has CFS or Lyme disease. (PRL CL 186, 279)

- Mr. Merrick and his attending physicians certified Mr. Merrick's ongoing disability status on a regular basis (see claims file).

- After extensive testing and many physician visits, Mr. Merrick was found to have a "constellation of symptoms" that best fit "the spectrum of CFS". He also had a diagnosis of depression, and other health problems, symptoms and complaints that worked together to cause his disability within the meaning of the policy. (See medical records in the claims file and outline of some of the pertinent events, records and dates in "Exhibit E", attached hereto.)

10

- Defendants own Medical Director, Dr. Goldstein, determined that the records supported **significant impairment**. (PRL CL 174-175)

- Dr. Epstein made it clear that Mr. Merrick's illness made it impossible for him to function, and that he was unable to work in his previous career. (PRL CL 208-214)

- Defendants considered taking the position that Mr. Merrick's occupation was really an "unemployed person", but ultimately decided to evaluate his claim based on his occupation as a venture capitalist (PRL CL 186, 203). Defendants **routinely** take the position that a person's occupation is an "unemployed person" – particularly in those cases where they feel they can't defeat the claim based on the medical evidence. (See my reports in ***Norcia v. Equitable*** and ***Dick v. Paul Revere.***) This "tactic" to defeat valid claims is despicable and further evidence of institutional bad faith. (See Judge Young's and Judge Strand's opinions in the ***Norcia*** case). **NOTE:** during recent depositions, defense counsel's questions and witness statements suggest defendants may try and resurrect the "unemployed person" argument.

- Kris Bostek advised Elsa Salvador that Dr. Goldstein felt the medical documents he reviewed supported significant impairment, but that the **diagnosis** was incorrect. (PRL CL 203) Defendants then decided to send out a field claim representative to offer a compromise on the claim (Which is another tactic defendants routinely use

11

to unreasonably close claims – see ***Norcia*** report and activities of Joe Mauvais.) The FCR discussed a "compromise", apparently a payment of $48,000, which the insured refused. (PRL CL 229-231, 222)

- Mr. Merrick's medical problems were diagnosed and confirmed by numerous physicians. His diagnosis of CFS was made by clinical evaluation, over time. There were also some abnormalities in the tests he was given. All reasonable insurance companies understand that the opinion of the insured's treating doctors, particularly in cases involving "subjective" illnesses like CFS, Depression, etc., should generally be given **greater weight** than the insurance companies consultants (who do limited "paper reviews" and never see the patient) or an "IME" Physician who sees the insured on a single occasion. This is particularly true for conditions such as CFS, which is a **clinical diagnosis**, with symptoms that wax and wane. Greater weight is given to a treating physician in the context of ERISA disability cases and Social Security cases as well, and is commonly known as the "treating physician rule". See also *The Human Body – Its Function in Health and Disease*, 3rd Edition, (co-authored by Marvin Goldstein, M.D.).

- Dr. Goldstein agreed that Dr. Epstein's PAF (PRL CL 208-214) probably reflects an **accurate functional level** albeit he disagreed with the diagnosis. (Dr. Epstein made it clear that Mr. Merrick's functional deficits are marked, and that he is unable to work at his previous career.) Dr.

12

Goldstein agreed to request a neuro IME – "but only with a major figure that all will accept as definitive". Dr. Goldstein wanted a particular doctor from the University of Connecticut (who was unavailable), so defendants selected Dr. Donaldson (from the same University) to conduct the IME. Dr. Goldstein attempted to influence Dr. Donaldson by highlighting certain records, and sending only those he determined were "pertinent", and the "IME" was conducted on 11-20-95. (See PRL CL 236-237, 245)

- Dr. Donaldson's IME report (dated 12-15-95) **supports** Mr. Merrick's disability claim. (PRL CL 265-269)

- Upon receipt of Dr. Donaldson's report, Dr. Goldstein concluded it was an **excellent** review that confirmed his previous opinions. Mr. Merrick had depression – not CFS or Lyme disease. Dr. Goldstein directed the claims handler to write back to Dr. Donaldson to directly answer the issue of employment. (There is no evidence in the claim file this direction was ever followed.) Dr. Goldstein stated he believed that **Dr. Donaldson implied Mr. Merrick could not return to work at this time...** (PRL CL 276)

- Defendants then started to "set up" the denial of benefits and determined that based on review **or** the IME "we have determined that there exists no objective evidence that you have CFS or Lymes disease" and future payments were made under ROR. (PRL CL 279)

13

- Sandra Fallon concluded that fatigue is a common symptom of depression, as well as other syndromes. (PRL CL 285)

- Dr. Rapoport continued to certify Mr. Merrick's disability as **permanent.**

- Dr. Epstein (who was unable to locate his treatment notes for 1995) suggested that Mr. Merrick's condition was medical, and that he was no longer treating him.

- Dr. Rapoport wrote to the defendants stating why he disagreed with the IME. (PRL CL 335-337)

- Todd K waived the monthly APS requirement. (PRL CL 349)

- The insured had many **additional** problems arise in his life – (e.g. his son drowned in a swimming pool).

- Dr. Cusher offered no conclusions of underlying medical illness. (PRL CL 503)

- Defendants once again tried to compromise and close the claim. (PRL CL 506, 512) **NOTE:** At this point in 11-96, defendants already felt they had enough at this time to **deny** further benefits. (which is a "bad faith" focus)

- Defendants **agreed** that Mr. Merrick was depressed and had cognitive problems, but speculated that they were not severe enough to be of disabling proportions. (PRL CL 508) **NOTE:** Defendants **never attempted** to investigate information to **support** Mr. Merrick's claim. When Mr. Merrick

14

refused to "compromise", defendants **closed the file**, and refused further payments beyond the end of the calendar year. (They wanted his claim off the books with the resulting reserve reduction.) (See PRL CL 490, 507, 510, 523, 518-521, 534, 535) Dr. Goldstein recommended surveillance, but the claims personnel apparently never followed up on this suggestion. (PRL CL 535)

- The defendants ignored the insured's comments in 12-96 over the telephone (PRL CL 518-521) and on 12-9-96 **denied** that any further benefits were due based on a review of the medical information submitted and Dr. Donaldson's IME. Defendants concluded there was no **objective medical documentation** to support Mr. Merrick's inability to perform his duties as a venture capitalist. (PRL CL 525)

- Mr. Merrick was continuously seeking treatment, and tried many different treatments to get well.

- Mr. Merrick never returned to his prior occupation after his disability date, (even though he made considerably more money working than he did on disability).

- Mr. Merrick met the CDC criteria for CFS.

**(12)** The "cornerstone" of defendants decision to deny is Dr. Goldstein's opinion(s) and Dr. Donaldson's "IME". This "support" for denial pales in comparison to the **overwhelming weight of the evidence** that supports continued payment. The following factors are important to consider:

15

Dr. Goldstein was a paid, full-...e employee of defendant, who does not specialize in CFS, who never treated Mr. Merrick, but instead completed a cursory "paper review" of the medical records he received. (**NOTE:** Assuming he reviewed at all. See *Watson v. UNUMProvident Corp.)*

- Dr. Goldstein routinely takes unreasonable positions that favor his corporate employer without regard to the insured's rights and reasonable expectations of coverage. In the _**McKendry**_ case, he said he never reads the insurance policies and "could care less about them". He refused to accept subjective, self-reported problems by Mr. McKendry to establish a CFS related disability, but eagerly accepted Dr. Almer's **subjective** interpretation of what McKendry purportedly said to deny the claim. (**NOTE:** Dr. Almer did a limited examination and refers to CFS as "a bunch of garbage". He refers to CFS as a "fashionable diagnosis" like "yeast infections" or "chronic pain syndrome". (See my supplemental report in **McKendry**, attached as Exhibit "F" to my _**Norcia**_ report, Exhibit "F" to this report).

- Dr. Goldstein's opinions have been strongly criticized in other cases (some of which have resulted in published court opinions).

- Dr. Goldstein's comments in the Merrick case actually provide additional **support** for Mr. Merrick's claim (see PRL CL 236-237, 174-175, 276)

16

- Dr. Donaldson's "IME" actually **supports** Mr. Merrick's claim (see PRL CL 265-269).

- When James Adams approved the termination of benefits, he "probably relied **solely** on Dr. Goldstein". (See deposition testimony of James Adams, 7-10-01 and PRL CL 610)

**(13)** After the initial denial of benefits by defendants in January 1997, Mr. Merrick, his doctors, and his attorney submitted additional information to support his claim. Instead of attempting in good faith to fairly and reasonably reconsider their denial decision, defendants "dug in their heels" and continued to act unreasonably and in bad faith. The additional information reflected in the claims file that supports payment of the claim includes:

- Dr. Cheney's records and reports. (A specialist in CFS, referred to by defendants as a "pretty well known CFS Doctor" – See PRL CL 696).

- Mr. Merrick's additional letters and responses to defendant's position. (See PRL CL 556 and 559 for example.)

- Attorney Sasser's letters and additional records sent on 12-22-99.

- Medical reports by Dr. Sandman and James O'Halloran.

- Defendant's failure to conduct surveillance, contact collaterals or others that might have information to **support** Mr. Merrick's claim.

(14) The claims file and other documents reviewed clearly demonstrate that defendants conducted an unreasonable investigation – **focusing on reasons not to pay** and **ignoring the weight of the evidence that supported payment.** Defendants were given repeated opportunities to reverse their unreasonable decision and reinstate payment, but defendants stood firm, and refused to change any of their opinions thereby forcing Mr. Merrick to file suit. (See PRL CL 697) Defendants added a "good faith tag line" to each of their denial responses, but the claims handler acknowledged internally that the additional information Dr. Cusher was requesting was not likely to change the **no coverage** determination made in January 1997. (See PRL CL 687-695)

(15) Defendants have a general business practice of acting in bad faith, and they routinely focus on ways to **deny** compensable claims in order to increase corporate profitability. I have discussed my opinions in this regard on repeated occasions – in my reports, depositions and trial testimony. In the present case, defendants refuse to admit any wrongdoing, and the witnesses have testified that this claim was handled fairly, and in accordance with defendant's standards, practices and procedures. Reasonable insurance companies understand that it is highly improper to look at the medical records with a focus on trying to find things to support the **denial** of a claim, yet that is **exactly** what defendants have done here. (Dr. Goldstein conceded under oath in the **McKendry** case that it would be **highly improper** to look at medical records with such a focus.) They tried to eliminate the depression component to Mr. Merrick's disability claim by selectively interpreting Dr. Epstein's responses (as well as other doctors) and they demanded

18

p. of by "objective evidence" as discussed in greater detail above. They made no reasonable effort to determine if Mr. Merrick's symptoms created an inability to perform his occupational duties in the "real world".

**(16)** The claims handlers and the medical staff that reviewed Mr. Merrick's claim for defendants have less knowledge, training, and clinical experience pertaining to CFS than the clinicians who supported Mr. Merrick's disability claim. (See deposition transcripts.) The MAYO Clinic, Dr. Cheney, the treating physicians who saw Mr. Merrick over time are better qualified in this case to reach conclusions about Mr. Merrick's sickness than Dr. Donaldson, Dr. Goldstein and the other "paper review" consultants hired by defendants to attack claims – not fairly evaluate them. Dr. Cusher said he had no need to know the definition of disability in Mr. Merrick's policy, and he was unsure if CFS was a physical or mental illness. He felt that medical doctors should diagnose CFS, and he wasn't familiar with CFID's. He doesn't even know if CFS can be disabling and he never spoke to, or saw Mr. Merrick. He said he would defer to Dr. Goldstein who is extremely knowledgeable about CFS. Dr. Donaldson evaluated Mr. Merrick "for almost an hour", and found him to be a "candid fellow, although he looked tired". (See Mr. Merrick's comments about Dr. Donaldson in PRL CL 559). Dr. Goldstein is a board certified internist with a subspecialty in cardiology, who was a full-time employee of defendants. As of March, 1985, he guessed he had previously reviewed a total of about 12 to 24 chronic fatigue files (See deposition testimony in **_McKendry_**). He never saw, or spoke to Mr. Merrick, or his treating doctors.

19

**(17)** Ralph Mohney, the head of defendants nationwide claims operations, testified in ***Jordan v. Provident,*** that there are no guidelines he's aware of regarding the weight to give an "IME" versus the attending physician. But, it is well known and understood in the insurance industry that a treating physician has the **benefit of seeing a patient on repeated occasions over time,** and their opinions are entitled to substantial weight. In ***Fontaine v. Provident,*** Mr. Mohney testified differently and said that when deciding whose opinion to follow, defendants consider:

> (1) The opinions of other medical experts who review the file;
>
> (2) Their qualifications;
>
> (3) The quality of their work;
>
> (4) The independence of the Doctors (biased or not);
>
> (5) Consistency of the diagnosis;
>
> (6) What the insured is doing consistent or inconsistent with the claim; and
>
> (7) The insured's credibility. (See Mohney deposition 7-15-98)

In the present case, the claims file and deposition testimony confirms that the weight of the medical evidence and other information supports payment of Mr. Merrick's ongoing disability claim.

(18) Defendants have an established pattern and practice of "doctor shopping" – looking for medical doctors who

will provide supportive information in IME's, or in-house "paper reviews". Defendants routinely disregard the weight of the medical evidence, and seek out opinions to create a **plausible basis for the denial** of a claim. When deposed, claims handlers routinely testify that they don't make medical decisions (they rely on "IME" doctors, or limited "paper reviews" by their in-house medical consultants) and the doctors claim, "we don't make claims decisions – we just evaluate impairments". This technique allows defendants to argue at trial that there was a "genuine dispute as to coverage" and ergo no liability for bad faith or punitive damages.

(19)   In the present case, the evidence is clear from the pre-litigation claims file produced and from the deposition testimony, and other records reviewed, that defendants acted unreasonably and in bad faith.

It is my opinion that defendants have an established pattern and practice of acting in bad faith, and that its practices and procedures described in this report are an extreme deviation from the standards of conduct adhered to by honest insurance companies.  Defendants rarely admit any wrongdoing, and when litigation arises, they routinely attack their own insured, deny the existence of important documents and records, stonewall discovery, and withhold information from the claims file.

(20)   It is my opinion and belief that defendants **post-litigation** investigation and discovery is being conducted to **attack** Mr. Merrick, his claims, his attorneys and anyone else who gets in their way.  Defendants are now conducting discovery and questioning collaterals (such as Mr. Merrick's former wife and business partners) that should have been contacted, if necessary, **before** denial

21

of his claim. This technique – trying to justify a denial **after the fact** - is further evidence of bad faith.

(21)   Reasonable insurance companies understand that if you deny a claim, you must have a reasonable basis for the decision at **the time the decision is made**. You cannot justify the decision by later acquired information that should have, or could have been acquired earlier.

Defendants now have a **post-litigation** claims file, and have hired attorneys and new medical "experts" to support their position.  They are attacking Mr. Merrick personally, scrutinizing medical records that played no part in their decision to deny coverage, and doing everything in their power to discredit, attack, harass and oppress Mr. Merrick – even though he is still paying premiums to defendants, and has not returned to his prior occupation as a venture capitalist.  The conduct of defendants in this case exemplifies bad faith.

(22)   The deposition testimony in the present case provides a further factual basis for my opinions set forth in this report.

- James Adams approved termination of benefits here, and probably relied solely on Dr. Goldstein – he never fairly evaluated or considered the evidence supporting payment of Mr. Merrick's claim.  He further testified that at Paul Revere there were no written claims guidelines, or standards (which is not true, and of course good insurance practice and applicable law **require** written claims handling standards).  He said the termination here was proper under Paul Revere's policies.  He said he could recall **no training**

22

sessions on "CFS" and no special CFS protocols (although there are many documents I have reviewed in other cases regarding training sessions on CFS, CFS Protocols, and the "objectification" of psychiatric claims. See also my Provident General Background outline, "Exhibit H" to my **_Norcia_** report.) He agrees CFS is a medical impairment.

- Kristine Bostek conceded in her deposition that what an insured's condition is called (e.g. CFS, depression, etc.) is not the concern – rather, it's how the symptoms affect his ability to perform his occupation. She stated that if a claim is paid without Reservation of Rights, that the insurance company is satisfied with the documentation at that time.

- Susan Breckley "vaguely recalled" Mr. Merrick had some complaints of physical problems. She observed some confusion and/or attention problems. She said Mr. Merrick was a person of integrity, honest, etc.; but had difficulty remembering a lot of details.

- Dr. Alan Cusher had limited knowledge and/or experience with CFS, and was not sure anyone can be diagnosed with CFS. He wasn't sure if CFS could be disabling. (Yet, he still disagrees with Dr. Cheney and uses **post**-litigation information to support his **pre**-litigation conclusions.) He agrees there are no "objective" tests for CFS and that someone can have CFS and it doesn't show up in neuro-psychological testing. He deferred to Dr. Goldstein who he feels is extremely knowledgeable

23

about CFS. He suggested Dr. Paul Lees-Haley to conduct additional testing (for this litigation).

- Dr. Epstein observed Mr. Merrick over time and observed his flat effect, memory problems, distractibility, attention problems, etc. He saw changes in Mr. Merrick's condition in 12 visits over several years. He doesn't think Mr. Merrick is a "malingerer", nor does he question his credibility. He said that seeing a patient over time is better than a one-time evaluation (a "snapshot" vs. a "clinical movie")

- Dr. Frohwirth said that Mr. Merrick gave his best effort in responding to the tests he administered.

- Dr. Ivnik confirmed that a diagnosis of CFS is not made by testing – it is made by history, examination and other criteria. He confirmed that you can have health problems, CFS, etc. and still have relatively mild cognitive problems or no impairment that shows up on testing.

- Young Mee Jeon spends a lot of time with Mr. Merrick and she discussed the many health problems he has, what she has observed, things he can and can't do, etc.

- Todd Kachadoorian never followed Dr. Goldstein's direction to contact Dr. Donaldson directly to answer the issue about Mr. Merrick's employment. He said that defendants look at the condition for which an insured is claiming disability (CFS/Lyme disease here), and there's nothing on the claims form saying depression. He never even read the

24

IME report, or Dr. Epstein's PAF. He said there was no psychiatric condition being claimed by Mr. Merrick, and that it was Mr. Merrick's burden to provide defendants with objective medical information to support his claim. He said that he started to "reserve rights" after the IME and to resolve the claim amicably, he sent the FCR out to try and "strike a compromise" (in lieu of asking for money back). Normally, he said, we ask for repayment of benefits. He testified that technically, we can deny benefits, or not pay until objective medical information is obtained. He said Mr. Merrick's claim was handled "above and beyond fairly". He said the policy determines if the claim is payable or not. He said there are no practices or standards he adheres to, because there are none.

- Michael Kunkin tried to compromise this claim. He was requested to handle the claim by year-end, and he explained the company's position to Mr. Merrick – that he was no longer disabled.

- Bruce LaCasse testified that the Paul Revere/Provident procedures were the same in terms of how he handled claims, and that the procedures didn't change when Provident merged with UNUM. He said all claims handlers had the California Regulations and "if we follow California's Regulations, we are in compliance with all other states". He said the California Regulations are a standard for UNUMProvident, "so that we conduct fair claims practices". He signed his 4-19-99 letter as a representative of Paul Revere (even though

Paul Revere had no separate claims department)
and he told Mr. Sasser that the policy required Mr.
Merrick to be receiving "appropriate care" (even
though it doesn't). He said that CFS has been
discussed at Round Tables (**NOTE:** Roundtables
and CFS training are both discussed in Provident's
"Claim Improvement Initiatives" under the heading
"Sharpen Legal Defense"). He said that once Mr.
Merrick filed his lawsuit, the claim goes to the legal
department.

- Bruce LaCasse agreed it would be improper to base
a denial of a claim on what another insurance
company was doing. He didn't see any improper
claims handling here. He discusses "action plans"
and "ERD's" (which I have discussed in other
reports/cases referenced in this report). He agrees
that it is improper to focus an investigation on
finding grounds to deny; that you can't deny a
claim based on speculation and that you can't
misrepresent important facts/policy provisions to
insureds (which occurred repeatedly in this case).
He says it appears this claim never went to a
"roundtable". His actions in handling this file
conformed to defendants' policies and procedures.
He takes direction on file handling post-litigation
from Mr. McKennon or the legal department.

- Clinton Merrick provided additional documentation
about his medical problems, symptoms, etc.

- Jean Marie Merritt received copies of California's
Regulations and stated, "if these are followed in
other states you're doing okay". She states she has
received no formal or informal training on CFS at

26

Provident. She reviewed the file here, made notes, and threw them out. She has no opinion on whether the termination here was appropriate or not. She's not aware of any Provident policy that requires her to keep her notes.

- Judith Morrissette reviews files, probably makes notes, and throws them "in the trash". She has received no training on CFS, she admits she made a "snide" comment in the claims file. She knows that CFS can be disabling.

- Dr. Rapoport said there is no such thing as objective evidence for CFS. He diagnosed many problems in the present case. He knows Dr. Donaldson (he always favors the insurance company – not objective – sides 100% of the time with insurance companies). Mr. Merrick is not a malingerer. He treats approximately 50 CFS patients currently. CFS and "a combination of things" disabled Mr. Merrick. He takes care of many people who are disabled without "objective" findings.

- Dr. Michael Silber believes that CFS is the correct diagnosis. His opinions are based on many factors discussed in his deposition.

- Julie Skerry testified that when making claims decisions, you must fully investigate and weigh information equally and objectively. She was involved in training and quality assurance. She said you look at "the weight of the information…" When training, "we essentially said the California Regulations were the standard".

27

■ Ray Squires, PhD. evaluated Mr. Merrick at MAYO. His exercise test on 1-23-95 was excellent, and Mr. Merrick gave good effort. However, there is no specific test to diagnose CFS, and patients with CFS may have a completely normal exercise test.

■ Joanne Theodoss sent an FCR to try and compromise the claim by year-end (to get the claim "off the books"). She's trained to look at the application file when she reviews the claim – she's sure that possible misrepresentations in the 1989 application crossed her mind. She believed Mr. Merrick was sincere and believed he had problems. She said it doesn't matter what the diagnosis is called – we're looking for impairment. She always considered his occupation to be a venture capitalist. There was always a conclusion that there was some impairment – but not disabling. "We tried to give our insured the benefit of the doubt." She didn't contact Mr. Merrick's place of employment to discuss his duties. Mr. Merrick expressed concern about money. She discusses ERISA (which management wanted to see if it does/should apply – see PRL CL 616). There were no real changes in the way the file was handled after the merger between Provident and Paul Revere. There's a specific color form for "roundtables". Extramarital affairs were not a factor in handling this claim. Insufficient objective medical data here to support the claim. She never received any articles or other materials on CFS. "Objective medical evidence" is medical tests that would yield objective results of impairment. (She was trained that objective medical data is

28

required.)  She relied on Dr. Goldstein.  When she got the claim, it was in "Pay" status for 23 months. **When benefits were terminated here, defendant's investigation and evaluation was complete.**  She never interviewed the insured's wife, employer, or friends.  The normal procedure is to obtain **all medical records.** (**NOTE:**  The claims file must contain complete, current medical information *before* a final claims decision is made – which doesn't appear happened here.)  There was nothing improper about the way this claim was handled.

- Dr. Paul Cheney discusses certain objective findings and the insured's constellation of symptoms.  He explains CFS is a complex illness that is not well understood by most physicians.  He says "objective evidence" is really only necessary for disability adjudication (**NOTE:** he clearly was never told by anyone that objective evidence is **not** required by Mr. Merrick's policy.  He apparently gets involved in Social Security disability determinations that have different standards – see, for example, Social Security Ruling 99-2p: Titles II and XVI: Evaluating Chronic Fatigue Syndrome.)

Defendant's institutional standards, practices, and procedures are discussed in great length in my reports/depositions listed on page 1-2, incorporated herein by reference.  Defendants have been sued **thousands of times** in recent years for their bad faith conduct. (I have received a 69-page list of lawsuits against the Paul Revere Life Insurance Company alone for the period between 4/1/97 and 6/19/00.) Defendant's conduct in the Merrick case, coupled with defendant's

29

unremediated pattern and practice of acting in bad faith warrants the imposition of substantial punitive damages.

I understand that I may be provided with additional materials, as they become available. Out of fairness to Mr. Merrick and Defendants, I will review additional documents provided by either party, and I reserve the right to later amend this report based on my receipt and review of additional materials. I also understand that I may be asked to review portions of the actual trial transcript and/or comment on the evidence and testimony at trial.

**Stephen D. Prater**
**February 25, 2002**

## Exhibit "A"

## List of Documents Reviewed

| | Document | Description |
|---|---|---|
| 1. | Paul Revere Claim File | Bates Nos. 192-544 |
| 2. | Paul Revere Insurance Policy | Bates Nos. 545-572 |
| 3. | Tax Records (1994-1999, excluding 1997) | Bates Nos. 612-823 |
| 4. | Northwestern Mutual Life Records | Bates Nos. 824-898 |
| 5. | Tax Records (1997) | Bates Nos. 941-987 |
| 6. | Complaint | April 26, 2000 |
| 7. | Answer | June 27, 2000 |
| 8. | Initial Disclosures | August 8, 2000 |
| 9. | Plaintiff's Objection to and Motion for Protective Order Respecting Defendant's Notices of Deposition and Subpoenas to "Non-Party Witness" | September 28, 2000 |
| 10. | Order (granting motion) | November 3, 2000 |
| 11. | Plaintiff's Responses to Defendant Paul Revere Life Insurance Company's First and Second Sets of Requests for Admission to Plaintiff | October 2000 |
| 12. | Plaintiff's Responses to Defendant Paul Revere Life Insurance Company's First and Second Set of Interrogatories and requests for production to Plaintiff | October 2000 |
| 13. | Plaintiff's First Requests for Production to Defendant | December 22, 2000 |
| 14. | Plaintiff's First Set of Interrogatories to Defendant | December 22, 2000 |
| 15. | Medical Records | Bates Nos. 1-191 and 899-940 |
| 16. | Monthly Progress Reports | Bates Nos. 573-596 |
| 17. | Separation Agreement/Waiver | Bates Nos. 597-611 |
| 18. | Paul Cheney's File | Produced to Plaintiff by the Defendant |

31

| 19. | Defendant UNUMProvident Corporation Responses to Plaintiff's Request for Production of Documents | Nos. 1-18 – dated November 1, 2001 |
| --- | --- | --- |
| 20. | Defendant UNUMProvident Corporation's Response to Plaintiff's Request for Admissions (Set Two) | October 15, 2001 |
| 21. | Defendant UNUMProvident Corporation's Answers to Interrogatories | January 31, 2002 |
| 22. | State of Connecticut, Department of Health, Consent Order re Mark Anderson, M.D. and Custodian of records certification | |
| 23. | Plaintiff's Documents produced to Defendant | Bates Nos. 1-987 |
| 24. | Plaintiff's Documents produced to Defendant | Bates Nos. 988-1390 |
| 25. | Mr. Merrick's medical records from Paul Revere, Dr. Mushlin and Dr. Donaldson | |
| 26. | Customer Care Center Claims Manual | Bates Nos. PRL CL 4022-4558 |
| 27. | Training Materials | Bates Nos. PRL CL 1-2288 |
| 28. | California Fair Claims Settlement Practices Regulations Manual | Bates Nos. PRL CL 4559-4660 |
| 29. | Provident/Paul Revere Transition Plan Process Team – Best Practices Recommendations & Transition Plans for The Merger of Provident & Paul Revere | Bates Nos. PRL 2229-2670 |
| 30. | UNUM's 1999 Annual Report | |
| 31. | Defendant The Paul Revere Life Insurance Company's Response to Plaintiff's Request for Admissions | Set One |
| 32. | Defendant The Paul Revere Life Insurance Company's Response to Plaintiff's request for production of documents | |
| 33. | Defendant The Paul Revere Life Insurance Company's responses to | |

Plaintiff's Interrogatories

34. Defendant's Supplemental responses to plaintiff's Request for production of documents

35. Plaintiff's Response to Defendant Paul Revere Life Insurance Company's second set of requests for admission to Plaintiff G. Clinton Merrick, Jr.

36. Plaintiff's Response to Defendant Paul Revere Life Insurance Company's second request for production of documents to Plaintiff G. Clinton Merrick, Jr.

37. Plaintiff's Answers to Defendant Paul Revere Life Insurance Company's second set of interrogatories to Plaintiff G. Clinton Merrick, Jr.

38. Plaintiff's Amended Response to Defendant Paul Revere Life Insurance Company's first set of requests for admission to Plaintiff G. Clinton Merrick, Jr.

39. Plaintiff's Response to Defendant Paul Revere Life Insurance Company's first set of requests for admission to Plaintiff G. Clinton Merrick, Jr.

40. Plaintiff's Amended Answers to Defendant Paul Revere Life Insurance Company's first set of interrogatories No. 2 to Plaintiff G. Clinton Merrick, Jr.

41. Plaintiff's Answers to Defendant Paul Revere Life Insurance Company's first set of interrogatories to Plaintiff G. Clinton Merrick, Jr.

42. Dr. Cusher's Report, D: 05/05/01    Bates Nos. PRLCL 4661-4670

43. Loss Ratios for Paul Revere from Annual Statements    Bates Nos. PRL CL 04009-04020

44. PR Marketing Material    Bates Nos. PRL CL 03959 – 04008

33

| | | |
|---|---|---|
| 45. | PR Claim payment computer system | Bates Nos. PRL CL 03927-03958 |
| 46. | Independent Medical Examination Report | James Rosenberg, M.D. |
| 47. | Independent Medical Examination Report | Paul R. Lees-Haley |
| 48. | September 21, 2001 Letter from Attorney Robert Hess | |
| 49. | E-Mail from Dr. Cusher to Dave Layden | Bates Nos. PRL CL 4671 |
| 50. | Referral Memo from Dr. Kaplan to Bruce LaCasse | Bates Nos. PRL CL 4672-4673 |
| 51. | Defendant Paul Revere and UNUMProvident responses to Request for Admissions (Set Two) | |
| 52. | Defendant's Supplemental Responses to Plaintiff's Request for Production of Documents (Set Number One) | |
| 53. | Training Manuals provided to claims adjusters Kris Bostek and Jean-Marie Merritt – in response to Request No. 3 | KB001-KB1573 and JMM0001-JMM1172, respectively |
| 54. | MAYO Clinic Medical Records | 02889-02931 |
| 55. | Motion re: David Layden, Esq. (and telephonic statement on 2-8-2002) | |
| 56. | Northwestern Mutual Claim File | |
| 57. | Deposition Transcripts: | Joanne Theodoss |
| | | Laurie Skerry |
| | | Judith Morrissette |
| | | Jean Marie Merritt |
| | | Bruce LaCasse |
| | | Alan Cusher, PhD. |
| | | Robin Cassavant |
| | | Kristine Bostek |
| | | James Adams |
| | | Clinton Merrick |
| | | Gayla Merrick |

Russell Walker

Lewis Etcoff, PhD.

Young Mee Jeon

Dr. Richard Frohwirth

Dr. Simon Epstein

Christopher Kirchen

Susan Breckley

Pearson Cummin III

Todd Kachadoorian

Dr. Alfred Kaplan

Michael Kunkin

Ray Squires, PhD.

Toshihiko Maruta

Dr. Michael Silber

Dr. Robert Ivnick

Dr. Charles Gardner

Mark Anderson

Dr. Thomas Conley

Dr. Randy Butler

Dr. Joram Seggev

Dr. Paul Cheney

Dr. Alan Rapoport

EXHIBIT 2a

January 29, 1996

Mr. G. Clinton Merrick
528 Field Point Road
Greenwich, CT  06730

Claim #01-02433108-001

Dear Mr. Merrick:

Your claim has come to our attention and we are pleased to correspond with you at this time.

As you are aware, a recent Independent Medical Examination was performed on you on Monday, November 20, 1995. We have reviewed the findings of this exam and would like to advise you of the status of your claim at this time. Based upon the review or the Independent Medical Examination, we have determined that there exists no objective evidence showing that you have Chronic Fatigue Syndrome or Lyme Disease. We are at this time questioning the diagnosis being given to us by your attending physician, Dr. Alan Rapoport. A copy of this exam has been forwarded to Dr. Rapoport for his review and comments.

We are also in the process of requesting updated medical records in the further evaluation of your claim for Disability Benefits. Please be advised that any further payments regarding your claim for disability will be considered to you on an exceptional basis without waiving any of the rights or privileges afforded to us under your contract.

Once the above requested information is received and reviewed, we will be in further contact with you.

Should you have any questions or concerns regarding the above, please contact us.

Very truly yours,

Todd F. Kachadoorian
Claim Examiner
The Paul Revere Life Insurance Company

TFK

cc 068-F7064

02916 12

PRI.CL.00279

## FIELD TRANSMITTAL

Please Circle One: (Individual) / Group / NWNL / TNE / GW / EQ / GA

```
| From _____Jo-Anne Theodoss  X5417_____     Date Sent ____Nov 20, 1996_____ |
|                                                                              |
| To ____Mike Kunkin_____  Claimant's Phone # ___203-625-5566_____ |
|                                                                              |
| Claimant ___G. Clinton Merrick_____  City, State __Greenwich, CT  06830____  |
```

************************************************
* PACE REFERRAL CODE: __ET/MI_____ *
************************************************

|  | YES | NO |  |  | POLICY/CLAIM# CASE/UNIT/MEMBER# | PHOTO APP | CLIPS -ONLY- ALSO | PRINTS ONLY |
|---|---|---|---|---|---|---|---|---|
| INS. ADVISED | _ | x | EE EFFECTIVE | __/__/__ | 01-02433108-001 | x | x | _ |
| CONTESTABLE | _ | x | ISSUE DATE | 12/18/89 | _____ | _ | _ | _ |
| WITHHOLDING | x | _ | BEN PAID TO | 10/27/96 | _____ | _ | _ | _ |
| ON WAIVER | x | _ | WAIVER DATE | 07/18/94 | Employer Name _____ | | | |

If PR/LTD Claim Form is--> _ PAY          Contact Person _____
received while you have--> x CALL YOU
the file, we will--------> _ REFER TO YOU  Phone Number _____

Agent/Broker Name _____Collection Point _____
_____

```
| REASONS FOR REFERRAL|
|_____|
```

| | | |
|---|---|---|
| _ INTERVIEW MD: | _ INTERVIEW EMPLYR | x INTERVIEW INSURED   _ GOODWILL |
| _ HISTORY | _ INCOME | _ LATE NOTICE |
| _ PROGNOSIS | _ DUTIES | _ EXTENT OF DISABILITY |
| _ REHAB | _ WC INFO. | _ DETERMINE IF IME IS ADVISABLE |
| _ TD VS. PD | _ RETRAIN FOR OTHER | _ REHABILITATION |
| _ R.T.W. IN ANOTHER | POSITION | _ OBTAIN & REVIEW ROF DOCUMENTS |
| OCC. | _ POSITION HELD OPEN | _ COMPLETE JOB DESCRIPTION |
| _ PRE-EXISTING COND. | _ SALARY CONT. | _ FIRST RESIDUAL HANDLING |

Mike, I am referring this case to you, as you handled it back in August, 1995.
Please handle on a rush basis, as we would like to resolve this matter prior to
year end. If you are unable to handle, pls let me know.

There have been ? regarding the insured's cause of dis. The file/med reds/ &
tests have been reviewed by MC/ Psych. Consultant/ Neuropsych. Consultant/ &
and IME has been done. PLS see referrals in file.

In summary, the ins's AP is ex to Chronic Fatigue Syndrome/ Lyme Disease and
Neurological disorder, due to past head trauma. MC states ins's condition
has been wrongly diag. and is not CFS/Lyme Disease, but that fatigue is due to
depression. IME finds no neuro. problems and no active Lyme Disease (W. Blot

PRLCL00508

## CLAIM DEPARTMENT
## PHONE MEMO

**Claimant** _Clinton Merrick_

**Address** _____

CT

☐ Call in          Call out ☐

**Person calling/called:**

Ⓔ

Ⓘ

| Pol/Claim # | Need Clm. | App. |
|---|---|---|
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |
| | ☐ | ☐ |

**Conversation:** Ⓔ called looking for his ✓ . . told me Ⓔ that it was my understanding that he met w/ FCR mXK + mXK exp. status of clm. Ⓔ stated "All he told me was that if I didn't accept draft, it would be dropped" I apologized to Ⓔ if that was the extent of mXK's explanation. Ⓔ then stated that mXK might have said more than that. I told Ⓔ we have had file reviewed by in-house med. + psy. consultants, as well as IME => no obj. med. data to support TD in YOCC. Ⓔ stated that IME never mentioned (ES. I exp to Ⓔ that I did not have his file here, as I am currently waiting for its return from mXK, however, it is my recollection that IME DC found no cognitive difficulties that would preclude RTW F/T in YOCC + that Ⓔ

PRLC.00518

☐ **Call back:** _____  **Phone #:** _____

**Return by:** _____  **Refer to:** _____

Date Stamp/Time

2248 (6/85)

. might be fatigued, but fatigue was due to depression. Told ⊕ that our in-house psy con. + ⊕'s own psy. find no psy. impairment that would cause TD. ⊘ stated he was not claiming psy. dis., dis = CFS . I told ⊕ that med. info does not support CFS or Lyme's disease - As he had a neg. Lyme test. ⊕ stated that MAYO had + Lyme test. I told ⊕ we recognize that in past he tested + for Lyme but mos recently he tested neg. ⊕ stated Lyme is latent → Inactive. ⊕ stated that there is no objective data or testing for C.FS. ⊕ Asked me if there was, stating he would have it done. I told ⊕ I was unable to answer that, I am not a medical doctor. It is my understanding that CFS has several symptoms +/or impairments. Exp to ⊕ again that based on our review of all med. info → his impairments he might be having would not be of TD proportions. ⊕ stated that if that was our decision, he has no choice but no file suit. I told ⊕, if that was the avenue he

PRI.CL.00519

## CLAIM DEPARTMENT
## PHONE MEMO

Claimant _____

Address _____

☐ Call in          Call out ☐

Person calling/called:
_____ ② _____

_____

Pol/Claim # _____

|  | Need |  |
|---|---|---|
|  | Clm. | App. |
| Personal | ☐ | ☐ |
|  | ☐ | ☐ |
|  | ☐ | ☐ |
|  | ☐ | ☐ |
|  | ☐ | ☐ |
|  | ☐ | ☐ |

Conversation: felt he had to take, then he must do
what he feels he must do.
          ② stated he + his family are using
up all capital, need $, he doesn't have
$ to go to court, but will if we dont pay.
          ② then asked me if we rec'd report
from Dr. Preston that was w/ FR. Told ②
yes - I rec'd them + that I am currently
waiting for his file from MXK. Told ②
since I dont have file, I do not know if Dr.
Preston's report was already rec'd + reviewed
Told ② I called Dr. Preston's office to see
when report was done. Dr. Preston's office
stated ② was seen may 8, '96. Since it
was long time ago - assuming we have report,
but need file to verify. ② stated we do not

PRLCL00520

☐ Call back: _____  Phone #: _____

Return by: _____  Refer to: _____

Date Stamp/Time

2248 (6/85)

have report already. Told ⊕ that we want
to review all medical info... not going to
simply deny w/out having all med. info
reviewed. Told ⊕ that once I get file
back, will review to see if Dr. Preston's
report is in ǂ - if not, will send to mc
to review + determine if opinion changes.

Told ⊕ that I would call him once
file rec'd so he knows if sending to
mc or not - OK.

Told ⊕ I would issue 1 mo.
benefit - as an exception, since we are
waiting for file + since file may need to
go to mc again. Exp this is an exception
to be of service while we wait additional
review.    ⊕ thanked me - Goodbye.

PRLCL00521

December 9, 1996

G. Clinton Merrick, Jr.
528 Field Point Road
Greenwich, CT  06830

Claim #01-02433108-001

Dear Mr. Merrick:

Thank you for the courtesies you extended to me during our telephone conversation on Monday, December 9, 1996. Enclosed please find a check providing benefits from October 27, 1996 to November 27, 1996. Please be aware that this check was issued on an exceptional basis, in an effort to be of service to you, without waiving any of our rights or defenses as afforded by our contract, while we wait for your file to be returned to us from our Field Claim Representative, Mr. Michael Kunkin.

As we discussed, your file has been reviewed by our in-house medical and psychological consultants.  Based on their review of all medical information that has been submitted, as well as the Independent Medical Exam from Dr. Donaldson, we find no objective medical documentation which supports an inability to perform the duties of your occupation as a venture capitalist.

Presently, we are in receipt of your Progress Report, which was submitted along with an EEG report from Dr. Preston.  Once your file has been returned from Mr. Kunkin, we will review it to determine if Dr. Preston's report has previously been received and reviewed by our in-house medical consultant.  If Dr. Preston's report has not been previously reviewed, we will do so at that time.

Upon receipt of your file, and a review of your file in conjunction with the EEG report, we will be in contact with you.  If you have any additional questions regarding this matter, please feel free to contact us at 1-800-799-0990.

Sincerely,

Jo-Anne M. Theodoss
Claim Examiner
Paul Revere Life Insurance Company

JMT3
Enc. CK
cc. 068-F7064

PRLCL00525

that this "report" is undated.

② I retain quite comfortable that Waterbaus
11/20/95 Neurology IME and Cvolar's 10/29/96
in-home review of the zeurosych testings.

③ Finally, recognized the physical limitations, go
to "CFS", how much and well has the
client's "golf game" (9/18/96) progressed?!
Perhaps surveillance could decline that aspect
of his status for us; I suspect the client's
new home in Nevada (FRR 11/27/96) will be
near a golf course.

PRLCL00534

**CLAIM DEPT.**
**MANAGEMENT REFERRAL**

| TO: | | INSURED: | |
|-----|-----|----------|-----|
| FROM: | (date stamp) | ROUTE #: | CLAIM # |

**REASON FOR REFERRAL:**

Discussed clm w/ mgr, Chuck miller.
Should we order surv. or deny clm based
on all med. info in file?

**RECOMMENDATIONS:**

Per mgr, surv not Appropriate At this
time. Based on med. doc, mc reviews ... no
objective info to support clm. Send position
in writing.

♦ JMF   ÎJAN  · 1997.

**MANAGERS COMMENTS:**

PRLCL00535

REVIEWED:

FORM #6776 (5/83)

January 6, 1997

G Clinton Merrick, Jr.
528 Field Point Road
Greenwich, CT  06830

Claim #01-02433108-001

Dear Mr. Merrick:

Your file has recently come to me for review, and I would like to update you on
the status of your claim.

As you are aware, the QEEG report sent to us along with your Progress Report
dated November 20, 1996 was recently reviewed by our in-house medical
consultant.  It is the opinion of our medical consultant that this report
does not offer any new or additional objective medical information to help
substantiate your claim for total disability.  As such, our decision regarding
the above referenced claim remains as stated in our letter to you dated
December 9, 1996.

I am sorry that our decision could not be more favorable, but per our review
of all medical information that has been submitted, we find no objective
medical documentation which supports an inability to perform the duties of your
occupation as a venture capitalist.  Therefore, we are unable to provide
further financial assistance at this time.

We are willing to review any other medical information that may be available.
If you have any questions regarding this matter, please feel free to contact
me at 1-800-799-0990, ext. 5417.

Sincerely,

Jo-Anne M. Theodoss
Claim Examiner
Paul Revere Life Insurance Company

JMT3
cc. 068-F7064

PRLCL00536

January 20, 1997

G Clinton Merrick, Jr.
8905 Tavistock Ct.
Greenwich, CT  06830

Claim #01-02433108-001

Dear Mr. Merrick:

I have received your Progress Report dated December 26, 1996 and would like to
update you on the status of your claim.

Mr. Merrick, our position regarding your claim remains as stated in my letters
to you dated December 9, 1996 and January 6, 1997.  Copies of these letters are
enclosed for your reference.

Since we do not find any objective medical documentation to support your claim
for Total Disability, we cannot be of further financial assistance and your
claim is now closed as of November 27, 1996.

Again, we are willing to review any other medical information that may be
available.  If you have any questions regarding your claim, please feel free
to contact me.

Sincerely,


Jo-Anne M. Theodoss
Claim Examiner
Paul Revere Life Insurance Company

JMT3
Enc.: 12/9/96 & 1/6/97 ltrs
cc. 068-F7064

PRL CL00539

objective medical data for CFS?. He continued
to say that CFS doesn't really have objective
data, but his impairments are symptoms
supportive of CFS.

Told ⊕ I realized CFS has several
symptoms + to some it is controversial, to
others not. Told ⊕ we can't tell him what
tests to have done, can only go by info
sent to us.

⊕ Stated he has spent about 20K
on tests, Drs, etc supporting this clm. His
impairments prevent him from doing occ —
high investments + complex decisions. Maybe
not prevent him from digging ditches, but does
prevent him from his occ. ⊕ said he doesn't
know where to go from here — except Lawyer
+ doesn't want to do that as expensive for
both parties. ⊕ Stated he recently saw Dr.
Cheney, last wk, which it took a yr to
see him. He is a specialist in field. Dr
Cheney was the one to order QEEG report
(ordered prior to actually seeing ⊕). He went
through series of tests. Asked when tests
results will be available — 6 wks. Ok. Told ⊕
I would discuss clm w/ mgr again + CB
tomorrow — Ok. Thx you & [JAN ? 1997]

PRLCL00543

CLAIM DEPT.
MANAGEMENT REFERRAL

| TO: Chuck Miller | | INSURED: G. Clinton Merrick |
|---|---|---|
| FROM: J. Theodoss | (date stamp) JAN 2 8 1997 | ROUTE #: 895-54  CLAIM #: 01-0243 3108-001 |

REASON FOR REFERRAL:

Chuck,
we have recently denied this clm based on no objective medical data to support CFS/Lyme disease - the conditions the Ⓘ's AP continues to cx to. This file has been reviewed by me, psy. consult., IME done, + all find fatigue to be due to depression, yet Ⓘ's own

RECOMMENDATIONS: psychiatrist states impairment is medical, not psychological. Our reviews have also concluded that cognitive impairment does not warrant TD.

Pls see pm dated 1-28-97 .... it appears we are @ a point where we clearly disagree w/ AP + Ⓘ. Reviews document impairment, just not due to CFS/Lyme disease. Also, it appears Ⓘ saw new doctor last week + had further testing done. I would appreciate your direction on this as I am unsure as to where to take this next: shoul

MANAGERS COMMENTS: we hold open until receipt of new info? should we order surv. as suggested by last me? or
~~shouldalone~~ ~~see~~ thx,
Jo-Anne

Jo-Anne ~ This claim is currently closed and it should remain that way for now since nothing new has yet been presented. However, we should inform the Ⓘ of our willingness to review test results and office notes from Dr. Cheney or any other treating source (in Nevada?) Once additional information is presented and reviewed by our Medical Consultants, let's discuss further handling. Thank you!
Chuck

| CFM | JAN 3 0 199 |
|---|---|
| REVIEWED: | |

FORM #6776 (5/83)

PRLCL00544

. determine dis. is supported

Ⓘ stated is very generous, but
feels we are not acting in good faith + are
in breech of contract. Ⓘ stated contract
does not say anything about objective medical
doc for CFS - a condition which does not
have much objective doc. He stated he has
had several dr. support impairment + feels
he is in catch 22, as we wont pay CFS
b/c no obj. med data + feel it is depression -
yet we also say his own ψ does not cx
to depression.

Told Ⓘ again that we recognize
depressed + abnormal MRI, for example, which
shows past head trauma, but information
does not support impairment of TD proportions.

Told Ⓘ we need to wait for
Dr Cheney's info + will review further @
that time. Told him if he sees any other
dr or has info we have not reviewed yet,
to pls let us know.

Ⓘ apologized if he is a bother
but is fighting for his life here. Told him
to call @ any time - no bother.
will send ✓ + Ltr - OK

PRLQL00550

JAN 7 1997

**CLAIM DEPARTMENT
PHONE MEMO**

| Claimant | G Clinton Merrick | Pol/Claim # | | Need |
|---|---|---|---|---|
| | | | Clm. | App. |

Claimant  G Clinton Merrick

Address _____

_____  CT  _____

☒ Call in          Call out ☐

Person calling/called:

Karen Deeds w/
Northwest Mutual

Pol/Claim #

01-02433108-001   ☐ ☐
_____   ☐ ☐
_____   ☐ ☐
_____   ☐ ☐
_____   ☐ ☐
_____   ☐ ☐

Conversation: Karen called to find out if we were still paying benes.
Do we have an auth. from your co? Yes. I have spoken
w/ a claims examiner there before. Ok. Yes we are still
paying bens. Ok. NW scheduled an IME for
yesterday which Ⓘ didn't show up for. They tried
to call him (same phone # we have) + phone was
disconnected. Ok, thanks for info.

(with in back office ?)
CA'd Karen back - exp. our clm is closed
due to lack of cry med. data. Ⓘ has
moved to NV - gave her Ⓘ's phone #.
Their clm is still open - ptd = 1/97.

_____
_____
_____                 s no fi   97
_____
_____

PRLCL00553

Date Stamp/Time

☐ Call back: _____  Phone #: _____

Return by: _____  Refer to: _____

2248 (6/85)

September 2, 1997

Mr. G. Clinton Merrick
8905 Tavistock Court
Las Vegas, NV  89134

Claim #01-02433108-001

Dear Mr. Merrick:

We have received the information referenced in my letter dated July 23, 1997 and this information has been reviewed by our Medical Consultant. At this time, I would like to update you on the status of your claim.

It is the opinion of our Medical Consultant that this information does not offer any new or additional objective medical documentation to substantiate your claim for Total Disability Benefits. As such, our decision remains as stated in our initial letter dated December 9, 1996.

We regret our decision could not be more favorable. We are willing to review any other medical information you may wish to submit. If you have any questions regarding this matter, please feel free to contact me.

Sincerely,

Jo-Anne M. Theodoss
Claim Representative
The Paul Revere Life Insurance Company

JMT3
cc  068-F7064
22107 8

PRLCL00811

EXHIBIT 2b

**CLAIM DEPARTMENT**
**PHONE MEMO**

| Claimant | _Clinton Merrick_ | | Pol/Claim # | | | Need |
|---|---|---|---|---|---|---|
| | | | | | Clm. | App. |

Address _____

CT

☑ Call in          Call out ☐

Person calling/called:

_____

**Conversation:** Ⓒ called looking for his ✓ . . told ~~of~~ Ⓒ that it was my understanding that he met w/ FCR MXK + MXK exp. status of clm. Ⓒ stated "All he told me was that if I didn't accept draft, it would be dropped." I apologized to Ⓒ if that was the extent of mxk's explanation. Ⓒ then stated that mxk might have said more than that. I told Ⓒ we have had file reviewed by in-house med. + psy. consultants, as well as EME ⇒ no obj. med. data to support TD in yocc. Ⓒ stated that IME never mentioned CFS. I exp. to Ⓒ that I did not have his file here, as I am currently waiting for its return from mxk, however, it is my recollection that IME DC found no cognitive difficulties that would preclude RTW F/T in yocc + that Ⓒ

PRLCL00518

Call back: _____  Phone #: _____

Return by: _____  Refer to: _____

Date Stamp/Time

2248 (5/85)

objective medical data for CFS?. He continued
to say that CFS doesn't really have objective
data, but his impairments are symptoms
supportive of CFS.

Told ⊕ I realized CFS has several
symptoms + to some it is controversial, to
others not. Told ⊕ we can't tell him what
tests to have done, can only go by info
sent to us.

⊕ Stated he has spent about 20K
on tests, Drs, etc supporting this clm. His
impairments prevent him from doing occ —
high investments + complex decisions. maybe
not prevent him from digging ditches, but does
prevent him from his occ. ⊕ said he doesn't
know where to go from here - except lawyer
+ doesn't want to do that as expensive for
both parties. ⊕ Stated he recently saw Dr.
Cheney, last wk, which it took a yr to
see him. He is a specialist in field. Dr
Cheney was the one to order QEEG report
(ordered prior to actually seeing ⊕). He went
through series of tests. Asked when test
results will be available - 6 wks. Ok. Told ⊕
I would discuss clm w/ mgr again + cb
tomorrow - ok. Thx you •  ⌐JAN ? 1997⌐

PRLCL00543

· determine dis is supported.

(E) stated is very generous, but feels we are not acting in good faith + are in breech of contract. (E) stated contract does not say anything about objective medical doc for CFS - a condition which does not have much objective doc. He stated he has had several dr. support impairment + feels he is in catch 22, as we wont pay CFS b/c no obj. med data + feel it is depression - yet we also say his own y does not cx to depression.

Told (E) again that we recognize depressed + abnormal MRI, for example, which shows past head trauma, but information does not support impairment of TD proportions.

Told (E) we need to wait for Dr Cheney's info + will review further @ that time. Told him if he sees any other dr or has info we have not reviewed yet, to pls let us know.

(E) apologized if he is a bother but is fighting for his life here. Told him to call @ any time - no bother.

Will send ✓ + ltr - ok

**JAN 7 1997**

PRLCL00550

This substantiation also included the opinion of my psychiatrist who I saw regularly for several years and a staff psychiatrist at Mayo Clinic. They concluded from their medical judgment as well as by neuropsychological testing that my mental symptoms were organic in nature.

You have denied coverage since January, 1997 based on a brief physical examination by a neurologist hired by the Company, a so-called "independent" opinion. This neurologist has minimal experience with Chronic Fatigue Syndrome and regularly testifies on behalf of insurance companies. He never evaluated my CFIDs diagnosis. Instead he offered an opinion that my problem was solely clinical depression, an opinion based on no testing of any kind and contradicted by psychiatrists. You also base your denial on the opinions of staff physicians at Paul Revere who have never seen me.

Fortunately in severe CFID's cases like mine, functional disability can now be demonstrated through specific, sophisticated peer reviewed tests of neurological, endocrine and other critical bodily systems. I am fully confident presenting this case to state insurance regulatory agencies or to the objectivity of the courts, if necessary. However, this would not be advantageous to the Company or to me and can be easily be avoided by a good faith implementation of the Contract.

I, therefore urge your Company to honor its contractual obligations to me in good faith. I expect the Company to remit the past due disability payments from February through June totaling $60,000 immediately, before a continuation of bad faith increases the suffering and damages my family and I are experiencing due to this breach of contract.

Thank you for your prompt action on this matter.

Very truly yours,

G. Clinton Merrick

PRLCL 00559

WASHINGTON        )    S.S.       **AFFIDAVIT**
DISTRICT OF COLUMBIA   )

    I, JAMES Q. BUTLER, after being duly sworn according to law, depose and say that I am the attorney for the Plaintiff in the within action and that I have first hand knowledge of the facts herein described:

    1. Attached to the Plaintiff's Memorandum in Opposition to Defendants' Motion for Sanctions pursuant to Rule 11 of Federal Rules of Civil Procedure is a true and accurate copy of the deposition of former medical director of UNUM Provident Dr. William Feist and deposition; the Plaintiff's (Merrick's) Supplemental Response to Defendants' Objections Filed October 24, 2002 with Exhibits;

    2. Attached to the Plaintiff's Memorandum in Opposition to Defendants' Motion for Sanctions pursuant to Rule 11 of Federal Rules of Civil Procedure is a true and accurate copy of Plaintiff's Supplemental Response to Defendants' Objections to Evidence filed October 24, 2002;

    3. Attached to the Plaintiff's Memorandum in Opposition to Defendants' Motion for Sanctions pursuant to Rule 11 of Federal Rules of Civil Procedure is a true and accurate copy of the Ninth Circuit Court of Appeals decision in the case of *Merrick v. Paul Revere Life Ins. UNUM Provident,* Case no. 05-17059 (9th Cir. Aug. 27, 2007), affirming the jury verdict which was rendered in December, 2004, in the District Court of Nevada.

    4. Attached to the Plaintiff's Memorandum in Opposition to Defendants' Motion for Sanctions pursuant to Rule 11 of Federal Rules of Civil Procedure is a true and accurate copy of the subject Regulatory Settlement.

FURTHER AFFIANT SAYETH NAUGHT.

1

/s/ James Q. Butler
James Q. Butler, Attorney for Plaintiff

SWORN TO AND SUBSCRIBED before me on this 26th day of November, 2007.

_____
NOTARY PUBLIC

District of Columbia : SS
Subscribed and Sworn to before me, in my presence,
this 3rd day of December 2007
_____
Lynn Faught, Notary Public, D.C.
My commission expires January 1, 2009

2